Appeal No. 2014-1725

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

**SIEMENS ENERGY, INC.**

Plaintiff-Appellant,

**TITAN WIND ENERGY (SUZHOU) CO., LTD., CS WIND TECH CO., LTD., CS WIND VIETNAM CO., LTD., CHENGXI SHIPYARD CO., LTD.,**

Plaintiffs,

v.

**UNITED STATES, WIND TOWER TRADE COALITION,**

Defendants-Appellees.

Appeals from the United States Court of International Trade
Case No. 1:13-cv-00104-MAB, 1:13-cv-00107-MAB, Judge Mark A. Barnett

**JOINT APPENDIX**
**Nonconfidential Version**

Elliot J. Feldman
Michael S. Snarr
Shawnna M. Yashar
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, NW
Washington, DC  20036

December 29, 2014

## JOINT APPENDIX – TABLE OF CONTENTS
## SIEMENS ENERGY, INC. V. UNITED STATES, 2014-1725

The following statement is made pursuant to Federal Circuit Rule 30(h)(1)(B). Confidential business proprietary information that is subject to protective order has been deleted from pages JA0017 through JA3261 of the Nonconfidential Joint Appendix. The redacted information relates to tower price data, production and production capacity figures for domestic producers, supply agreements as well as information bracketed by the International Trade Commission and other parties throughout the proceedings pertaining to the business practices of certain producers.  The confidential information contained on pages JA0068A, JA0965-JA0969, JA1036-JA1158, JA1162-JA1170, JA1471-JA1472, JA1510, JA2100-2113, JA3165 and JA3183-3214 is not susceptible to public summary and has been omitted from this Nonconfidential Joint Appendix.

Note:  The page numbers of the public version of the CIT Slip Op. 14-66 as well as the USITC's public versions of the Views of the Commissioners and Commission Staff Report (Final) do not necessarily align with the page numbers of the CIT's and USITC's unredacted, confidential versions of those documents.   Joint Appendix references to these documents in the parties' briefs correspond to the page numbers of the Confidential Joint Appendix.

| DOCUMENT | APPENDIX PAGES |
|---|---|
| International Trade Commission Administrative Protective Order and APO Service List | JPO 000001 – JPO 000005 |
| U.S. Court of International Trade Rule 73.2(c) and Appendix on Access to Business Proprietary Information Pursuant | JPO 000006 – JPO 000012 |
| Administrative Order 02-01: Electronic Filing Procedures and Submission of Confidential Information | JPO 000013 – JPO 000033 |
| Docket Listing for CIT Consol. Ct. No. 13-104 | JPO 000034 – JPO 000049 |

| DOCUMENT | APPENDIX PAGES |
|---|---|
| CIT Form 17s for Counsel filed in CIT Ct. No. 13-104 | JPO 000050 – JPO 000076 |
| Docket Listing for CIT Ct. No. 13-107 | JPO 000077 – JPO 000085 |
| CIT Form 17s for Counsel filed in CIT Ct. No. 13-107 | JPO 000086 – JPO 0000112 |
| *Siemens Energy, Inc. v. United States*, Consol. Ct. No. 13-104, Slip Op. 14-66 (Ct. Int'l Trade Jun. 17, 2014) | JA 000017 – JA 000068 |
| *Siemens Energy, Inc. v. United States*, Consol. Ct. No. 13-104, Confidential Errata (Ct. Int'l Trade Jul. 7, 2014) | JA 000068A |
| "Views of the Commission," *Utility Scale Wind Towers from China and Vietnam*, Inv. Nos. 701-TA-486 and 731-TA-1195-1196 (Final) (Feb. 13, 2013) | JA 000069 – JA 000109 |
| "Views of Commissioner Dean A. Pinkert," *Utility Scale Wind Towers from China and Vietnam*, Inv. Nos. 701-TA-486 and 731-TA-1195-1196 (Final) (Feb. 13, 2013) | JA 000110 – JA 000117 |
| "Views of Commissioners Daniel R. Pearson, David S. Johanson, And Meredith M. Broadbent," *Utility Scale Wind Towers from China and Vietnam*, Inv. Nos. 701-TA-486 and 731-TA-1195-1196 (Final) (Feb. 13, 2013) | JA 000118 – JA 000138 |
| Final Staff Report, *Utility Scale Wind Towers from China and Vietnam*, Inv. Nos. 701-TA-486 and 731-TA-1195-1196 (Final) (Feb. 13, 2013), I-3, I-4, I-10, I-12, I-13, II-1, V-37 and C-3; as well as Table V-1, Table V-2, Table V-6 and Table C-1. (Jan. 7, 2013) | JA 000139 - JA 000178 |

| DOCUMENT | APPENDIX PAGES |
|---|---|
| Excerpt of Pre-Hearing Brief of Siemens Energy, Inc. and Siemens Power Generation, *Utility Scale Wind Towers from China and Vietnam*, Inv. Nos. 701-TA-486 and 731-TA-1195-1196 (Final) (Dec. 7, 2012) | JA 000179-JA 000181, JA 000181B |
| Tabs 8B through 8L of Appendix to Plaintiffs' Rule 56.2 Motion for Judgment on the Agency Record, *Siemens Energy, Inc. v. United States*, Consol. Ct. No. 13-104 (Aug. 29, 2013) | JA000182 – JA 000226 |
| Staff Report to the Commission, *Utility Scale Wind Towers from China and Vietnam*, Inv. Nos. 701-TA-486 and 731-TA-1195-1196 (Final) (Jan. 7, 2013) | JA 000300 – JA 000575 |
| Hearing Transcript, *Utility Scale Wind Towers from China and Vietnam*, Inv. Nos. 701-TA-486 and 731-TA-1195-1196 (Final) (Dec. 13, 2012) | JA 000576 – JA 000857 |
| Post-Hearing Brief of the Wind Tower Trade Coalition ("WTTC"), *Utility Scale Wind Towers from China and Vietnam,* Inv. Nos. 701-TA-486 and 731-TA-1195-1196 (Dec. 20, 2012) | JA 000862 – JA 001289 |
| Staff Report to the Commission, *Utility Scale Wind Towers from China and Vietnam*, Inv. Nos. 701-TA-486 and 731-TA-1195-1196 (Preliminary) (Feb. 6, 2012) | JA 001290 – JA 001469 |
| [<br><br><br>    ], Inv. Nos. 701-TA-486 and 731-TA-1195-1196. | JA 001470 – JA 001475 |
| U.S. Purchasers' Questionnaire Response of [<br>                    ], Inv. Nos. 701-TA-486 and 731-TA-1195-1196. | JA 001476 - JA 001553 |

| DOCUMENT | APPENDIX PAGES |
|---|---|
| Letter from Wiley Rein LLP to Acting Sec'y to the Commission, re: *Utility Scale Wind Towers from China and Vietnam: Prehearing Brief of the Wind Tower Trade Coalition ("WTTC")* (Dec. 6, 2012) | JA 001554 – JA 002382 |
| U.S. Producers' Questionnaire Response of [                              ], Inv. Nos. 701-TA-486 and 731-TA-1195-1196. | JA 003125 - JA 003178 |
| Letter from Wiley Rein LLP to Nathanael Comly, Office of Investigations, re: *Utility Scale Wind Towers from China and Vietnam: Framework Agreement* (Dec. 21, 2012), Inv. Nos. 701-TA-486 and 731-TA-1195-1196. | JA 003179 - JA 003214 |
| Final Comments of the Wind Tower Trade Coalition ("WTTC"), *Utility Scale Wind Towers from China and Vietnam:* (Jan. 15, 2013), Inv. Nos. 701-TA-486 and 731-TA-1195-1196. | JA 003219 - JA 003235 |
| Excerpt of the Preliminary Conference Transcript, *Utility Scale Wind Towers from China and Vietnam*, Inv. Nos. 701-TA-486 and 731-TA-1195-1196 (Jan. 19, 2012) | JA 003236 – JA 003239 |
| Excerpt of U.S. Producers' Questionnaire Response of [                              ] Inv. Nos. 701-TA-486 and 731-TA-1195-1196 (Oct. 12, 2012) | JA 003240 – JA 003244 |
| Post-hearing Brief on Behalf of GE Generators (Pensacola) LLC, *Utility Scale Wind Towers from China and Vietnam*, Inv. Nos. 701-TA-486 and 731-TA-1195-1196 (Dec. 20, 2012) | JA 003245 – JA 003248 |
| Post-hearing Brief of the Wind Tower Trade Coalition, Exhibit 2, *Utility Scale Wind Towers from China and Vietnam*, Nos. 701-TA-486 and 731-TA-1195-1196 (Dec. 20, 2012) | JA 003249 – JA 003254 |

| DOCUMENT | APPENDIX PAGES |
|---|---|
| Pre-hearing Brief of Siemens Energy, Inc. and Siemens Power Generation, Exhibits 16 & 17, *Utility Scale Wind Towers from China and Vietnam*, Nos. 701-TA-486 and 731-TA-1195-1196 (Dec. 6, 2012) | JA 003255 – JA 003261 |



<div align="right">

***AD/CVD** APO Form*
***Revised May 2011***

</div>

**UNITED STATES  INTERNATIONAL TRADE COMMISSION**
**Washington, DC 20436**

**ADMINISTRATIVE PROTECTIVE ORDER**

**Inv. No(s).**
**701-TA-486 and 731-TA-1195-1196(Preliminary)**

**(Name of Investigation(s))**
**UTILITY SCALE WIND TOWERS FROM CHINA AND VIETNAM**

## A. Application

(1) To obtain disclosure of business proprietary information (BPI) under this Administrative Protective Order (APO), an authorized applicant, as defined in section 207.7(a)(3) of the Commission's Rules of Practice and Procedure (19 C.F.R. § 207.7(a)(3), as amended), must comply with the terms of this APO.

(2) An application for disclosure must be made by an authorized applicant in the form attached hereto. The authorized applicant shall file an application with the Secretary of the Commission (the Secretary) within the deadlines provided in section 207.7(a)(2) of the Commission's rules. An authorized applicant need file only one application in order to obtain BPI in both the preliminary and the final phases of an investigation.

(3) In order to obtain disclosure of BPI under this APO from Commission personnel, an authorized applicant must present a copy of his application and personal identification satisfactory to the Secretary. If the authorized applicant wishes a person described in paragraph B(1)(iv) of this APO to act for him in obtaining disclosure, the person must present a copy of his Acknowledgment for Clerical Personnel and personal identification satisfactory to the Secretary.

## B. Obligations of the authorized applicant

By filing an application, the authorized applicant shall agree to:

(1) Not divulge any of the BPI disclosed under this APO or otherwise obtained in this investigation and not otherwise available to him, to any person other than

(i) Personnel of the Commission concerned with the investigation,

(ii) The person or agency from whom the BPI was obtained,

(iii) A person whose application for disclosure of BPI under this APO has been granted by the Secretary, and

(iv) Other persons, such as paralegals and clerical staff, who (a) are employed or supervised by and under the direction and control of the authorized applicant or another authorized applicant in the same firm whose application has been granted; (b) have a need thereof in connection with the investigation; (c) are not involved in competitive decision making for an interested party which is a party to the investigation; and (d) have signed the Acknowledgment for Clerical Personnel in the form attached hereto (the authorized applicant shall also sign such acknowledgment and will be deemed responsible for such persons' compliance with this APO);

(2) Use such BPI solely for the purposes of the above-captioned Commission investigation or for judicial or binational panel review of such Commission investigation;

(3) Not consult with any person not described in paragraph (1) concerning BPI disclosed under this APO or otherwise obtained in this investigation without first having received the written consent of the Secretary and the party or the representative of the  party from whom such BPI was obtained;

(4) Whenever materials (e.g. documents, computer disks, etc.) containing such BPI are not being used, store such material in a locked file cabinet, vault, safe, or other suitable container (N.B.: storage of BPI on so-called hard disk computer media is to be avoided, because mere erasure of data from such media may not irrecoverably destroy the BPI and may result in violation of paragraph C of this APO);

(5) Serve all materials containing BPI disclosed under this APO as directed by the Secretary and pursuant to section 207.7(f) of the Commission's rules;

(6) Transmit each document containing BPI disclosed under this APO:

(i) with a cover sheet identifying the document as containing BPI,

(ii) with all BPI enclosed in brackets and each page warning that the document contains BPI,

(iii) if the document is to be filed by a deadline, with each page marked "Bracketing of BPI not final for one business day after date of filing," and

(iv) if by mail, within two envelopes, the inner one sealed and marked "Business Proprietary Information--To be opened only by [name of recipient]", and the outer one sealed and not marked as containing BPI;

(7) Comply with the provisions of this APO and section 207.7 of the Commission's rules;

(8) Make true and accurate representations in the authorized applicant's application and promptly notify the Secretary of any changes that occur after the submission of the application and that affect the representations made in the application (e.g., change in personnel assigned to the investigation);

(9) Report promptly and confirm in writing to the Secretary any possible breach of this APO; and

(10) Acknowledge that breach of this APO may subject the authorized applicant and other persons to such sanctions or other actions as the Commission deems appropriate, including the administrative sanctions and actions set out in this APO.

## C. Return or destruction of BPI

(1) At any time, the Secretary may order the return, destruction, or transfer of any BPI disclosed under this
APO, in which case the authorized applicant shall promptly return such BPI to the Secretary or to the submitter of the BPI or destroy the BPI or transfer the BPI to another authorized applicant, as the Secretary may direct. Unless
otherwise directed, an authorized applicant to whom BPI was disclosed under this APO during the preliminary phase of the above-captioned investigation may retain possession of such BPI during the final phase of the investigation.

(2) Subject to paragraphs C(3) and C(4) below, within sixty (60) days after the completion of this investigation (e.g., after the publication in the *Federal Register* of a Commission preliminary negative determination, a Commerce Department final negative determination, a Commission final determination, or other final termination of this investigation), or at such other time as the Secretary may direct, the authorized applicant shall return or destroy all copies of BPI disclosed under this APO and all other materials containing such BPI, such as charts or notes based on such BPI. Whenever the authorized applicant returns or destroys BPI pursuant to this paragraph, he shall file a certificate attesting that to the applicant's knowledge and belief all copies of such BPI have been returned or destroyed and no copies of such BPI have been made available to any person to whom disclosure was not specifically authorized and a copy of the signed and dated Acknowledgment for Clerical Personnel forms maintained during the course of the investigation(s).

(3) In the event that judicial review of the Commission's determination in the above-captioned investigation is sought, the authorized applicant shall not be required to comply with paragraph C(2) above, provided that the authorized applicant applies to the appropriate reviewing authority for a protective order agreed to by the Commission within 150 days after the completion of the investigation or, in cases before the U.S. Court of International Trade, file a BPI certification agreed to by the Commission, within 150 days. If by such date a protective order has not been applied for, or a BPI certification has not been filed, the

authorized applicant shall then promptly comply with paragraph C(2) above.

(4) Special rule applicable only to investigations involving imports from Canada or Mexico:

(i) An authorized applicant may retain BPI disclosed under this APO during any binational panel review of the Commission's determination in the above-captioned investigation, subject to the additional terms and conditions set forth in the current version of APO NAFTA Form C. By filing an application for disclosure of BPI under this APO, and by failing to return or destroy all copies of BPI disclosed under this APO on or before the fifteenth (15) day after a First Request for Panel Review has been filed with the NAFTA Secretariat, the authorized applicant agrees to be bound as of that date by the terms and conditions set forth in APO NAFTA Form C, and by the provisions in that form regarding sanctions for violations of those terms and conditions.

(ii) Persons described in paragraph B(1)(iv) of this APO who have filed a statement described in that
paragraph shall become subject to the terms and conditions of APO NAFTA Form C on the same date as the authorized applicant, or as soon thereafter as they file a statement described in paragraph B(1)(iv).

**D. Sanctions and other actions for breach of this APO.**

The authorized applicant shall in the application acknowledge that, pursuant to section 207.7(d) of the Commission's rules, breach of this Administrative Protective Order may subject an offender to:

(1) Disbarment from practice in any capacity before the Commission along with such person's partners,
associates, employer, and employees, for up to seven years following publication of a determination that the order has been breached:

(2) Referral to the United States Attorney;

(3) In the case of an attorney, accountant, or other professional, referral to the ethics panel of the appropriate, professional association;

(4) Such other administrative sanctions as the Commission determines to be appropriate, including public
release of, or striking from, the record any information or briefs submitted by, or on behalf of, such person or the party he represent, denial of further access to business proprietary information in the current or any future investigations before the Commission, and issuance of a public or private letter of reprimand; and

(5) Such other actions, including but not limited to, a warning letter, as the Commission determines to be appropriate.

By order of the Commission.

James R. Holbein
Secretary to the Commission

Issued:  December 29, 2011

**UTILITY SCALE WIND TOWERS FROM CHINA**          **701-TA-486 and**
**AND VIETNAM**                                   **731-TA-1195-1196(F)**

### AMENDED ADMINISTRATIVE PROTECTIVE ORDER
### SERVICE LIST

I, Lisa R. Barton, hereby certify that the parties listed have been approved, entered an appearance and have agreed to the Administrative Protective Order.  **CONFIDENTIAL INFORMATION MUST BE EXCHANGED AMONG THESE PARTIES.**  Served October 25, 2012.  **\*NOTE:  Changes to personnel.**

/s/

_____
Lisa R. Barton, Acting Secretary
U.S. International Trade Commission
500 E Street, S.W.
Suite 112
Washington, D.C. 20436

**On behalf of petitioner the Wind Tower Trade Coalition**
APO: 12-33

Alan H. Price, Lead Attorney
Timothy C. Brightbill, Esq.
John R. Shane, Esq.
Daniel B. Pickard, Esq.
Adam H. Gordon, Esq.
Christopher B. Weld, Esq.
Maureen E. Thorson, Esq.
Matthew Fogarty, Esq.
Robert E. Defrancesco, III, Esq.
Usha Neelakantan, Esq.
Lori E. Scheetz, Esq.
Tessa V. Capeloto, Esq.
Laura El-Sabaawi, Esq.
Derick G. Holt, Esq.
D. Scott Nance, Consultant
Paul A. Zucker, Consultant
Richard F. DiDonna, Consultant
Michael F. Panfeld, Consultant
Nova Daly, Consultant
\*Rebecca Woodings, Consultant
**Wiley Rein LLP**
1776 K Street, NW
Washington, D.C.  20006
202.719.7000– voice
202.719-7049.1783 – fax
aprice@wileyrein.com

**On behalf of Siemens Energy, Inc. and Siemens Power Generation:**
APO:  12-24

Elliot J. Feldman, Lead Attorney
John J. Burke, Esq.
Michael S. Snarr, Esq.
Udyogi Hangawatte, Esq.
William T. DeVinney, Esq.
Jing Zhu, International Trade Analyst
**BAKER & HOSTETLER LLP**
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5304
202.861.1500 – voice
202.861.1783 – fax
EFeldman@bakerlaw.com

**UTILITY SCALE WIND TOWERS**
**701-TA-486 and 731-TA-1195-1196(F)**
**ADMINISTRATIVE PROTECTIVE**
**ORDER**
**SERVICE LIST**

**On behalf of Chengxi Shipyard Co., Ltd.,**
**Titan Wind Energy (Suzhou) Co., Ltd.,**
**Shanghai Taisheng Wind Power**
**Equipment Co., Ltd., CS Wind Tech Co.,**
**Ltd., China Chamber of Commerce for**
**Import & Export of Machinery &**
**Electronic Products, and CS Wind**
**Vietnam Co., Ltd.:**
APO: 12-26

Francis J. Sailer, Lead Attorney
Elaine F. Wang, Esq.
DN Choudhary, Esq.
Kavita Mohan, Esq.
Francis J. Sailer, Esq.
Bruce M. Mitchell, Esq.
Max F. Schutzman, Esq.
Ned H. Marshak, Esq.
Andrew T. Schutz, Esq.
Jeffrey O. Frank, Esq.
Kavita Mohan, Esq.
*Brandon M. Petelin, Esq.
**GRUNFELD, DESIDERIO, LEBOWITZ,**
**SILVERMAN & KLESTADT LLP**
1201 New York Avenue, N.W.
Suite 650
Washington, D.C. 20005
202.783.6881 – voice
202.783.0405 – fax
fsailer@gdlsk.com
nmarshak@gdlsk.com

**On behalf of Vestas-American Wind**
**Technology, Inc. and Vestas Towers**
**America, Inc.:**
APO: 12-32

Elizabeth M. Hein, Lead Attorney
Jason M. Waite, Esq.
Chunlian Yang, Esq.
**ALSTON & BIRD LLP**
950 F Street, N.W.
Washington, D.C. 20004-1404
202.239.3300 – voice
202.654.4955 – fax
Elizabeth.hein@alston.com
Jason.waite@alston.com

**On behalf of GE Generators (Pensacola)**
**LLC:**
APO: 12-93

Charles S. Levy, Lead Attorney
John D. Greenwald, Esq.
James R. Cannon, Jr., Esq.
Thomas M. Beline, Esq.
Carl P. Moyer, Dir. Of Economic Analysis
B. Alekzander Sellers, Int'l Trade Specialist
Andrea Y. Kwong, Int'l Trade Specialist
**CASSIDY LEVY KENT (USA) LLP**
2000 Pennsylvania Avenue, N.W.
Suite 4500
Washington, D.C. 20006
202.567.2303 – voice
202.567.2301 – fax
clevy@cassidylevy.com

**JPO 000005**

**Rule 73.2.**  Documents in an Action Described in 28 U.S.C. § 1581(c) or (f)

(a) <u>Actions Described in 28 U.S.C. § 1581(c)</u>. Unless the alternative procedure prescribed by subdivision (b) of this rule is followed, in an action described in 28 U.S.C. § 1581(c), within 40 days after the date of service of the complaint on the administering authority established to administer title VII of the Tariff Act of 1930 or the United States International Trade Commission, the administering authority or the Commission must file with the clerk of the court the items specified in paragraphs (1) and (2) of this subdivision (a), if they exist, and the certified list specified in paragraph (3) of this subdivision (a), as part of the official record of the civil action.

(1) A copy of all information presented to or obtained by the administering authority or the Commission during the course of the administrative proceedings, including all governmental memoranda pertaining to the case and the record of ex parte meetings required to be maintained by section 777(a)(3) of the Tariff Act of 1930.

(2) A copy of the determination and the facts and conclusions of law on which such determination was based, all transcripts or records of conferences or hearings, and all notices published in the Federal Register.

(3) A certified list of all items specified in paragraphs (1) and (2) of this subdivision.

(b) <u>Alternative Procedure in an Action Described in 28 U.S.C. § 1581(c)</u>. As an alternative to the procedures prescribed in subdivision (a) of this rule in an action described in 28 U.S.C. § 1581(c):

(1) Within 40 days after the date of service of the complaint on the administering authority or the International Trade Commission, the administering authority or the Commission may file with the clerk of the court a certified list of all items described in subdivisions (a)(1) and (a)(2) of this rule, along with a copy of the determination and the facts and conclusions of law on which such determination was based. The Commission must in addition file a copy of its staff report of information received in the investigation

(2) The agency must retain the remainder of the record. All parts of the record will be a part of the record on review for all purposes.

(3) At any time, the court may order any part of the record retained by the agency to be filed. A motion by a party to have the agency file a retained part of the record must set forth reasons why the submission of appendices required by Rule 56.2(c) is insufficient to fairly present the relevant portions of the record to the court.

(c)  Confidential or Privileged Information in an Action Described in 28 U.S.C. § 1581(c).

(1) In an action described in 28 U.S.C. § 1581(c), any document, comment, or information that is accorded confidential or privileged status by the agency whose action is being contested and that is required to be filed with the clerk of the court, must be filed under seal. Any such document, comment, or information must be accompanied by a non-confidential description of the nature of the material being transmitted. For the purposes of this rule and Rule 81(h), the term "confidential

information" includes business proprietary information as defined in 19 U.S.C. § 1677f(b).

(2) An attorney or consultant may retain or otherwise have access to business proprietary information in the administrative record in an action described in 28 U.S.C. § 1581(c) if: (i) the attorney or consultant timely files with the court a Business Proprietary Information Certification which must be substantially in the form set forth in Form 17 of the Appendix of Forms making each of the certifications therein required or (ii) the court issues an order granting the attorney or consultant access to such information. On meeting either of these requirements, the attorney or consultant will retain or have access to business proprietary information pursuant to the terms of Administrative Order No. 02-01.

(3) A Business Proprietary Information Certification for an attorney or consultant representing or retained on behalf of a party or applicant for intervention is timely if it is filed: (i) at the time the summons or application for intervention is filed, as applicable or (ii) at any other time if the party or applicant for intervention is, at the time of filing, represented by an attorney who retains or has access to business proprietary information pursuant to this rule.

(4) When an attorney or consultant:

(A) has access to business proprietary information in an action pursuant to subdivision (2) and

(B) (i) the attorney terminates the attorney's appearance in the action, (ii) the consultant ceases to be retained for purposes of the  action, (iii) the time period for appealing a final judgment in the action has expired without the filing of a notice of appeal or (iv) all appeals of the action have concluded,

the attorney or consultant must file with the court and serve on parties, within 30 days of the event described in subdivision (B), a Notice of Termination of Access to Business Proprietary Information which must be substantially in the form set forth in Form 18 of the Appendix of Forms, certifying that the attorney or consultant meets the requirements therein. The attorney or consultant must also mail the notice to: Secretary, United States International Trade Commission, when a determination of that Commission is contested; and to APO Unit, United States Department of Commerce, when a determination of that Department is contested.

(5) If filed fewer than 31 days after the date of service of the complaint, any Certification under subdivision (2) or other request for access to business proprietary information, in addition to being served on all parties to the action, must be served on any interested party described in Rule 3(f) that has not become a party to the action as of the time of service.

(d) Documents in an Action Described in 28 U.S.C. § 1581(f). In an action described in 28 U.S.C. § 1581(f), within 15 days after the date of service of the summons and complaint on the administering authority or the International Trade Commission, the administering authority or the Commission must file, with the

clerk of the court, under seal, the confidential information involved, together with pertinent parts of the record, which must be accompanied by a non-confidential description of the nature of the information being filed, as part of the official court record of the action.

(e) <u>Documents Filed-Copies</u>. Certified copies of the original papers in the agency proceeding may be filed.

(f) <u>Filing of the Record With the Clerk of the Court-What Constitutes</u>. The filing of the record will be as prescribed by subdivision (a) of this rule, unless the alternative procedure prescribed by subdivision (b) of this rule is followed.  In the latter event, the filing of the certified list and the part of the record filed pursuant to subdivision (b) constitutes filing of the record.


**PRACTICE COMMENT:**  The court has established Security Procedures for Safeguarding Confidential Information in the Custody and Control of the Clerk. These procedures apply to confidential information or privileged information received by the court and may include: trade secrets, commercial or financial information, and information provided to the United States by foreign governments or foreign businesses or persons.  These procedures do not pertain to national security information.

Section 11(a) of Security Procedures regulates the transmittal of confidential information to and from the clerk by governmental agencies and private parties.  A copy of Section 11(a) is available on request from, and is posted in the Office of the Clerk.


(Added Sept. 30, 2011, eff. Jan. 1, 2004; and amended Nov. 25, 2009, eff. Jan. 1, 2010; Dec. 7, 2010, eff. Jan. 1, 2011; Dec. 4, 2012, eff. Jan. 1, 2013.)

**Form 17**

As provided in Rule 73.2(c), the filing of a properly executed Business Proprietary Information Certification with the court entitles an attorney representing a party in an action brought pursuant to 28 U.S.C. § 1581(c) to have access to business proprietary information in the administrative record. Further, as also provided in Rule 73.2(c), the filing of a properly executed Business Proprietary Information Certification (including the required additional certifications as detailed in Form 17) entitles a non-attorney consultant to have access to business proprietary information in such an action. The Business Proprietary Information Certification shall be substantially in the form set forth in Form 17. Assuming that the properly executed Certification is timely filed, obtaining the consent of the other parties is not necessary for individuals who were subject to the administrative protective order in the underlying proceeding. Form 17 and the provisions referred to in the form are designed specifically for use in an action brought pursuant to 28 U.S.C. § 1581(c), and are not intended for use in other actions.

(Added Jan. 25, 2000, eff. May 1, 2000; and amended Sept. 30, 2003, eff. Jan. 1, 2004.)

**Form 18**

As provided in Rule 73.2(c), in an action brought pursuant to 28 U.S.C. § 1581(c) in which a party has access to business proprietary information, a Notification of Termination of Access to Business Proprietary Information Pursuant to Rule 73.2(c) is to be utilized to inform the court and the other parties of the attorneys and consultants whose access to business proprietary information has been terminated. As also provided in Rule 73.2(c), the removal of parties from access to business proprietary information is, to the extent practicable, to be a matter of notice. Use of a standard form is intended to facilitate that process and further ease the burden on any parties who are subject to the terms of Rule 73.2(c) and the Appendix on Access to Business Proprietary Information Pursuant to Rule 73.2(c). The Notification of Termination of Access to Business Proprietary Information Pursuant to Rule 73.2(c) shall be substantially in the form set forth in Form 18.

(Added Jan. 25, 2000, eff. May 1, 2000; and amended Sept. 30, 2003, eff. Jan. 1, 2004.)

**UNITED STATES COURT OF INTERNATIONAL TRADE**

```
-------------------------------------------------------------X
                                        :
                                        :      ADMINISTRATIVE ORDER
In re ELECTRONIC FILING PROCEDURES     :
AND SUBMISSION OF CONFIDENTIAL         :      No. 02-01
INFORMATION                            :
                                        :
-------------------------------------------------------------X
```

WHEREAS, Rules 1, 5, 79 and 80 of the Rules of the U.S. Court of International

Trade and 28 U.S.C. §§ 251, 258, 451, 452, 1651, 2632 and 2633 authorize the Court to

enter all appropriate orders respecting practices and procedures for filing, signing, verifying

and providing access to the public to Court documents; and

WHEREAS, this Administrative Order is intended to be applied and interpreted in

connection with the Public Access to Court Electronic Records (PACER) System, the

Court's Case Management/Electronic Case Files (CM/ECF) System and the Case

Management/Electronic Case Files (CM/ECF) User's Manual for Electronically Filing Case

Events (the "CM/ECF User's Manual") which, together with this Administrative Order, shall

be termed the "Electronic Filing Procedures" or "EFPs"; and

WHEREAS, the Court has formulated the EFPs with the assistance of the Court's

Advisory Committee, and has solicited and considered public comment on the proposed

procedures; and

WHEREAS, consistent with the EFPs, the Court has established a World Wide

Website at **www.cit.uscourts.gov** ("USCIT Website") with the technological capacity to

provide access to all contents of that Website, including links to all electronically-filed

documents via the PACER System, and to permit direct electronic filing of documents on the Court's CM/ECF System; and

WHEREAS, the EFPs provide adequate procedures for the safeguarding of documents that contain Confidential Information (including Business Proprietary Information) and access to and use of such documents in conjunction with Rule 73.2(c); and

WHEREAS, the EFPs make adequate provision for filing, notice and service of documents and proceedings in actions before the Court, consistent with the requirements of the Rules of the Court; and

WHEREAS, the EFPs provide a means for counsel of record and unrepresented parties to sign documents electronically; and

WHEREAS, the EFPs require the Clerk's Office to provide adequate procedures for electronic filing of documents on behalf of persons who are not able to access the Court's CM/ECF System;

NOW, THEREFORE, IT IS ORDERED as follows:

1.    <u>Actions Subject to the EFPs</u>.

(a)    All actions commenced in accordance with Rule 3(a) of the Rules of the Court shall be subject to the EFPs of the Court, unless the Court has ordered that the action not be subject to the EFPs pursuant to section (b) of this paragraph.

(b)    Upon motion of any party for good cause shown, or upon its own initiative, the Court may terminate or modify application of the EFPs in any action.

(c)    A party who is not represented by an attorney and who is permitted by the Rules of the Court to appear without an attorney must file all documents in paper form,

unless such party is permitted to become a Registered CM/ECF Filer pursuant to paragraph 3(b).

2.    <u>Access to Confidential Information</u>.

Unless amended by a subsequent order of the Court, this Administrative Order governs access to all Confidential Information filed in any action, including access to Business Proprietary Information (as defined in 19 U.S.C. § 1677f(b)) pursuant to Rule 73.2(c) in an action commenced under 28 U.S.C. § 1581(c). For all actions filed under 28 U.S.C. § 1581(c), the terms of this Order covering access to Confidential Information will take effect with regard to a non-government attorney or consultant upon the filing of a Business Proprietary Certification, substantially in the form set forth in Form 17 of the Appendix of Forms; for government attorneys, the terms regarding access will take effect upon the filing of an entry of appearance.  In all other cases, access to Confidential Information will take effect upon the entry of a judicial protective order.

3.    <u>Registration, Assignment of Passwords, Notification Requirement of Changes in Information, Authorization for Filing Using User ID and Password of Registered CM/ECF User or Confidential Information Filer</u> .

(a)    (i) <u>Types of Registration</u>:  Anyone  may register to become a "Registered PACER User" on the PACER System.  A Registered PACER User will have access to all public documents maintained in the Court's CM/ECF System.  In addition to becoming a Registered PACER User with access to the public documents, any attorney admitted to practice before the Court may register to become a "Registered CM/ECF Filer" on the Court's CM/ECF System in order to file public documents on that System.  Alternatively, such attorney may register as a "Confidential Information Filer," which will allow the

attorney to file and access not only public information, but also Confidential Information using the CM/ECF System pursuant to the Court's Rules and this Order.

(ii) <u>Registration Process</u>: PACER registration will be accomplished through the PACER website, **www.pacer.gov**. Registered CM/ECF Filer and Confidential Information Filer registration will be accomplished with a non-electronic CM/ECF Registration Form prescribed by the Clerk. This form will require, as appropriate, identification of the registrant's name, employer (if applicable), address, telephone number, Internet e-mail address(es) (e-mail address(es) of record), an identification of the CM/ECF access level being requested, together with a declaration that the attorney, if applicable, is a member in good standing of the Bar of the Court. CM/ECF Registration Forms must be mailed or delivered to the Office of the Clerk of the Court, United States Court of International Trade, One Federal Plaza, New York, New York 10278-0001.

(b) The Court may permit a party to a pending action who is not represented by an attorney and who is permitted by the Rules of the Court to appear without an attorney to become a Registered CM/ECF Filer solely for purposes of the action. Registration will be by non-electronic filing of the CM/ECF Registration Form prescribed by the Clerk. If the party wishes to file confidential information, he or she will do so in accordance with paragraph 7(f) of this order. If during the course of the action, the party retains an attorney who appears on the party's behalf, the appearing attorney must advise the Clerk to terminate the party's registration as a Registered CM/ECF Filer upon the attorney's appearance.

(c) Each attorney of record to an action is obligated to become a Registered CM/ECF Filer or Confidential Information Filer, unless the Court has otherwise ordered in accordance with paragraph 1(b) of this Order. An attorney is required to become a

Confidential Information Filer only if that attorney intends to electronically file or access documents containing Confidential Information.

(d)   Everyone registered on the CM/ECF System must immediately notify the Clerk of any change in the information provided in the CM/ECF Registration Form by submitting a Request for Change in Information Form.

(e)   Each person registered on the CM/ECF System will, upon registration, be issued a User Identification Designation ("User ID") and a Password by the Clerk. The Clerk will maintain a confidential record of issued User IDs. Confidential Information Filers are required to change their Passwords at least once a year. Failure of a Confidential Information Filer to change his or her Password at least once a year will result in termination of his or her ability to file documents and termination of access to confidential documents on the CM/ECF System until the Password is changed or a new CM/ECF status is requested.

(f)   Except as expressly provided in subparagraph (g), the User ID and Password must be maintained as confidential. Upon learning of the compromise of the confidentiality of the CM/ECF Password, the Password holder must change his/her Password immediately and notify the Clerk without delay.

(g)   A Registered CM/ECF Filer or Confidential Information Filer may authorize another person to file a document using the User ID and Password of the Registered CM/ECF Filer or Confidential Information Filer. Under these circumstances, the Registered CM/ECF Filer or Confidential Information Filer will retain full responsibility and will be treated as a signatory under the Rules of the Court for any document so filed.

(h)     The Court's CM/ECF System will include for each action subject to the EFPs a current list of the e-mail addresses of record maintained by the Clerk.  Each attorney of record must file with the Court a notice of any changes in his or her e-mail address, in the manner prescribed by Rule 75(e) of the Rules of the Court, in addition to submitting the Notice required under paragraph 3(d) of this Order.

4.     <u>Electronic Filing of Documents</u>.

(a)     Except as otherwise ordered by the Court, all pleadings and other documents required to be filed with the Clerk, including documents containing Confidential Information, must be filed electronically on the Court's CM/ECF System pursuant to the EFPs, except for certain documents described in subparagraph (e) below.  Electronic filing may be made only by a Registered CM/ECF Filer or Confidential Information Filer, or by a person authorized by a Registered CM/ECF Filer or Confidential Information Filer pursuant to paragraph 3(g) of this Order.  Any document filed with the Court that contains any Confidential Information must be conspicuously marked in accordance with Rule 81(h) and any Confidential Information must be appropriately marked by bracketing.

(b)     With the exception of agency records filed in accordance with Rules 73.1, 73.2 and 73.3 and federal agency remand determinations, every document filed electronically must be signed for the purposes of Rule 11 of the Rules of the Court by one or more attorneys of record (each "Rule 11 Signatory") pursuant to paragraph 5(a) of this Order.  For each Rule 11 Signatory, the document must identify the Signatory by name and provide such Signatory's law firm or agency, address, telephone number and e-mail address(es) of record.

(c)    Except as provided in subsection (e) of this paragraph, electronic transmission of a document to the Court's CM/ECF System consistent with the EFPs, together with the receipt by the person making the filing of a Notice of Electronic Filing from the Court as provided in Paragraph 6 of this Order, shall constitute filing of the document for all purposes under the Rules of the Court, and shall constitute entry of that document on the docket kept by the Clerk pursuant to Rules 58 and 79 of the Rules of the Court.  A document filed electronically shall be deemed filed at the date and time stated on the Notice of Electronic Filing from the Court.

(d)    (i) When a document has been filed electronically, the official document of record is the electronic recording of the document as stored by the Court, and the filing party shall be bound by the document as filed, unless amended by order of the Court.  A party wishing to correct a filing must file a motion for errata after seeking consent from all parties, in accordance with the provisions of Rule 7(b) of the Rules of the Court.  A motion for errata must list each correction, including the page number for each correction, and must provide a complete copy of the corrected document, or indicate that the corrections are minor.  The motion must also include a proposed order either permitting the substitution of the complete corrected copy or ordering the corrections deemed made without physical substitution because the corrections are minor.  The corrected filing will become the official document of record and the filing date will remain the date of the filing of the original electronic filing.  When a motion for errata is made upon consent of all parties in an unassigned case, the Clerk may dispose of the motion as if such motion were expressly listed in Rule 82(b) of the Rules of the Court.

JPO 000019

(ii)  If a document containing Confidential Information is erroneously filed as a public document, is filed in the wrong case, or otherwise improperly releases Confidential Information, the filing party must immediately contact the Clerk.  Parties should use the emergency number posted on the USCIT Website to contact the Clerk after hours.  Parties must also follow the procedures set forth in paragraph 17 of this Order.

(e)      Documents, portions of documents or sets of documents that are not readily convertible to electronic form, or which are more appropriately filed as physical exhibits, may be filed in paper form and must be accompanied by a Notice of Manual Filing.  Likewise, documents, portions of documents or sets of documents that are in electronic form but exceed certain technical parameters may be filed on electronic media or in paper form, and must be accompanied by a Notice of Manual Filing.

Summonses and original complaints referred to in Rule 3 of the Rules of the Court; original third party complaints; original complaints filed pursuant to 28 U.S.C. § 1581(b); Notices of Appeal filed in accordance with Rule 3 of the Rules of the United States Court of Appeals for the Federal Circuit; and a request for transfer to the Court from a binational panel or committee pursuant to 19 U.S.C. § 1516a(g)(12)(B) or (D) may be filed electronically or manually.  A Notice of Manual Filing must accompany manually-filed documents.  Notwithstanding any other provision of the EFPs, no document containing classified information may be filed electronically.  A party filing a document that contains classified information must file such document manually in accordance with the Rules of the Court.  Public versions of such document must be filed electronically in accordance with the requirements and limitations of this Order.

(f)     A document properly and timely submitted and filed in non-electronic form pursuant to Rule 5 of the Rules of the Court shall be deemed filed on the date set forth in Rule 5(d)(4).   Subsequent electronic submission of the same document shall not be deemed to change the date of original filing of that document.   Where a portion of a document is filed electronically and another portion is filed in paper form, or on electronic media, the latest filing date and time of the multiple portions will be used to determine compliance with applicable deadlines.

(g)     Unless otherwise ordered by the Court, an agency filing an administrative record pursuant to Rule 73.2 will follow the procedure in Rule 73.2(b).

5.     <u>Signatures</u>.

(a)     A document filed with the Court electronically shall be deemed to be signed by a person when the document identifies the person as a Signatory and the filing complies with subparagraph (b), (c) or (d).  When the document is filed with the Court in accordance with any of these methods, the filing shall bind the Signatory as if the document (or the document to which the filing refers, in the case of a Notice of Endorsement filed pursuant to subparagraph (d)) were physically signed and filed, and shall function as the Signatory's signature, whether for purposes of Rule 11 of the Rules of the Court, to attest to the truthfulness of an affidavit or declaration, or for any other purpose.

(b)     In the case of a Signatory who is a Registered CM/ECF Filer or Confidential Information Filer as described in paragraph  3, such document shall be deemed signed, regardless of the existence of a physical signature on the document, provided that such document is filed using the User ID and Password of the Signatory.  The page on which the physical signature would appear if filed in non-electronic form must be filed electronically,

but need not be filed in an optically scanned format displaying the signature of the Signatory.  In such cases, the electronically filed document shall indicate an "electronic signature", e.g., "s/Jane Doe".

(c)    In the case of a Signatory who is  a Registered CM/ECF Filer or Confidential Information Filer, but whose User ID and Password will not be utilized in the electronic filing of the document, such document will be deemed signed and filed when the document is physically signed by the Signatory, the document is filed electronically, and the signature page is filed in optically scanned form pursuant to and consistent with the EFPs.

(d)    In the case of a stipulation or other document to be signed by two or more persons, the following procedure shall be used:

(i)  The filing party shall initially confirm that the content of the document is acceptable to all persons required to sign the document and shall indicate in the document that such confirmations have been made. To the extent practicable, the filing party shall obtain the physical signatures of all parties on the document.

(ii)  The filing party shall then file the document electronically, indicating the original signatures that have been obtained, e.g., "s/Jane Doe," "s/John Doe," etc., and the signatures that will be provided through Notices of Endorsement.

(iii)  The filing party or attorney shall retain the hard copy of the document containing the original signatures until one year after the final disposition of the action in which it was filed.

(iv)  In the case of any person required to sign the document but for whom the filing party does not obtain a physical signature, such person shall file a Notice of

Endorsement of the document. The document shall be deemed fully executed upon the filing of any and all such Notices of Endorsement.

6. <u>Notice of Electronic Filing</u>.

Upon electronic filing of a pleading or other document, a Notice of Electronic Filing will be sent by the Clerk to all e-mail address(es) of record in the action. Such Notice shall provide, at a minimum, the electronic docket number and the title of the document filed, and shall provide the date and time filed.

7. <u>Service</u>.

(a)    A pro se party who becomes a Registered CM/ECF User or Filer, or an attorney who becomes a Registered CM/ECF Filer or Confidential Information Filer, is deemed to have consented in writing to electronic service of all documents that are filed electronically. Therefore, except as otherwise ordered by the Court, electronic filing of any document and the Court's transmission of a Notice of Electronic Filing of that document, as described in Paragraph 6 of this Order, will constitute service of such document on all counsel or pro se parties with CM/ECF accounts. Documents that are not filed electronically must be served in non-electronic form in accordance with Rule 5 of the Rules of the Court, and the Court's transmission of a Notice of Electronic Filing will not constitute service.

(b)    Counsel excused in any particular case under Paragraph 1(b) of this Order and pro se parties who do not have a CM/ECF account must serve and be served with all filed documents in non-electronic form as provided in Rule 5 of the Rules of the Court.

(c)    For any document which is served electronically pursuant to subparagraph (a) of this paragraph, the requirement for the filing of a certificate or other proof of service

set forth in Rule 5 of the Rules of the Court will be satisfied by the Court's transmission of the Notice of Electronic Filing described in Paragraph 6 of this Order.

(d)     Whenever a person has the right or is required to do some act within a prescribed period after the service of a notice or other document upon that person, and such document is filed and served electronically pursuant to the EFPs, five days shall be added to the prescribed period.

(e)     Notwithstanding any provision of this Order, where the Rules of the Court require that any document be served but not filed, or that any document be served and filing of that document be delayed, service of that document shall be in non-electronic form. Any subsequent filing of such previously-served document shall be accomplished in the manner prescribed by this Order, and the document need not be re-served upon parties who were previously served.

(f)     Any document containing Confidential Information not required to be electronically filed as permitted in this Order must be served on all parties whose counsel are authorized to have access to such document. The document must be contained in a wrapper conspicuously marked on the front "Confidential – to be opened only by (authorized attorney for that party)." If served by mail, the confidential document must be placed within two envelopes, the inner one sealed and marked "Confidential Information – to be opened only by (name of authorized attorney)" or Business Propriety Information – to be opened only by (name of authorized attorney)," and the outer one sealed and not marked as containing Confidential/Business Proprietary Information. Parties not authorized to have access to any such document pursuant to this Order are to be served in

JPO 000024

accordance with Rule 81(h) with a copy of the document from which all Confidential Information has been deleted.

8.  Docket.

The Court's CM/ECF System shall denote in a separate electronic document for each action subject to the EFPs the filing of any document by or on behalf of a party and the entry of any order or judgment by the Court, regardless of whether such document was filed electronically.  The record of those filings and entries for each case shall be consistent with Rule 79 of the Rules of the Court and shall constitute the docket for purposes of that Rule.

9.  Notice of Entry of Orders and Judgments.

The Clerk will file electronically all orders, decrees, judgments, and proceedings of the Court in accordance with the EFPs, which filing will constitute entry of the order, decree, judgment or proceeding on the docket kept by the Clerk pursuant to Rules 58 and 79 of the Rules of the Court.  Upon the entry of an order or judgment in an action subject to the EFPs, the Clerk will transmit by e-mail to all e-mail addresses(es) of record in the action a notice of the entry of the order or judgment and will make a note of the transmission in the docket.  Transmission of the notice of entry will constitute notice as required by Rule 79(c) of the Rules of the Court and will constitute service of such notice unless non-electronic service is required under paragraph 7(b) of this Order.

10.  Technical Failures.

(a)  The Clerk will deem the USCIT CM/ECF System to be subject to a technical failure on a given day if the CM/ECF System is unable to accept filings continuously or intermittently over the course of any period of time greater than one hour after 12:00 noon

in New York, New York on that day.  The Clerk will provide notice of all such technical failures on the CM/ECF Help Desk line, 866-450-1859, which persons may telephone in order to learn the current status of the CM/ECF System.  The Clerk will maintain records of the nature and duration of all such technical failures.  Filings due that day, which were not filed due solely to such technical failures, will become due the next business day.  Such delayed filings will be rejected unless accompanied by a declaration or affidavit attesting to the filing person's failed attempts to file electronically at least two times after 12:00 noon in New York, New York, separated by at least one hour on that day due to such technical failure. A declaration or affidavit will not be required if, on the day a filing is due, a notice is posted on the Court's Website or on the Court's CM/ECF Help Desk line indicating that the CM/ECF System is not available on that day for a period of one hour or more after 12:00 noon in New York, New York.

(b)    If a Notice of Electronic Filing is not received from the Court following transmission of a document for filing, the document will not be deemed filed.  The person filing must attempt to re-file the document electronically until such a Notice is received, consistent with the provisions of subparagraph (a) permitting delayed filings.

(c)    If, within one business day after filing a document electronically, the party filing the document discovers that the version of the document available for viewing on the Court's CM/ECF System does not conform to the document as transmitted upon filing, the filing party must contact the Clerk, who will either ensure that the document is properly posted as filed or direct the party to re-transmit the document, which will be marked "Re-transmitted". This provision (and the designation "Re-transmitted") will not be used for filing a motion for errata as set forth in paragraph 4(d)(i) of this Order.

11.    <u>Copyright and Other Proprietary Rights</u>.

(a)    The USCIT Website will bear a prominent notice as follows: "The contents of each filing in the electronic case files on the Court's CM/ECF System  may be subject to copyright and other proprietary rights (with the exception of the opinions, memoranda and orders of the Court).  It is the user's obligation to determine and satisfy copyright or other use restrictions when publishing or otherwise distributing material found in the electronic case files.  Transmission or reproduction of protected items beyond that allowed by fair use requires the written permission of the copyright owners.  Users must make their own assessments of rights in light of their intended use."

(b)    By consenting to the EFPs, each party or other person and their counsel are deemed to consent to all uses of the filed materials consistent with the notice set forth in subparagraph (a).

(c)    By producing discovery materials in an action subject to electronic filing, or by filing any material in the action electronically or otherwise, each party or subpoenaed non-party or other non-party so producing or filing, and all of the counsel to such persons, are deemed to consent to all uses of such materials by all parties to the action solely in connection with and for the purposes of the action, including the electronic filing in the action (by a party who did not originally file or produce such materials) of portions of such excerpts, quotations, or selected exhibits from such discovery materials or other filed materials as part of motion documents, pleadings or other filings with the Court which must refer to such excerpts, quotations, etc.

12.    <u>Protective Order</u>.

In connection with discovery or the filing of any material, other than those items specifically exempted from electronic filing in subparagraph 4(a) or (e) of this Order, any person may apply by motion for an order prohibiting the electronic filing in the action of certain specifically-identified materials on the grounds that such materials are subject to copyright, other proprietary rights, privacy interests, or other specifically-identified interests and that electronic filing in the action is likely to result in substantial prejudice to those rights or interests.  A motion for such an order must be filed not less than five days before the materials to which the motion pertains are due to be produced or filed with the Court.  Any material not filed electronically pursuant to such an order shall be filed with the Clerk and served as if the action were not subject to the EFPs.  Nothing in this paragraph may be construed to change the standard for the issuance of a protective order respecting confidentiality in an action subject to the EFPs.

13.    <u>Disclosure and Access to Confidential Information</u>.

(a)        (i) Individuals who have access to Confidential Information pursuant to Rule 73.2(c) and/or this Order will not disclose it to anyone (including, without limitation, any officer, shareholder, director, or employee of any of the parties in the action), other than the Court, authorized Court personnel, and other persons authorized under this Order.  An authorized attorney or authorized consultant may use Confidential Information only for issues relating to the federal administrative agency proceeding that is the subject of the action, in administrative proceedings resulting from an order of the Court remanding the matter to that agency, or in an appeal of a decision rendered by the Court in the action.  In the event of the consolidation of actions arising from determinations of the International

JPO 000028

Trade Commission and the Department of Commerce, nothing in this Order will be read to require or allow the use of Confidential Information from the records of one agency in argumentation related to the decision of the other agency or the service upon one agency of documents containing Confidential Information from the record of the other.

With respect to Confidential Information that was originally submitted by a party to the action, nothing in Rule 73.2(c) or this Order prevents an attorney for that party from disclosing that information or using that information in any way, so long as such disclosure or use does not result in the disclosure of another entity's Confidential Information to anyone not authorized under Rule 73.2(c) and/or this Order to have access to the Confidential Information.

(ii) The Clerk of the Court will permit access to documents containing Confidential Information, including electronic access, only to the Court, authorized Court personnel, and individuals authorized by this Order to have access to such documents.

(b)    Authorized Consultants.  An authorized consultant may have access to Confidential Information in an action only under the direction and control of an authorized attorney, who will assume responsibility for compliance with the terms of Rule 73.2(c) and/or this Order by such authorized consultant, and subject to the terms of Rule 73.2(c) and/or this Order.  Consultants include non-attorneys such as economists, accountants and computer specialists.

As to any consultant who is subject to the agency's administrative protective order issued in the proceeding that gave rise to the action whom an authorized attorney considers necessary to preparation of the case in the action, the authorized attorney must file with the Court a Business Proprietary Information Certification which must be

substantially in the form set forth in Form 17 of the Appendix of Forms executed by the consultant.

As to any consultant not described in the preceding paragraph whom an authorized attorney considers necessary to preparation of the case, the authorized attorney must, prior to seeking consent for the filing of such a Certification, provide counsel for the parties with the curriculum vitae of the proposed consultant. If all counsel consent, the authorized attorney may then file such a Certification, executed by the proposed consultant, with the Court. If all counsel do not consent, access to Confidential Information for the consultant may be sought by motion.

(c)    An authorized attorney or authorized consultant may disclose Confidential Information to office personnel (such as paralegals, administrative assistants, etc.) who are actively assisting in the action and are employed by or supervised by him or her and under his or her direction and control. The authorized attorney charged with direction and control of the authorized consultant will assume responsibility for compliance with the terms of Rule 73.2(c) and/or this Order by all office personnel described in this paragraph. An authorized consultant will assume responsibility for compliance with the terms of Rule 73.2(c) and/or this Order by all of his or her own office personnel. All office personnel authorized to see the Confidential Information must comply with the terms of Rule 73.2(c) and/or this Order, and must, before having access to any confidential documents, sign a statement of recognition that he or she is bound by the terms of Rule 73.2(c) and/or this Order, that the information is confidential and that such information will not be disclosed to anyone other than authorized attorneys, authorized consultants or authorized office personnel. Such

statements of recognition must be retained by an authorized attorney, but need not be filed with the Court or served on the parties.

14.     Safeguarding Confidential Information.

The individuals covered by Rule 73.2(c) and/or this Order must review the procedures for the protection of Confidential Information listed in any federal agency administrative protective orders on the administrative record and comply with such procedures for the duration of the action.

15.     Termination of Access to Confidential Information.

Termination of access to Confidential Information in other than one filed under 28 U.S.C. § 1581(c) will occur under the terms of the protective order issued in the case.  For actions filed under 28 U.S.C. § 1581(c), the following procedures will apply.  An authorized attorney or authorized consultant will cease to have access to Confidential Information subject to this Order on the filing of a Notice of Termination pursuant to Rule 73.2(c).  For government attorneys, access to Confidential Information will cease upon the filing of a Form 18A.  A former authorized attorney or authorized consultant remains bound by his or her obligation to abide by the terms of Rule 73.2(c) and/or this Order and may not divulge Confidential Information that he or she learned during the action or in the underlying administrative proceeding to any person.  Within 28 days of final judgment, including all appeals, the parties will file a Joint Notice Regarding Termination of Access to Confidential Information, and the Clerk's Office will terminate electronic access to any confidential documents on receipt of that filing.

JPO 000031

16.   <u>Use of Confidential Information During Proceedings in Open Court</u>.

Authorized attorneys will endeavor to avoid the unnecessary use of Confidential Information in any oral proceeding before the Court.  If an authorized attorney for any party in the action finds it necessary to refer to Confidential Information in any oral proceeding before the Court, such attorney must notify the Court and all other counsel of record as soon as the necessity becomes apparent and propose whatever mechanism may be available and appropriate to prevent disclosure of Confidential Information to persons other than those authorized by this Order.

17.   <u>Breach of Requirements Regarding Confidential Information</u>.

The individuals covered by Rule 73.2(c) and/or this Order must promptly report any breach of paragraphs 13-16 of this Order to the Court, to counsel for the federal administrative agency involved, and to counsel for the party whose Confidential Information is involved.  The individuals covered by Rule 73.2(c) and/or this Order must take all reasonable steps to remedy the breach and must cooperate fully in any investigation of the breach undertaken by the Court.

18.   <u>Miscellaneous Provisions</u>.

(a)   The Clerk will establish procedures to permit pleadings and other documents to be presented for electronic filing at the Court.  The Clerk will also provide for appropriate access to all electronic Court records.  Facilities and equipment made available at the Court to permit access to the PACER System may not be used for any other purpose.

(b)   Until such time as the United States Court of Appeals for the Federal Circuit provides notice to the Court that public access to the PACER System obviates or modifies

any need for transmittal of the record on appeal of any action subject to the EFPs as to which a notice of appeal to that Court of Appeals has been filed, when required, the Clerk will deliver to the Court of Appeals, at that Court's election, either a complete non-electronic copy of the record on appeal or an electronic reproduction of that record on appeal as such record is reflected in the PACER System.

(c)    This Administrative Order and the CM/ECF User's Manual will be posted on the USCIT Website in a location that may be reached from the home page of that Website via one or more highly visible and easily found hyperlinks and will be posted prominently in and otherwise made available in the Office of the Clerk.  Any amendments to the EFPs will be similarly posted and published.

(d)    The effective date of this  Administrative Order and the CM/ECF User's Manual is April 1, 2002 and may be amended by the Court from time to time on the Court's own initiative.  This Administrative Order shall apply to all proceedings in actions brought after its effective date and all further proceedings in actions then pending, except actions in which a complaint was filed prior to the effective date of this Order.

For the Court:

/S/

_____
By:    Tina Potuto Kimble
       Clerk of the Court

Dated:  April 1, 2002, amended Nov. 28, 2006, eff. Jan. 1, 2007; amended Aug. 2, 2010, eff. Sept. 1, 2010; amended Dec. 4, 2012, eff. Jan. 1, 2013; amended August 7, 2013, eff. October 1, 2013.

New York, New York

APPEAL,CONSOLIDATION,TERMINATED

# U.S. Court of International Trade
## LIVE Database (New York)
## CIT DOCKET FOR CASE #: 1:13-cv-00104-MAB

Siemens Energy, Inc. v. United States
**Assigned to:** Mark A. Barnett
**Lead Docket:**

| | |
|---|---|
| **Jurisdiction:**<br>28USC § 1581(c) Antidumping or Countervailing Duty Determination(s) | **Date Filed:** 03/15/2013<br>**Jury Demand:** No |
| | **Date Terminated:** 06/17/2014 |
| **Category:**<br>Final Affirmative Determinations: Investigations 19USC § 1516a(a)(2)(B)(i) | **Date Reopened:**<br><br>**Does this action raise an issue of constitutionality?:** N |
| **Agency:**<br>U.S. International Trade Commission | |

**Product Description:**
Utility Scale Wind Towers

**Export Country:**
China
Viet Nam

**Plaintiff**

| | | |
|---|---|---|
| **Siemens Energy, Inc.** | represented by | **Elliot Jay Feldman**<br>Baker & Hostetler, LLP<br>Washington Square, Suite 1100<br>1050 Connecticut Avenue, NW.<br>Washington, DC 20036-5304<br>(202) 861-1679<br>Fax: (202) 861-1783<br>Email: efeldman@bakerlaw.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br>***ATTORNEY IN SEALED GROUP***<br>***Bar Status: ACTIVE***<br><br>**Michael Steven Snarr** |

**JPO 000034**

Baker & Hostetler, LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, NW.
Washington, DC 20036-5304
(202) 861-1710
Fax: (202) 861-1783
Email: msnarr@bakerlaw.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Shawnna M. Yashar**
Baker & Hostetler, LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, NW.
Washington, DC 20036-5304
(202) 861-1518
Fax: (202) 861-1783
Email: syashar@bakerlaw.com
*ATTORNEY TO BE NOTICED*
***Bar Status: ACTIVE***

**Consolidated Plaintiff**

**Titan Wind Energy (Suzhou) Co., Ltd.**

represented by **Bruce M. Mitchell**
Grunfeld Desiderio Lebowitz Silverman
& Klestadt, LLP
399 Park Avenue
25th Floor
New York, NY 10022
(212) 973-7712
Fax: (212) 557-4415
Email: bmitchell@gdlsk.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
***Bar Status: ACTIVE***

**Andrew Brehm Schroth**
Grunfeld Desiderio Lebowitz Silverman
& Klestadt, LLP
No. 9 Queen's Road Central
Suite 2407
Hong Kong
S.A.R.
+852-9858-6626
Fax: +852-2137-2701
Email: aschroth@gdlsk.com
*ATTORNEY TO BE NOTICED*
***Bar Status: ACTIVE***

**Andrew Thomas Schutz**
Grunfeld Desiderio Lebowitz Silverman
& Klestadt, LLP
1201 New York Avenue, NW.
Suite 650
Washington, DC 20005
(202) 661-7795
Fax: (202) 783-0405
Email: aschutz@gdlsk.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Dharmendra Narain Choudhary**
Grunfeld Desiderio Lebowitz Silverman
& Klestadt, LLP
1201 New York Avenue, NW.
Suite 650
Washington, DC 20005
(202) 661-7786
Fax: (202) 783-0405
Email: dchoudhary@gdlsk.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Kavita Mohan**
Grunfeld Desiderio Lebowitz Silverman
& Klestadt, LLP
3826 Windom Place, NW
Suite 650
Washington, DC 20016
(202) 783-6881
Fax: (202) 783-0405
Email: kmohan@gdlsk.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Max F. Schutzman**
Grunfeld Desiderio Lebowitz Silverman
& Klestadt, LLP
399 Park Avenue
25th Floor
New York, NY 10022
(212) 973-7723
Fax: (212) 557-4415
Email: mschutzman@gdlsk.com
*ATTORNEY TO BE NOTICED*

*Bar Status: ACTIVE*

**Ned Herman Marshak**
Grunfeld Desiderio Lebowitz Silverman
& Klestadt, LLP
399 Park Avenue
25th Floor
New York, NY 10022
(212) 557-4000
Fax: (212) 557-4415
Email: nmarshak@gdlsk.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Consolidated Plaintiff**

**CS Wind Tech Co., Ltd.**                    represented by   **Bruce M. Mitchell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: ACTIVE*

**Andrew Brehm Schroth**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: ACTIVE*

**Andrew Thomas Schutz**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Dharmendra Narain Choudhary**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Kavita Mohan**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Max F. Schutzman**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: ACTIVE*

Ned Herman Marshak
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Consolidated Plaintiff**

**CS Wind Vietnam Co., Ltd.**                represented by **Bruce M. Mitchell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: ACTIVE*

**Andrew Brehm Schroth**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: ACTIVE*

**Andrew Thomas Schutz**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Dharmendra Narain Choudhary**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Kavita Mohan**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Max F. Schutzman**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: ACTIVE*

**Ned Herman Marshak**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Consolidated Plaintiff**

**Chengxi Shipyard Co., Ltd.**  represented by  **Bruce M. Mitchell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: ACTIVE*

**Andrew Brehm Schroth**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: ACTIVE*

**Andrew Thomas Schutz**
(See above for address)
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**Dharmendra Narain Choudhary**
(See above for address)
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**Kavita Mohan**
(See above for address)
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**Max F. Schutzman**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: ACTIVE*

**Ned Herman Marshak**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: ACTIVE*

**Defendant**

**United States**  represented by  **Michael Kenneth Haldenstein**
U.S. International Trade Commission
Office of the General Counsel
500 E Street, SW.
Washington, DC 20436
(202) 205-3041
Fax: (202) 205-3111
Email: michael.haldenstein@usitc.gov
*LEAD ATTORNEY*

**JPO 000039**

*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**Neal Joseph Reynolds**
U.S. International Trade Commission
Office of the General Counsel
500 E Street, SW
Suite 614
Washington, DC 20436
(202) 205-3093
Fax: (202) 205-3111
Email: neal.reynolds@usitc.gov
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**Intervenor Defendant**

**Wind Tower Trade Coalition**          represented by   **Alan Hayden Price**
Wiley Rein, LLP
1776 K Street, NW.
Washington, DC 20006
(202) 719-3375
Fax: (202) 719-7049
Email: aprice@wileyrein.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**Daniel Brian Pickard**
Wiley Rein, LLP
1776 K Street, NW.
Washington, DC 20006
(202) 719-7285
Fax: (202) 719-7049
Email: dpickard@wileyrein.com
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**Derick G. Holt**
Wiley Rein, LLP
1776 K Street, NW.
Washington, DC 20006
(202) 719-7479
Fax: (202) 719-7049
Email: dholt@wileyrein.com
*ATTORNEY TO BE NOTICED*

*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**Lori Ellen Scheetz**
Wiley Rein, LLP
1776 K Street, NW.
Washington, DC 20006
(202) 719-7419
Fax: (202) 719-7049
Email: lscheetz@wileyrein.com
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**Maureen Elizabeth Thorson**
Wiley Rein, LLP
1776 K Street, NW.
Washington, DC 20006
(202) 719-7272
Fax: (202) 719-7049
Email: mthorson@wileyrein.com
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**Robert Edward DeFrancesco , III**
Wiley Rein, LLP
1776 K Street, NW.
Washington, DC 20006
(202) 719-7473
Fax: (202) 719-7049
Email: rdefrancesco@wileyrein.com
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**Usha Neelakantan**
Wiley Rein, LLP
1776 K Street, NW.
Washington, DC 20006
(202) 719-7209
Fax: (202) 719-7049
Email: uneelakantan@wileyrein.com
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

| Date Filed | # | Docket Text |
|------------|---|-------------|
|            |   |             |

| 03/15/2013 | 1 | Summons . Filed by Elliot Jay Feldman of Baker & Hostetler, LLP on behalf of Siemens Energy, Inc.. (Feldman, Elliot) (Entered: 03/15/2013) |
|---|---|---|
| 03/15/2013 | 2 | Form 5 Information Statement . Filed by Elliot Jay Feldman of Baker & Hostetler, LLP on behalf of Siemens Energy, Inc.. (Feldman, Elliot) (Entered: 03/15/2013) |
| 03/15/2013 | 3 | Form 11 Notice of Appearance *Elliot J. Feldman & Michael S. Snarr*. Filed by Elliot Jay Feldman of Baker & Hostetler, LLP on behalf of Siemens Energy, Inc..(Feldman, Elliot) (Entered: 03/15/2013) |
| 03/15/2013 | 4 | Form 17 Business Proprietary Information Certification filed on behalf of *Elliot J. Feldman.* Filed by Elliot Jay Feldman of Baker & Hostetler, LLP on behalf of Siemens Energy, Inc.. (Attachments: # 1 Michael S. Snarr's Certification) (Feldman, Elliot) (Entered: 03/15/2013) |
| 03/15/2013 | 5 | Form 13 Corporate Disclosure Statement . Filed by Elliot Jay Feldman of Baker & Hostetler, LLP on behalf of Siemens Energy, Inc.. (Feldman, Elliot) (Entered: 03/15/2013) |
| 03/15/2013 | 6 | Complaint against United States. Administrative Record due by 4/29/2013. Filed by Elliot Jay Feldman of Baker & Hostetler, LLP on behalf of Siemens Energy, Inc..(Feldman, Elliot) (Entered: 03/15/2013) |
| 03/15/2013 | 7 | Certificate of service (related document(s) 5 , 1 , 4 , 2 ). Filed by Elliot Jay Feldman of Baker & Hostetler, LLP on behalf of Siemens Energy, Inc.. (Feldman, Elliot) (Entered: 03/15/2013) |
| 03/18/2013 | 8 | Summons served by Clerk's Office upon Plaintiff and appropriate Government Agency/Agencies . (Goell, Geoffrey) (Entered: 03/18/2013) |
| 03/20/2013 | 9 | Form 11 Notice of Appearance . Filed by Michael Kenneth Haldenstein of U.S. International Trade Commission on behalf of United States.(Haldenstein, Michael) (Entered: 03/20/2013) |
| 03/26/2013 | 10 | Form 17 Business Proprietary Information Certification filed on behalf of *Randolph Stayin as consultant*. Filed by Elliot Jay Feldman of Baker & Hostetler, LLP on behalf of Siemens Energy, Inc.. (Feldman, Elliot). (Entered: 03/26/2013) |
| 04/02/2013 | 11 | Motion to Intervene as defendant intervenor . Responses due by 4/22/2013. Filed by Alan Hayden Price of Wiley Rein, LLP on behalf of Wind Tower Trade Coalition.(Price, Alan) (Entered: 04/02/2013) |
| 04/02/2013 | 12 | Form 11 Notice of Appearance *of Alan Price, Daniel Pickard, Lori Scheetz, Usha Neelakantan and Derick Holt*. Filed by Alan Hayden Price of Wiley Rein, LLP on behalf of Wind Tower Trade Coalition.(Price, Alan) (Entered: 04/02/2013) |
| 04/02/2013 | 13 | Form 17 Business Proprietary Information Certification filed on behalf of *Alan Price, Daniel Pickard, Lori Scheetz, Usha Neelakantan and Derick Holt*. Filed by Alan Hayden Price of Wiley Rein, LLP on behalf of Wind Tower Trade Coalition. (Price, Alan) (Entered: 04/02/2013) |
| 04/02/2013 | 14 | |

| | | |
|---|---|---|
| | | Form 13 Corporate Disclosure Statement . Filed by Alan Hayden Price of Wiley Rein, LLP on behalf of Wind Tower Trade Coalition. (Price, Alan) (Entered: 04/02/2013) |
| 04/02/2013 | 15 | Certificate of service (related document(s) 11 , 13 , 12 , 14 ). Filed by Alan Hayden Price of Wiley Rein, LLP on behalf of Wind Tower Trade Coalition. (Price, Alan) (Entered: 04/02/2013) |
| 04/03/2013 | 16 | Order entered on 4/3/2013 granting Consent Motion to intervene as Defendant-Intervenor. (Related Doc # 11 ).. (Goell, Geoffrey) (Entered: 04/03/2013) |
| 04/08/2013 | 17 | Order entered on 4/8/2013 assigning action to Judge Richard K. Eaton. (Cheevers, Casey) (Entered: 04/08/2013) |
| 04/18/2013 | 18 | Form 11 Notice of Appearance *of Robert E. DeFrancesco, III*. Filed by Robert Edward DeFrancesco, III of Wiley Rein, LLP on behalf of Wind Tower Trade Coalition.(DeFrancesco, Robert) (Entered: 04/18/2013) |
| 04/18/2013 | 19 | Form 17 Business Proprietary Information Certification filed on behalf of *Robert E. DeFrancesco, III*. Filed by Robert Edward DeFrancesco, III of Wiley Rein, LLP on behalf of Wind Tower Trade Coalition. (DeFrancesco, Robert) (Entered: 04/18/2013) |
| 04/18/2013 | 20 | Certificate of service (related document(s) 18 , 19 ). Filed by Robert Edward DeFrancesco, III of Wiley Rein, LLP on behalf of Wind Tower Trade Coalition. (DeFrancesco, Robert) (Entered: 04/18/2013) |
| 04/29/2013 | 21 | Letter filed by Court concerning *Rule 56.2 requirements and statement of issues.*. (Demb, Rebecca) (Entered: 04/29/2013) |
| 04/29/2013 | 22 | Public Administrative record for International Trade Commission filed . Filed by Michael Kenneth Haldenstein of U.S. International Trade Commission on behalf of United States. (Attachments: # 1 Publication, # 2 Public Final Staff Report, # 3 Public Prehearing Staff Report)(Haldenstein, Michael) (Entered: 04/29/2013) |
| 04/29/2013 | 23 | Confidential Administrative record for International Trade Commission filed . Filed by Michael Kenneth Haldenstein of U.S. International Trade Commission on behalf of United States. (Attachments: # 1 Commission Views, # 2 Conf. Final Staff Report, # 3 Revisions to Staff Report, # 4 Additions and Corrections to Staff Report)(Haldenstein, Michael) (Entered: 04/29/2013) |
| 05/03/2013 | 24 | Consent Motion to consolidate case(s) 13-00104, 13-00107 with lead case 13-00104. Responses due by 5/22/2013. Filed by Kavita Mohan of Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP on behalf of Titan Wind Energy (Suzhou) Co., Ltd., CS Wind Tech Co., Ltd., CS Wind Vietnam Co., Ltd., Chengxi Shipyard Co., Ltd.. (Mohan, Kavita) (Entered: 05/03/2013) |
| 05/03/2013 | 25 | Order entered on 5/3/2013 granting Motion to consolidate cases. Case number 13-107 is consolidated under this case. (Related Doc # 24 ). (Demb, Rebecca) (Entered: 05/03/2013) |
| 05/29/2013 | 26 | Statement of Issues . Filed by Kavita Mohan of Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP on behalf of CS Wind Tech Co., Ltd., CS Wind |

**JPO 000043**

| | | |
|---|---|---|
| | | Vietnam Co., Ltd., Chengxi Shipyard Co., Ltd., Titan Wind Energy (Suzhou) Co., Ltd.. (Mohan, Kavita) (Entered: 05/29/2013) |
| 05/29/2013 | 27 | Joint status report and proposed briefing schedule. Filed by Elliot Jay Feldman of Baker & Hostetler, LLP on behalf of All Parties. (Feldman, Elliot) (Entered: 05/29/2013) |
| 05/29/2013 | 28 | Statement of Issues . Filed by Elliot Jay Feldman of Baker & Hostetler, LLP on behalf of Siemens Energy, Inc.. (Feldman, Elliot) (Entered: 05/29/2013) |
| 05/30/2013 | 29 | Proposed scheduling order *and order on word limits*. Filed by Elliot Jay Feldman of Baker & Hostetler, LLP on behalf of All Parties. (Feldman, Elliot) (Entered: 05/30/2013) |
| 05/31/2013 | 30 | Order entered on 5/31/2013 Scheduling Order: Plaintiffs shall file their motions for judgment upon the agency record by 8/22/2013. Defendant and Defendant-Intervenor shall file their response briefs by 11/8/2013. Plaintiffs shall file their reply brief by 12/12/2013. Requests for oral argument due by 12/19/2013. ORDERED that the Rule 56.2 motions for judgment upon the agency record and response briefs each will be limited to 17,000 words, and the reply brief will be limited to 8,500 words. (Cheevers, Casey) (Entered: 05/31/2013) |
| 06/21/2013 | 31 | Order entered on 6/21/2013 reassigning action from Judge Richard K. Eaton to Judge Mark A. Barnett.(Demb, Rebecca) (Entered: 06/21/2013) |
| 08/22/2013 | 32 | Confidential Motion for judgment on agency record 56.2 *and Brief in Support*. Response to 56.2 Motion due by 11/8/2013. Filed by Ned Herman Marshak of Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP on behalf of CS Wind Tech Co., Ltd., CS Wind Vietnam Co., Ltd., Chengxi Shipyard Co., Ltd., Titan Wind Energy (Suzhou) Co., Ltd..(Marshak, Ned) Modified on 8/22/2013 (Demb, Rebecca). (Entered: 08/22/2013) |
| 08/22/2013 | 33 | Public Motion for judgment on agency record 56.2 *and Brief in Support*. Response to 56.2 Motion due by 11/8/2013. Filed by Ned Herman Marshak of Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP on behalf of CS Wind Tech Co., Ltd., CS Wind Vietnam Co., Ltd., Chengxi Shipyard Co., Ltd., Titan Wind Energy (Suzhou) Co., Ltd..(Marshak, Ned) Modified on 8/22/2013 (Demb, Rebecca). (Entered: 08/22/2013) |
| 08/22/2013 | 34 | Confidential Motion for judgment on agency record 56.2 . Response to 56.2 Motion due by 11/8/2013. Filed by Elliot Jay Feldman of Baker & Hostetler, LLP on behalf of Siemens Energy, Inc.. (Attachments: # 1 Brief Memorandum in Support)(Feldman, Elliot) Modified on 8/23/2013 (Demb, Rebecca). (Entered: 08/22/2013) |
| 08/22/2013 | 35 | Public Motion for judgment on agency record 56.2 . Response to 56.2 Motion due by 11/8/2013. Filed by Elliot Jay Feldman of Baker & Hostetler, LLP on behalf of Siemens Energy, Inc.. (Attachments: # 1 Brief Memorandum in Support)(Feldman, Elliot) THIS DOCKET ENTRY IS REPLACED BY DOCKET ENTRY NUMBER 38 AS PER ORDER DATED 8/27/2013. Modified on 8/23/2013 (Demb, Rebecca). (Entered: 08/22/2013) |
| 08/23/2013 | 36 | |

| | | |
|---|---|---|
| | | Consent Motion for errata to correct *Nonconfidential Rule 56.2 Motion and Memorandum for Judgment on The Agency Record*. Filed with the Court electronically on 08/22/2013 as document number 35 (related document(s) 35 ). Responses due by 9/11/2013. Filed by Elliot Jay Feldman of Baker & Hostetler, LLP on behalf of Siemens Energy, Inc.. (Attachments: # 1 Motion Amended Public Rule 56.2 Motion for Judgment on The Agency Record, # 2 Brief Amended Public Version of Memoradum in Support of Rule 56.2 Motion) (Feldman, Elliot) (Entered: 08/23/2013) |
| 08/27/2013 | 37 | Order entered on 8/27/2013 granting Motion for errata. Docket entry number 35 shall be replaced by docket entry number 38. (Related Doc # 36 ). (Demb, Rebecca) (Entered: 08/27/2013) |
| 08/27/2013 | 38 | Motion for judgment on agency record 56.2 *with brief in support. To replace docket entry number 35, as per order dated today, deemed filed 8/22/2013.*. Response to 56.2 Motion due by 11/8/2013. Filed by Elliot Jay Feldman of Baker & Hostetler, LLP on behalf of Siemens Energy, Inc..(Demb, Rebecca) (Entered: 08/27/2013) |
| 08/29/2013 | 39 | Confidential Appendix *to Plaintiffs' Rule 56.2 Motion for Judgment on The Agency Record* (related document(s) 34 ). Filed by Elliot Jay Feldman of Baker & Hostetler, LLP on behalf of Siemens Energy, Inc.. (Attachments: # 1 Appendix Tabs 1-12 Confidential Administrative Record, # 2 Appendix Public Administrative Record)(Feldman, Elliot) (Entered: 08/29/2013) |
| 08/29/2013 | 40 | Public Appendix *to Plaintiffs' Rule 56.2 Motion for Judgment on The Agency Record* (related document(s) 38 ). Filed by Elliot Jay Feldman of Baker & Hostetler, LLP on behalf of Siemens Energy, Inc.. (Attachments: # 1 Appendix Tabs 13-17 Public Administrative Record)(Feldman, Elliot) (Entered: 08/29/2013) |
| 08/29/2013 | 41 | Confidential Appendix *to Plaintiffs' Brief in Support of Rule 56.2 Motion* (related document(s) 32 ). Filed by Ned Herman Marshak of Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP on behalf of CS Wind Tech Co., Ltd., CS Wind Vietnam Co., Ltd., Chengxi Shipyard Co., Ltd., Titan Wind Energy (Suzhou) Co., Ltd.. (Attachments: # 1 Exhibit Documents 1-9, # 2 Exhibit Documents 10-20)(Marshak, Ned) (Entered: 08/29/2013) |
| 08/29/2013 | 42 | Public Appendix *to Plaintiffs' Brief in Support of Rule 56.2 Motion* (related document(s) 33 ). Filed by Ned Herman Marshak of Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP on behalf of CS Wind Tech Co., Ltd., CS Wind Vietnam Co., Ltd., Chengxi Shipyard Co., Ltd., Titan Wind Energy (Suzhou) Co., Ltd.. (Marshak, Ned) (Entered: 08/29/2013) |
| 10/23/2013 | 43 | Unopposed Motion for extension of time until 12/19/2013 to file brief . Responses due by 11/12/2013. Filed by Michael Kenneth Haldenstein of U.S. International Trade Commission on behalf of United States.(Haldenstein, Michael) (Entered: 10/23/2013) |
| 10/24/2013 | 44 | Revised Proposed Order *to correct typographical error*. Filed by Michael Kenneth Haldenstein of U.S. International Trade Commission on behalf of United States. (Haldenstein, Michael) (Entered: 10/24/2013) |

| 10/24/2013 | 45 | Order entered on 10/24/2013 granting Motion for extension of time to file brief (Related Doc # 43 ). Response briefs due by 12/19/13. Replies due by 1/29/2014. Motions for oral argument due by 2/5/2014. (Demb, Rebecca) (Entered: 10/24/2013) |
| --- | --- | --- |
| 12/19/2013 | 46 | Confidential Response *of the Wind Tower Trade Coalition* to motion *for judgment on the agency record* (related document(s) 35 , 33 , 32 , 34 ). Reply due by 1/29/2014. Filed by Daniel Brian Pickard of Wiley Rein, LLP on behalf of Wind Tower Trade Coalition.(Pickard, Daniel) Modified on 12/20/2013 (Demb, Rebecca). (Entered: 12/19/2013) |
| 12/19/2013 | 47 | Confidential Response to motion (related document(s) 35 , 33 , 38 , 32 , 36 , 34 ). Reply due by 1/29/2014. Filed by Michael Kenneth Haldenstein of U.S. International Trade Commission on behalf of United States.(Haldenstein, Michael) Modified on 12/20/2013 (Demb, Rebecca). (Entered: 12/19/2013) |
| 12/19/2013 | 48 | Public Response to motion (related document(s) 35 , 33 , 38 , 32 , 36 , 34 ). Reply due by 1/29/2014. Filed by Michael Kenneth Haldenstein of U.S. International Trade Commission on behalf of United States.(Haldenstein, Michael) Modified on 12/20/2013 (Demb, Rebecca). (Entered: 12/19/2013) |
| 12/20/2013 | 49 | Revised Confidential Response *of WTTC* to motion *for judgment on agency record* (related document(s) 33 , 38 , 32 , 34 ). Reply due by 1/29/2014. Filed by Daniel Brian Pickard of Wiley Rein, LLP on behalf of Wind Tower Trade Coalition.(Pickard, Daniel) Modified on 12/23/2013 (Demb, Rebecca). (Entered: 12/20/2013) |
| 12/20/2013 | 50 | Public Response *of WTTC* to motion *for judgment on agency record* (related document(s) 33 , 38 , 32 , 34 ). Reply due by 1/29/2014. Filed by Daniel Brian Pickard of Wiley Rein, LLP on behalf of Wind Tower Trade Coalition.(Pickard, Daniel) Modified on 12/23/2013 (Demb, Rebecca). (Entered: 12/20/2013) |
| 12/20/2013 | 51 | Confidential Appendix *for Response to Rule 56.2 Motion* (related document(s) 32 , 34 ). Filed by Michael Kenneth Haldenstein of U.S. International Trade Commission on behalf of United States. (Haldenstein, Michael) (Entered: 12/20/2013) |
| 12/20/2013 | 52 | Public Appendix *for Response to Rule 56.2 Motion* (related document(s) 35 , 33 ). Filed by Michael Kenneth Haldenstein of U.S. International Trade Commission on behalf of United States. (Haldenstein, Michael) (Entered: 12/20/2013) |
| 12/26/2013 | 53 | Confidential Appendix *to Def-Inv WTTC's Response to Pl's Motions for Judgment on the Agency Record* (related document(s) 49 , 46 ). Filed by Daniel Brian Pickard of Wiley Rein, LLP on behalf of Wind Tower Trade Coalition. (Attachments: # 1 Appendix Tabs 7-9, # 2 Appendix Tab 10 (Exh 1), # 3 Appendix Tab 10 (Exhs 2, 4, 5), # 4 Appendix Tabs 11-20, # 5 Certificate of Service COS)(Pickard, Daniel) (Entered: 12/26/2013) |
| 12/26/2013 | 54 | Public Appendix *to Def-Inv WTTC's Response to Pl's Motions for Judgment on the Agency Record* (related document(s) 50 ). Filed by Daniel Brian Pickard of Wiley Rein, LLP on behalf of Wind Tower Trade Coalition. (Attachments: # 1 Appendix, # 2 Certificate of Service)(Pickard, Daniel) (Entered: 12/26/2013) |

**JPO 000046**

| 01/29/2014 | 55 | Confidential Reply *to Defendant and Defendant-Intervenors Response to Plaintiffs Rule 56.2 Motion for Judgment Upon the Agency Record* (related document(s) 49 , 46 , 47 ). Filed by Kavita Mohan of Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP on behalf of CS Wind Tech Co., Ltd., CS Wind Vietnam Co., Ltd., Chengxi Shipyard Co., Ltd., Titan Wind Energy (Suzhou) Co., Ltd.. (Mohan, Kavita) (Entered: 01/29/2014) |
|---|---|---|
| 01/29/2014 | 56 | Public Reply *to Defendant and Defendant-Intervenors Response to Plaintiffs Rule 56.2 Motion for Judgment Upon the Agency Record* (related document(s) 48 , 50 ). Filed by Kavita Mohan of Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP on behalf of CS Wind Tech Co., Ltd., CS Wind Vietnam Co., Ltd., Chengxi Shipyard Co., Ltd., Titan Wind Energy (Suzhou) Co., Ltd.. (Mohan, Kavita) (Entered: 01/29/2014) |
| 01/29/2014 | 57 | Supplemental Appendix *in Support of Reply Brief - CONFIDENTIAL* (related document(s) 55 ). Filed by Kavita Mohan of Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP on behalf of CS Wind Tech Co., Ltd., CS Wind Vietnam Co., Ltd., Chengxi Shipyard Co., Ltd., Titan Wind Energy (Suzhou) Co., Ltd.. (Mohan, Kavita) (Entered: 01/29/2014) |
| 01/29/2014 | 58 | Supplemental Appendix *in Support of Reply Brief - PUBLIC* (related document (s) 56 ). Filed by Kavita Mohan of Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP on behalf of CS Wind Tech Co., Ltd., CS Wind Vietnam Co., Ltd., Chengxi Shipyard Co., Ltd., Titan Wind Energy (Suzhou) Co., Ltd.. (Mohan, Kavita) (Entered: 01/29/2014) |
| 01/29/2014 | 59 | Confidential Reply *In Support Of Rule 56.2 Motion For Judgment On The Agency Record* (related document(s) 48 , 49 , 50 , 46 , 47 ). Filed by Michael Steven Snarr of Baker & Hostetler, LLP on behalf of Siemens Energy, Inc.. (Snarr, Michael) (Entered: 01/29/2014) |
| 01/30/2014 | 60 | Confidential Reply *(Revised) In Support Of Rule 56.2 Motion For Summary Judgment On The Agency Record* (related document(s) 48 , 59 , 49 , 50 , 46 , 47 ). Filed by Michael Steven Snarr of Baker & Hostetler, LLP on behalf of Siemens Energy, Inc..(Snarr, Michael) (Entered: 01/30/2014) |
| 01/30/2014 | 61 | Public Reply *In Support Of Rule 56.2 Motion For Judgment On The Agency Record* (related document(s) 60 , 48 , 59 , 49 , 50 , 46 , 47 ). Filed by Michael Steven Snarr of Baker & Hostetler, LLP on behalf of Siemens Energy, Inc.. (Snarr, Michael) (Entered: 01/30/2014) |
| 02/04/2014 | 62 | Unopposed Motion for oral argument on Rule 56.2 Motion (related document(s) 32 ). Responses due by 2/24/2014. Filed by Andrew Thomas Schutz of Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP on behalf of CS Wind Tech Co., Ltd., CS Wind Vietnam Co., Ltd., Chengxi Shipyard Co., Ltd., Titan Wind Energy (Suzhou) Co., Ltd..(Schutz, Andrew) (Entered: 02/04/2014) |
| 02/05/2014 | 63 | Supplemental Appendix *(Confidential) To Reply In Support Of Rule 56.2 Motion For Judgment On The Agency Record* (related document(s) 60 , 59 , 61 ). Filed by Michael Steven Snarr of Baker & Hostetler, LLP on behalf of Siemens Energy, Inc.. (Snarr, Michael) (Entered: 02/05/2014) |
| 02/05/2014 | 64 | |

**JPO 000047**

| | | Supplemental Appendix *(Public)* To Reply In Support Of Rule 56.2 Motion For Judgment On The Agency Record (related document(s) 60 , 59 , 61 ). Filed by Michael Steven Snarr of Baker & Hostetler, LLP on behalf of Siemens Energy, Inc.. (Snarr, Michael) (Entered: 02/05/2014) |
|---|---|---|
| 02/14/2014 | 65 | Order entered on 2/14/2014 granting Motion for oral argument (Related Doc # 62 ). An oral argument is scheduled for 3/25/2014 02:00 PM in Courtroom No. 1 before Mark A. Barnett. (Demb, Rebecca) (Entered: 02/14/2014) |
| 03/26/2014 | 66 | Oral argument (partially confidential) held on 3/25/2014 at 2:00 pm in courtroom 1. . (Demb, Rebecca) (Entered: 03/26/2014) |
| 03/26/2014 | 67 | Form 11 Notice of Appearance . Filed by Max F. Schutzman of Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP on behalf of CS Wind Tech Co., Ltd., CS Wind Vietnam Co., Ltd., Chengxi Shipyard Co., Ltd., Titan Wind Energy (Suzhou) Co., Ltd..(Schutzman, Max) (Entered: 03/26/2014) |
| 03/26/2014 | 68 | Form 17 Business Proprietary Information Certification filed on behalf of *Max F. Schutzman*. Filed by Max F. Schutzman of Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP on behalf of CS Wind Tech Co., Ltd., CS Wind Vietnam Co., Ltd., Chengxi Shipyard Co., Ltd., Titan Wind Energy (Suzhou) Co., Ltd.. (Schutzman, Max) (Entered: 03/26/2014) |
| 06/17/2014 | 69 | Confidential Order entered on 6/17/2014 Slip opinion: 14-66 Plaintiffs challenge numerous aspects of the United States International Trade Commissions affirmative determination in the final injury investigation. The court denies Plaintiffs motions for judgment on the agency record. (related document(s) 33 , 38 , 32 , 34 ).(Demb, Rebecca) (Entered: 06/17/2014) |
| 06/17/2014 | 70 | Order entered on 6/17/2014 Judgment: Ordered that Plaintiffs' motions for judgment on the agency record are Denied; and it is further Ordered that judgment is entered for the Defendant. (related document(s) 69 ).(Demb, Rebecca) (Entered: 06/17/2014) |
| 06/17/2014 | 71 | Letter filed by Court concerning *redaction of confidential information for public version of slip opinion*. (Demb, Rebecca) (Entered: 06/17/2014) |
| 06/23/2014 | 72 | Response to Court's Request/Order *re confidential information in decision*. Filed by Elliot Jay Feldman of Baker & Hostetler, LLP on behalf of Siemens Energy, Inc.. (Feldman, Elliot) (Entered: 06/23/2014) |
| 06/25/2014 | 73 | Letter *in Response to Court's 6/17/14 letter requesting redaction comments*. Filed by Andrew Thomas Schutz of Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP on behalf of CS Wind Tech Co., Ltd., CS Wind Vietnam Co., Ltd., Chengxi Shipyard Co., Ltd., Titan Wind Energy (Suzhou) Co., Ltd.. (Schutz, Andrew) (Entered: 06/25/2014) |
| 06/26/2014 | 74 | Confidential Letter *in Response to Judge Mark A. Barnett's Request for Comments on Redaction of Court's Opinion*. Filed by Michael Kenneth Haldenstein of U.S. International Trade Commission on behalf of United States. (Haldenstein, Michael) (Entered: 06/26/2014) |
| 06/26/2014 | 75 | Public Letter *in Response to Judge Mark A. Barnett's Request for Comments on Redaction of Court's Opinion*. Filed by Michael Kenneth Haldenstein of U.S. |

**JPO 000048**

| | | International Trade Commission on behalf of United States. (Haldenstein, Michael) (Entered: 06/26/2014) |
|---|---|---|
| 06/27/2014 | 76 | Confidential Letter *in Response to June 17, 2014 Letter*. Filed by Daniel Brian Pickard of Wiley Rein, LLP on behalf of Wind Tower Trade Coalition. (Pickard, Daniel) (Entered: 06/27/2014) |
| 06/27/2014 | 77 | Public Letter *in Response to June 17, 2014 Letter*. Filed by Daniel Brian Pickard of Wiley Rein, LLP on behalf of Wind Tower Trade Coalition. (Pickard, Daniel) (Entered: 06/27/2014) |
| 07/07/2014 | 78 | Confidential Errata filed for slip opinion 14-66 (related document(s) 69 ). (Demb, Rebecca) (Entered: 07/07/2014) |
| 07/07/2014 | 79 | Order entered on 7/7/2014 Public Slip Op.: 14-66 (related document(s) 69 ). (Demb, Rebecca) (Entered: 07/07/2014) |
| 08/13/2014 | 80 | Form 11 Notice of Appearance *for Shawnna M. Yashar*. Filed by Michael Steven Snarr of Baker & Hostetler, LLP on behalf of Siemens Energy, Inc.. (Snarr, Michael) (Entered: 08/13/2014) |
| 08/13/2014 | 81 | Form 17 Business Proprietary Information Certification filed on behalf of *Shawnna M. Yashar*. Filed by Michael Steven Snarr of Baker & Hostetler, LLP on behalf of Siemens Energy, Inc.. (Snarr, Michael) (Entered: 08/13/2014) |
| 08/14/2014 | 82 | Notice of Appeal of Slip Op. 14-66 filed. (related document(s) 70 , 69 ). Filed by Michael Steven Snarr of Baker & Hostetler, LLP on behalf of Siemens Energy, Inc.. (Snarr, Michael) (Entered: 08/14/2014) |
| 08/20/2014 | 83 | Appeal of *Slip Op. 14-66* docketed on 8/20/2014 by the USCAFC as appeal no. 14-1725 (related document(s) 82 ). (Demb, Rebecca) (Entered: 08/20/2014) |
| 08/28/2014 | 84 | Form 11 Notice of Appearance *for Maureen E. Thorson*. Filed by Daniel Brian Pickard of Wiley Rein, LLP on behalf of Wind Tower Trade Coalition. (Attachments: # 1 Certificate of Service)(Pickard, Daniel) (Entered: 08/28/2014) |
| 08/28/2014 | 85 | Form 17 Business Proprietary Information Certification filed on behalf of *Maureen E. Thorson*. Filed by Daniel Brian Pickard of Wiley Rein, LLP on behalf of Wind Tower Trade Coalition. (Attachments: # 1 Certificate of Service) (Pickard, Daniel) (Entered: 08/28/2014) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 10/21/2014 14:06:11 | | |
| PACER Login: | bh3241 | Client Code: | 025661.000032 |
| Description: | Docket Report | Search Criteria: | 1:13-cv-00104-MAB |
| Billable Pages: | 12 | Cost: | 1.20 |

**Form 17**

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| Siemens Energy, Inc. <br> Plaintiff, <br><br> v. <br><br> United States <br> Defendant. | Court No.　1:13-cv-*00104* |

### BUSINESS PROPRIETARY INFORMATION CERTIFICATION

Elliot J. Feldman _____ certifies that

1.　I am

☑　an attorney at the law firm of Baker Hostetler LLP _____; or an attorney in the corporate legal department of _____, and I have read and am familiar with the Rules of the United States Court of International Trade.

☐　a consultant employed by _____.

2.　I represent, or am retained by or on behalf of

☑　a party to this action,

☐　an interested party that has filed a motion to intervene in this action, which is identified below:

_____.

3.　I was

☑　granted access to business proprietary information subject to an administrative protective order in the administrative proceeding which gives rise to this action.

☐　not subject to an administrative protective order in the administrative proceeding which gives rise to this action. All parties to this action and interested parties who are entitled to service of this Certification pursuant to Rules 5 and 73.2(c)(5) of the United States Court of International Trade are listed below:

Form 17-2

| Party | Attorney | Date of Contact |
|-------|----------|-----------------|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

Each of these parties or interested parties has been contacted; none has objected to my access to proprietary information in this action subject to Administrative Order No. 02-01 of the United States Court of International Trade.

4.   I am

☑   (for attorneys) not involved in competitive decision making for the interested party I represent.

☐   (for consultants) independent of all parties in this action.

5.   I have read and agree to be bound by the terms of Administrative Order No. 02-01 of the United States Court of International Trade.

_____
[Attorney or consultant]

1050 Connecticut Ave. NW, Suite 1100

Washington, DC 20036

202-861-1679
[Address and Telephone Number]

Date: _____

**Form 17**

## UNITED STATES COURT OF INTERNATIONAL TRADE

Siemens Energy, Inc.

                    Plaintiff,

         v.

United States

                    Defendant.

Court No.    1:13-cv-00104

## BUSINESS PROPRIETARY INFORMATION CERTIFICATION

Michael S. Snarr _____ certifies that

1.   I am

     ☑  an attorney at the law firm of Baker Hostetler LLP _____ ; or an attorney in the corporate legal department of _____, and I have read and am familiar with the Rules of the United States Court of International Trade.

     ☐  a consultant employed by _____.

2.   I represent, or am retained by or on behalf of

     ☑  a party to this action,

     ☐  an interested party that has filed a motion to intervene in this action, which is identified below:

     _____.

3.   I was

     ☑  granted access to business proprietary information subject to an administrative protective order in the administrative proceeding which gives rise to this action.

     ☐  not subject to an administrative protective order in the administrative proceeding which gives rise to this action. All parties to this action and interested parties who are entitled to service of this Certification pursuant to Rules 5 and 73.2(c)(5) of the United States Court of International Trade are listed below:

| Party | Attorney | Date of Contact |
|-------|----------|-----------------|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

Each of these parties or interested parties has been contacted; none has objected to my access to proprietary information in this action subject to Administrative Order No. 02-01 of the United States Court of International Trade.

4.  I am

    ☑ (for attorneys) not involved in competitive decision making for the interested party I represent.

    ☐ (for consultants) independent of all parties in this action.

5.  I have read and agree to be bound by the terms of Administrative Order No. 02-01 of the United States Court of International Trade.

    _____
    [Attorney or consultant]

    1050 Connecticut Ave. NW, Suite 1100
    _____

    Washington, DC 20036
    _____

    202-861-1710
    _____
    [Address and Telephone Number]

Date: 3/15/2013

**Form 17**

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| Siemens Energy, Inc. | |
| Plaintiff, | |
| v. | Court No.   1:13-cv-00104 |
| United States | |
| Defendant. | |

### BUSINESS PROPRIETARY INFORMATION CERTIFICATION

Randolph Stayin _____ certifies that

1.   I am

☐   an attorney at the law firm of _____; or an attorney in the corporate legal department of _____, and I have read and am familiar with the Rules of the United States Court of International Trade.

☑   a consultant employed by  Baker & Hostetler LLP _____.

2.   I represent, or am retained by or on behalf of

☑   a party to this action,

☐   an interested party that has filed a motion to intervene in this action, which is identified below:

_____.

3.   I was

☐   granted access to business proprietary information subject to an administrative protective order in the administrative proceeding which gives rise to this action.

☑   not subject to an administrative protective order in the administrative proceeding which gives rise to this action.  All parties to this action and interested parties who are entitled to service of this Certification pursuant to Rules 5 and 73.2(c)(5) of the United States Court of International Trade are listed below:

Form 17-2

| Party | Attorney | Date of Contact |
|---|---|---|
| United States | Michael K. Haldenstein | 3/22/2013 |
| United States | Neal J. Reynolds | 3/22/2013 |
| Wind Tower Trade Coalition | Alan H. Price | 3/22/2013 |
| Chengxi Shipyard Co., Ltd. et al. | Francis J. Sailer | 3/22/2013 |
| Vestas- American | Elizabeth M. Hein | 3/22/2013 |
| GE Generators | Charles S. Levy | 3/22/2013 |

Each of these parties or interested parties has been contacted; none has objected to my access to proprietary information in this action subject to Administrative Order No. 02-01 of the United States Court of International Trade.

4.  I am

☐ (for attorneys) not involved in competitive decision making for the interested party I represent.

☑ (for consultants) independent of all parties in this action.

5.  I have read and agree to be bound by the terms of Administrative Order No. 02-01 of the United States Court of International Trade.

_____
[Attorney or consultant]

1050 Connecticut Ave. NW, Suite 1100
_____

Washington, DC 20036
_____

202-861-1700
_____
[Address and Telephone Number]

Date: _March 22, 2013_

## CERTIFICATE OF SERVICE

I, Jing Zhu, hereby certify that on the 26th day of March, 2013, copies of the foregoing Form 17 were served on the following parties via first-class mail:

Barbara S. Williams, Esq.
International Trade Field Office
Commercial Litigation Branch
U.S. Department of Justice
26 Federal Plaza
Room 346
New York, New York  10278

Supervising Attorney
U.S. Department of Justice
Commercial Litigation Branch
Civil Division
1100 L Street, N.W.
Washington, D.C.  20530

Lisa R. Barton, Acting Secretary
U.S. International Trade Commission
Room 112A
500 E Street, S.W.
Washington, D.C.  20436

Francis J. Sailer, Esq.
Grunfeld, Desiderio, Lebowitz,
    Silverman & Klestadt, LLP
1201 New York Avenue, N.W.
Suite 650
Washington, D.C. 20005

Alan H. Price, Esq.
Wiley Rein LLP
1776 K Street, N.W.
Washington, D.C.  20006

Elizabeth M. Hein, Esq.
Alston & Bird LLP
950 F Street, N.W.
Washington, D.C. 20004-1404

Charles S. Levy, Esq.
CASSIDY LEVY KENT (USA) LLP
2000 Pennsylvania Avenue, N.W.
Suite 3000
Washington, D.C. 20006

/s/ Jing Zhu
_____
Jing Zhu, International Trade Analyst

BAKERHOSTETLER
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Tel:  202-861-1768
Fax: 202-861-1783
jzhu@bakerlaw.com

Form 17-1

**Form 17**

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| Siemens Energy, Inc.<br><br>                        Plaintiff,<br><br>             v.<br><br>United States<br><br>                        Defendant. | Court No.        1:13-cv-104 |

### BUSINESS PROPRIETARY INFORMATION CERTIFICATION

<u>Shawnna M. Yashar</u> certifies that

1.   I am

    [✓]  an attorney at the law firm of <u>BakerHostetler LLP</u>    ; or an attorney in the corporate legal department of _____, and I have read and am familiar with the Rules of the United States Court of International Trade.

    [ ]  a consultant employed by _____.

2.   I represent, or am retained by or on behalf of

    [✓]  a party to this action,

    [ ]  an interested party that has filed a motion to intervene in this action, which is identified below:

    _____.

3.   I was

    [ ]  granted access to business proprietary information subject to an administrative protective order in the administrative proceeding which gives rise to this action.

    [✓]  not subject to an administrative protective order in the administrative proceeding which gives rise to this action. All parties to this action and interested parties who are entitled to service of this Certification pursuant to Rules 5 and 73.2(c)(5) of the United States Court of International Trade are listed below:

Form 17-2

| Party | Attorney | Date of Contact |
|---|---|---|
| U.S. Int'l Trade Comm'n | Robin Turner (on behalf of | |
| | Michael K. Haldenstein) | Aug. 13, 2014 |
| CS Wind Tech Co., Ltd., et al | Bruce M. Mitchell | Aug. 13, 2014 |
| Wind Tower Coalition | Daniel Pickard | Aug. 13, 2014 |
| | | |
| | | |

Each of these parties or interested parties has been contacted; none has objected to my access to proprietary information in this action subject to Administrative Order No. 02-01 of the United States Court of International Trade.

4.  I am

☑ (for attorneys) not involved in competitive decision making for the interested party I represent.

☐ (for consultants) independent of all parties in this action.

5.  I have read and agree to be bound by the terms of Administrative Order No. 02-01 of the United States Court of International Trade.

*Shawnna M Yashar*

[Attorney or consultant]

1050 Connecticut Ave. NW, Suite 1100

Washington, DC 20036

202-861-1518

[Address and Telephone Number]

Date: 8/13/14

Form 17

## UNITED STATES COURT OF INTERNATIONAL TRADE

SIEMENS ENERGY, INC.,

       Plaintiff,

       v.

UNITED STATES,

       Defendant.

Court No. 13-00104

RECEIVED
APR - 8 2013

## BUSINESS PROPRIETARY INFORMATION CERTIFICATION

<u>Alan H. Price</u> certifies that

1.    I am

    ☒ an attorney at the law firm of <u>Wiley Rein LLP</u>; or an attorney in the corporate legal department of _____, and I have read and am familiar with the Rules of the United States Court of International Trade.

    ☐ a consultant employed by _____.

2. I represent, or am retained by or on behalf of

    ☒ a party to this action,

    ☐ an interested party that has filed a motion to intervene in this action, which is identified below:

_____

3. I was

    ☒ granted access to business proprietary information subject to an administrative protective order in the administrative proceeding which gives rise to this action.

    ☐ not subject to an administrative protective order in the administrative proceeding which gives rise to this action. All parties to this action and interested parties who are entitled to service of this Certification pursuant to Rules 5 and 73.2(c)(5) of the United States Court of International Trade are listed below:

| Party | Attorney | Date of Contact |
|-------|----------|-----------------|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

Each of these parties or interested parties has been contacted; none has objected to my access to proprietary information in this action subject to Administrative Order No. 02-01 of the United States Court of International Trade.

4. I am

☒ (for attorneys) not involved in competitive decision making for the interested party I represent.

☐ (for consultants) independent of all parties in this action.

5. I have read and agree to be bound by the terms of Administrative Order No. 02-01 of the United States Court of International Trade.

_____
Alan H. Price

**Wiley Rein LLP**
1776 K Street, NW
Washington, DC 20006
(202) 719-3375
aprice@wileyrein.com

Date: April 2, 2013

(Added Jan. 25, 2000, eff. May 1, 2000; and amended Sept. 30, 2003, eff. Jan. 1, 2004; Feb. 6, 2013, eff. Mar. 1, 2013.)

## UNITED STATES COURT OF INTERNATIONAL TRADE

SIEMENS ENERGY, INC.,

       Plaintiff,

       v.

UNITED STATES,

       Defendant.

Court No. 13-00104

RECEIVED

APR - 8 2013

## BUSINESS PROPRIETARY INFORMATION CERTIFICATION

Daniel B. Pickard certifies that

1.   I am

    ☒ an attorney at the law firm of Wiley Rein LLP; or an attorney in the corporate legal department of _____, and I have read and am familiar with the Rules of the United States Court of International Trade.

    ☐ a consultant employed by _____.

2. I represent, or am retained by or on behalf of

    ☒ a party to this action,

    ☐ an interested party that has filed a motion to intervene in this action, which is identified below:

_____

3. I was

    ☒ granted access to business proprietary information subject to an administrative protective order in the administrative proceeding which gives rise to this action.

    ☐ not subject to an administrative protective order in the administrative proceeding which gives rise to this action. All parties to this action and interested parties who are entitled to service of this Certification pursuant to Rules 5 and 73.2(c)(5) of the United States Court of International Trade are listed below:

| Party | Attorney | Date of Contact |
|-------|----------|-----------------|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

Each of these parties or interested parties has been contacted; none has objected to my access to proprietary information in this action subject to Administrative Order No. 02-01 of the United States Court of International Trade.

4. I am

&#9746; (for attorneys) not involved in competitive decision making for the interested party I represent.

&#9744; (for consultants) independent of all parties in this action.

5. I have read and agree to be bound by the terms of Administrative Order No. 02-01 of the United States Court of International Trade.

Daniel B. Pickard

**Wiley Rein LLP**
1776 K Street, NW
Washington, DC 20006
(202) 719-7285
dpickard@wileyrein.com

Date: April 2, 2013

(Added Jan. 25, 2000, eff. May 1, 2000; and amended Sept. 30, 2003, eff. Jan. 1, 2004; Feb. 6, 2013, eff. Mar. 1, 2013.)

Form 17

## UNITED STATES COURT OF INTERNATIONAL TRADE

SIEMENS ENERGY, INC.,

        Plaintiff,

        v.

UNITED STATES,

        Defendant.

Court No. 13-00104

RECEIVED

APR 2013

## BUSINESS PROPRIETARY INFORMATION CERTIFICATION

Lori E. Scheetz certifies that

1.    I am

    ☒ an attorney at the law firm of Wiley Rein LLP; or an attorney in the corporate legal department of _____, and I have read and am familiar with the Rules of the United States Court of International Trade.

    ☐ a consultant employed by _____.

2.  I represent, or am retained by or on behalf of

    ☒ a party to this action,

    ☐ an interested party that has filed a motion to intervene in this action, which is identified below:

    _____

3. I was

    ☒ granted access to business proprietary information subject to an administrative protective order in the administrative proceeding which gives rise to this action.

    ☐ not subject to an administrative protective order in the administrative proceeding which gives rise to this action. All parties to this action and interested parties who are entitled to service of this Certification pursuant to Rules 5 and 73.2(c)(5) of the United States Court of International Trade are listed below:

**Form 17**

| Party | Attorney | Date of Contact |
|-------|----------|-----------------|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

Each of these parties or interested parties has been contacted; none has Each of these parties or interested parties has been contacted; none has objected to my access to proprietary information in this action subject to Administrative Order No. 02-01 of the United States Court of International Trade.

4. I am

&#9746; (for attorneys) not involved in competitive decision making for the interested party I represent.

&#9744; (for consultants) independent of all parties in this action.

5. I have read and agree to be bound by the terms of Administrative Order No. 02-01 of the United States Court of International Trade.

Lori E. Scheetz

**Wiley Rein LLP**
1776 K Street, NW
Washington, DC 20006
(202) 719-7419
lscheetz@wileyrein.com

Date: April 2, 2013

(Added Jan. 25, 2000, eff. May 1, 2000; and amended Sept. 30, 2003, eff. Jan. 1, 2004; Feb. 6, 2013, eff. Mar. 1, 2013) JPO 000064

## UNITED STATES COURT OF INTERNATIONAL TRADE

SIEMENS ENERGY, INC.,

        Plaintiff,

        v.

UNITED STATES,

        Defendant.

Court No. 13-00104

RECEIVED

APR – 8 2013

## BUSINESS PROPRIETARY INFORMATION CERTIFICATION

<u>Usha Neelakantan</u> certifies that

1.    I am

    ☒ an attorney at the law firm of <u>Wiley Rein LLP</u>; or an attorney in the corporate legal department of _____, and I have read and am familiar with the Rules of the United States Court of International Trade.

    ☐ a consultant employed by _____.

2. I represent, or am retained by or on behalf of

    ☒ a party to this action,

    ☐ an interested party that has filed a motion to intervene in this action, which is identified below:

_____

3. I was

    ☒ granted access to business proprietary information subject to an administrative protective order in the administrative proceeding which gives rise to this action.

    ☐ not subject to an administrative protective order in the administrative proceeding which gives rise to this action. All parties to this action and interested parties who are entitled to service of this Certification pursuant to Rules 5 and 73.2(c)(5) of the United States Court of International Trade are listed below:

| Party | Attorney | Date of Contact |
|-------|----------|-----------------|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

Each of these parties or interested parties has been contacted; none has objected to my access to proprietary information in this action subject to Administrative Order  No. 02-01 of the United States Court of International Trade.

4. I am

☒ (for attorneys) not involved in competitive decision making for the interested party I represent.

☐ (for consultants) independent of all parties in this action.

5. I have read and agree to be bound by the terms of Administrative Order No. 02-01 of the United States Court of International Trade.

*Usha Neelakantan*
Usha Neelakantan

**Wiley Rein LLP**
1776 K Street, NW
Washington, DC 20006
(202) 719-7209
uneelakantan@wileyrein.com

Date: April 2, 2013

(Added Jan. 25, 2000, eff. May 1, 2000; and amended Sept. 30, 2003, eff. Jan. 1, 2004; Feb. 6, 2013, eff. Mar. 1, 2013.)

Form 17

# UNITED STATES COURT OF INTERNATIONAL TRADE

SIEMENS ENERGY, INC.,

    Plaintiff,

    v.

UNITED STATES,

    Defendant.

Court No. 13-00104

RECEIVED
APR – 8 2013

## BUSINESS PROPRIETARY INFORMATION CERTIFICATION

Derick G. Holt certifies that

1. I am

  ☒ an attorney at the law firm of Wiley Rein LLP; or an attorney in the corporate legal department of _____, and I have read and am familiar with the Rules of the United States Court of International Trade.

  ☐ a consultant employed by _____.

2. I represent, or am retained by or on behalf of

  ☒ a party to this action,

  ☐ an interested party that has filed a motion to intervene in this action, which is identified below:

_____

3. I was

  ☒ granted access to business proprietary information subject to an administrative protective order in the administrative proceeding which gives rise to this action.

  ☐ not subject to an administrative protective order in the administrative proceeding which gives rise to this action. All parties to this action and interested parties who are entitled to service of this Certification pursuant to Rules 5 and 73.2(c)(5) of the United States Court of International Trade are listed below:

| Party | Attorney | Date of Contact |
|-------|----------|-----------------|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

Each of these parties or interested parties has been contacted; none has objected to my access to proprietary information in this action subject to Administrative Order No. 02-01 of the United States Court of International Trade.

4. I am

☒ (for attorneys) not involved in competitive decision making for the interested party I represent.

☐ (for consultants) independent of all parties in this action.

5. I have read and agree to be bound by the terms of Administrative Order No. 02-01 of the United States Court of International Trade.

_____
Derick G. Holt

**Wiley Rein LLP**
1776 K Street, NW
Washington, DC 20006
(202) 719-3524
dholt@wileyrein.com

Date: April 2, 2013

(Added Jan. 25, 2000, eff. May 1, 2000; and amended Sept. 30, 2003, eff. Jan. 1, 2004; Feb. 6, 2013, eff. Mar. 1, 2013.)

## Certificate of Service

PUBLIC SERVICE

*Siemens Energy, Inc. v. United States*
**United States Court of International Trade**
**Court No. 13-00104**

I certify that a copy of this document was served on the following parties, via first class mail, on April 2, 2013.

**On behalf of Siemens Energy, Inc.**

Elliot Jay Feldman
**Baker & Hostetler, LLP**
Washington Square, Suite 1100
1050 Connecticut Avenue, NW.
Washington, DC 20036-5304

**On behalf of the United States:**

Michael Kenneth Haldenstein
**U.S. International Trade Commission**
Office of the General Counsel
500 E Street, SW.
Washington, DC 20436

Form 17

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| SIEMENS ENERGY, INC., | |
| Plaintiff, | |
| v. | Court No. 13-00104 |
| UNITED STATES, | |
| Defendant. | |

## BUSINESS PROPRIETARY INFORMATION CERTIFICATION

<u>Robert E. DeFrancesco, III</u> certifies that

1.    I am

☒ an attorney at the law firm of <u>Wiley Rein LLP</u>; or an attorney in the corporate legal department of _____, and I have read and am familiar with the Rules of the United States Court of International Trade.

☐ a consultant employed by _____.

2. I represent, or am retained by or on behalf of

☒  a party to this action,

☐ an interested party that has filed a motion to intervene in this action, which is identified below:

_____

3. I was

☒ granted access to business proprietary information subject to an administrative protective order in the administrative proceeding which gives rise to this action.

☐ not subject to an administrative protective order in the administrative proceeding which gives rise to this action. All parties to this action and interested parties who are entitled to service of this Certification pursuant to Rules 5 and 73.2(c)(5) of the United States Court of International Trade are listed below:

| Party | Attorney | Date of Contact |
|-------|----------|-----------------|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

Each of these parties or interested parties has been contacted; none has objected to my access to proprietary information in this action subject to Administrative Order No. 02-01 of the United States Court of International Trade.

4. I am

☒ (for attorneys) not involved in competitive decision making for the interested party I represent.

☐ (for consultants) independent of all parties in this action.

5. I have read and agree to be bound by the terms of Administrative Order No. 02-01 of the United States Court of International Trade.

_____
Robert E. DeFrancesco

**Wiley Rein LLP**
1776 K Street, NW
Washington, DC 20006
(202) 719-7473
rdefrancesco@wileyrein.com

Date: April 18, 2013

(Added Jan. 25, 2000, eff. May 1, 2000; and amended Sept. 30, 2003, eff. Jan. 1, 2004; Feb. 6, 2013, eff. Mar. 1, 2013.)

Form 17-1

**Form 17**

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| Siemens Energy, Inc | |
| Plaintiff, | |
| v. | Court No.    13-00104 |
| United States | |
| Defendant. | |

### BUSINESS PROPRIETARY INFORMATION CERTIFICATION

Maureen E. Thorson _____ certifies that

1.    I am

☑    an attorney at the law firm of Wiley Rein LLP _____; or an attorney in the corporate legal department of _____, and I have read and am familiar with the Rules of the United States Court of International Trade.

☐    a consultant employed by _____.

2.    I represent, or am retained by or on behalf of

☑    a party to this action,

☐    an interested party that has filed a motion to intervene in this action, which is identified below:

_____.

3.    I was

☑    granted access to business proprietary information subject to an administrative protective order in the administrative proceeding which gives rise to this action.

☐    not subject to an administrative protective order in the administrative proceeding which gives rise to this action.  All parties to this action and interested parties who are entitled to service of this Certification pursuant to Rules 5 and 73.2(c)(5) of the United States Court of International Trade are listed below:

| Party | Attorney | Date of Contact |
|-------|----------|-----------------|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

Each of these parties or interested parties has been contacted; none has objected to my access to proprietary information in this action subject to Administrative Order No. 02-01 of the United States Court of International Trade.

4. I am

☑ (for attorneys) not involved in competitive decision making for the interested party I represent.

☐ (for consultants) independent of all parties in this action.

5. I have read and agree to be bound by the terms of Administrative Order No. 02-01 of the United States Court of International Trade.

_[signature]_
[Attorney or consultant]

1776 K Street, NW

Washington, DC 20002

(202) 719-7272
[Address and Telephone Number]

Date: 8/28/2014

# CERTIFICATE OF SERVICE

PUBLIC SERVICE

*Siemens Energy, Inc. v. United States*
**United States Court of International Trade**
**Court No. 13-00104**

I certify that a copy of this document was served on the following parties, by the court's electronic case filing (ECF) system, on August 28, 2014.

*Dirk Holt*

**On behalf of Siemens Energy, Inc.:**

Elliot J. Feldman
**Baker & Hostetler, LLP**
Washington Square, Suite 1100
1050 Connecticut Avenue, NW
Washington, DC 20036-5304

**On behalf of CS Wind Tech Co., Ltd., CS Wind Vietnam Co., Ltd., Chengxi Shipyard Co., Ltd., Titan Wind Energy (Suzhou) Co., Ltd.**

Bruce M. Mitchell
**Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP**
399 Park Avenue
25th Floor
New York, NY 10022

**On behalf of the United States:**

Michael K. Haldenstein
**U.S. International Trade Commission**
Office of the General Counsel
500 E Street, SW
Washington, DC 20436

FORM 17

# UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE: THE HONORABLE MARK A. BARNETT**

| | |
|---|---|
| _____x | |
| SIEMENS ENERGY, INC, et. al, | : |
| | : |
| Plaintiffs, | : |
| v. | : |
| | : |
| UNITED STATES, | :      Consolidated Ct. No. 13-00104 |
| | : |
| Defendant, | : |
| and | : |
| | : |
| WIND TOWER TRADE COALITION, | : |
| | : |
| Defendant-Intervenor. : |
| | : |
| _____x | |

## BUSINESS PROPRIETARY INFORMATION CERTIFICATION

Max F. Schutzman _____ certifies that:

1. I am

    _X_   an attorney at the law firm of  Grunfeld, Desiderio, Lebowitz Silverman &
          Klestadt LLP; or an attorney in the corporate legal department of
          _____, and I have read and am familiar with the
          Rules of the United States Court of International Trade.

    _____   a consultant employed by  _____.

2. I represent, or am retained by or on behalf of

    _X_   a party to this action,

    _____   an interested party that has filed a motion to intervene in this action,
          which is identified below:

    _____.

8952687_1

3. I was

    __X__  granted access to business proprietary information subject to an administrative protective order in the administrative proceeding which gives rise to this action.

    _____  not subject to an administrative protective order in the administrative proceeding which gives rise to this action. All parties to this action and interested parties who are entitled to service of this Certification pursuant to Rules 5 and 71(c)(5) of the United States Court of International Trade are listed below:

| **PARTY** | **ATTORNEY** | **DATE OF CONTACT** |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

Each of these parties or interested parties has been contacted; none has objected to my access to proprietary information in this action subject to the Appendix on Access to Business Proprietary Information Pursuant to Rule 71(c) to the Rules of the United States Court of International Trade

4. I am

    __X__  (for attorneys) not involved in competitive decision making for the interested party I represent.

    _____  (for consultants) independent of all parties in this action.

5. I have read and agree to be bound by the terms of the Appendix on Access to Business Proprietary Information Pursuant to Rule 71(c) to the Rules of the United States Court of International Trade.

                                _____/s/ Max F. Schutzman_____
                                      [Attorney or consultant]

                                GRUNFELD, DESIDERIO, LEBOWITZ, SILVERMAN & KLESTADT LLP
                                399 Park Avenue, 25th Floor
                                New York, NY 10022
                                (212) 557-4000
                                mschutzman@gdlsk.com

Date: March 26, 2014

8952687_1

CONSOLIDATED,TERMINATED

# U.S. Court of International Trade
## LIVE Database (New York)
### CIT DOCKET FOR CASE #: 1:13-cv-00107-MAB

**Titan Wind Energy (Suzhou) Co., Ltd. et al v. United States**
**Assigned to:** Mark A. Barnett
**Lead Docket:** 1:13-cv-00104-MAB
Member case: (View Member Case)

**Date Filed:** 03/18/2013
**Jury Demand:** No

**Jurisdiction:**
28USC § 1581(c) Antidumping or Countervailing Duty
Determination(s)

**Date Terminated:** 06/17/2104

**Category:**
Final Affirmative Determinations: Investigations 19USC §
1516a(a)(2)(B)(i)

**Date Reopened:**

**Does this action raise an issue of
constitutionality?:** N

**Agency:**
U.S. International Trade Commission

**Product Description:**
Utility Scale Wind Towers From China and Vietnam

**Export Country:**
(Not Applicable)
China
Viet Nam

**Plaintiff**

**Titan Wind Energy (Suzhou) Co.,
Ltd.**

represented by **Bruce M. Mitchell**
Grunfeld Desiderio Lebowitz Silverman
& Klestadt, LLP
399 Park Avenue
25th Floor
New York, NY 10022
(212) 973-7712
Fax: (212) 557-4415
Email: bmitchell@gdlsk.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
**Bar Status: ACTIVE**

**Andrew Brehm Schroth**
Grunfeld Desiderio Lebowitz Silverman
& Klestadt, LLP
No. 9 Queen's Road Central
Suite 2407
Hong Kong
S.A.R.
+852-9858-6626
Fax: +852-2137-2701
Email: aschroth@gdlsk.com
*ATTORNEY TO BE NOTICED*
*Bar Status: ACTIVE*

**Andrew Thomas Schutz**
Grunfeld Desiderio Lebowitz Silverman
& Klestadt, LLP
1201 New York Avenue, NW.
Suite 650
Washington, DC 20005
(202) 661-7795
Fax: (202) 783-0405
Email: aschutz@gdlsk.com
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**Dharmendra Narain Choudhary**
Grunfeld Desiderio Lebowitz Silverman
& Klestadt, LLP
1201 New York Avenue, NW.
Suite 650
Washington, DC 20005
(202) 661-7786
Fax: (202) 783-0405
Email: dchoudhary@gdlsk.com
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**Kavita Mohan**
Grunfeld Desiderio Lebowitz Silverman
& Klestadt, LLP
3826 Windom Place, NW
Suite 650
Washington, DC 20016
(202) 783-6881
Fax: (202) 783-0405
Email: kmohan@gdlsk.com

*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Ned Herman Marshak**
Grunfeld Desiderio Lebowitz Silverman
& Klestadt, LLP
399 Park Avenue
25th Floor
New York, NY 10022
(212) 557-4000
Fax: (212) 557-4415
Email: nmarshak@gdlsk.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Plaintiff**

**CS Wind Tech Co., Ltd.**                represented by **Bruce M. Mitchell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: ACTIVE*

**Andrew Brehm Schroth**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: ACTIVE*

**Andrew Thomas Schutz**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Dharmendra Narain Choudhary**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Kavita Mohan**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Ned Herman Marshak**
(See above for address)

*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

<u>**Plaintiff**</u>

**CS Wind Vietnam Co., Ltd.**                represented by **Bruce M. Mitchell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
***Bar Status: ACTIVE***

**Andrew Brehm Schroth**
(See above for address)
*ATTORNEY TO BE NOTICED*
***Bar Status: ACTIVE***

**Andrew Thomas Schutz**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Dharmendra Narain Choudhary**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Kavita Mohan**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

**Ned Herman Marshak**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
***Bar Status: ACTIVE***

<u>**Plaintiff**</u>

**Chengxi Shipyard Co., Ltd.**                represented by **Bruce M. Mitchell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
***Bar Status: ACTIVE***

**Andrew Brehm Schroth**
(See above for address)

*ATTORNEY TO BE NOTICED*
*Bar Status: ACTIVE*

**Andrew Thomas Schutz**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Dharmendra Narain Choudhary**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Kavita Mohan**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Ned Herman Marshak**
(See above for address)
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Defendant**

**United States**                    represented by   **Michael Kenneth Haldenstein**
U.S. International Trade Commission
Office of the General Counsel
500 E Street, SW.
Washington, DC 20436
(202) 205-3041
Fax: (202) 205-3111
Email: michael.haldenstein@usitc.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Neal Joseph Reynolds**
U.S. International Trade Commission
Office of the General Counsel
500 E Street, SW
Suite 614
Washington, DC 20436
(202) 205-3093
Fax: (202) 205-3111

Email: neal.reynolds@usitc.gov
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**Intervenor Defendant**

**Wind Tower Trade Coalition**          represented by   **Alan Hayden Price**
Wiley Rein, LLP
1776 K Street, NW.
Washington, DC 20006
(202) 719-3375
Fax: (202) 719-7049
Email: aprice@wileyrein.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**Daniel Brian Pickard**
Wiley Rein, LLP
1776 K Street, NW.
Washington, DC 20006
(202) 719-7285
Fax: (202) 719-7049
Email: dpickard@wileyrein.com
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**Derick G. Holt**
Wiley Rein, LLP
1776 K Street, NW.
Washington, DC 20006
(202) 719-7479
Fax: (202) 719-7049
Email: dholt@wileyrein.com
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*
*Bar Status: ACTIVE*

**Lori Ellen Scheetz**
Wiley Rein, LLP
1776 K Street, NW.
Washington, DC 20006
(202) 719-7419
Fax: (202) 719-7049
Email: lscheetz@wileyrein.com
*ATTORNEY TO BE NOTICED*
*ATTORNEY IN SEALED GROUP*

*Bar Status: ACTIVE*

**Robert Edward DeFrancesco , III**
Wiley Rein, LLP
1776 K Street, NW.
Washington, DC 20006
(202) 719-7473
Fax: (202) 719-7049
Email: rdefrancesco@wileyrein.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

**Usha Neelakantan**
Wiley Rein, LLP
1776 K Street, NW.
Washington, DC 20006
(202) 719-7209
Fax: (202) 719-7049
Email: uneelakantan@wileyrein.com
*ATTORNEY TO BE NOTICED*
***ATTORNEY IN SEALED GROUP***
*Bar Status: ACTIVE*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/18/2013 | 1 | Summons *on behalf of Titan Wind Energy (Suzhou) Co., Ltd., CS Wind Tech Co., Ltd., CS Wind Vietnam Co., Ltd., and Chengxi Shipyard Co., Ltd.*. Filed by Kavita Mohan of Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP on behalf of All Plaintiffs. (Mohan, Kavita) (Entered: 03/18/2013) |
| 03/18/2013 | 2 | Form 5 Information Statement . Filed by Kavita Mohan of Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP on behalf of All Plaintiffs. (Mohan, Kavita) (Entered: 03/18/2013) |
| 03/18/2013 | 3 | Form 13 Corporate Disclosure Statement . Filed by Kavita Mohan of Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP on behalf of All Plaintiffs. (Mohan, Kavita) (Entered: 03/18/2013) |
| 03/18/2013 | 4 | Form 11 Notice of Appearance *Bruce M. Mitchell, Andrew B. Schroth, Ned H. Marshak,Dharmendra Choudhary,Andrew T. Schutz,Kavita Mohan*. Filed by Kavita Mohan of Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP on behalf of All Plaintiffs.(Mohan, Kavita) (Entered: 03/18/2013) |
| 03/18/2013 | 5 | Form 17 Business Proprietary Information Certification filed on behalf of *Bruce M. Mitchell, Ned H. Marshak, Dharmendra Choudhary, Andrew T. Schutz, Kavita Mohan*. Filed by Kavita Mohan of Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP on behalf of All Plaintiffs. (Mohan, Kavita) (Entered: 03/18/2013) |
| 03/18/2013 | 6 | |

|            |    | Certificate of service (related document(s) <u>4</u> , <u>3</u> , <u>2</u> , <u>1</u> , <u>5</u> ). Filed by Kavita Mohan of Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP on behalf of All Plaintiffs. (Mohan, Kavita) (Entered: 03/18/2013) |
| 03/21/2013 | <u>7</u>  | Summons served by Clerk's Office upon Plaintiff and appropriate Government Agency/Agencies . (Benbow, Troy) (Entered: 03/21/2013) |
| 04/12/2013 | <u>8</u>  | Complaint against United States. Administrative Record due by 5/28/2013. Filed by Kavita Mohan of Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP on behalf of All Plaintiffs.(Mohan, Kavita) (Entered: 04/12/2013) |
| 04/19/2013 | <u>9</u>  | Consent Motion to Intervene as Defendant intervenor *as a Matter of Right*. Responses due by 5/8/2013. Filed by Alan Hayden Price of Wiley Rein, LLP on behalf of Wind Tower Trade Coalition.(Price, Alan) (Entered: 04/19/2013) |
| 04/19/2013 | <u>10</u> | Form 11 Notice of Appearance *of Alan H. Price, Robert E. DeFrancesco, III, Usha Neelakantan, and Derick G. Holt*. Filed by Alan Hayden Price of Wiley Rein, LLP on behalf of Wind Tower Trade Coalition.(Price, Alan) (Entered: 04/19/2013) |
| 04/19/2013 | <u>11</u> | Form 13 Corporate Disclosure Statement . Filed by Alan Hayden Price of Wiley Rein, LLP on behalf of Wind Tower Trade Coalition. (Price, Alan) (Entered: 04/19/2013) |
| 04/19/2013 | <u>12</u> | Form 17 Business Proprietary Information Certification filed on behalf of *Alan H. Price, Robert E. DeFrancesco, III, Usha Neelakantan, and Derick G. Holt*. Filed by Alan Hayden Price of Wiley Rein, LLP on behalf of Wind Tower Trade Coalition. (Price, Alan) (Entered: 04/19/2013) |
| 04/19/2013 | <u>13</u> | Certificate of service (related document(s) <u>10</u> , <u>12</u> , <u>11</u> , <u>9</u> ). Filed by Alan Hayden Price of Wiley Rein, LLP on behalf of Wind Tower Trade Coalition. (Price, Alan) (Entered: 04/19/2013) |
| 04/22/2013 | <u>14</u> | Order entered on 4/22/2013, Granting Wind Tower Trade Coalition Consent Motion to intervene as a Defendant-Intervenor (Related Doc # <u>9</u> ) (Benbow, Troy) (Entered: 04/22/2013) |
| 04/22/2013 | <u>15</u> | Form 11 Notice of Appearance *of Daniel B. Pickard and Lori E. Scheetz*. Filed by Daniel Brian Pickard of Wiley Rein, LLP on behalf of Wind Tower Trade Coalition.(Pickard, Daniel) (Entered: 04/22/2013) |
| 04/22/2013 | <u>16</u> | Form 17 Business Proprietary Information Certification filed on behalf of *Daniel B. Pickard and Lori E. Scheetz*. Filed by Daniel Brian Pickard of Wiley Rein, LLP on behalf of Wind Tower Trade Coalition. (Pickard, Daniel) (Entered: 04/22/2013) |
| 04/22/2013 | <u>17</u> | Certificate of service (related document(s) <u>16</u> , <u>15</u> ). Filed by Daniel Brian Pickard of Wiley Rein, LLP on behalf of Wind Tower Trade Coalition. (Pickard, Daniel) (Entered: 04/22/2013) |
| 04/24/2013 | <u>18</u> | Order entered on 4/24/2013 assigning action to Judge Richard K. Eaton. (Cheevers, Casey) (Entered: 04/24/2013) |
| 04/26/2013 | <u>19</u> | Letter filed by Court concerning *Rule 56.2 requirements*. (Demb, Rebecca) (Entered: 04/26/2013) |

| 04/30/2013 | 20 | Form 11 Notice of Appearance . Filed by Michael Kenneth Haldenstein of U.S. International Trade Commission on behalf of United States.(Haldenstein, Michael) (Entered: 04/30/2013) |
| 05/02/2013 | 21 | Consent Motion to consolidate case(s) 13-00104, 13-00107 with lead case 13-00104 . Responses due by 5/21/2013. Filed by Kavita Mohan of Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP on behalf of All Plaintiffs. (Mohan, Kavita) (Entered: 05/02/2013) |
| 05/03/2013 | 22 | Order entered on 5/3/2013 granting Motion to consolidate cases. This case consolidated under lead case 13-104. (Related Doc # 21 ). (Demb, Rebecca) (Entered: 05/03/2013) |
| 06/17/2014 | 23 | Order entered on 6/17/2014 Slip opinion: 14-66 Plaintiffs challenge numerous aspects of the United States International Trade Commissions affirmative determination in the final injury investigation. The court denies Plaintiffs motions for judgment on the agency record(related document(s) 22 ).(Demb, Rebecca) (Entered: 06/17/2014) |
| 06/17/2014 | 24 | Order entered on 6/17/2014 Judgment: Ordered that Plaintiffs' motions for judgment on the agency record are Denied; and it is further Ordered that judgment is entered for the Defendant. (related document(s) 23 ).(Demb, Rebecca) (Entered: 06/17/2014) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 10/21/2014 14:08:15 | | |
| **PACER Login:** bh3241 | **Client Code:** | 025661.000032 |
| **Description:** Docket Report | **Search Criteria:** | 1:13-cv-00107-MAB |
| **Billable Pages:** 7 | **Cost:** | 0.70 |

# FORM 17

## UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____x
                                         :
TITAN WIND ENERGY (SUZHOU) CO., LTD.,    :
CS WIND TECH CO., LTD., CS WIND          :
VIETNAM CO., LTD., and CHENGXI SHIPYARD  :
CO., LTD.,                               :
                                         :
                                         :        Court No. 13-00107
                      Plaintiffs,        :
                                         :
              v.                         :
                                         :
UNITED STATES,                           :
                                         :
                      Defendant.         :
_____x
```

### BUSINESS PROPRIETARY INFORMATION CERTIFICATION

Bruce M. Mitchell_____ certifies that:

1. I am

     _X_   an attorney at the law firm of  Grunfeld, Desiderio, Lebowitz Silverman &
            Klestadt LLP; or an attorney in the corporate legal department of
            _____, and I have read and am familiar with the
            Rules of the United States Court of International Trade.

     _____   a consultant employed by _____.

2. I represent, or am retained by or on behalf of

     _X_   a party to this action,

     _____   an interested party that has filed a motion to intervene in this action,
            which is identified below:

_____.

3. I was

   __X__   granted access to business proprietary information subject to an administrative protective order in the administrative proceeding which gives rise to this action.

   _____   not subject to an administrative protective order in the administrative proceeding which gives rise to this action. All parties to this action and interested parties who are entitled to service of this Certification pursuant to Rules 5 and 71(c)(5) of the United States Court of International Trade are listed below:

| PARTY | ATTORNEY | DATE OF CONTACT |
|-------|----------|-----------------|
|       |          |                 |
|       |          |                 |
|       |          |                 |
|       |          |                 |

Each of these parties or interested parties has been contacted; none has objected to my access to proprietary information in this action subject to the Appendix on Access to Business Proprietary Information Pursuant to Rule 71(c) to the Rules of the United States Court of International Trade

4. I am

   __X__   (for attorneys) not involved in competitive decision making for the interested party I represent.

   _____   (for consultants) independent of all parties in this action.

5. I have read and agree to be bound by the terms of the Appendix on Access to Business Proprietary Information Pursuant to Rule 71(c) to the Rules of the United States Court of International Trade.

                            _____/s/ Bruce M. Mitchell_____
                                  [Attorney or consultant]

                        GRUNFELD, DESIDERIO, LEBOWITZ, SILVERMAN & KLESTADT LLP
                        399 Park Avenue, 25th Floor
                        New York, NY 10022

8696651_1

(212) 557-4000
bmitchell@gdlsk.com

Date: March 18, 2013

8696651_1

**JPO 000088**

# FORM 17

# UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____x
                                            :
TITAN WIND ENERGY (SUZHOU) CO., LTD.,       :
CS WIND TECH CO., LTD., CS WIND             :
VIETNAM CO., LTD., and CHENGXI SHIPYARD     :
CO., LTD.,                                  :
                                            :
                                            :   Court No. 13-00107
                       Plaintiffs,          :
                                            :
                                            :
             v.                             :
                                            :
UNITED STATES,                              :
                                            :
                       Defendant.           :
_____x
```

## BUSINESS PROPRIETARY INFORMATION CERTIFICATION

Ned H. Marshak_____ certifies that:

1. I am

     _X_ an attorney at the law firm of  Grunfeld, Desiderio, Lebowitz Silverman &
Klestadt LLP; or an attorney in the corporate legal department of
_____, and I have read and am familiar with the
Rules of the United States Court of International Trade.

     _____ a consultant employed by _____.

2. I represent, or am retained by or on behalf of

     _X_ a party to this action,

     _____ an interested party that has filed a motion to intervene in this action,
which is identified below:

8696651_1

**JPO 000089**

_____.

3. I was

   __X__   granted access to business proprietary information subject to an administrative protective order in the administrative proceeding which gives rise to this action.

   _____   not subject to an administrative protective order in the administrative proceeding which gives rise to this action. All parties to this action and interested parties who are entitled to service of this Certification pursuant to Rules 5 and 71(c)(5) of the United States Court of International Trade are listed below:

| PARTY | ATTORNEY | DATE OF CONTACT |
|-------|----------|-----------------|
|       |          |                 |
|       |          |                 |
|       |          |                 |
|       |          |                 |

Each of these parties or interested parties has been contacted; none has objected to my access to proprietary information in this action subject to the Appendix on Access to Business Proprietary Information Pursuant to Rule 71(c) to the Rules of the United States Court of International Trade

4. I am

   __X__   (for attorneys) not involved in competitive decision making for the interested party I represent.

   _____   (for consultants) independent of all parties in this action.

5. I have read and agree to be bound by the terms of the Appendix on Access to Business Proprietary Information Pursuant to Rule 71(c) to the Rules of the United States Court of International Trade.

   _/s/ Ned H. Marshak_
    [Attorney or consultant]

GRUNFELD, DESIDERIO, LEBOWITZ, SILVERMAN & KLESTADT LLP
399 Park Avenue, 25th Floor
New York, NY 10022

8696651_1

(212) 557-4000
NMarshak@GDLSK.COM

Date: March 18, 2013

# FORM 17

## UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____x
                                         :
TITAN WIND ENERGY (SUZHOU) CO., LTD.,    :
CS WIND TECH CO., LTD., CS WIND          :
VIETNAM CO., LTD., and CHENGXI SHIPYARD  :
CO., LTD.,                               :
                                         :
                                         :     Court No. 13-00107
                    Plaintiffs,          :
                                         :
          v.                             :
                                         :
UNITED STATES,                           :
                                         :
                    Defendant.           :
_____x
```

## BUSINESS PROPRIETARY INFORMATION CERTIFICATION

Dharmendra Choudhary _____ certifies that:

1. I am

    __X__   an attorney at the law firm of  Grunfeld, Desiderio, Lebowitz Silverman & Klestadt LLP; or an attorney in the corporate legal department of _____, and I have read and am familiar with the Rules of the United States Court of International Trade.

    _____   a consultant employed by _____.

2. I represent, or am retained by or on behalf of

    __X__   a party to this action,

    _____   an interested party that has filed a motion to intervene in this action,

which is identified below:

_____.

3. I was

    __X__   granted access to business proprietary information subject to an administrative protective order in the administrative proceeding which gives rise to this action.

    _____  not subject to an administrative protective order in the administrative proceeding which gives rise to this action. All parties to this action and interested parties who are entitled to service of this Certification pursuant to Rules 5 and 71(c)(5) of the United States Court of International Trade are listed below:

| PARTY | ATTORNEY | DATE OF CONTACT |
|-------|----------|------------------|
|       |          |                  |
|       |          |                  |
|       |          |                  |
|       |          |                  |

Each of these parties or interested parties has been contacted; none has objected to my access to proprietary information in this action subject to the Appendix on Access to Business Proprietary Information Pursuant to Rule 71(c) to the Rules of the United States Court of International Trade

4. I am

    __X__   (for attorneys) not involved in competitive decision making for the interested party I represent.

    _____  (for consultants) independent of all parties in this action.

5. I have read and agree to be bound by the terms of the Appendix on Access to Business Proprietary Information Pursuant to Rule 71(c) to the Rules of the United States Court of International Trade.

                       /s/ Dharmendra Choudhary
                         [Attorney or consultant]

8696651_1

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
1201 New York Avenue, NW, Suite 650
Washington D.C. 20005
(202) 783-6881
dchoudhary@gdlsk.com

Date: March 18, 2013

# FORM 17

# UNITED STATES COURT OF INTERNATIONAL TRADE

_____x
:
TITAN WIND ENERGY (SUZHOU) CO., LTD.,    :
CS WIND TECH CO., LTD., CS WIND    :
VIETNAM CO., LTD., and CHENGXI SHIPYARD    :
CO., LTD.,    :
:
:    Court No. 13-00107
        Plaintiffs,    :
:
     v.    :
:
UNITED STATES,    :
:
        Defendant.    :
_____x

## BUSINESS PROPRIETARY INFORMATION CERTIFICATION

Andrew T. Schutz _____ certifies that:

1. I am

    __X__    an attorney at the law firm of  Grunfeld, Desiderio, Lebowitz Silverman &
                Klestadt LLP; or an attorney in the corporate legal department of
                _____, and I have read and am familiar with the
                Rules of the United States Court of International Trade.

    _____    a consultant employed by  _____.

2. I represent, or am retained by or on behalf of

    __X__    a party to this action,

    _____    an interested party that has filed a motion to intervene in this action,
                which is identified below:

8696651_1

_____.

3. I was

    **X**    granted access to business proprietary information subject to an administrative protective order in the administrative proceeding which gives rise to this action.

\_\_\_\_ not subject to an administrative protective order in the administrative proceeding which gives rise to this action. All parties to this action and interested parties who are entitled to service of this Certification pursuant to Rules 5 and 71(c)(5) of the United States Court of International Trade are listed below:

| **PARTY** | **ATTORNEY** | **DATE OF CONTACT** |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

Each of these parties or interested parties has been contacted; none has objected to my access to proprietary information in this action subject to the Appendix on Access to Business Proprietary Information Pursuant to Rule 71(c) to the Rules of the United States Court of International Trade

4. I am

    **X**    (for attorneys) not involved in competitive decision making for the interested party I represent.

\_\_\_\_ (for consultants) independent of all parties in this action.

5. I have read and agree to be bound by the terms of the Appendix on Access to Business Proprietary Information Pursuant to Rule 71(c) to the Rules of the United States Court of International Trade.

             _/s/ Andrew T. Schutz_
              [Attorney or consultant]

           GRUNFELD, DESIDERIO, LEBOWITZ,
           SILVERMAN & KLESTADT LLP

8696651_1

1201 New York Avenue, NW, Suite 650
Washington D.C. 20005
(202) 783-6881
aschutz@gdlsk.com

Date: March 18, 2013

# FORM 17

## UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____x
                                             :
TITAN WIND ENERGY (SUZHOU) CO., LTD.,        :
CS WIND TECH CO., LTD., CS WIND              :
VIETNAM CO., LTD., and CHENGXI SHIPYARD      :
CO., LTD.,                                   :
                                             :
                                             :     Court No. 13-00107
                         Plaintiffs,         :
                                             :
              v.                             :
                                             :
UNITED STATES,                               :
                                             :
                         Defendant.          :
_____x
```

### BUSINESS PROPRIETARY INFORMATION CERTIFICATION

<u>Kavita Mohan</u>_____ certifies that:

1. I am

   <u> X  </u>   an attorney at the law firm of  <u>Grunfeld, Desiderio, Lebowitz Silverman &</u> <u>Klestadt LLP</u>; or an attorney in the corporate legal department of _____, and I have read and am familiar with the Rules of the United States Court of International Trade.

   _____   a consultant employed by _____.

2. I represent, or am retained by or on behalf of

   <u> X  </u>   a party to this action,

   _____   an interested party that has filed a motion to intervene in this action, which is identified below:

8696651_1

_____.

3. I was

   **X**    granted access to business proprietary information subject to an administrative protective order in the administrative proceeding which gives rise to this action.

_____ not subject to an administrative protective order in the administrative proceeding which gives rise to this action. All parties to this action and interested parties who are entitled to service of this Certification pursuant to Rules 5 and 71(c)(5) of the United States Court of International Trade are listed below:

| PARTY | ATTORNEY | DATE OF CONTACT |
|-------|----------|-----------------|
|       |          |                 |
|       |          |                 |
|       |          |                 |
|       |          |                 |

Each of these parties or interested parties has been contacted; none has objected to my access to proprietary information in this action subject to the Appendix on Access to Business Proprietary Information Pursuant to Rule 71(c) to the Rules of the United States Court of International Trade

4. I am

   **X**    (for attorneys) not involved in competitive decision making for the interested party I represent.

_____ (for consultants) independent of all parties in this action.

5. I have read and agree to be bound by the terms of the Appendix on Access to Business Proprietary Information Pursuant to Rule 71(c) to the Rules of the United States Court of International Trade.

        /s/ Kavita Mohan
        [Attorney or consultant]

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
1201 New York Avenue, NW, Suite 650

8696651_1

Washington D.C. 20005
(202) 783-6881
kmohan@gdlsk.com

Date: March 18, 2013

8696651_1

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| TITAN WIND ENERGY (SUZHOU) CO., LTD., *et al.*,<br><br>               Plaintiff,<br><br>               v.<br><br>UNITED STATES,<br><br>               Defendant. | Court No. 13-00107 |

### BUSINESS PROPRIETARY INFORMATION CERTIFICATION

<u>Alan H. Price</u> certifies that

1.    I am

    ☒ an attorney at the law firm of <u>Wiley Rein LLP</u>; or an attorney in the corporate legal department of _____, and I have read and am familiar with the Rules of the United States Court of International Trade.

    ☐ a consultant employed by _____.

2. I represent, or am retained by or on behalf of

    ☐ a party to this action,

    ☒ an interested party that has filed a motion to intervene in this action, which is identified below:

    <u>The Wind Tower Trade Coalition.</u>

3. I was

    ☒ granted access to business proprietary information subject to an administrative protective order in the administrative proceeding which gives rise to this action.

    ☐ not subject to an administrative protective order in the administrative proceeding which gives rise to this action. All parties to this action and interested parties who are entitled to service of this Certification pursuant to Rules 5 and 73.2(c)(5) of the United States Court of International Trade are listed below:

| Party | Attorney | Date of Contact |
|-------|----------|-----------------|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

Each of these parties or interested parties has been contacted; none has objected to my access to proprietary information in this action subject to Administrative Order No. 02-01 of the United States Court of International Trade.

4. I am

☒ (for attorneys) not involved in competitive decision making for the interested party I represent.

☐ (for consultants) independent of all parties in this action.

5. I have read and agree to be bound by the terms of Administrative Order No. 02-01 of the United States Court of International Trade.

_____
Alan H. Price

**Wiley Rein LLP**
1776 K Street, NW
Washington, DC 20006
(202) 719-3375
aprice@wileyrein.com

Date: April 19, 2013

(Added Jan. 25, 2000, eff. May 1, 2000; and amended Sept. 30, 2003, eff. Jan. 1, 2004; Feb. 6, 2013, eff. Mar. 1, 2013.)

<div align="right">Form 17</div>

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| TITAN WIND ENERGY (SUZHOU) CO., LTD., *et al.*,<br><br>         Plaintiff,<br><br>         v.<br><br>UNITED STATES,<br><br>         Defendant. | Court No. 13-00107 |

### BUSINESS PROPRIETARY INFORMATION CERTIFICATION

<u>Robert E. DeFrancesco, III</u> certifies that

1.     I am

    ☒ an attorney at the law firm of <u>Wiley Rein LLP</u>; or an attorney in the corporate legal department of _____, and I have read and am familiar with the Rules of the United States Court of International Trade.

    ☐ a consultant employed by _____.

2. I represent, or am retained by or on behalf of

    ☐ a party to this action,

    ☒ an interested party that has filed a motion to intervene in this action, which is identified below:

    <u>The Wind Tower Trade Coalition.</u>

3. I was

    ☒ granted access to business proprietary information subject to an administrative protective order in the administrative proceeding which gives rise to this action.

    ☐ not subject to an administrative protective order in the administrative proceeding which gives rise to this action. All parties to this action and interested parties who are entitled to service of this Certification pursuant to Rules 5 and 73.2(c)(5) of the United States Court of International Trade are listed below:

| Party | Attorney | Date of Contact |
|-------|----------|-----------------|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

Each of these parties or interested parties has been contacted; none has objected to my access to proprietary information in this action subject to Administrative Order No. 02-01 of the United States Court of International Trade.

4. I am

☒ (for attorneys) not involved in competitive decision making for the interested party I represent.

☐ (for consultants) independent of all parties in this action.

5. I have read and agree to be bound by the terms of Administrative Order No. 02-01 of the United States Court of International Trade.

_____
Robert E. DeFrancesco

**Wiley Rein LLP**
1776 K Street, NW
Washington, DC 20006
(202) 719-7473
rdefrancesco@wileyrein.com

Date: April 19, 2013

(Added Jan. 25, 2000, eff. May 1, 2000; and amended Sept. 30, 2003, eff. Jan. 1, 2004; Feb. 6, 2013, eff. Mar. 1, 2013.)

## UNITED STATES COURT OF INTERNATIONAL TRADE

TITAN WIND ENERGY (SUZHOU) CO.,
LTD., *et al.*,

              Plaintiff,

          v.

UNITED STATES,

              Defendant.

Court No. 13-00107

## BUSINESS PROPRIETARY INFORMATION CERTIFICATION

<u>Usha Neelakantan</u> certifies that

1.     I am

      ☒ an attorney at the law firm of <u>Wiley Rein LLP</u>; or an attorney in the corporate legal department of _____, and I have read and am familiar with the Rules of the United States Court of International Trade.

      ☐ a consultant employed by _____.

2. I represent, or am retained by or on behalf of

      ☐ a party to this action,

      ☒ an interested party that has filed a motion to intervene in this action, which is identified below:

      <u>The Wind Tower Trade Coalition.</u>

3. I was

      ☒ granted access to business proprietary information subject to an administrative protective order in the administrative proceeding which gives rise to this action.

      ☐ not subject to an administrative protective order in the administrative proceeding which gives rise to this action. All parties to this action and interested parties who are entitled to service of this Certification pursuant to Rules 5 and 73.2(c)(5) of the United States Court of International Trade are listed below:

| Party | Attorney | Date of Contact |
|-------|----------|-----------------|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

Each of these parties or interested parties has been contacted; none has objected to my access to proprietary information in this action subject to Administrative Order No. 02-01 of the United States Court of International Trade.

4. I am

☒ (for attorneys) not involved in competitive decision making for the interested party I represent.

☐ (for consultants) independent of all parties in this action.

5. I have read and agree to be bound by the terms of Administrative Order No. 02-01 of the United States Court of International Trade.


_____
Usha Neelakantan

**Wiley Rein LLP**
1776 K Street, NW
Washington, DC 20006
(202) 719-7209
uneelakantan@wileyrein.com

Date: April 19, 2013


(Added Jan. 25, 2000, eff. May 1, 2000; and amended Sept. 30, 2003, eff. Jan. 1, 2004; Feb. 6, 2013, eff. Mar. 1, 2013.)

## UNITED STATES COURT OF INTERNATIONAL TRADE

TITAN WIND ENERGY (SUZHOU) CO., LTD., *et al.*,

                Plaintiff,

                v.

UNITED STATES,

                Defendant.

Court No. 13-00107

### BUSINESS PROPRIETARY INFORMATION CERTIFICATION

<u>Derick G. Holt</u> certifies that

1.    I am

    ☒ an attorney at the law firm of <u>Wiley Rein LLP</u>; or an attorney in the corporate legal department of _____, and I have read and am familiar with the Rules of the United States Court of International Trade.

    ☐ a consultant employed by _____.

2. I represent, or am retained by or on behalf of

    ☐ a party to this action,

    ☒ an interested party that has filed a motion to intervene in this action, which is identified below:

    <u>The Wind Tower Trade Coalition.</u>

3. I was

    ☒ granted access to business proprietary information subject to an administrative protective order in the administrative proceeding which gives rise to this action.

    ☐ not subject to an administrative protective order in the administrative proceeding which gives rise to this action. All parties to this action and interested parties who are entitled to service of this Certification pursuant to Rules 5 and 73.2(c)(5) of the United States Court of International Trade are listed below:

| Party | Attorney | Date of Contact |
|-------|----------|-----------------|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

Each of these parties or interested parties has been contacted; none has objected to my access to proprietary information in this action subject to Administrative Order  No. 02-01 of the United States Court of International Trade.

4. I am

☒ (for attorneys) not involved in competitive decision making for the interested party I represent.

☐ (for consultants) independent of all parties in this action.

5. I have read and agree to be bound by the terms of Administrative Order No. 02-01 of the United States Court of International Trade.

_____
Derick G. Holt

**Wiley Rein LLP**
1776 K Street, NW
Washington, DC 20006
(202) 719-3524
dholt@wileyrein.com

Date: April 19, 2013

(Added Jan. 25, 2000, eff. May 1, 2000; and amended Sept. 30, 2003, eff. Jan. 1, 2004; Feb. 6, 2013, eff. Mar. 1, 2013.)

Form 17

## UNITED STATES COURT OF INTERNATIONAL TRADE

TITAN WIND ENERGY (SUZHOU) CO.,
LTD., *et al.*,

      Plaintiffs,

      v.

UNITED STATES,

      Defendant.

Court No. 13-00107

## BUSINESS PROPRIETARY INFORMATION CERTIFICATION

<u>Daniel B. Pickard</u> certifies that

1.  I am

   ☒ an attorney at the law firm of <u>Wiley Rein LLP</u>; or an attorney in the
corporate legal department of _____, and I have
read and am familiar with the Rules of the United States Court of
International Trade.

   ☐ a consultant employed by _____.

2. I represent, or am retained by or on behalf of

   ☒ a party to this action,

   ☐ an interested party that has filed a motion to intervene in this action,
which is identified below:

   _____.

3. I was

   ☒ granted access to business proprietary information subject to an
administrative protective order in the administrative proceeding which
gives rise to this action.

   ☐ not subject to an administrative protective order in the administrative
proceeding which gives rise to this action. All parties to this action and
interested parties who are entitled to service of this Certification pursuant
to Rules 5 and 73.2(c)(5) of the United States Court of International Trade
are listed below:

Form 17

| Party | Attorney | Date of Contact |
|-------|----------|-----------------|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

Each of these parties or interested parties has been contacted; none has objected to my access to proprietary information in this action subject to Administrative Order No. 02-01 of the United States Court of International Trade.

4. I am

☒ (for attorneys) not involved in competitive decision making for the interested party I represent.

☐ (for consultants) independent of all parties in this action.

5. I have read and agree to be bound by the terms of Administrative Order No. 02-01 of the United States Court of International Trade.

Daniel B. Pickard

**Wiley Rein LLP**
1776 K Street, NW
Washington, DC 20006
(202) 719-7285
dpickard@wileyrein.com

Date: April 22, 2013

(Added Jan. 25, 2000, eff. May 1, 2000; and amended Sept. 30, 2003, eff. Jan. 1, 2004; Feb. 6, 2013, eff. Mar. 1, 2013).

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| TITAN WIND ENERGY (SUZHOU) CO., LTD., *et al.*, | |
| Plaintiffs, | Court No. 13-00107 |
| v. | |
| UNITED STATES, | |
| Defendant. | |

## BUSINESS PROPRIETARY INFORMATION CERTIFICATION

<u>Lori E. Scheetz</u> certifies that

1.     I am

☒ an attorney at the law firm of <u>Wiley Rein LLP;</u> or an attorney in the corporate legal department of _____, and I have read and am familiar with the Rules of the United States Court of International Trade.

☐ a consultant employed by _____.

2. I represent, or am retained by or on behalf of

☒  a party to this action,

☐ an interested party that has filed a motion to intervene in this action, which is identified below:

_____.

3. I was

☒  granted access to business proprietary information subject to an administrative protective order in the administrative proceeding which gives rise to this action.

☐ not subject to an administrative protective order in the administrative proceeding which gives rise to this action. All parties to this action and interested parties who are entitled to service of this Certification pursuant to Rules 5 and 73.2(c)(5) of the United States Court of International Trade are listed below:

| Party | Attorney | Date of Contact |
|-------|----------|-----------------|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

Each of these parties or interested parties has been contacted; none has Each of these parties or interested parties has been contacted; none has objected to my access to proprietary information in this action subject to Administrative Order No. 02-01 of the United States Court of International Trade.

4. I am

&#9746; (for attorneys) not involved in competitive decision making for the interested party I represent.

&#9744; (for consultants) independent of all parties in this action.

5. I have read and agree to be bound by the terms of Administrative Order No. 02-01 of the United States Court of International Trade.

_____
Lori E. Scheetz

**Wiley Rein LLP**
1776 K Street, NW
Washington, DC 20006
(202) 719-7419
lscheetz@wileyrein.com

Date: April 22, 2013

(Added Jan. 25, 2000, eff. May 1, 2000; and amended Sept. 30, 2003, eff. Jan. 1, 2004; Feb. 6, 2013, eff. Mar. 1, 2013.)

Slip Op. 14- 66

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| SIEMENS ENERGY, INC., *et al.*, | : | |
| Plaintiffs, | : | |
| v. | : | **PUBLIC VERSION**<br>Before: Mark A. Barnett, Judge |
| UNITED STATES, | : | |
| Defendant, | : | Consol. Court No. 13-00104 |
| and | : | |
| WIND TOWER TRADE COALITION, | : | |
| Defendant-Intervenor. | : | |

## OPINION

[Plaintiffs challenge numerous aspects of the United States International Trade Commission's affirmative determination in the final injury investigation. The court denies Plaintiffs' motions for judgment on the agency record.]

Dated:     6/17/2014

Elliot J. Feldman, Baker Hostetler, of Washington, DC, argued for plaintiff Siemens Energy, Inc. With him on the brief was Michael S. Snarr.

Ned H. Marshak, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, DC, argued for plaintiffs Titan Wind Energy (Suzhou) Co., Ltd., CS Wind Tech Co., Ltd., CS Wind Vietnam Co. Ltd., and Chengxi Shipyard Co., Ltd. With him on the brief were Bruce M. Mitchell, Max F. Schutzman, Andrew B. Schroth, Andrew T. Schutz, and Kavita Mohan.

Michael K. Haldenstein, Attorney, Office of the General Counsel, U.S. International Trade Commission, of Washington, DC, argued for defendant. With him on the brief

were <u>Dominic L. Bianchi</u>, General Counsel, and <u>Neal J. Reynolds</u>, Assistant General Counsel for Litigation.

<u>Daniel B. Pickard</u>, Wiley Rein LLP, of Washington, DC, argued for defendant-intervenor. With him on the brief were <u>Alan H. Price</u>, <u>Robert E. DeFrancesco, III</u>, and <u>Usha Neelakantan</u>.

      Barnett, Judge:  Plaintiffs, Siemens Energy, Inc. ("Siemens"), Titan Wind Energy (Suzhou), CS Wind Tech, CS Wind Vietnam, and Chengxi Shipyard (collectively, "Titan"), move, pursuant to USCIT R. 56.2, for judgment on the agency record, challenging the United States International Trade Commission's ("Commission" or "ITC") affirmative determination in the final injury investigations in antidumping and countervailing duty investigations concerning utility scale wind towers ("wind towers") from the People's Republic of China ("China") and in an antidumping investigation of wind towers from the Socialist Republic of Vietnam ("Vietnam") published in *Utility Scale Wind Towers from China and Vietnam*, 78 Fed. Reg. 10,210 (ITC Feb. 13, 2013) ("*Final Determination*"), and the accompanying memorandum, *Utility Scale Wind Towers from China and Vietnam*, USITC Pub. 4372, Inv. Nos. 701-TA-486 and 731-TA-1195-1196 (Final) (Feb. 2013) ("*Views of the Commission*" or "*Views*").[1]  For the reasons stated below, the court denies Siemens' and Titan's motion.

---

[1] All citations to the *Views of the Commission* are to the confidential version of the document.  All six Commissioners joined in sections I-VI of the *Views.* Section VII of the *Views* ("Material Injury By Reason of Subject Imports") represents the views of Chairman Williamson and Commissioner Aranoff.  Commissioner Pinkert issued a separate threat of injury determination, which will be cited hereafter as "*Pinkert Views.*"

## BACKGROUND AND PROCEDURAL HISTORY

On December 29, 2011, the Wind Tower Trade Coalition[2] filed petitions with the United States Department of Commerce ("Commerce") and the Commission, seeking the imposition of antidumping and countervailing duties on wind towers imported from China and antidumping duties on wind towers from Vietnam. Commerce issued notices initiating investigations on January 24, 2012. *See Utility Scale Wind Towers from the People's Republic of China and the Socialist Republic of Vietnam*, 77 Fed. Reg. 3440 (Dep't Commerce Jan. 24, 2012) (initiation of antidumping duty investigations); *Utility Scale Wind Towers from the People's Republic of China*, 77 Fed. Reg. 3447 (Dep't Commerce Jan. 24, 2012) (initiation of countervailing duty investigation). Following a preliminary investigation, the Commission issued a preliminary determination on February 13, 2012, voting in a 5-0 decision that there was a reasonable indication that an industry in the United States was threatened with material injury by imports of wind towers from China and Vietnam. *Utility Scale Wind Towers from China and Vietnam*, 77 Fed. Reg. 9700 (ITC Feb. 17, 2012) (preliminary determination).

In the final investigation, the Commission relied on data from certified questionnaire responses from foreign producers of subject imports and from U.S. importers and domestic producers of the like product. The period of investigation

---

[2] The Wind Tower Trade Coalition consists of four domestic producers, Broadwind Towers, Inc.; DMI Industries; Katana Summit LLC; and Trinity Structural Towers, Inc.

("POI") spanned 2009 through the first six months of 2012 ("interim 2012"). *Views* at 9 n.30. Six domestic producers submitted questionnaire responses, accounting for the vast majority of U.S. shipments of wind towers during 2011.[3] Five Chinese and two Vietnamese producers submitted questionnaire responses, providing data for almost all subject imports during the POI.[4] Eleven U.S. importers submitted questionnaire responses, representing over 95 percent of subject imports during the POI.[5]

Relying on this data, the Commission reached a divided final determination. Four Commissioners found "no material injury," and two Commissioners made affirmative determinations on the basis of "material injury." Three Commissioners found "no threat of material injury," and one made an affirmative determination on the basis of "threat of material injury."[6] Combined, the two affirmative determinations based on material injury, by Chairman Williamson and Commissioner Aranoff, and the one affirmative determination based on threat of material injury, by Commissioner Pinkert, resulted in a final affirmative determination that the domestic industry was materially injured or threatened with material injury by reason of Chinese and Vietnamese imports of wind towers.

---

[3] The six domestic producers accounted for more than [[    ]] percent of U.S. shipments during 2011. *Views* at 4 (citing *Confidential Staff Report*, INV-LL-002 (Jan. 7, 2013) (revised by INV-LL-006, Jan. 11, 2013) ("*Staff Report*") at III-1 n.1).
[4] *Views* at 4 (citing *Staff Report* at VII-5, VII-11).
[5] *Views* at 4 (citing *Staff Report* at IV-1).
[6] The two Commissioners who made affirmative determinations on the basis of material injury did not make a threat of material injury determination.

The Commission defined wind towers as "large tubular steel towers that are part of wind turbines." *Views* at 6.  It elaborated:

> Wind turbines convert the mechanical energy of wind to electrical energy and are comprised of three main components – the nacelle, rotor, and tower.  The nacelle houses the wind turbine's main power generation components (the gearbox, generator, and other components), while the rotor typically consists of three blades and the hub.  The nacelle sits on top of the wind tower. . . . [W]ind towers within the scope of these investigations are 50 meters or more in height and designed to support the nacelle and rotor blades in a wind turbine with a minimum rated electrical power generation capacity in excess of 100 kilowatts.[7]

---

[7] Commerce defined the scope of the imported merchandise under investigation in further detail, as including:

> [C]ertain wind towers, whether or not tapered, and sections thereof. Certain wind towers are designed to support the nacelle and rotor blades in a wind turbine with a minimum rated electrical power generation capacity in excess of 100 kilowatts ("kW") and with a minimum height of 50 meters measured from the base of the tower to the bottom of the nacelle (i.e., where the top of the tower and nacelle are joined) when fully assembled.

> A wind tower section consists of, at a minimum, multiple steel plates rolled into cylindrical or conical shapes and welded together (or otherwise attached) to form a steel shell, regardless of coating, end-finish, painting, treatment, or method of manufacture, and with or without flanges, doors, or internal or external components (e.g., flooring/decking, ladders, lifts, electrical buss boxes, electrical cabling, conduit, cable harness for nacelle generator, interior lighting, tool and storage lockers) attached to the wind tower section. Several wind tower sections are normally required to form a completed wind tower.

> Wind towers and sections thereof are included within the scope whether or not they are joined with nonsubject merchandise, such as nacelles or rotor blades, and whether or not they have internal or external components attached to the subject merchandise.

> Specifically excluded from the scope are nacelles and rotor blades, regardless of whether they are attached to the wind tower. Also excluded

*Views* at 6 (citing *Staff Report* at I-8 to I-9).  Despite limited interchangeability between wind towers manufactured to different original equipment manufacturers' ("OEMs") specifications, the Commission found that wind towers within the scope of the investigation constituted a single domestic like product because they shared common physical characteristics and uses, channels of distribution, manufacturing facilities, production processes and employees, and producer and customer perceptions.  *Views* at 7-8.  The Commission further determined that subject imports compete with each other and the domestic like product.  *Views* at 11-14.

Against this backdrop, two Commissioners made affirmative determinations that subject imports had materially injured the domestic industry.  They found that the volume and increase in volume of Chinese and Vietnamese wind towers were significant in absolute terms and relative to domestic consumption and production.  *Views* at 27-30.  They further decided that these imports suppressed prices in the domestic market, despite the absence of underselling and price depression on a total delivered price basis.  *Views* at 30-35.  They thus determined that the subject imports' high volumes and price effects had an adverse impact on the domestic industry over the POI, and particularly during interim 2012.  *Views* at 35-42.  They concluded:

_____

are any internal or external components which are not attached to the wind
towers or sections thereof.

*Views* at 5-6 (citing *Utility Scale Wind Towers from the People's Republic of China*, 77 Fed. Reg. 75,978 (Dep't Commerce Dec. 26, 2012); 77 Fed. Reg. 75,985 (Dep't Commerce Dec. 26, 2012); 77 Fed. Reg. 75,993-94 (Dep't Commerce Dec. 26, 2012)).

The increasing volumes of subject imports resulted in reduced growth in sales volumes and U.S. shipments and suppressed domestic price increases despite a robust growth in demand at the end of the period. Their effects have also included lower rates of capacity utilization, as well as declining market share and financial losses. . . .

[Therefore,] we conclude that there is a causal nexus between the subject imports and the poor performance of the domestic industry. Consequently, we find that the domestic industry is materially injured by reason of subject imports.

*Views* at 42.

A third Commissioner made an affirmative determination on the basis that the subject imports posed an imminent threat of material injury to the domestic wind tower industry. Weighing the statutory factors for finding threat, 19 U.S.C. § 1677(7)(F), he found, *inter alia*, that the subject imports competed in all major regions of the United States; Chinese and Vietnamese producers could accelerate production and delivery; subject import prices were trending downward; China had inventories of undelivered product; and subject import volume was significant and would likely increase significantly. *Pinkert Views* at 3-8. He found that demand for wind towers would soon moderate, such that "in the near future, it should take a much smaller volume of subject imports to constitute a significant share of the market than it took" during the POI. *Pinkert Views* at 6. He thus concluded that subject imports were likely to have an adverse impact on the domestic industry in the imminent future. *Pinkert Views* at 7-8. The two affirmative determinations based on material injury, combined with the third affirmative determination based on threat of material injury, resulted in a final affirmative injury determination.

Plaintiffs now challenge this *Final Determination* on several grounds.  (*See generally* Siemens Energy, Inc.'s Rule 56.2 Motion for Judgment on the Agency Record ("Siemens Mot."); Memorandum of Law in Support of Plaintiffs' Rule 56.2 Motion for Judgment Upon the Agency Record ("Titan Mot.").)  First, Siemens argues that the court should not defer to the Commission's affirmative determination because the determination did not arise from a majority vote for either material injury or threat of material injury.  (Siemens Mot. 14-18.)  Second, Titan and Siemens contest the material injury determination, alleging that the Commission improperly found that (1) the volume of subject imports displaced a significant volume of domestic wind towers; (2) competition from subject imports suppressed domestic wind tower prices; and (3) subject imports adversely impacted the domestic industry.  (*See generally* Siemens Mot.; Titan Mot.)  Third, they challenge Commissioner Pinkert's threat of material injury determination, alleging that he improperly found that the subject imports posed an imminent threat of material injury to the domestic wind tower industry.  (*See generally* Siemens Mot.; Titan Mot.)  The court has subject matter jurisdiction pursuant to 28 U.S.C. § 1581(c).

## STANDARD OF REVIEW

An ITC determination is "presumed to be correct," and the burden of proving otherwise rests upon the challenging party.  28 U.S.C. § 2639(a)(1).  The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).

Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). It requires "'more than a mere scintilla,'" but "'less than the weight of the evidence.'" *Nucor Corp. v. United States*, 34 CIT __, __, 675 F. Supp. 2d 1340, 1345 (2010) (quoting *Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004)). In determining whether substantial evidence supports the Commission's determination, the court must consider "the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)). The Commission need not address every piece of evidence presented by the parties; absent a showing to the contrary, the court presumes that the Commission has considered all of the record evidence. *Aluminum Extrusions Fair Trade Comm. v. United States*, 36 CIT __, __, 2012 WL 5201218, at *2 (2012) (citing *USEC Inc. v. United States*, 34 F. App'x 725, 731 (Fed. Cir. 2002)).

That a plaintiff can point to evidence that detracts from the agency's conclusion or that there is a possibility of drawing two inconsistent conclusions from the evidence does not preclude the agency's finding from being supported by substantial evidence. *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933, 936 (Fed. Cir. 1984) (citing *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 619-20 (1966); *Armstrong Bros. Tool Co. v. United States*, 626 F.2d 168, 170 n.4 (C.C.P.A. 1980)).

Moreover, "when adequate evidence exists on both sides of an issue, assigning

evidentiary weight falls exclusively within the authority of the Commission." *Nippon*

*Steel Corp. v. United States*, 458 F.3d 1345, 1358 (Fed. Cir. 2006). The court may not

"'even as to matters not requiring expertise . . . displace the [agency's] choice between

two fairly conflicting views, even though the court would justifiably have made a different

choice had the matter been before it *de novo*.'" *Mitsubishi Materials Corp. v. United*

*States*, 20 CIT 328, 331, 918 F. Supp. 422, 425 (1996) (quoting *Universal Camera*

*Corp. v. NLRB*, 340 U.S. 474, 488 (1951) (ellipses in original)). Thus, the court "may

not reweigh the evidence or substitute its own judgment for that of the agency." *Usinor*

*v. United States*, 28 CIT 1107, 1111, 342 F. Supp. 2d 1267, 1272 (2004) (citation

omitted).

Furthermore, when presented with a challenge to the Commission's

methodology, the court examines "not what methodology [Plaintiff] would prefer," but

"whether the methodology actually used by the Commission was reasonable."

*Shandong TTCA Biochem. Co. v. United States*, 45 CIT at __, __, 774 F. Supp. 2d

1317, 1329 (2011) (quotation marks omitted). "As long as the agency's methodology

and procedures are a reasonable means of effectuating the statutory purpose . . . the

court will not . . . question the agency's methodology." *Int'l Imaging Materials, Inc. v.*

*United States*, 30 CIT 1181, 1189 (2006) (quoting *Ceramica Regiomontana, S.A. v.*

*United States*, 10 CIT 399, 404-05, 636 F. Supp. 961, 966 (1986)) (first ellipses in

original).

The two-step framework provided in *Chevron, U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 842-45 (1984), governs judicial review of the Commission's interpretation of the antidumping and countervailing duty statutes. *Nucor Corp. v. United States*, 414 F.3d 1331, 1336 (Fed. Cir. 2005). First, the court must determine "'whether Congress has directly spoken to the precise question at issue.'" *Heino v. Shinseki*, 683 F.3d 1372, 1377 (Fed. Cir. 2012) (quoting *Chevron*, 467 U.S. at 842). If Congress's intent is clear, "'that is the end of the matter . . . .'" *Id.* (quoting *Chevron*, 467 U.S. at 842-43). However, "if the statute is silent or ambiguous," the court must determine whether the agency's action "is based on a permissible construction of the statute." *Dominion Res., Inc. v. United States*, 681 F.3d 1313, 1317 (Fed. Cir. 2012) (citing *Chevron*, 467 U.S. at 842-43).

## DISCUSSION

### I.    The Tariff Act's Tie-Vote Provision

#### a. Siemens' Contentions

Siemens argues that the court should not defer to the Commission's affirmative determination because the determination did not arise from a majority vote for either material injury or threat of material injury. (Siemens Mot. 14-16.) Siemens points out that four of the six Commissioners found no material injury to the domestic industry, while just two of the six Commissioners found present material injury. (Siemens Mot. 16-17.) As to the "threat of material injury," only one Commissioner found threat, three found no threat, and the two who found material injury did not vote with respect to threat. (Siemens Mot. 17.) Thus, Siemens argues, the Commission reached an affirmative determination by aggregating the two material injury votes with

the single threat of material injury vote, even though these determinations arise from

different criteria and analyses. (*See* Siemens Mot. 17-18.) Although Siemens

concedes that the Tariff Act requires aggregation of material injury and threat of material

injury votes to reach an affirmative determination, it opposes judicial deference to an

affirmative determination reached in this manner. (Siemens Mot. 14-15). Instead,

Siemens urges that the court should defer to the majority of Commissioners who made

negative determinations of material injury and threat of material injury. (Siemens Mot.

15-16.)

    Siemens cites two cases for support. It contends that *Wind Tower Trade

Coalition v. United States*, a recent Federal Circuit decision related to this case, held

that "'the ITC as a whole makes a finding'" of whether there is material injury. (Siemens

Reply 7.) As a result, disregarding "'two-thirds of the ITC's votes' flouts the purpose of

the statute." (Siemens Reply 7.) Siemens also relies on *Nippon Steel Corp. v. United

States* in which the court stated, "'when the totality of the evidence does not illuminate a

black-and-white answer to a disputed issue, it is the role of the expert fact-finder – here

the majority of the Presidentially-appointed, Senate-approved Commissioners – to

decide which side's evidence to believe.'" (Siemens Reply 6.) Siemens argues these

cases indicate that the court should defer to the majority of Commissioners, here, the

four Commissioners who found no material injury, rather than the views of the two

Commissioners reflected on the views of the Commission.

### b. Analysis

The Tariff Act considers the Commission's voting pattern relevant in two

scenarios. First, it is relevant under the section of the Act that explains how to

aggregate votes when the Commission is evenly-divided. This section of the Act states:

> If the Commissioners voting on a determination by the Commission . . .
> are evenly divided as to whether the determination should be affirmative
> or negative, the Commission shall be deemed to have made an affirmative
> determination. For the purpose of applying this paragraph when the issue
> before the Commission is to determine whether there is—
>
> (A)     material injury to an industry in the United States,
>
> (B)     threat of material injury to such an industry, or
>
> (C)     material retardation of the establishment of an industry in the
>           United States,
>
> by reason of imports of the merchandise, an affirmative vote on any of the
> issues shall be treated as a vote that the determination should be
> affirmative.

19 U.S.C. § 1677(11). This section clearly provides that any affirmative vote for

material injury, threat of material injury, or material retardation of the domestic industry

"shall be treated as a vote that the determination should be affirmative" when the

Commissioners are evenly divided as to whether a determination is affirmative or

negative. *See id.* Thus, an affirmative determination need not arise from three

affirmative votes on the same basis, as long as there are at least three affirmative votes

on any of the three bases. *See id.*

In the case of a divided vote by the Commission, as occurred here, this

statutory provision is important. The provision defines an evenly divided vote as an

affirmative determination for purposes of determining whether an antidumping or

countervailing duty order will be put in place.  Moreover, it makes it clear that the

Commission shall be deemed to have made that affirmative determination.  The

standard of review to be applied by this court, as established by Congress, is whether

the determination of the Commission is "unsupported by substantial evidence on the

record, or otherwise not in accordance with law..."  19 U.S.C. § 1516a(b)(1)(B)(i).  By

making the standard of review applicable to court review of the determination of the

Commission (*see* 19 U.S.C. §§ 1516a(a)(2)(A)(i)(II), 1516a(a)(2)(B)(i)), and defining a

tie vote as affirmative and as the determination of the Commission (*see* 19 U.S.C. §

1677(11)), Congress made plain that the same standard of review is applicable to the

Commission determination even when it is based on a split, tie vote.

      The Commission's voting pattern also is relevant to the sections of the

Tariff Act that deal with the effective date of Commerce's antidumping and/or

countervailing duty orders when the Commission has reached an affirmative

determination.  *See* 19 U.S.C. §§ 1671e(a), 1673e(a) (providing parallel rules for

countervailing and antidumping duties, respectively); *see also Wind Tower Trade Coal.*

*v. United States*, 741 F.3d 89, 96-97 (Fed. Cir. 2014).  According to these sections, the

effective date of these orders may be retrospective, from the date the entries were

suspended (the "General Rule"), or prospective, from the date of publication of the final

Commission determination (the "Special Rule").  These Rules provide:

    (1)    General rule

> If the [Commission], in its final determination ... finds material injury
> or threat of material injury which, but for the suspension of
> liquidation ... would have led to a finding of material injury, then
> entries of the [subject merchandise], the liquidation of which has

been suspended ..., shall be subject to the imposition of ... duties....

(2)    Special rule

If the [ITC], in its final determination ... finds threat of material injury, other than threat of material injury described in paragraph (1), ... then [subject merchandise] which is entered, or withdrawn from warehouse, for consumption on or after the date of publication of notice of an affirmative determination of the [ITC] ... shall be subject to the [assessment or imposition] of ... duties ..., and [Customs] shall release any bond or other security, and refund any cash deposit made.

*Id.* §§ 1671e(b), 1673e(b). "In other words, the General Rule applies if the ITC makes (1) an affirmative finding of present material injury, or (2) a finding of a threat of material injury that would have been a finding of present material injury ["but for"] provisional measures." *Wind Tower*, 741 F.3d at 97. The General Rule mandates that antidumping and countervailing duties be collected retrospectively on merchandise that entered the United States during the investigation. *Id.* In contrast, the Special Rule applies when the ITC finds a threat of material injury that would *not* be present material injury "but for" the application of provisional measures. *Id.* Under the Special Rule, antidumping or countervailing duties are collected prospectively, from the date the ITC publishes its final determination, and any provisional cash deposits are refunded. *Id.*

In arguing that the court should not defer to an affirmative determination arising from a divided vote, Siemens conflates the Tariff Act provision dealing with tied votes with the sections dealing with the effective date of duties. The tied-vote provision explicitly requires aggregation of material injury and threat of material injury decisions to reach an affirmative determination without regard to the "but for" findings in sections 1671e(b)(1) and 1673e(b)(1). *See, e.g.*, *Metallverken Nederland B.V. v. United States*,

13 CIT 1013, 728 F. Supp. 730 (1989). In contrast, the Tariff Act provision dealing with

the effective date of antidumping and countervailing duties emphasizes the importance

of the "but for" finding when the Commission makes a threat determination, but does not

explain how to treat a divided voting pattern. *See Wind Tower*, 741 F.3d at 96-97; *see*

*also MBL (USA) Corp. v. United States*, 16 CIT 108, 113-14, 787 F. Supp. 202, 207-08

(1992).

      The cases that Siemens cites are inapposite as to whether the court

should decline to defer to a divided affirmative vote or otherwise apply some different,

less deferential, standard of review. The *Wind Towers* case deals with the vagary of

how to treat a divided voting pattern when applying the General Rule or the Special

Rule for collecting duties. *See* 741 F.3d at 97. It does not address the issue of

deference to a divided affirmative vote. *See generally id.* Siemens also misstates the

significance of the *Nippon Steel* quote that "when the totality of the evidence does not

illuminate a black-and-white answer to a disputed issue, it is the role of . . . the majority

of the . . . Commissioners – to decide which side's evidence to believe." 458 F.3d at

1359. *Nippon* does not concern the question of divided affirmative determinations, and

so the court's emphasis on the majority of Commissioners lacks the significance with

which Siemens would imbue it.

      The court sees no basis in the statute, precedent, or logic to apply a

different standard of review to affirmative determinations based on a divided vote than it

would apply to an affirmative determination in which a majority of the Commissioners

reached a common conclusion about the nature of the injury. The language of 19

U.S.C. § 1677(11) provides no basis for treating an affirmative determination by a

divided Commission any differently than any other Commission determination.

Similarly, the standard of review provided in 19 U.S.C. § 1516a(b)(1)(B)(i) does not

suggest any distinction when reviewing a determination by a divided Commission.

Indeed, cases reviewing a determination by a divided Commission have applied the

same "substantial evidence" standard of review as used in cases with more uniform

voting patterns.  *See, e.g.*, *Metallverken*, 13 CIT 1013, 728 F. Supp. 730; *cf. Corus

Staal Bv v. United States*, 27 CIT 459, 2003 WL 1475045 (2003).

     This approach makes sense given the absence of a manageable

alternative standard of review.  Substantial evidence review acknowledges that

substantial evidence may exist to support different conclusions.  *See Matsushita*, 750

F.2d at 936 (citing *Consolo*, 383 U.S. at 619-20; *Armstrong Bros.*, 626 F.2d at 170 n.4);

*see also Metallverken*, 13 CIT at 1017, 728 F. Supp. at 734 ("It is well settled that

substantial evidence may exist in a record to support several inconsistent

conclusions.").  Substantial evidence review is not a vote counting exercise.  *See, e.g.*,

*Philip Bros., Inc. v. United* States, 10 CIT 485, 486, 640 F. Supp. 1340, 1342 (1986)

(finding that the "size of the Commission majority is . . . irrelevant" when reviewing the

determination and that the court "may consider only whether the determination of the

Commission is unsupported by substantial evidence").  Even when four Commissioners

are persuaded by certain evidence, it does not mean that a contrary vote by the other

two Commissioners cannot be supported by substantial evidence or that such

substantial evidence must be reviewed with less deference by this court.  Treating

affirmative determinations by a divided Commission differently from uniform

determinations would ask the reviewing court to engage in impermissible reweighing of

the evidence in such cases.  See *Usinor*, 28 CIT at 1111, 342 F. Supp. 2d at 1272; *see*

*also Metallverken*, 13 CIT at 1017, 728 F. Supp. at 734.  In *Metallverken*, which

presented the same voting pattern as the underlying determination, the court rejected

plaintiff's argument to negate an affirmative determination based solely on the findings

of the dissenting commissioners.  The court reasoned as follows:

> In asking the Court to negate a commissioner's determination based upon the
> findings of dissenting commissioners, plaintiffs are, in essence, asking the Court
> to reweigh the evidence.  The function of this Court is not to reweigh the
> evidence, but rather to ascertain whether the Commissioner's determination is
> "unsupported by substantial evidence on the record or otherwise not in
> accordance with law."

*Metallverken*, 13 CIT at 1017, 728 F. Supp. at 734 (citations omitted).  Thus, contrary to

Siemens' arguments, the court reviews the Commission's determination, no matter how

reached, based upon the substantial evidence standard.

## II.    The Material Injury Determination

Plaintiffs contest the Commission's material injury determination, alleging

that the Commission improperly found that (1) the volume of subject imports displaced a

significant volume of domestic wind towers; (2) competition from subject imports

suppressed domestic wind tower prices; and (3) subject imports adversely impacted the

domestic industry.  (*See generally* Siemens Mot.; Titan Mot.)

Pursuant to the Tariff Act, as amended, the Commission determines

whether a domestic industry is materially injured, or threatened with material injury, by

reason of unfairly subsidized or dumped imports.  *See* 19 U.S.C. §§ 1671d(b),

1673d(b).  The Commission will issue an affirmative determination if it finds "present

material injury or a threat thereof" and makes a "finding of causation."  *Hynix*

*Semiconductor, Inc. v. United States*, 30 CIT 1208, 1210, 431 F. Supp. 2d 1302, 1306

(2006) (quotation marks omitted).  In making a material injury determination, the

Commission evaluates "(1) the volume of subject imports; (2) the price effects of subject

imports on domestic like products; and (3) the impact of subject imports on the domestic

producers of domestic like products."  *Id.* (citing 19 U.S.C. §§ 1677(7)(B)(i)(I)-(III));

*accord GEO Specialty Chems., Inc. v. United States*, Slip Op. 09-13, 2009 WL 424468,

at *2 (CIT Feb. 19, 2009).  The Commission may also consider "'such other economic

factors as are relevant in the determination.'"  *Hynix Semiconductor*, 30 CIT at 1210,

431 F. Supp. 2d at 1306 (quoting 19 U.S.C § 1677(7)(B)(ii)).

### a. Volume

In performing its volume analysis, the ITC must consider "'whether the

volume of imports of the merchandise, or any increase in that volume, either in absolute

terms or relative to production or consumption in the United States, is significant.'"

*Shandong TTCA Biochem.*, 45 CIT at ___, 774 F. Supp. 2d at 1322 (quoting 19 U.S.C.

§ 1677(7)(C)(i)).

In its *Views*, the Commission assessed several metrics and determined

that the volume and the increase in volume of subject imports were significant, both in

absolute terms and relative to consumption.  *Views* at 27.  Specifically, the Commission

found that the volume of subject imports, by quantity, grew significantly between 2009

and 2011, and that "[t]he growth in subject imports in interim 2012 relative to interim

2011 was dramatic." *Views* at 27 (citing *Staff Report* at Table IV-2).[8] The Commission also observed that, although subject imports' U.S. market share fell slightly between 2009 and 2010, it increased significantly in 2011. *Views* at 28 (citing *Staff Report* at Table IV-6). Likewise, subject imports' share of the U.S. market, by quantity, rose from interim 2011 to interim 2012. *Views* at 28 (citing *Staff Report* at Table IV-6). The ratio of subject imports to U.S. production similarly increased substantially both from 2009 to 2011 and from interim 2011 to interim 2012, despite an increase in U.S. production. *Views* at 28 (citing *Staff Report* at Table IV-7).

The Commission also considered domestic industry volume trends. It found that the domestic industry's volume decreased, despite an increase in demand in interim 2012 prompted by the anticipated expiration of the investment tax credit and the production tax credit ("PTC"). *Views* at 19-20 (citing *Staff Report* at II-11), 28-29.[9] To benefit from the PTC, the wind turbine had to be operational by the end of 2012. *Views* at 19-20 (citing *Staff Report* at II-11). Thus, OEMs rushed to install wind towers to benefit from the PTC, leading to a substantial increase in apparent U.S. consumption of wind towers between interim 2011 and interim 2012. *Views* at 28 (citing *Staff Report* at Table IV-6). Although the Commission acknowledged that the domestic industry's market share rose somewhat between 2009 and 2011, it found that it was "far lower . . .

---

[8] Subject imports grew by 41.8 percent between 2009 and 2011 and increased from 456 towers to 1,257 towers from interim 2011 to interim 2012. *Views* at 27 (citing *Staff Report* at Table IV-2).
[9] The PTC provided a 2.2 cents per kilowatt-hour credit for the first ten years of a wind turbine's operation. *Views* at 20 (citing *Staff Report* at II-10 to II-11).

than at any prior point during the period of investigation" by interim 2012, dropping by

more than [[  ]] points from interim 2011 to interim 2012.  *Views* at 28 (citing *Staff Report*

at Table IV-6).  The Commission found that subject imports disproportionately benefited

from the surge in demand, with their shipments increasing "even more sharply" than the

rise in apparent U.S. consumption.  *Views* at 28 (citing *Staff Report* at Table C-1).

The Commission considered several alternative explanations for why

domestic market share declined while subject import market share dramatically

increased during the POI.  It considered, for example, that subject imports took market

share from nonsubject imports.  *Views* at 28-29.  It found, however, that "[t]he increase

in subject imports' share of the U.S. market . . . came primarily at the direct expense of

the domestic industry rather than nonsubject imports," noting that nonsubject imports'

market share declined from 2009 to 2011, and even by a small amount during interim

2012 when demand was peaking.  *Views* at 28-29 (citing *Staff Report* at Table IV-6).

The Commission also rejected the possibility that the domestic industry's inability to

supply the market accounted for the high levels of subject imports, observing that the

domestic industry had excess capacity that would have allowed it to fill a greater share

of demand than it did.  *Views* at 29 (citing *Staff Report* at III-18, Tables III-3, III-5, III-6,

IV-2, Figs. E-1 to E-4).  It concluded,

> [w]hile factors such as operational inefficiencies and the expected non-
> renewal of the PTC and other federal incentives may have played some role
> in the domestic industry's modest growth in production and shipments
> during interim 2012, the record indicates that the subject imports also
> played a role in precluding the domestic industry from increasing production
> to take advantage of the increase in apparent consumption.

*Views* at 30 (citing *Staff Report* at III-18 n.33, VI-11; Hr'g Tr. (Cole) 81, 122-123).

The Commission thus determined that the volume and increase in volume of subject imports was significant during the POI. *Views* at 30.

### i. Tax Credit Argument

Titan argues that the anticipated expiration of the PTC and investment tax credit at the end of 2012 led to an anomalous surge in demand that domestic producers were unable to accommodate. (Titan Mot. 5, 24-25, 36.) Relying on the dissenting Commissioners' rationale, Titan contends that, "'[d]uring the latter half of the POI, subject imports filled demand that was itself inflated and accelerated by the likely expiration of the PTC and other federal incentives, but subject imports did not displace significant amounts of domestic production or sales.'" (Titan Mot. 25.) As a result, Titan urges that the Commission lacked substantial evidence to support its determination of a significant volume and increase in volume of subject imports during the POI.

However, the Commission acknowledged that the surge in demand at the end of the POI was particularly strong because of the anticipated non-renewal of the PTC. *Views* at 28. Citing substantial record evidence, it found that significant volumes of subject imports prevented the domestic industry from taking full advantage of this surge. *Views* at 28. It cited, for example, the increase in quantity of subject imports, *Views* at 27 (citing *Staff Report* at Table IV-2), and their growing market share during the POI, *Views* at 28 (citing *Staff Report* at Tables IV-6, C-1). The Commission also relied on record evidence that showed subject imports' market share increased "more sharply" than demand between interim 2011 and interim 2012 while the domestic industry's market share fell to its lowest point during that timeframe. *Views* at 28 (citing

*Staff Report* at Table IV-6, C-1).  The Commission considered and dismissed the

possibility that subject import market share grew at the expense of nonsubject imports,

finding that nonsubject imports lost a small amount of market share when subject

imports were increasing dramatically.  *Views* at 28-29 (citing *Staff Report* at Table IV-6).

These findings provide substantial evidence to support the conclusion of

significant volumes and increase in volumes of subject imports during the POI, both in

absolute terms and relative to consumption.  Relying on the dissenting Commissioners'

findings, Titan argues that the Commission determination is unsupported by substantial

evidence.  That Titan can point to evidence that detracts from the Commission's

conclusion, however, does not preclude the Commission's finding from being supported

by substantial evidence.  *Matsushita*, 750 F.2d at 936.  In fact, in light of the dissent of

three Commissioners, the court is hardly surprised that the record contains contrary

evidence.  Conflicting evidence, however, is insufficient for Titan to carry the day.  *Id.*

While the court must consider the record as a whole, when the Commission has based

its determination on substantial evidence and considered the evidence that fairly

detracts from its conclusion, the court may not displace the agency's choice.  *Mitsubishi*,

918 F. Supp. at 425.  Titan's arguments improperly ask the court to reweigh the record

evidence and, therefore, must be rejected.  *Usinor*, 28 CIT at 1111, 342 F. Supp. 2d at

1272.

### ii. Excess Capacity

Titan and Siemens challenge the Commission finding that the domestic

industry had excess capacity during the POI as unsupported by substantial evidence.

(*See* Siemens Mot. 44-55; Titan Mot. 25-36.)  They argue that the domestic industry

was unable to meet the spike in demand for wind towers, leaving purchasers with no

choice but to purchase subject imports.  (*See* Siemens Mot. 44-55; Titan Mot. 25-36.)

In support of this argument, Titan and Siemens cite record evidence that calls into

question the domestic industry's reported capacity.  (*See* Siemens Mot. 44-55; Titan

Mot. 25-36.)  For example, they point to record evidence that one company backed out

of orders, (Siemens Mot. 51-53), and that another company turned away orders from

domestic plants in 2010 and 2011 (Siemens Mot. 47-48).  Plaintiffs also note that a third

company reported excess capacity though it told OEMs it could not accommodate

certain projects, (Siemens Mot. 55), and had not yet constructed a facility for which it

reported capacity (Titan Mot. 28-29).  Similarly, Plaintiffs observe that a company

claimed capacity for a plant that lacked the staff to produce towers (Siemens Mot. 53-

54; Titan Mot. 29).  Based on these examples of delayed and declined orders, Plaintiffs

argue that OEMs were forced to pay premiums for subject imports because the

domestic industry lacked actual capacity.  (*See* Siemens Mot. 44-55; Titan Mot. 25-36.)

Notwithstanding these claims, the Commission cited substantial record

evidence corroborating domestic producers' reported excess capacity.  It reasonably

relied on the domestic producers' certified capacity data.  *See Views* at 4, 29-30.  This

data provided substantial evidence for the Commission's conclusion that the domestic

industry had excess capacity during the POI.

Further, the Commission reasonably addressed evidence that detracted

from the data upon which it relied.  It acknowledged that domestic producers were not

able to meet all of the growing demand, but found that OEMs elected to purchase wind

towers overseas despite available capacity among domestic producers. *Views* at 29

(citing *Staff Report* at Tables III-3, III-5, III-6, Figs. E-1 to E-4). For example, the

Commission observed that several qualified facilities operated at modest rates of

capacity utilization during interim 2012, *Views* at 30 n.169 (citing *Staff Report* at Table

III-5), and that one company built a facility that its expected customer declined to use,

*Views* at 30 n.170 (citing *Staff Report* at II-4 n.6, V-67). Additionally, the Commission

found that domestic producers had no choice but to decline certain orders because of

the contractual obligations they had undertaken through long-term supply agreements

that they believed required them to reserve certain production capacity for particular

OEM customers. *See Views* at 30 n.173 (citing *e.g.*, Hr'g Tr. (Cole) 81, 122-123).

When the OEMs later renegotiated these agreements, domestic producers were left

with unused excess capacity. *See id.*[10] In addition, the Commission noted that some

domestic producers submitted bids for large projects for which subject imports were

used, undermining Plaintiffs' allegations that these producers lacked capacity. *Views* at

41 n.234 (citing *Staff Report* at II-4 n.6). The Commission further determined that

concerns about the preparedness of certain domestic production were unfounded given

the two-year delivery horizon, the large number of towers involved, and the OEMs'

---

[10] For example, one large producer, [[       ]], could not operate at capacity because it
had a long-term supply agreement with [[   ]] that [[   ]] later renegotiated in favor of
purchasing more subject imports. *Views* at 30 n.173 (citing *e.g.*, Hr'g Tr. (Cole) 81, 122-
123). Meanwhile, [[  ]] lowered its prices per tower by over [[   ]] percent under this long-
term agreement. OEMs similarly renegotiated contracts with [[
        ]]. *Views* at 30 n.171 (citing *Staff Report* at III-18 n.33, V-11).

decisions to qualify new facilities after production begins. *Views* at 30 n.170. Finally,

the Commission addressed and rejected the argument that domestic producers'

facilities were too far from the wind tower sites, noting several examples in which OEMs

relied on subject imports despite nearby domestic facilities with reported excess

capacity.[11] *Views* at 29-30 (citing *Staff Report* at Tables V-1, V-2, V-5, III-5).

Thus, the Commission relied on substantial record evidence to conclude

that the domestic industry had excess capacity due to the significant volume and

increasing volume of subject imports. Plaintiffs have not identified any error with the

Commission's analysis. As discussed with respect to the standard of review applied by

this court, even if Plaintiffs may point to evidence relied on by the dissenters and

inconsistent with the Commission's conclusion, that does not preclude the

Commission's finding from being supported by substantial evidence. *Matsushita*, 750

F.2d at 936; *Armstrong Bros.*, 626 F.2d at 170 n.4. The court "may not reweigh the

---

[11] [[      ]], for example, relied on subject imports for a Midwest project even though
Trinity had facilities with capacity in Iowa and Texas. *Views* at 29 (citing *Staff Report* at
Tables V-2, III-5). [[      ]] also opted to supply its Shephard's Flats project entirely with
subject imports, even though [[         ]] had a nearby facility and Broadwind offered to
build a new facility to supply the project. *Views* at 30 (citing *Staff Report* at II-4 n.6, V-
67). Plaintiffs' claims that the [[                                                        ]] is
also without merit. (*See* Siemens Mot. 54; Titan Mot. 29.) While Plaintiffs accurately
note that the record indicates that there were only [[
       ]] (Titan Mot. 29 (citing *Staff Report* at III-29 n.53)), the record also indicates that
[[
                        ]] (*See Staff Report* at III-29 n.53.) Consequently, there was
substantial evidence to support the Commission's finding that this plant had excess
production capacity.

evidence or substitute its own judgment for that of the agency." *Usinor*, 28 CIT at 1111,

342 F. Supp. 2d at 1272.

### b. Price Effects

When performing a price effects analysis, the ITC must consider (1)

whether there has been significant price underselling by the imported merchandise as

compared with the price of the domestic like product and (2) whether the effect of

subject imports otherwise depresses prices to a significant degree or suppresses prices

to a significant degree. 19 U.S.C. § 1677(7)(C)(ii).

The Commission evaluated the existence of underselling, price

depression, and price suppression. It found that subject imports and the domestic like

product are generally substitutable, and compete for sales to OEMs. *Views* at 31 (citing

*Staff Report* at II-19, II-31 to II-32). It also noted that most OEMs ranked total cost, of

which f.o.b. prices are the largest component, as the most important factor in

purchasing decisions. *Views* at 31 (citing *Staff Report* at Tables V-1, V-5). Further, the

Commission observed that OEM pricing data indicated that subject imports generally

had lower f.o.b. prices than domestic towers, but that domestic towers were less

expensive on a delivered basis. *Views* at 32 (citing *Staff Report* at Table V-1; Hr'g Tr.

(Dougan) 156-157). Thus, the Commission found that subject imports were not

significantly underselling domestic products on a delivered basis. *Views* at 32-33. The

Commission likewise found that the subject imports did not have price depressing

effects on the domestic industry, concluding that unit value was an unreliable metric for

evaluating price depression in this case because the size of wind towers increased as

sale values increased over the period of investigation. *Views* at 33.

However, the Commission found substantial record evidence of price

suppression because the domestic industry's ratio of cost of goods sold to net merchant

market sales ("COGS ratio") increased significantly during the POI. *Views* at 34 (citing

*Staff Report* at Table VI-1).[12] The Commission observed that the rising COGS ratio

coincided with the increasing volume of subject imports during 2011 and interim 2012.

*Views* at 34-35. It found this trend to be discordant with the price increases it would

have expected given the inelastic nature of the wind tower market and the spiking

demand during the period. *Views* at 35.

The Commission attributed the domestic industry's unexpected cost-price

squeeze to evidence that OEMs negotiated based on f.o.b. prices. *Views* at 33-34

(citing Pet'r's Post-Hr'g Br., Ex. 2; Hr'g Tr. (Cole) 31-32; Hr'g Tr. (Smith) 37). It

reasoned,

> There have also been instances where the OEMs have pressured the
> domestic producers to renegotiate their supply agreements to set lower
> prices or alter volumes in light of the availability of low-priced subject
> imports. The small number of OEMs in the market, the importance to
> them of price in purchasing decisions, their pattern of negotiating prices
> with domestic producers, and the availability of alternative sources of
> supply in the market (the most prominent of which during the latter portion
> of the period of investigation was subject imports), placed pressure on
> domestic producers to discipline their prices in order to receive bid
> solicitations or orders.

---

[12] The domestic industry's COGS ratio increased from [[    ]] percent in 2009 to [[    ]]
percent in 2010 to [[    ]] percent in 2011. *Views* at 34 (citing *Staff Report* at Table VI-
1). In interim 2011, this ratio was [[    ]] percent, and in 2012 it was [[    ]]. *Id.*

*Views* at 34 (citing *Staff Report* at II-23, III-11, III-12, VI-17 n.28).  Thus, the

Commission concluded that subject imports prevented the domestic industry from

raising prices during the POI, resulting in significant adverse price effects on the

industry.  *Views* at 35.

### i. Price Suppression

Siemens challenges the Commission's determination of adverse price

effects as unsupported by substantial evidence because the Commission found no

evidence of significant price underselling, price depressing effects by subject imports, or

confirmed lost sales.  (Siemens Mot. 43-44.)  It further argues that the Commission's

price suppression determination is inconsistent with the finding that subject imports cost

more on a delivered basis.  (Siemens Mot. 44.)

However, the Commission did not need to find underselling, price

depression, or lost sales[13] to determine that the subject imports adversely affected the

domestic industry by suppressing prices.  *Cemex, S.A. v. United States*, 16 CIT 251,

260-61, 790 F. Supp. 290, 299 (1992) ("To require findings of underselling would be

inconsistent with the proposition that price suppression or depression is sufficient."),

*aff'd*, 989 F.2d 1202 (Fed. Cir. 1993).  Likewise, higher priced subject imports are not

inconsistent with price suppression.  *Maine Potato Council v. United States*, 9 CIT 293,

301-02, 613 F. Supp. 1237, 1245 (1985) (holding that higher quality imports may have

---

[13] The Commission acknowledged the absence of confirmed lost sales, but pointed out
that it viewed the [[                              ]] as a sales opportunity that was lost during the
demand boom in interim 2012.  *Views* at 33 n.190, 41 (citing *Staff Report* at II-4 n.6).

price suppressing effects notwithstanding their higher price); *Allegheny Ludlum Corp. v. United States*, 24 CIT 858, 880-81, 116 F. Supp. 2d 1276, 1298-99 (2000) (postulating that higher, though declining prices for subject imports could have depressed prices). Indeed, the Commission explained that, in this case, subject imports suppressed prices because OEMs negotiated with domestic producers to lower their f.o.b. prices, which were higher than those of subject imports. *Views* at 34 (citing Pet'r's Post-Hr'g Br., Ex. 2; Hr'g Tr. (Cole) 31-32; Hr'g Tr. (Smith) 37).

The Commission reasonably found that subject imports suppressed domestic prices and Plaintiffs have not demonstrated any error in the Commission's assessment of the facts. The Commission's determination regarding the subject imports' price suppressing effects on the domestic industry is supported by substantial evidence. Thus, the court may not reweigh the record evidence or otherwise second-guess the Commission's reasonable explanation. *See Usinor*, 28 CIT at 1111, 342 F. Supp. 2d at 1272.

### ii. COGS Ratio

Titan challenges the Commission's methodology for finding price suppression. It argues that the Commission failed to show a causal link between the subject imports and the domestic industry's rising COGS ratio. (Titan Mot. 42-43.) Specifically, Titan contends that the COGS ratio cannot reliably show that subject imports suppressed domestic prices because the COGS ratio does not correlate with

the domestic industry's net sales on a year-to-year basis. (Titan Mot. 42.)[14]  Titan

asserts that the lack of year-to-year correlation between subject import market share,

domestic industry market share, and the COGS ratio disrupts the causal link between

subject imports and any price suppressing effects the domestic industry may have

experienced. (Titan Mot. 42.)  Titan postulates that operational inefficiencies prevented

the domestic industry from raising prices during this period rather than subject imports.

(*See* Titan Mot. 46; *see also* Siemens Mot. 35-37, 58.)

   However, the Commission reasonably relied on the rising COGS ratio as

evidence of price suppression. *See, e.g.*, *Nippon Steel*, 458 F.3d at 1354 n.4 ("When

cost of goods sold ('COGS') exceeds price, the producer is unable to sell the product for

more than what it costs to produce the product; if the producer is unable to raise prices,

the industry finds itself in what is referred to as a cost-price squeeze."); *Chlorinated*

*Isocyanurates from China and Spain*, Inv. Nos. 731-TA-1082-1083 (Final), USITC Pub.

3782 (June 2005) at 30 (finding that rises in unit COGS and in ratio of COGS to net

sales indicates cost-price squeeze).  Indeed, the Commission articulated a sufficient

causal link between the subject imports and the domestic industry's rising COGS ratio.

It focused on the trend of volume increases and elevated COGS ratios in 2011 and

interim 2012, not across the entire POI.  *Views* at 35-36.  The Commission observed

---

[14] For example, Titan notes that between 2009 and 2010, subject import market share decreased while domestic COGS increased by [[    ]] points. (Titan Mot. 42 (citing *Staff Report* at Tables C-1 and C-2).)  And, between 2009 and 2011, domestic market share increased while COGS increased. (Titan Mot. 42 (citing *Staff Report* at Tables C-1 and C-2).)  Further, during interim 2011 and interim 2012, domestic market share decreased while COGS decreased. (Titan Mot. 42 (citing *Staff Report* at Tables C-1 and C-2).)

that the COGS ratio increased from 2009 to 2011, remaining very high in interim 2012. *Views* at 34 (citing *Staff Report* at Table VI-1).  The Commission found that the high COGS ratio in 2011 and interim 2012 coincided with dramatic increases in subject import volumes. *Views* at 34-35 (citing *Staff Report* at Table VI-1).  There is no support for Titan's argument that there must be a perfect correlation between subject imports and COGS on a yearly basis.  The Commission may reasonably rely on the trend of volume increases and elevated COGS ratios as it did here.

Furthermore, the Commission reasoned that the domestic industry should have been able to raise prices during 2011 and interim 2012 given the spike in demand, but found it could not because of competition with subject imports. *Views* at 34-35 (citing *Staff Report* at Table V-2).  The Commission acknowledged that operational inefficiencies contributed to the domestic industry's inability to raise costs, but concluded that these issues did not account for the entirety of the cost-price squeeze. *Views* at 34-35.[15]  Rather, the Commission found that market conditions, such as the small number of OEMs, the importance of price in purchasing decisions, negotiations based on f.o.b. pricing, and the availability of subject imports, "placed pressure on domestic producers to discipline their prices in order to receive bid solicitations or orders." *Views* at 34.  It determined that the changes in the COGS ratio reflected this price suppressive effect. *Views* at 34-35.

---

[15] Moreover, the Commission found that at least some of these inefficiencies resulted from OEM customers pressuring domestic producers to change production designs to accommodate their shift to subject imports for designs previously supplied by the domestic producer  *Views* at 34 n.195 (citing *Staff Report* at VI-17 n.28).

The Commission examined the relevant data and articulated a reasonable explanation. To that end, the Commission established a sufficient causal link between the subject imports and the domestic industry's rising COGS ratio. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also* Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103–316, at 156 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4184–85 ("SAA") (stating that the Commission "need not isolate the injury caused by other factors from injury caused by unfair imports ... [r]ather, the Commission must examine other factors to ensure that it is not attributing injury from other sources to the subject imports"). Plaintiffs' ability to point to evidence that detracts from the Commission's findings, evidence that was examined and discounted by the Commission, does not provide a justification for this court to reweigh the evidence that was before the Commission. *Usinor*, 28 CIT at 1111, 342 F. Supp. 2d at 1272 (2004); *see also Matsushita*, 750 F.2d at 936.

### iii. F.O.B. and Delivered Costs Argument

Plaintiffs next argue that the Commission lacked substantial evidence to support its determination that OEMs negotiated with domestic producers based on f.o.b. prices, thereby preventing price increases. (Siemens Mot. 43; Titan Mot. 38-41.) They argue that delivered costs were more important to OEMs than f.o.b prices, and that domestic wind towers were less expensive on that basis. (Titan Mot. 41.) Titan further observed that domestic producers could not have known about the f.o.b. prices quoted by their subject import competitors because OEM price negotiations were closed. (Titan Mot. 40-41.) Titan urges that the fact that OEMs attempted to reduce prices through

negotiations does not constitute the requisite causal link between subject imports and domestic prices. (Titan Mot. 41.) Moreover, Siemens argues that the Commission based its assessment of OEM negotiation patterns entirely on a misreading of a single email. (Siemens Mot. 43.)

Contrary to Plaintiffs' contentions, the Commission relied on substantial evidence to determine that subject imports' lower f.o.b. prices gave OEMs leverage in negotiating with domestic producers, thereby suppressing domestic prices. The Commission acknowledged that subject imports were more expensive on a delivered basis, *Views* at 32-33 (citing *Staff Report* at V-1, V-2, V-6), but cited record evidence that f.o.b. price was the biggest component of total cost and that OEMs negotiated based on those prices. *Views* at 33-34 (citing Pet'r's Post-Hr'g Br., Ex. 2; Hr'g Tr. (Cole) 31-32; Hr'g Tr. (Smith) 37). These negotiations pressured domestic producers to lower prices to compete with subject imports. *Id*. Though bids were closed, the Commission cited hearing testimony that OEMs leveraged quotes from other producers to drive f.o.b. prices down. *Id*. Further, the Commission found that OEMs pressured domestic producers to renegotiate supply agreements to set lower prices or alter volumes based on lower priced subject imports. *Views* at 34 (citing *Staff Report* at II-23, III-11, III-12).[16]

---

[16] For example, the Commission found that [[

                                                                          ]]
*Views* at 34 n.195 (citing *Staff Report* at V-17 n.28). It also found that [[  ]] awarded bids to subject import producers over [[                        ]] even though these

Thus, the Commission examined the relevant data and articulated a reasonable explanation for its determination that was supported by substantial evidence. *See Motor Vehicle Mfrs.*, 463 U.S. at 43.

### c. Adverse Impact

In examining the impact of subject imports, the Commission "shall evaluate all relevant economic factors which have a bearing on the state of the industry," including output, sales, inventories, ability to raise capital, research and development, and factors affecting domestic prices. 19 U.S.C. § 1677(7)(C)(iii). No single factor is dispositive, and all are considered "within the context of the business cycle and conditions of competition that are distinctive to the affected industry." *Id.*

The Commission found that subject imports adversely affected the domestic industry during the POI based on these factors and considerations. *Views* at 36. It determined that "the domestic industry was unable to benefit from the sharp increase in apparent U.S. consumption before the PTC was expected to expire" and "experienced a decline in market share and only a modest increase in production and U.S. shipments" as a result of significant volumes of subject imports during the POI, and especially in interim 2012. *Views* at 36. The Commission further observed that the domestic industry was unable to raise prices because of the presence of subject imports and pressure by OEMs to lower f.o.b. prices to better compete with subject imports.

---

domestic producers could have had new plants ready to produce towers within the two-year delivery timeframe. *See Views* at 30, 30 n.170 (citing *Staff Report* at II-4 n.6, V-67).

*Views* at 36.  As a result, the domestic industry was unable to cover increased costs,

causing steep declines in operating income and resources available for capital

expenditures.  *Views* at 36.  The Commission evaluated whether other factors – non-

subject imports, operational inefficiencies, and the geographic location of projects – may

have harmed the industry during the POI, but found that these other factors accounted

for only a part of the adverse impact the domestic industry experienced.  *See Views* at

40-41.  The Commission concluded that the "record contains ample evidence that the

presence of the subject imports led to reduced production levels, shipments, capacity

utilization and price increases for the domestic industry as the OEMs turned to subject

imports rather than rely upon the domestic producers who had nearby unused capacity."

*Views* at 42.

### i. Excess Capacity

Plaintiffs challenge the Commission's adverse impact finding on the basis

that the industry did not have excess capacity and actually gained market share

throughout the POI.  (*See* Siemens Mot. 44-55; Titan Mot. 25-36.)  In particular,

Plaintiffs argue that data showing excess capacity did not reflect actual market

conditions, noting that OEMs paid a premium for subject imports and that U.S.

producers refused and canceled orders throughout the period.  (*See* Siemens Mot. 44-

55; Titan Mot. 25-36.)

As discussed previously in reviewing the Commission's volume and price

effects analysis, Plaintiffs' arguments that the domestic industry lacked excess capacity

cannot withstand the standard of review.  The Commission relied on substantial record

evidence from the domestic industry's certified questionnaire responses to support its

finding of excess capacity. *Views* at 40 (citing *Staff Report* at Tables III-5, III-6). It also

had substantial evidence to support its determination that subject imports suppressed

domestic industry prices because OEMs used subject imports' lower f.o.b. prices as

leverage in negotiations with domestic producers. *Views* at 33-34, 36 (citing Pet'r's

Post-Hr'g Br., Ex. 2; Hr'g Tr. (Cole) 31-32; Hr'g Tr. (Smith) 37). The Commission cited

record evidence that domestic producers refused and canceled orders because of long-

term supply agreements with OEMs that tied up their production. These domestic

producers were then left with excess capacity when the OEMs subsequently

renegotiated downward the quantity of wind towers they would purchase from the

domestic producers and increased their purchases of subject imports. *See Views* at 30

n.171, n.173 (citing Hr'g Tr. (Cole) 81, 122-123; *Staff Report* at III-18 n.3, V-11). The

Commission thus had substantial evidence to support its *Views*. Plaintiffs have not

identified any error in the Commission's analysis and, instead, simply disagree with the

outcome of that analysis. The court may not reweigh the evidence, as Plaintiffs

request. *Usinor*, 28 CIT at 1111, 342 F. Supp. 2d at 1272.

### ii. Market Share

Plaintiffs argue that the Commission lacked substantial evidence to

support its determination that the domestic industry's market share declined as a result

of increased subject imports. Titan argues that subject imports could not have

adversely affected the domestic industry given that domestic producers gained market

share throughout the POI. (Titan Mot. 46.) Siemens urges that the Commission should

have viewed any loss in market share in the context of overall expansion of demand

that saturated domestic production capacity, such that "any further growth necessarily

meant a decline in domestic market share with no implications for the domestic

industry's prosperity." (Siemens Mot. 41-42.)

The Commission acknowledged that domestic market share grew

throughout most of the POI, but found that the domestic industry lost market share

during interim 2012, when demand was spiking. *Views* at 37-38. As previously

discussed, the Commission also found that the domestic industry had excess capacity

during this period, indicating that growth in market share did not have to go to subject

imports, as Siemens contends. *Views* at 40. The Commission reasonably found that

the domestic industry's market share declined as a result of increased subject imports.

Because the Commission's determination is supported by substantial evidence, the

court may not reweigh the record evidence by second-guessing the Commission's

reasonable explanation. *See Usinor*, 28 CIT at 1111, 342 F. Supp. 2d at 1272.

### iii.    Non-Subject Imports

Siemens also challenges the Commission's finding of adverse impact by

revisiting the contention that the Commission insufficiently analyzed the role of non-

subject imports in domestic market trends. (Siemens Mot. 59.)

As addressed earlier, the Commission considered the role of non-subject

imports and found that they did not have an adverse impact on the domestic market

during the POI. The Commission determined that "nonsubject imports lost market share

throughout the period of investigation" and "[a]t the same time that subject imports were

generally increasing, nonsubject imports' share of the market was declining." *Views* at

23, 28 (citing *Staff Report* at Tables IV-2, IV-6; Tr (Revak) 226). Based on this record

evidence, the Commission concluded that non-subject imports could not have caused

the adverse impact that the domestic industry experienced during the POI. The

Commission instead decided that the "increase in subject imports in interim 2012

relative to interim 2011 came almost entirely at the expense of the domestic industry,

while nonsubject imports remained a minor factor in the growing U.S. market." *Views* at

40 (citing *Staff Report* at Table C-2). Because the Commission relied on substantial

record evidence to support its conclusion about the role of non-subject imports, the

court may not reweigh the record evidence. *Usinor*, 28 CIT at 1111, 342 F. Supp. 2d at

1272.

### III.    The Threat of Material Injury Determination

In determining whether a domestic industry is threatened with material

injury by reason of subject imports, the Tariff Act requires the ITC to consider, "among

other relevant economic factors," (i) the nature of any countervailable subsidy; (ii) any

existing unused production capacity or imminent, substantial increase in production

capacity in the exporting country, taking into account the availability of other export

markets to absorb any additional exports; (iii) a significant rate of increase of the

volume or market penetration of the subject merchandise; (iv) the likely price effects of

the subject imports; (v) inventories of the subject imports; (vi) the potential for product-

shifting in facilities currently being used to produce other products; (vii) if the

investigation involves raw agricultural products, any product processed from such

products; (viii) the actual and potential negative effects on the existing development and

production efforts of the domestic industry; and (ix) any other adverse trends that

indicate that material injury by reason of subject imports is likely.  19 U.S.C.

§ 1677(7)(F)(i).  Though the presence or absence of any factor is not decisive, "a

determination may not be made on the basis of mere conjecture or supposition."  *See*

19 U.S.C. § 1677(7)(F)(ii).[17]

In his *Views*, Commissioner Pinkert weighed the relevant statutory factors

and determined that wind tower imports from China and Vietnam posed a threat of

material injury to the domestic industry.  *See generally Pinkert Views*.  Focusing on

market conditions at the end of the POI, he found that the domestic industry was

vulnerable to material injury in the imminent future because foreign producers had, *inter*

*alia*, significantly increased volumes and market share; significantly and rapidly

expanded their presence throughout the U.S. market, even in regions where they did

not traditionally compete; generated substantial excess capacity that could quickly be

directed at the U.S. market; and accumulated significant inventories.  *Pinkert Views* at

3-6.  Commissioner Pinkert further observed that the price differential between the

---

[17] 19 U.S.C. § 1677(7)(F)(ii) states:

The Commission shall consider the factors set forth in clause (i) as a whole
in making a determination of whether further dumped or subsidized imports
are imminent and whether material injury by reason of imports would occur
unless an order is issued or a suspension agreement is accepted under this
subtitle. The presence or absence of any factor which the Commission is
required to consider under clause (i) shall not necessarily give decisive
guidance with respect to the determination. Such a determination may not
be made on the basis of mere conjecture or supposition.

domestic product and subject imports narrowed during this timeframe and that demand

for wind towers in the foreseeable future was expected to moderate from the 2012 high.

*Pinkert Views* at 6-7. In this context, he determined that subject import volumes will

likely be significant in the imminent future, leading to increased price competition with

the domestic industry. *Pinkert Views* at 7-8. He concluded:

> Limited sales opportunities in a less than robust market will intensify price
> competition between subject imports and domestic producers, and even a
> modest volume of subject imports would be likely to result in negative
> effects on the domestic industry. As a consequence, in the absence of
> trade relief, the industry is likely in the imminent future to suffer a
> significant loss of revenues that will cause a further deterioration in its
> financial condition, as well as declining employment, output, and
> productivity.

*Pinkert Views* at 8.

Plaintiffs challenge Commissioner Pinkert's determination, arguing that he

lacked substantial evidence to support a finding that injury to the domestic market was

"imminent"; improperly extrapolated conditions from interim 2012 in finding imminent

threat; and lacked substantial evidence to support the statutory factors that he found

indicated an imminent threat of material injury to the domestic market. (*See generally*

Siemens Mot.; Titan Mot.) Thus, they argue that his findings, as a whole, rest on

speculation and conjecture. (*See generally* Siemens Mot.; Titan Mot.)

### a. "Imminent" Material Injury

In his Views, Commissioner Pinkert found that the termination of the PTC

and the investment tax credit in 2012, and their one-year renewal for 2013, would cause

demand to moderate in the near future. He reasoned:

> [I]t should take a much smaller volume of subject imports to constitute a
> significant share of the market than it took during the period of heightened
> demand in 2011 and 2012 leading up to the then-expected end of the PTC
> and [investment tax credit]. Given moderate demand, subject producers
> are likely to compete intensely for U.S. sales in order to better utilize their
> available capacity. Consequently, for the above reasons, I find that, in the
> absence of trade relief, imports of the subject merchandise in the
> imminent future are likely to be significant and to increase significantly,
> both in absolute terms and relative to consumption, over the low-to-
> nonexistent levels to which they fell as a result of expectations that the
> PTC and [investment tax credit] would not be renewed.

*Pinkert Views* at 6 (citing *Staff Report* at II-10, Table VII-9). He further indicated that

such increased volumes of subject imports were imminent because "it would likely take

six to nine months for purchasers to respond to the renewal of the PTC with new

orders." *Pinkert Views* at 6-7 n.27 (citing Hr'g Tr. (Smith) 80).

Siemens urges that the harm Commissioner Pinkert predicted could not

occur imminently because a year or more would pass between planning projects in

response to the renewed tax credits and delivery of towers. (Siemens Mot. 25-26.) It

argues that this timeframe is at odds with the dictionary definition of "imminent" as

meaning "about to happen." (Siemens Mot. 25-26 (citing *Oxford Concise Dictionary* (2d

ed. 1989).)

Commissioner Pinkert's determination was supported by substantial

evidence and in accordance with law. A six to nine month timeframe is sufficiently

imminent to support a threat determination. Although "[n]o bright-line test exists to

determine when injury is imminent", this court has found timeframes longer than "six to

nine months" to be "imminent." *Asociacion de Productores de Salmon y Trucha de*

*Chile A.G. v. USITC*, 26 CIT 29, 39, 180 F. Supp. 2d 1360, 1371 (2002) (rejecting

arguments that imminent "cannot mean within one to two years"); *accord Goss Graphics System, Inc. v. United States*, 22 CIT 983, 1007-08, 33 F. Supp. 2d 1082, 1103-04 (1998) (upholding as reasonable finding that harm was imminent where it would manifest in two or more years); *see also Co-Steel Raritan, Inc. v. USITC*, 29 CIT 562, 570-71 (2005).  Further Commissioner Pinkert cited hearing testimony to support his finding that competition with subject imports would increase within a "six to nine month" timeframe. *Pinkert Views* at 6-7 n.27 (citing Hr'g Tr. (Smith) at 80).  That Plaintiffs can point to record evidence that supports a different timeframe is of no moment.  *See Matsushita*, 750 F.2d at 936.

### b. Tax Credit Renewal

Plaintiffs also argue that Commissioner Pinkert improperly speculated that significant subject import volumes during interim 2012 represented a trend, urging that 2012 was actually a unique year during which domestic producers could not satisfy demand.  (Siemens Mot. 27-29, 34-35; Titan Mot. 48-49.)  Plaintiffs contend that the looming expiration of the PTC and investment tax credit drove 2012's spike in demand, (Siemens Mot. 27-29, 34-35; Titan Mot. 48-49), and that Commissioner Pinkert wrongfully assumed that the renewal of these tax credits would lead to continued high demand.  (Siemens Mot. 17-18, 27-29, 34-35; Titan Mot. 48-49.)  They assert that the renewal could not produce the same level of demand as existed in interim 2012 because the tax credits' terms changed for 2013.  (Siemens Mot. 17-18, 27-29, 34-35; Titan Mot. 48-49.)  In contrast to the 2012 tax credits, the 2013 tax credits required that projects be commenced, not that orders be placed, by the end of the year to qualify.

(Siemens Mot. 17-18, 27-29, 34-35; Titan Mot. 48-49.)  Therefore, Plaintiffs assert that

projects commenced in 2013 "[m]ight never be finished, depending upon the economic

circumstances and prospects for grid parity." (Siemens Mot. 29.)  Plaintiffs thus

contend that Commissioner Pinkert's determination about demand trends in the

imminent future was inherently speculative and conjectural.  (*See* Siemens Mot. 29.)

          Commissioner Pinkert used an accepted methodology and relied on

substantial evidence to support his determination that the renewal of the tax credits

would spur further demand.  The court has repeatedly upheld reliance on trends as

constituting substantial evidence in support of a threat of material injury determination.

*See Asociacion de Productores*, 26 CIT at 38, 180 F. Supp. 2d at 1370 (holding that

trend data showing imminent increase in import volumes constituted substantial

evidence to support Commission's threat finding); *see also Bando Chem. Indus., Ltd. v.*

*United States*, 17 CIT 798, 807 (1993), *aff'd*, 26 F.3d 139 (Fed. Cir. 1994) (finding that

the Commission reasonably inferred from trend data that increased foreign production

was likely destined for U.S. market).  Commissioner Pinkert thus reasonably relied on

substantial record evidence of trends showing, *inter alia*, increased volumes, market

share, and excess capacity among foreign producers as evidence of a threat of

imminent material injury to the domestic industry.

          **c. Factors for Finding Threat of Material Injury**

          Finally, Plaintiffs challenge Commissioner Pinkert's weighing of the

statutory factors for examining whether there is a threat of material injury.  (Siemens

Mot. 39-42; Titan Mot. 48-52.)  They argue that no substantial evidence supports

Commissioner Pinkert's findings that (i) the surge in subject import volume would

continue after interim 2012; (ii) subject imports had an expanding presence in the U.S.

market; (iii) foreign producers had excess capacity; (iv) foreign producers had significant

end-of-year inventories poised for the U.S. market; and (v) subject imports would have

future price effects on the domestic industry.

### i. Volume After Interim 2012

With respect to Plaintiffs' argument that the interim 2012 surge in volume

was an anomaly, as discussed previously, Commissioner Pinkert reasonably relied on

the trend in subject import volumes at the end of the POI in assessing whether a threat

of material injury existed to the domestic market. *See Asociacion de Productores*, 26

CIT at 38, 180 F. Supp. 2d at 1370; *Bando Chem.*, 17 CIT at 807. In particular,

Commissioner Pinkert identified substantial evidence to support his determination that

subject import volumes were trending upward.[18] He noted that most of this surge

occurred late in the period of investigation and came at the expense of the domestic

industry. *Pinkert Views* at 3-4 (citing *Staff Report* at Table C-1). He also addressed the

absence of future orders, explaining that record data was compiled before the renewal

of the tax credits and that purchasers would have been reluctant to place orders until

after that situation had been clarified. *Pinkert Views* at 6-7 n.27 (citing Hr'g Tr. (Smith)

80). He reasoned that, with the renewal of the PTC and investment tax credit for

---

[18] Commissioner Pinkert observed that shipments of subject imports were [[      ]] percent higher in interim 2012 than in interim 2011. *Pinkert Views* at 3-4 (citing *Staff Report* at Table C-1).

construction projects beginning in 2013, "purchasers are necessarily compelled to act quickly to place orders, likely resulting in intense competition for the reduced volume of sales and likely negatively impacting domestic producers in the imminent time frame." *Pinkert's Views* at 6-7 n.27 (citing Hr'g Tr. (Smith) 80).

While Plaintiffs have a point that the situation in 2013 will differ from that in 2012 with the changes in the two tax credits, Commissioner Pinkert had to make a determination on the basis of the record that was before him. While discussing the future is inherently uncertain, Commissioner Pinkert tied his findings with regard to the future to the facts of record as they existed at the time he was making his determination. On that basis, Commissioner Pinkert relied on substantial record evidence in finding that subject import volumes would remain high in the imminent future.

### ii. Expanding Presence

In weighing the statutory factors for threat of material injury, Commissioner Pinkert reasoned,

> There is no reason to believe that the subject exporters, having expanded their presence in the U.S. market so significantly, beginning in 2011 and accelerating in 2012, including in the central region of the country where they might be expected not to be fully competitive due to transportation costs and logistical difficulties, would, in the absence of trade relief, relinquish it by not competing in the imminent future to their fullest abilities in all regions of the U.S. market.

*Pinkert Views* at 4. Plaintiffs contend that Commissioner Pinkert lacked substantial evidence to support this conclusion. (Siemens Mot. 38; Titan Mot. 49.) They argue that OEMs had no choice but to rely on subject imports because domestic producers routinely defaulted and rejected orders. (Siemens Mot. 38; Titan Mot. 49.) With less

demand after interim 2012, they urge, OEMs are likely to return to their preferred

practice of sourcing from domestic producers. (Titan Mot. 49.)

Contrary to Plaintiffs' contentions, Commissioner Pinkert reasonably found

substantial record evidence that subject imports had an expanding presence in the U.S.

market. He noted that purchases and installations of subject imports increased

significantly at the end of the POI, even in regions where Plaintiffs argue subject imports

do not compete with domestic wind towers. *Pinkert Views* at 4 (citing Siemens Post-

Hr'g Br. at 1, 8-10; Foreign Resp'ts Final Comments, at 11-12 & n.43; *Staff Report* at

Tables V-1, V-5).[19] Moreover, as previously discussed, Commissioner Pinkert identified

record evidence indicating that the domestic industry's operational inefficiencies could

not account for the full surge in subject import volume at the end of the POI, and that

OEMs caused these inefficiencies in some cases by renegotiating contracts in favor of

purchasing more subject imports. Thus, Commissioner Pinkert based his finding of

expanding presence of subject imports at the end of the POI on substantial evidence.

### iii. Excess Capacity

As part of his threat determination, Commissioner Pinkert found that "the

Chinese and Vietnamese industries have significant unused capacity for the production

of wind towers that they can use to export to the United States in the imminent future."

---

[19] For example, he found that subject imports sold in Midwestern states grew
substantially over prior years to [[    ]] units in all of 2011 and then surged to [[    ]]
units in the first six months of 2012. Similarly, he found that the number of subject
imports sales in the region consisting of Texas, Oklahoma, New Mexico, and Arizona
grew from [[    ]] units in all of 2010 to [[    ]] units during interim 2012. *Pinkert Views*
at 4 (citing *Staff Report* at Tables V-1, V-5).

*Pinkert Views* at 5 (citing *Staff Report* at Table VII-6; Pet'r's Post-Conf. Br. at Ex. 2). He

based this finding on data from foreign producers showing significantly increased

capacity between 2009 and 2012 and no projection that this capacity would fall in 2013.

*Pinkert Views* at 4-5 (citing *Staff Report* at Table VII-6).

Titan argues that Commissioner Pinkert lacked substantial evidence to

support this determination. (Titan Mot. 50.) It asserts that foreign producers reported

theoretical data on capacity when they were actually already operating at full capacity.

(Titan Mot. 50.) It further contends that foreign producers with capacity cannot ship in

the absence of orders, and that OEMs prefer to purchase from domestic producers.

(Titan Mot. 50.)

Commissioner Pinkert cited certified data from Chinese and Vietnamese

producers about their capacity to support his conclusion. *See Pinkert Views* at 4-5

(citing *Staff Report* at Table VII-6). This data constituted substantial evidence that

foreign producers had increased their capacity in recent years; that their capacity

utilization was falling across the period; and that, as a result, they had significant excess

capacity that they could use to export additional volumes of subject imports to the

United States. *See Pinkert Views* at 5 (citing *Staff Report* at Table VII-6). Although

Titan argues that the data relied upon was reported on a theoretical basis, it has failed

to support this contention with record evidence. In fact, Titan merely cites to the general

questionnaire responses of the foreign producers without any further support for its

theory that the data is theoretical. (Titan Mot. 50.) Thus, Titan has not established that

Commissioner Pinkert's findings on excess capacity were unreasonable or unsupported by substantial evidence.

### iv. End-of-Year Inventories

Commissioner Pinkert also found that foreign producers had significant end-of-year inventories poised for the U.S. market.  Plaintiffs argue that this conclusion is not supported by substantial evidence.  (Siemens Mot. 30, 34-36, 40; Titan Mot. 50-51.)  They explain that foreign producers inaccurately reported as "inventory" "made to order" towers that had already been sold.  (Siemens Mot. 30, 34-36, 40; Titan Mot. 50-51.)

Commissioner Pinkert considered the made-to-order nature of wind towers but also noted that they are not necessarily custom-made.  *Pinkert Views* at 5-6 n.23 (citing *Staff Report* at Tables VII-2, VII-4, VII-8).  Moreover, the record showed that at least on one occasion, a foreign producer used subject towers in its inventory that were made-to-order for one project for a different project.  (*See Staff Report* at V-48.)  Thus, Commissioner Pinkert's consideration of the subject producers' end-of-period inventories was reasonable and the existence of contradictory record evidence does not indicate that Commissioner Pinkert's determination was not supported by substantial evidence.  *See Armstrong Bros.*, 626 F.2d at 170 n.4.  Further, the statutory factors for assessing threat of material injury must be considered "as a whole," such that even if there were a weakness in the analysis of any one factor, it does not impeach the overall determination.  *See* 19 U.S.C. § 1677(7)(F)(ii).

### v. Price Effects

Commissioner Pinkert found that the price gap between subject imports and domestic products narrowed at the end of the POI and he anticipated that prices of subject imports would continue to fall as demand moderated in 2013. *Pinkert Views* at 7 (citing *Staff Report* at Tables V-2, V-6). He reasoned that competition would intensify, pushing down prices and adversely affecting an already vulnerable domestic industry. *Id.*

Plaintiffs assert that this finding is speculative because OEMs likely would return to their preferred practice of purchasing from domestic producers to obtain their base load requirements if demand moderated and domestic producers could meet such demand. (Titan Mot. 52.) They also argue that Commissioner Pinkert's finding of a narrowing price gap lacks substantial evidentiary support because the record shows that import prices were consistently higher than domestic prices on a delivered basis. (Siemens Mot. 39; Titan Mot. 51.) Siemens further contends that Commissioner Pinkert's finding of future price suppression is contrary to law because the Tariff Act requires that price suppression be found in the present. (Siemens Mot. 40 (citing 19 U.S.C. § 1677(7)(F)(iv) ("[Subject imports] are entering at prices that are likely to have a significant depressing or suppressing effect on domestic prices, and are likely to increase demand for further imports.")

Commissioner Pinkert reasonably found evidence of future price effects. He observed that the domestic industry's operating income margin declined from 2009 to 2011 and [[                    ]] in interim 2012, even as U.S. consumption of wind

towers peaked.[20]  Further, Commissioner Pinkert cited record evidence that the gap in

prices between subject imports and the domestic like product fell from 2009 to interim

2012.[21]  He reasoned that, in the context of increased subject imports and moderate

demand growth, subject import producers would further lower prices, exerting additional

downward pressures on domestic prices.  *Pinkert Views* at 8.  Commissioner Pinkert

noted that several domestic producers had already shuttered plants or switched to other

products in interim 2012.  *Pinkert Views* at 8 (citing *Staff Report* at III-1 to III-2).

Commissioner Pinkert thus concluded that subject imports were likely to

have negative price effects on the domestic industry.  Contrary to Plaintiffs' contentions,

Commissioner Pinkert reasonably extrapolated future price effects from these end-of-

POI trends.  *See, e.g., Goss*, 22 CIT at 1002-03, 33 F. Supp. 2d at 1099-1100 (affirming

Commission determination that small number of sales likely to be awarded in imminent

future would "likely result in intense competition among domestic and foreign suppliers

for bid awards. Moreover, this intensified competition for a smaller pool of sales

opportunities increases the incentive for suppliers of [subject] imports to compete on the

basis of price.").  Because Commissioner Pinkert supported his trend findings with

substantial evidence, the court will not reweigh the evidence or substitute its judgment

for the Commissioner's.  *Usinor*, 28 CIT at 1111, 342 F. Supp. 2d at 1272.

---

[20] Specifically, the domestic industry's operating income margin fell from [[    ]] percent in 2009, to only [[    ]] percent in 2011 and to [[                ]] in interim 2012. *Pinkert Views* at 8 (citing *Staff Report* at Tables C-1, C-2).
[21] In particular, Commissioner Pinkert found that the price gap shrunk from 28 percent in 2009-2011 to 11.2 percent in interim 2012. *Pinkert Views* at 7 (citing *Staff Report* at Tables V-2, V-6).

Court No. 13-00104                                                                 Page 52

## CONCLUSION

For the reasons provided above, the court denies Plaintiffs' motions for

judgment on the agency record.

                                                         /s/ Mark A. Barnett
                                                        Mark A. Barnett
                                                        Judge


Dated: June  17 , 2014
New York, New York

# VIEWS OF THE COMMISSION

Based on the record in these investigations, we find that an industry in the United States is materially injured by reason of imports of utility scale wind towers ("wind towers") from China found by the U.S. Department of Commerce ("Commerce") to be subsidized and sold in the United States at less than fair value and imports of wind towers from Vietnam found by Commerce to be sold in the United States at less than fair value.[1] [2]

## I.    BACKGROUND

The petitions in these investigations were filed by the Wind Tower Trade Coalition ("Petitioners").[3]  Petitioners appeared at the hearing and filed prehearing and posthearing briefs.[4]  A group of respondents consisting of CS Wind Tech Co., Ltd. ("CS Wind (China)"), CS Wind Vietnam Co., Ltd. ("CS Wind (Vietnam)"), Chengxi Shipyard Co., Ltd. ("Chengxi"), Titan Wind Energy Suzhou Co., Ltd ("Suzhou"), and Shanghai Taisheng Wind Power Equipment Co., Ltd., each of which produces and exports subject merchandise, and the China Chamber of Commerce for Import & Export of Machinery & Electronic Products, an association of Chinese producers of the subject merchandise (collectively, "Foreign Respondents"), filed prehearing and posthearing briefs.  Siemens Energy, Inc. and Siemens Power Generation ("Siemens"), an importer of subject merchandise and purchaser of the domestic like product, filed prehearing and posthearing briefs.  GE Generators (Pensacola), LLC ("GE"), which is also an importer and purchaser, filed a posthearing brief.

U.S. industry data are based on questionnaire responses of six firms that accounted for more than *** percent of U.S. shipments of wind towers during 2011.[5]  U.S. import data are based on questionnaire responses that cover over 95 percent of subject imports from China and Vietnam during the period from January 2009 to June 2012.[6]

Five Chinese producers responded to the Commission's questionnaire in the final phase of the investigations; two of those firms, Chengxi and CS Wind (China), estimated that they accounted for *** percent of total exports to the United States of wind towers from China in 2011.[7]  Data provided by two Vietnamese producers of wind towers that responded to the Commission's questionnaire, CS Wind

---

[1] Commissioner Dean A. Pinkert determines that a domestic industry is threatened with material injury by reason of subject imports of wind towers from China and Vietnam.  See Views of Commissioner Dean A. Pinkert.  Except to the extent otherwise noted, he joins sections I-VI of these views.

[2] Commissioners Daniel R. Pearson, David S. Johanson, and Meredith M. Broadbent determine that a domestic industry is neither materially injured nor threatened with material injury by reason of subject imports of wind towers from China and Vietnam.  See Dissenting Views of Commissioners Daniel R. Pearson, David S. Johanson, and Meredith M. Broadbent.  Except to the extent otherwise noted, they join sections I-VI of these views.

[3] The Wind Tower Trade Coalition consists of the following domestic producers of wind towers:  Broadwind Towers, Inc. of Manitowoc, Wisconsin; DMI Industries of Fargo, North Dakota; Katana Summit LLC of Columbus, Nebraska; and Trinity Structural Towers, Inc. of Dallas, Texas.

[4] Confidential Staff Report, INV-LL-002 (January 7, 2013) (revised by INV-LL-006, Jan. 11, 2013) ("CR") at I-1; Public Report, Utility Scale Wind Towers from China and Vietnam, Inv. Nos. 701-TA-486 and 731-TA-1195-1196 (Final), USITC Pub 4372 (January 2013) ("PR") at I-1.

[5] CR/PR at III-1 n.1.

[6] CR/PR at IV-1.

[7] CR/PR at VII-5.

3

(Vietnam) and UBI, reportedly accounted for the vast majority of production of subject wind towers in Vietnam and \*\*\* exports of wind towers to the United States from Vietnam in 2011.[8]

## II.    DOMESTIC LIKE PRODUCT

### A.    In General

In determining whether an industry in the United States is materially injured or threatened with material injury by reason of imports of subject merchandise, the Commission first defines the "domestic like product" and the "industry."[9]  Section 771(4)(A) of the Tariff Act of 1930, as amended ("the Tariff Act"), defines the relevant domestic industry as the "producers as a whole of a domestic like product, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of the product."[10]  In turn, the Tariff Act defines "domestic like product" as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation."[11]

The decision regarding the appropriate domestic like product in an investigation is a factual determination, and the Commission has applied the statutory standard of "like" or "most similar in characteristics and uses" on a case-by-case basis.[12]  No single factor is dispositive, and the Commission may consider other factors it deems relevant based on the facts of a particular investigation.[13]  The Commission looks for clear dividing lines among possible like products and disregards minor variations.[14]  Although the Commission must accept Commerce's determination as to the scope of the imported merchandise that is subsidized or sold at less than fair value,[15] the Commission determines what domestic product is like the imported articles Commerce has identified.[16]

---

[8] CR at VII-11, PR at VII-8.

[9] 19 U.S.C. § 1677(4)(A).

[10] 19 U.S.C. § 1677(4)(A).

[11] 19 U.S.C. § 1677(10).

[12] See, e.g., Cleo Inc. v. United States, 501 F.3d 1291, 1299 (Fed. Cir. 2007); NEC Corp. v. Department of Commerce, 36 F. Supp. 2d 380, 383 (Ct. Int'l Trade 1998); Nippon Steel Corp. v. United States, 19 CIT 450, 455 (1995); Torrington Co. v. United States, 747 F. Supp. 744, 749 n.3 (Ct. Int'l Trade 1990), aff'd, 938 F.2d 1278 (Fed. Cir. 1991) ("every like product determination 'must be made on the particular record at issue' and the 'unique facts of each case'").  The Commission generally considers a number of factors, including the following:  (1) physical characteristics and uses; (2) interchangeability; (3) channels of distribution; (4) customer and producer perceptions of the products; (5) common manufacturing facilities, production processes, and production employees; and, where appropriate, (6) price.  See Nippon, 19 CIT at 455 n.4; Timken Co. v. United States, 913 F. Supp. 580, 584 (Ct. Int'l Trade 1996).

[13] See, e.g., S. Rep. No. 96-249 at 90-91 (1979).

[14] Nippon, 19 CIT at 455; Torrington, 747 F. Supp. at 748-49; see also S. Rep. No. 96-249 at 90-91 (1979) (Congress has indicated that the like product standard should not be interpreted in "such a narrow fashion as to permit minor differences in physical characteristics or uses to lead to the conclusion that the product and article are not 'like' each other, nor should the definition of 'like product' be interpreted in such a fashion as to prevent consideration of an industry adversely affected by the imports under consideration.").

[15] See, e.g., USEC, Inc. v. United States, 34 Fed. Appx. 725, 730 (Fed. Cir. 2002) ("The ITC may not modify the class or kind of imported merchandise examined by Commerce."); Algoma Steel Corp. v. United States, 688 F. Supp. 639, 644 (Ct. Int'l Trade 1988), aff'd, 865 F.2d 240 (Fed. Cir.), cert. denied, 492 U.S. 919 (1989).

[16] Hosiden Corp. v. Advanced Display Mfrs., 85 F.3d 1561, 1568 (Fed. Cir. 1996) (the Commission may find a single like product corresponding to several different classes or kinds defined by Commerce); Cleo, 501 F.3d at 1298

(continued...)

B.    **Scope of These Investigations**

Commerce defined the scope of the imported merchandise under investigation as follows:

certain wind towers, whether or not tapered, and sections thereof.  Certain wind towers are designed to support the nacelle and rotor blades in a wind turbine with a minimum rated electrical power generation capacity in excess of 100 kilowatts ('`kW'') and with a minimum height of 50 meters measured from the base of the tower to the bottom of the nacelle (i.e., where the top of the tower and nacelle are joined) when fully assembled.

A wind tower section consists of, at a minimum, multiple steel plates rolled into cylindrical or conical shapes and welded together (or otherwise attached) to form a steel shell, regardless of coating, end-finish, painting, treatment, or method of manufacture, and with or without flanges, doors, or internal or external components (e.g., flooring/ decking, ladders, lifts, electrical buss boxes, electrical cabling, conduit, cable harness for nacelle generator, interior lighting, tool and storage lockers) attached to the wind tower section.  Several wind tower sections are normally required to form a completed wind tower.

Wind towers and sections thereof are included within the scope whether or not they are joined with nonsubject merchandise, such as nacelles or rotor blades, and whether or not they have internal or external components attached to the subject merchandise.

Specifically excluded from the scope are nacelles and rotor blades, regardless of whether they are attached to the wind tower.  Also excluded are any internal or external components which are not attached to the wind towers or sections thereof.[17]

Wind towers are large tubular steel towers that are part of wind turbines.  Wind turbines convert the mechanical energy of wind to electrical energy and are comprised of three main components – the nacelle, rotor, and tower.[18]  The nacelle houses the wind turbine's main power generation components (the gearbox, generator, and other components), while the rotor typically consists of three blades and the hub.  The nacelle sits on top of the wind tower.[19]  As the above language makes clear, wind towers within the scope of these investigations are 50 meters or more in height and designed to support the nacelle and rotor blades in a wind turbine with a minimum rated electrical power generation capacity in excess of 100 kilowatts.[20]  These towers are known in the industry as "utility scale" wind towers.[21]

---

[16] (...continued)
n.1 ("Commerce's {scope} finding does not control the Commission's {like product} determination."); Torrington, 747 F. Supp. at 748-52 (affirming the Commission's determination defining six like products in investigations in which Commerce found five classes or kinds).

[17] Utility Scale Wind Towers From the People's Republic of China: Final Affirmative Countervailing Duty Determination, 77 Fed. Reg. 75978 (Dec. 26, 2012).  See also 77 Fed. Reg. 75985 (Dec. 26, 2012); 77 Fed. Reg. 75993-94 (Dec. 26, 2012).

[18] CR at I-9, PR at I-7.

[19] CR at I-9, PR at I-7.

[20] CR at I-8, PR at I-6.

[21] CR at I-9 to I-10, PR at I-8.

JA 000071

C.     **Analysis**

In its preliminary determinations, the Commission rejected Siemens's argument that wind towers produced for Siemens's turbines should be defined as a separate like product.[22]  The Commission found that all wind towers, regardless of original equipment manufacturer ("OEM")[23] design, shared common physical characteristics and uses, channels of distribution, manufacturing facilities, production processes and employees, and producer and customer perceptions.  It noted that wind towers are made to order based on a purchaser's specification for a particular wind project and that multiple domestic producers may produce wind towers to a particular design.  Wind tower designs vary in terms of their size, steel standards, welding standards, and the components included in the wind towers by the manufacturer.  The Commission determined that such variations constituted only minor differences that were not an appropriate basis for defining a separate domestic like product.  The Commission found that, although there is a lack of interchangeability among wind towers produced to different OEMs' design specifications, such limited interchangeability among wind tower designs was not unexpected for made-to-order products, and it did not change the Commission's analysis of the other like product factors.[24]

In these final phase investigations, Siemens again argues that wind towers produced for its turbines are unique and should be a separate domestic like product.[25]  It asserts that there is "new information on the record" distinguishing the wind towers made for its turbines from towers made for GE, namely that GE is moving toward using a standardized set of towers while Siemens is not.[26]

The record in this final phase is not materially different from that in the preliminary phase and supports defining a single domestic like product that is coextensive with the scope of the investigations.  Siemens does not identify any new information in the record that undermines our conclusion that the differences between wind towers produced for different OEMs (such as size, steel standards, welding standards, and components) are minor and do not constitute clear dividing lines.  In our view, there are no significant differences between the physical characteristics, uses, and methods of production of the wind towers that Siemens purchases and those of the wind towers that other OEMs purchase.  Consequently, we find that the information in the record of these final phase investigations continues to indicate that Siemens's argument for dividing wind towers into separate like products based upon OEM design lacks merit.  We therefore find that all wind towers within the scope of the investigations constitute a single domestic like product.

## III.     DOMESTIC INDUSTRY

The domestic industry is defined as the domestic "producers as a whole of a domestic like product, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of the product."[27]  In defining the domestic industry, the Commission's general practice has been to include in the industry producers of all domestic production of the like product, whether toll-produced, captively consumed, or sold in the domestic merchant market.

---

[22]  Utility Scale Wind Towers from China and Vietnam, Inv. Nos. 701-TA-486 and 731-TA-1195-1196 (Preliminary), USITC Pub. 4304 (Feb. 2012) ("USITC Pub. 4304") at 8.

[23]  As used in the wind industry, an OEM is an original equipment manufacturer that purchases wind towers for use in the production and installation of finished wind turbines.

[24]  USITC Pub. 4304 at 8.

[25]  Siemens's Prehearing Brief at 53-58.

[26]  Siemens's Prehearing Brief at 57.

[27]  19 U.S.C. § 1677(4)(A).

6

The statute defines the relevant industry as the "producers as a [w]hole of a domestic like product, or those producers whose collective output of a domestic like product constitutes a major proportion of the product."[28]

In these final phase investigations, we have considered whether appropriate circumstances exist to exclude domestic producer *** from the domestic industry pursuant to the statutory related parties provision.[29] ***. *** affiliated subsidiary imported subject merchandise from *** during the period of investigation,[30] thus making *** a related party under the statute.[31]

Petitioners argue that exclusion of *** is appropriate.[32] Petitioners contend that *** imports a significant quantity of subject product and that its interests do not principally lie in U.S. production.[33] The Foreign Respondents and Siemens oppose excluding ***, arguing that *** imported because its U.S. production could not meet its own demand for wind towers.[34]

We find that *** principal interest lies in domestic production. It was the *** largest domestic producer during 2011, accounting for *** percent of total domestic production.[35] It ***, and its U.S. production increased *** during the period.[36] Its imports of subject merchandise in 2010 and 2011 were

---

[28] 19 U.S.C. § 1677(4)(A).

[29] 19 U.S.C. § 1677(4)(B). The primary factors the Commission has examined in deciding whether appropriate circumstances exist to exclude a related party include:

    (1)    the percentage of domestic production attributable to the importing producer;

    (2)    the reason the U.S. producer has decided to import the product subject to investigation, i.e., whether the firm benefits from the LTFV sales or subsidies or whether the firm must import in order to enable it to continue production and compete in the U.S. market, and

    (3)    the position of the related producer vis-a-vis the rest of the industry, i.e., whether inclusion or exclusion of the related party will skew the data for the rest of the industry.

See, e.g., Torrington Co. v. United States, 790 F. Supp. 1161 (Ct. Int'l Trade 1992), aff'd without opinion, 991 F.2d 809 (Fed. Cir. 1993). The Commission has also considered the ratio of import shipments to U.S. production for related producers and whether the primary interest of the related producer lies in domestic production or importation. See, e.g., Open-End Spun Rayon Singles Yarn from Austria, Inv. No. 731-TA-751 (Preliminary), USITC Pub. 2999 at 7 n.39 (October 1996). These latter two considerations were cited as appropriate factors as well in Allied Mineral Products, Inc. v. United States, —Fed. Supp. 2d.—, Slip Op. 04-139 (Ct. Int'l Trade November 12, 2004) at 6.

[30] The period for which data were collected in the final phase of these investigations includes 2009-2011 and the first six months of 2012 ("interim 2012.").

[31] CR/PR at Table III-12. In the preliminary investigations, the Commission found that *** was increasing its domestic production of wind towers and that there was no indication that its imports shielded it from subject imports or otherwise skewed its performance given that it performed worse than the rest of the domestic industry. USITC Pub. 4304 at 9-10. The Commission also noted that *** petition and that no party argued for its exclusion from the domestic industry. It therefore found that appropriate circumstances did not exist to exclude *** and defined the domestic industry to include all U.S. producers of wind towers. USITC Pub. 4304 at 10.

[32] Petitioners' Prehearing Brief at 11-23.

[33] Petitioners' Prehearing Brief at 13.

[34] Foreign Producers' Posthearing Brief at 47-49; Siemens's Posthearing Brief, Answers to Commissioners' Hearing Questions at 19.

[35] CR/PR at Table III-2.

[36] CR/PR at Tables III-4 & III-5.

lower than in 2009, and both its U.S. production and imports increased in interim 2012.[37]  Its ratio of total subject imports to domestic production fluctuated; it was *** percent in 2010 (when it ***), *** percent in 2011, *** percent in interim 2011, and *** percent in interim 2012.[38]  We also note that it does not oppose the petition.[39]  Moreover, there is no indication that its imports shielded *** from competition with the subject imports.[40] [41] [42]

Given its growing interest in domestic production of wind towers, we find that appropriate circumstances do not exist to exclude *** from the domestic industry on the basis of the related party provision  Accordingly, in light of our definition of the domestic like product, we define the domestic industry to include all U.S. producers of wind towers.[43]

## IV.    CUMULATION[44]

### A.    Legal Framework

For purposes of evaluating the volume and price effects for a determination of material injury by reason of the subject imports, section 771(7)(G)(i) of the Tariff Act requires the Commission to cumulate subject imports from all countries as to which petitions were filed and/or investigations self-initiated by Commerce on the same day, if such imports compete with each other and the domestic like product in the

---

[37] See CR/PR at Table III-12.  Its imports of subject merchandise from *** were *** wind towers in 2009, *** wind towers in 2010, *** wind towers in 2011 and *** wind towers in interim 2012.  CR/PR at Table III-12.  Its imports from *** were *** wind towers in 2009, *** wind towers in 2010, *** wind towers imports in 2011 and *** wind towers in interim 2012.  Id.

[38] CR/PR at Table III-12.

[39] CR/PR at Table III-2.

[40] See CR/PR at Table VI-3. *** ratio of operating income to net sales was *** percent in 2010, *** percent in 2011 and *** percent in interim 2012.  Although it performed *** than the industry average during 2010, its performance in 2011 and interim 2012 was *** than average.  See CR/PR at Table VI-3.

[41] Consistent with her practice in past investigations and reviews, Commissioner Aranoff does not rely on individual-company operating income margins, which reflect a domestic producer's financial operations related to production of the domestic like product, in assessing whether a related party has benefitted from importation of subject merchandise.  Rather, she determines whether to exclude a related party based principally on its ratio of subject imports to domestic production and whether its primary interests lie in domestic production or importation.

[42] Commissioner Pinkert does not rely upon the related party's financial performance as a factor in determining whether there are appropriate circumstances to exclude it from the domestic industry.  The present record is not sufficient to link the related party's profitability on U.S. operations to any specific benefit it derives from importing or from its relationship with an importer.  See Allied Mineral Products v. United States, 28 CIT 1861, 1865-67 (2004).

[43] Without addressing the statutory criteria in 19 U.S.C. § 1677(4)(C), Siemens argues that the wind tower installation patterns in the United States should lead the Commission to view the domestic industry as a regional industry.  Siemens's Posthearing Brief at 8.  No party to these investigations has argued that the regional industry provision applies or has asked the Commission to collect the information necessary to determine whether it applies.  Because the record consequently contains neither data nor arguments confirming that a regional industry analysis is appropriate, we have not considered the application of the regional industry provision to these investigations.

[44] Negligibility under 19 U.S.C. § 1677(24) is not an issue in these investigations.  Only 11 months of import data prior to the filing of the petitions are available based on official import statistics that accurately reflect subject imports on a monthly basis.  During that period, subject imports from China and Vietnam accounted for 49.9 percent and 16.1 percent of total imports of wind towers, respectively.  CR at IV-9, PR at IV-7.  These figures far exceed the statutory threshold of three percent for negligibility.

U.S. market.[45] In assessing whether subject imports compete with each other and with the domestic like product, the Commission has generally considered four factors:

(1) the degree of fungibility between the subject imports from different countries and between imports and the domestic like product, including consideration of specific customer requirements and other quality related questions;

(2) the presence of sales or offers to sell in the same geographic markets of subject imports from different countries and the domestic like product;

(3) the existence of common or similar channels of distribution for subject imports from different countries and the domestic like product; and

(4) whether the subject imports are simultaneously present in the market.[46]

Although no single factor is necessarily determinative, and the list of factors is not exclusive, these factors are intended to provide the Commission with a framework for determining whether the subject imports compete with each other and with the domestic like product.[47] Only a "reasonable overlap" of competition is required.[48]

### B. Discussion

In these investigations, the threshold criterion for cumulation is satisfied because petitioners filed the antidumping duty petitions with respect to China and Vietnam and the countervailing duty petition with respect to China on the same day. None of the exceptions to cumulation applies.[49] Subject imports from China and Vietnam are therefore eligible for cumulation. We consequently examine whether there is a reasonable overlap of competition between subject imports from China and Vietnam, as well as between subject imports and the domestic like product.[50]

#### 1. Fungibility

We find a reasonable degree of fungibility among the subject imports from each country and the domestic like product. The questionnaire responses indicate that market participants perceive domestically produced wind towers and the subject imports to have some degree of interchangeability.[51]

---

[45] 19 U.S.C. § 1677(7)(G)(i).

[46] See Certain Cast-Iron Pipe Fittings from Brazil, the Republic of Korea, and Taiwan, Invs. Nos. 731-TA-278 to 280 (Final), USITC Pub. 1845 (May 1986), aff'd, Fundicao Tupy, S.A. v. United States, 678 F. Supp. 898 (Ct. Int'l Trade), aff'd, 859 F.2d 915 (Fed. Cir. 1988).

[47] See, e.g., Wieland Werke, AG v. United States, 718 F. Supp. 50 (Ct. Int'l Trade 1989).

[48] The Statement of Administrative Action ("SAA") states that "the new section will not affect current Commission practice under which the statutory requirement is satisfied if there is a reasonable overlap of competition." SAA on Uruguay Round Agreements Act ("URAA"), H.R. Rep. 103-316, Vol. I at 848 (1994) (citing Fundicao Tupy, S.A. v. United States, 678 F. Supp. 898, 902 (Ct. Int'l Trade 1988)), aff'd, 859 F.2d 915 (Fed. Cir. 1988). See also, e.g., Goss Graphic Sys., Inc. v. United States, 33 F. Supp. 2d 1082, 1087 (Ct. Int'l Trade 1998) ("cumulation does not require two products to be highly fungible"); Wieland Werke, AG, 718 F. Supp. at 52 ("Completely overlapping markets are not required.").

[49] See 19 U.S.C. § 1677(7)(G)(ii).

[50] Petitioners argue that the prerequisites for cumulation for purposes of present material injury are satisfied in these investigations, Petitioners' Prehearing Brief at 6-8. No respondents have addressed the issue.

[51] All five responding producers indicated that subject imports from both subject countries are "always" interchangeable with domestically produced wind towers. CR/PR at Table II-6. Three of five responding importers (continued...)

Additionally, one of the larger importers, ***, reported that towers built for its turbines are built to its specifications and are interchangeable with other towers built to the same specifications, regardless of the manufacturer or the country of origin.[52]  Siemens has used a combination of imported and domestically produced wind towers for some of its projects as well.[53]

## 2.    Geographic Overlap

The record indicates a geographic overlap in sales between the subject imports and domestically produced wind towers.  The record indicates that wind towers from both domestic and subject sources are marketed and shipped nationwide.[54]  Three responding U.S. producers reported that approximately *** of their sales were destined for the Midwest and almost *** were destined for the Pacific Coast.[55]  Importers reported shipping imported Chinese wind towers to all U.S. geographic regions in 2011, and subject imports from Vietnam were shipped to all regions in the contiguous United States except the Southeast.[56]  Subject producers bid on projects across most regions of the United States,[57] and U.S. imports of wind towers from China and Vietnam entered multiple U.S. ports of entry, although they were concentrated in the West Coast and Gulf.[58]

## 3.    Channels of Distribution

The majority of shipments of both domestically produced merchandise and the subject imports were delivered directly to unrelated producers of wind turbines (OEMs) by both domestic producers and foreign producers.[59] ***, however, internally consumes its production.[60]

---

[51] (...continued)
consider the subject imports from China to be at least "sometimes" interchangeable with domestically produced wind towers.  Id.  Two of three responding importers consider the subject imports from Vietnam to be "always" or "frequently" interchangeable with domestically produced wind towers.  Two of three responding importers consider the subject imports from China to be "always" or "frequently" interchangeable with subject imports from Vietnam.  Id.  Three of five responding purchasers consider the subject imports from China to be at least "sometimes" interchangeable with domestically produced wind towers, and one of two responding purchasers considers the subject imports from Vietnam to be "always" interchangeable with domestically produced wind towers.  One of two responding purchasers considers the subject imports from Vietnam to be "always" interchangeable with subject imports from China.  Id.

[52] CR at II-31 to II-32, PR at II-19.

[53] CR/PR at Table V-5.

[54] See CR/PR at V-2 (eighteen facilities nationwide produced wind towers as of June 2012).  Domestic producers' current production facilities are concentrated in the Midwest and in Oklahoma and Texas, but during the period of investigation were also located in the Pacific Coast area.  CR/PR at Fig. III-1.

[55] See CR/PR II-1.

[56] CR at II-2, PR at II-1.

[57] See CR/PR at Tables V-1 and V-3.

[58] CR/PR at IV-7.

[59] CR/PR at II-1.

[60] CR/PR at II-1.

10

4.    **Simultaneous Presence**

Bid data indicate that domestically produced wind towers were present in the U.S. market during each year of the 2009-2012 period.[61]  Importers' questionnaires show that shipments of subject imports from China and Vietnam were also present throughout this period.[62]

C.    **Conclusion**

Based on the record, we find a reasonable overlap of competition among the subject imports from China and Vietnam and the domestic like product.  We therefore cumulatively assess the volume and price effects of subject imports from China and Vietnam for purposes of determining whether there is material injury to the domestic industry by reason of the subject imports.

V.    **LEGAL STANDARDS**

A.    **In General**

In the final phase of antidumping and countervailing duty investigations, the Commission determines whether an industry in the United States is materially injured or threatened with material injury by reason of the imports under investigation.[63]  In making this determination, the Commission must consider the volume of subject imports, their effect on prices for the domestic like product, and their impact on domestic producers of the domestic like product, but only in the context of U.S. production operations.[64]  The statute defines "material injury" as "harm which is not inconsequential, immaterial, or unimportant."[65]  In assessing whether the domestic industry is materially injured by reason of subject imports, we consider all relevant economic factors that bear on the state of the industry in the United States.[66]  No single factor is dispositive, and all relevant factors are considered "within the context of the business cycle and conditions of competition that are distinctive to the affected industry."[67]

Although the statute requires the Commission to determine whether the domestic industry is "materially injured or threatened with material injury by reason of" unfairly traded imports,[68] it does not define the phrase "by reason of," indicating that this aspect of the injury analysis is left to the Commission's reasonable exercise of its discretion.[69]  In identifying a causal link, if any, between subject imports and material injury to the domestic industry, the Commission examines the facts of record that

---

[61] See CR/PR at Tables V-1 and V-5 (indicating GE's and Siemens's purchases of domestically produced towers).

[62] See CR/PR at IV-1. See also CR/PR at Table IV-4 (U.S. imports of wind towers from China entered in each of the 22 months between January 2011 and October 2012, while U.S. imports of wind towers from Vietnam only entered in 13 of the 22 months).

[63] 19 U.S.C. §§ 1671d(b), 1673d(b).

[64] 19 U.S.C. § 1677(7)(B)(i).  The Commission "may consider such other economic factors as are relevant to the determination" but shall "identify each {such} factor ... and explain in full its relevance to the determination." 19 U.S.C. § 1677(7)(B).

[65] 19 U.S.C. § 1677(7)(A).

[66] 19 U.S.C. § 1677(7)(C)(iii).

[67] 19 U.S.C. § 1677(7)(C)(iii).

[68] 19 U.S.C. §§ 1671d(a), 1673d(a).

[69] Angus Chemical Co. v. United States, 140 F.3d 1478, 1484-85 (Fed. Cir. 1998) ("{T}he statute does not 'compel the commissioners' to employ {a particular methodology}."), aff'd, 944 F. Supp. 943, 951 (Ct. Int'l Trade 1996).

11

relate to the significance of the volume and price effects of the subject imports and any impact of those imports on the condition of the domestic industry. This evaluation under the "by reason of" standard must ensure that subject imports are more than a minimal or tangential cause of injury and that there is a sufficient causal, not merely a temporal, nexus between subject imports and material injury.[70]

In many investigations, there are other economic factors at work, some or all of which may also be having adverse effects on the domestic industry. Such economic factors might include nonsubject imports; changes in technology, demand, or consumer tastes; competition among domestic producers; or management decisions by domestic producers. The legislative history explains that the Commission must examine factors other than subject imports to ensure that it is not attributing injury from other factors to the subject imports, thereby inflating an otherwise tangential cause of injury into one that satisfies the statutory material injury threshold.[71] In performing its examination, however, the Commission need not isolate the injury caused by other factors from injury caused by unfairly traded imports.[72] Nor does the "by reason of" standard require that unfairly traded imports be the "principal" cause of injury or contemplate that injury from unfairly traded imports be weighed against other factors, such as nonsubject

_____

[70] The Federal Circuit, in addressing the causation standard of the statute, observed that "{a}s long as its effects are not merely incidental, tangential, or trivial, the foreign product sold at less than fair value meets the causation requirement." Nippon Steel Corp. v. USITC, 345 F.3d 1379, 1384 (Fed. Cir. 2003). This was further ratified in Mittal Steel Point Lisas Ltd. v. United States, 542 F.3d 867, 873 (Fed. Cir. 2008), where the Federal Circuit, quoting Gerald Metals, Inc. v. United States, 132 F.3d 716, 722 (Fed. Cir. 1997), stated that "this court requires evidence in the record 'to show that the harm occurred "by reason of" the LTFV imports, not by reason of a minimal or tangential contribution to material harm caused by LTFV goods.'" See also Nippon Steel Corp. v. United States, 458 F.3d 1345, 1357 (Fed. Cir. 2006); Taiwan Semiconductor Industry Ass'n v. USITC, 266 F.3d 1339, 1345 (Fed. Cir. 2001).

[71] SAA at 851-52 ("{T}he Commission must examine other factors to ensure that it is not attributing injury from other sources to the subject imports."); S. Rep. 96-249 at 75 (1979) (the Commission "will consider information which indicates that harm is caused by factors other than less-than-fair-value imports."); H.R. Rep. 96-317 at 47 (1979) ("in examining the overall injury being experienced by a domestic industry, the ITC will take into account evidence presented to it which demonstrates that the harm attributed by the petitioner to the subsidized or dumped imports is attributable to such other factors;" those factors include "the volume and prices of nonsubsidized imports or imports sold at fair value, contraction in demand or changes in patterns of consumption, trade restrictive practices of and competition between the foreign and domestic producers, developments in technology and the export performance and productivity of the domestic industry"); accord Mittal Steel, 542 F.3d at 877.

[72] SAA at 851-52 ("{T}he Commission need not isolate the injury caused by other factors from injury caused by unfair imports."); Taiwan Semiconductor Industry Ass'n v. USITC, 266 F.3d 1339, 1345 (Fed. Cir. 2001) ("{T}he Commission need not isolate the injury caused by other factors from injury caused by unfair imports. . . . Rather, the Commission must examine other factors to ensure that it is not attributing injury from other sources to the subject imports." (emphasis in original)); Asociacion de Productores de Salmon y Trucha de Chile AG v. United States, 180 F. Supp. 2d 1360, 1375 (Ct. Int'l Trade 2002) ("{t}he Commission is not required to isolate the effects of subject imports from other factors contributing to injury" or make "bright-line distinctions" between the effects of subject imports and other causes.); see also Softwood Lumber from Canada, Invs. Nos. 701-TA-414 and 731-TA-928 (Remand), USITC Pub. 3658 at 100-01 (Dec. 2003) (Commission recognized that "{i}f an alleged other factor is found not to have or threaten to have injurious effects to the domestic industry, i.e., it is not an 'other causal factor,' then there is nothing to further examine regarding attribution to injury"), citing Gerald Metals, Inc. v. United States, 132 F.3d 716, 722 (Fed. Cir. 1997) (the statute "does not suggest that an importer of LTFV goods can escape countervailing duties by finding some tangential or minor cause unrelated to the LTFV goods that contributed to the harmful effects on domestic market prices.").

JA 000078

imports, which may be contributing to overall injury to an industry.[73]  It is clear that the existence of injury caused by other factors does not compel a negative determination.[74]

Assessment of whether material injury to the domestic industry is "by reason of" subject imports "does not require the Commission to address the causation issue in any particular way" as long as "the injury to the domestic industry can reasonably be attributed to the subject imports" and the Commission "ensure{s} that it is not attributing injury from other sources to the subject imports."[75] [76]  Indeed, the Federal Circuit has examined and affirmed various Commission methodologies and has disavowed "rigid adherence to a specific formula."[77]

The Federal Circuit's decisions in Gerald Metals, Bratsk, and Mittal Steel all involved cases where the relevant "other factor" was the presence in the market of significant volumes of price-competitive nonsubject imports.  The Commission interpreted the Federal Circuit's guidance in Bratsk as requiring it to apply a particular additional methodology following its finding of material injury in cases involving commodity products and a significant market presence of price-competitive nonsubject imports.[78]  The additional "replacement/benefit" test looked at whether nonsubject imports might have replaced subject imports without any benefit to the U.S. industry.  The Commission applied that specific additional test in subsequent cases, including the Carbon and Certain Alloy Steel Wire Rod from Trinidad and Tobago determination that underlies the Mittal Steel litigation.

Mittal Steel clarifies that the Commission's interpretation of Bratsk was too rigid and makes clear that the Federal Circuit does not require the Commission to apply an additional test nor any one specific methodology; instead, the court requires the Commission to have "evidence in the record" to "show that the harm occurred 'by reason of' the LTFV imports," and requires that the Commission not attribute

---

[73] S. Rep. 96-249 at 74-75; H.R. Rep. 96-317 at 47.

[74] See Nippon Steel Corp., 345 F.3d at 1381 ("an affirmative material-injury determination under the statute requires no more than a substantial-factor showing.  That is, the 'dumping' need not be the sole or principal cause of injury.").

[75] Mittal Steel, 542 F.3d at 877-78; see also id. at 873 ("While the Commission may not enter an affirmative determination unless it finds that a domestic industry is materially injured 'by reason of' subject imports, the Commission is not required to follow a single methodology for making that determination ... {and has} broad discretion with respect to its choice of methodology.") citing United States Steel Group v. United States, 96 F.3d 1352, 1362 (Fed. Cir. 1996) and S. Rep. 96-249 at 75.

[76] Commissioner Pinkert does not join this paragraph or the following three paragraphs.  He points out that the Federal Circuit, in Bratsk, 444 F.3d 1369, and Mittal Steel, held that the Commission is required, in certain circumstances when considering present material injury, to undertake a particular kind of analysis of nonsubject imports, albeit without reliance upon presumptions or rigid fomulas.  Mittal Steel explains as follows:

> What Bratsk held is that "where commodity products are at issue and fairly traded, price-competitive, nonsubject imports are in the market," the Commission would not fulfill its obligation to consider an important aspect of the problem if it failed to consider whether nonsubject or non-LTFV imports would have replaced LTFV subject imports during the period of investigation without a continuing benefit to the domestic industry.  444 F.3d at 1369.  Under those circumstances, Bratsk requires the Commission to consider whether replacement of the LTFV subject imports might have occurred during the period of investigation, and it requires the Commission to provide an explanation of its conclusion with respect to that factor.

542 F.3d at 878.

[77] Nucor Corp. v. United States, 414 F.3d 1331, 1336, 1341 (Fed. Cir. 2005); see also Mittal Steel, 542 F.3d at 879 ("Bratsk did not read into the antidumping statute a Procrustean formula for determining whether a domestic injury was 'by reason' of subject imports.").

[78] Mittal Steel, 542 F.3d at 875-79.

JA 000079

injury from nonsubject imports or other factors to subject imports.[79]  Accordingly, we do not consider ourselves required to apply the replacement/benefit test that was included in Commission opinions subsequent to Bratsk.

The progression of Gerald Metals, Bratsk, and Mittal Steel clarifies that, in cases involving commodity products where price-competitive nonsubject imports are a significant factor in the U.S. market, the Court will require the Commission to give full consideration, with adequate explanation, to non-attribution issues when it performs its causation analysis.[80]

The question of whether the material injury threshold for subject imports is satisfied notwithstanding any injury from other factors is factual, subject to review under the substantial evidence standard.[81]  Congress has delegated this factual finding to the Commission because of the agency's institutional expertise in resolving injury issues.[82]

## VI.    CONDITIONS OF COMPETITION AND THE BUSINESS CYCLE

The following conditions of competition inform our analysis of whether there is material injury by reason of subject imports.  We note that, although there is captive consumption by one domestic producer, the requirements of the statutory captive production provision are not satisfied.[83]

---

[79] Mittal Steel, 542 F.3d at 873 (quoting from Gerald Metals, 132 F.3d at 722), 875-79 & n.2 (recognizing the Commission's alternative interpretation of Bratsk as a reminder to conduct a non-attribution analysis).

[80] To that end, after the Federal Circuit issued its decision in Bratsk, the Commission began to present published information or send out information requests in final phase investigations to producers in nonsubject countries that accounted for substantial shares of U.S. imports of subject merchandise (if, in fact, there were large nonsubject import suppliers).  In order to provide a more complete record for the Commission's causation analysis, these requests typically seek information on capacity, production, and shipments of the product under investigation in the major source countries that export to the United States.  The Commission plans to continue utilizing published or requested information in final phase investigations in which there are substantial levels of nonsubject imports.

[81] We provide in our respective discussions of volume, price effects, and impact a full analysis of other factors alleged to have caused any material injury experienced by the domestic industry in these investigations.

[82] Mittal Steel, 542 F.3d at 873; Nippon Steel Corp., 458 F.3d at 1350, citing U.S. Steel Group, 96 F.3d at 1357; S. Rep. 96-249 at 75 ("The determination of the ITC with respect to causation is ... complex and difficult, and is a matter for the judgment of the ITC.").

[83] Because of captive consumption by a domestic producer, ***, we have considered whether the captive production provision of the statute requires our primary focus to be on the merchant market when we assess market share and factors affecting the financial performance of the domestic industry.  In the preliminary phase of the investigations, the Commission found that the third statutory criterion was not satisfied.  Utility Scale Wind Towers from China and Vietnam, Inv. Nos. 701-TA-486 and 731-TA-1195-1196 (Preliminary), USITC Pub. 4304 (Feb. 2012) at 17 n.99.  The third criterion requires the Commission to examine whether the merchant market purchasers are generally using the domestic like product in the production of the same downstream article or articles as the integrated domestic producer.  19 U.S.C. § 1677(7)(C)(iv)(iii).  If the merchant market purchasers are using the domestic like product in the production of the same downstream article or articles as the integrated domestic producer, then the statutory criterion is not satisfied.  See Polyvinyl Alcohol from Taiwan, Inv. No. 731-TA-1088 (Preliminary), USITC Pub. 3732 (October 2004) at 16-17.
Petitioners argue that the Commission should find that the statutory provision is applicable to these investigations.  Petitioners' Prehearing Brief at 23-26.  However, the record indicates that wind towers sold in the merchant market are used in the production of the same downstream product (wind turbines) for which wind towers are captively consumed.  *** is integrated and internally consumes wind towers in the production of wind turbines. CR at III-24 n.46, PR at III-11 n. 46.  Accordingly, we find that the third criterion of the captive production provision is not satisfied.

14

## A.    Demand Considerations

Wind towers provide the support for wind turbines used in electrical power generation projects. Demand for wind towers is derived from demand for wind turbines and is driven by the installation of wind turbines in large wind projects. OEMs are generally the purchasers of wind towers.[84] After a project developer or purchaser awards a project or wind farm to an OEM, the OEM secures a supply of wind towers for the project.[85] The number of towers needed for a project can vary widely; record data show projects with as few as one tower and as many as 338 towers.[86] A limited number of OEMs purchase wind towers. Leading OEMs in 2011 included GE, Siemens, Vestas, Suzlon, Mitsubishi Power, Nordex, and Clipper; GE, Siemens, and Vestas accounted for over three-quarters of the wind turbine installations in the United States in 2011.[87]

Government incentives historically have had a powerful influence on demand for wind towers.[88] When a major government incentive, the production tax credit ("PTC"), was allowed to lapse, installations of wind turbines slowed dramatically.[89] The PTC, which originated in the Energy Policy Act of 1992, is a credit of 2.2 cents per kilowatt-hour for the first ten years a wind turbine is in operation.[90] The PTC and other government incentives were scheduled to expire at the end of 2012, and for projects to qualify for the PTC in particular, they had to be in operation by the end of 2012.[91] This resulted in extraordinary demand for wind towers toward the end of the period, particularly the first six months of 2012.[92] The PTC was renewed at the beginning of 2013,[93] but it now applies to projects for which construction is commenced by the end of 2013.[94]

The American Recovery and Reinvestment Act of 2009 ("ARRA") also made wind projects eligible for the 30 percent investment tax credit if completed by the end of 2012.[95] Under ARRA, firms could also seek to qualify for a newly created cash grant equal to the amount of the credit. In order to qualify, however, projects must have started construction before the end of 2011 and needed to be in commercial operation by the end of 2012.[96] The investment tax credit has also been renewed for 2013.[97]

In addition to the Federal tax credits, a number of states have implemented renewable portfolio standards ("RPS") mandating that a certain percentage of electricity come from renewable sources by a particular date. RPS mandates have also contributed to the growth of wind installations and the demand for wind towers. As of January 2012, 29 states, the District of Columbia, and Puerto Rico had mandatory

---

[84] CR/PR at I-3.

[85] CR at V-5; PR at V-3; CR at V-41; PR at V-5; Tr. at 149 (Revak).

[86] For example, *** required only a single wind tower, while Shepherds Flat required the installation of 338 wind towers. CR/PR at Table V-1; CR at V-67; PR at V-7.

[87] CR at I-4 n.4; PR at I-3, n.4.

[88] CR/PR at Fig. II-1.

[89] See CR/PR at Fig. II-1.

[90] CR at II-10 to II-11, PR at II-6.

[91] CR at II-11, PR at II-6.

[92] CR at II-10, PR at II-6, CR/PR at Fig. II-1.

[93] American Taxpayer Relief Act of 2012, Pub.L.112-240 (Jan. 2, 2013).

[94] CR at II-10, PR at II-6.

[95] CR at II-2, PR at II-1.

[96] CR at II-11, PR at II-6.

[97] CR at II-11, PR at II-6. See also EDIS Docs. 500775, 500751, 500526. No information has been received as to whether cash grants were among the programs renewed.

15

standards with respect to the percentage of electricity provided from renewable sources, while eight states had voluntary goals.[98]

Wind projects are generally concentrated where wind speeds are higher, predominantly in the Midwest corridor from Texas north to Canada and between the Mississippi River and the Rockies, in California, and in the Pacific Northwest.[99]  The states of Texas, California, Kansas, Oregon, Oklahoma, and Illinois saw the largest number of installations during the period of investigation.[100]

Apart from the government initiatives, several other factors influenced demand for wind towers during the period of investigation. The financial crisis, beginning in 2008, led to tightened credit and a decline in demand for wind towers during 2009 and 2010, because financing for wind projects became difficult to obtain.[101]  Low prices for natural gas, an alternative source of energy for the generation of electricity, may also have dampened demand for wind projects to some extent.[102]  Despite falling natural gas prices during the period, however, wind energy has achieved, or nearly achieved, grid parity in areas of the United States that are high-wind locations.[103]  As a result, and along with the push to benefit from the expiring tax credits, wind turbine installations increased during the latter portion of the period even though natural gas prices remained low.[104]

Apparent U.S. consumption of wind towers declined and then increased sharply during the period of investigation.  It decreased from 3,842 towers in 2009 to 2,887 towers in 2010, before increasing to *** towers in 2011.  Apparent U.S. consumption was *** towers in interim 2011 and *** towers in interim 2012.[105]

### B.     Supply Considerations

Six domestic producers, accounting for the substantial majority of U.S. production during 2011, provided information to the Commission.[106]  Four domestic producers have multiple production facilities.[107]  Production facilities are predominantly located in the Midwest, Oklahoma, and Texas, although two are on the West Coast.  Four domestic producers reported shutdowns or curtailments of their domestic production during the period examined, while five firms opened, expanded or upgraded production facilities.[108]  While the reported plant openings and expansions took place earlier in the period, DMI, Katana and Trinity all reported plant closings or sales of assets in 2012.[109]  Vestas, which began U.S. wind tower production in 2010, is the only U.S. producer whose overall operations are vertically

---

[98] CR at II-12, PR at II-7.

[99] Tr. at 118-119 (Cole); CR/PR at Table D-2 (listing states in order of total installations).

[100] CR/PR at Table D-2.

[101] CR at II-9, II-10, PR at II-5-6, Tr. at 74-75.

[102] CR at II-10, PR at II-5.

[103] Petitioners' Posthearing Brief at 53; Tr. at 102 (Mr. Rubin).  "Grid parity" for the wind energy industry is defined as occurring when the cost of producing electricity with wind is competitive with alternative fuels. Siemens's Prehearing Brief, at 12.

[104] Petitioners' Posthearing Brief at 54; CR/PR at Fig. II-5.

[105] CR/PR at Table IV-6.

[106] CR/PR at Table III-2.

[107] CR/PR at III-1, Table III-2

[108] CR/PR at Table III-4.

[109] See CR at III-2, PR at III-1 and Table III-1.

16

integrated, as it is *** for the production of wind turbines.[110]  Domestic production capacity increased from 3,343 wind towers in 2009 to 3,898 wind towers in 2010 and *** wind towers in 2011.[111]  It was *** towers in interim 2011 and *** towers in interim 2012.[112]

Two domestic producers (***) reported having supply agreements with OEMs (***) during the period of investigation.[113]  Typically, under these agreements the domestic producer reserves production capacity for towers to be supplied to an OEM, and the OEM agrees to purchase a certain number of towers each year.  These agreements may be subject to renegotiation by the parties, allowing the OEMs to reduce the number of towers ordered in a given year below the contract commitment, extend the timing of deliveries, or change the types of towers ordered.[114]

The domestic industry was the largest source of wind towers in the U.S. market until interim 2012, when subject imports captured the largest share of the market.[115]  Korea, Canada, Mexico, and Indonesia were the leading nonsubject sources of imports.[116]  Nonsubject imports lost market share throughout the period of investigation, and by 2011, subject imports were a larger source of supply than nonsubject imports.[117] [118]

### C.  Substitutability and Other Conditions

Most OEMs require qualification or certification of wind tower producers.[119]  Qualification requirements can include technical capability to run at the rate required, compliance with international standards, experience, facility inspections (for safety, cleanliness, and technical system and product capability), financial stability, ISO certification, on time delivery, quality assurance, quality of end product, quality specification, and technical reviews.[120]  Seven of the eight purchasers reported qualification times of between three and six months.[121]  Each production location is separately qualified, even for producers who operate multiple facilities.[122]  Typically, an OEM will order wind towers from a supplier it has qualified.  At the beginning of the period, the two largest OEMs, GE and Siemens,

---

[110] CR/PR at II-1.

[111] CR/PR at Table III-3.

[112] CR/PR at Table III-3.

[113] CR at III-11 to III-13, PR at III-7-8.

[114] CR at III-11 to III-13, PR at III-7-8.

[115] See CR/PR at Table IV-6.

[116] CR at VII-21, PR at VII-13.  Respondents argue that most wind towers installed along the Eastern seaboard, where there is no domestic production, are produced in Canada.  Foreign Respondents' Posthearing Brief at 9.  The record indicates, however, that some subject imports originating in Asia were shipped through the Panama Canal and installed in Eastern states.  CR/PR at Table V-5 (***); *** Importer Questionnaire, response to Question V-1, EDIS Docs. 499922, 499924, and 799925.

[117] See CR/PR at Table IV-6; Tr at 226 (Revak).

[118] Nonsubject imports totaled 1,175 towers in 2009, 783 towers in 2010, 475 towers in 2011, 246 towers in interim 2011, and 382 towers in interim 2012.  Subject imports totaled 646 towers in 2009, 366 towers in 2010, 916 towers in 2011, 456 towers in interim 2011, and 1,257 towers in interim 2012. CR/PR at Table IV-2.

[119] CR at II-28, PR at II-17.

[120] CR at II-29, PR at II-17.

[121] CR at II-29, PR at II-17.

[122] Tr. at 176 (Hazel).

17

had each qualified only a small number of domestic facilities.[123] Later in the period, however, as demand rose under uncertainty of the renewal of the PTC and other federal incentives, OEMs qualified more domestic suppliers and were sometimes willing to perform qualification after production had begun on tower orders.[124] [125]

Subject imports and domestically produced wind towers are at least moderately substitutable once production facilities are qualified for a wind project.[126] [127] Respondents argue that geography (due to substantial transportation costs) as well as long lead times limit the substitutability of otherwise comparable wind towers.[128] Nonetheless, subject imports compete in all regions, and wind towers sourced from both domestic producers and subject producers are often used in the same wind project.[129]

OEMs (***) explained that they do not necessarily solicit multiple bids when selecting their wind tower suppliers.[130] Each purchaser has its own method of wind tower procurement. ***[131] ***.[132] Siemens, however, uses custom tower designs that are unique to each wind farm project and orders towers on a spot basis only after securing individual projects. Siemens states that it tries to buy as many towers as possible for a project from the qualified facility closest to the project and bases its purchasing decision on the lowest delivered cost.[133] ***.[134] ***.[135]

Steel plate is the principal raw material used to produce wind towers, and raw materials account for the major share of the cost of goods sold ("COGS") for wind towers.[136] Raw materials accounted for between *** and *** percent of COGS during 2009-2011, *** percent of COGS in interim 2011, and *** percent in interim 2012.[137] The cost of steel is in some cases passed on to purchasers through the use of

---

[123] CR at III-13, n.27, PR at II-8, n.27.

[124] Tr. at 40 (Smith) and 142-32 (Hazel).

[125] Commissioners Pearson, Johanson, and Broadbent do not join this sentence. See Dissenting Views of Commissioners Daniel R. Pearson, David A. Johanson, and Meredith M. Broadbent.

[126] Three of five responding purchasers consider the subject imports from China to be always, frequently or sometimes interchangeable with domestically produced wind towers, and one of two responding purchasers considers the subject imports from Vietnam to be always interchangeable with domestically produced wind towers. One of two responding purchasers considers the subject imports from Vietnam to be always interchangeable with subject imports from China. CR/PR at Table II-6.

[127] Commissioners Pearson, Johanson, and Broadbent do not join the remainder of this paragraph. See Dissenting Views of Commissioners Daniel R. Pearson, David A. Johanson, and Meredith M. Broadbent.

[128] Respondents characterize the competition between the subject imports and domestic like product as attenuated by geography due to high transportation costs. Foreign Respondents' Prehearing Brief at 21-23. They contend that the ex-factory (f.o.b.) cost of a wind tower is less significant to the OEM than the costs that could be incurred if deliveries are late or the towers do not conform to stringent quality requirements. See CR at II-33, PR at II-20; Tr. at 206 (Feldman).

[129] See, e.g. CR at V-49, PR at V-6 (showing use of wind towers from different sources for one project). See also CR at II-31 to II-32, PR at II-19 (the ***).

[130] CR at V-4; PR at V-3.

[131] CR at V-7; PR at V-3, and CR/PR, Appendix F-4 - F-6.

[132] CR at V-5, PR at V-3.

[133] CR at V-41, PR at V-5.

[134] CR at III-27-28, PR at III-12.

[135] CR at V-61, PR at V-6.

[136] CR at I-15, PR at I-12.

[137] CR/PR at V-1.

18

escalation clauses in purchase contracts.[138]  In other instances, the purchaser/OEM provides the steel to the tower manufacturer and pays only a conversion fee.[139]

Wind towers are made to order, albeit not necessarily custom-made, and there are significant lead times between the time of the contract award and the delivery of towers to a wind project site. Responding producers indicated that lead times averaged 84 to 140 days.[140]

Because wind towers are large, heavy, and require specialized equipment to lift and move, purchasers reported considering both sales price and transportation costs when making purchase decisions.[141]  Wind towers are typically sold on an ex-works basis in the case of domestic producers and f.o.b. port of export in the case of subject and nonsubject imports.[142]  Shipping to the project site is arranged by the OEM.[143]  Given wind towers' large size, transportation of wind towers can be both logistically challenging and expensive.[144]  Towers are usually shipped from U.S. producers' plants by either truck or rail to the wind project site.[145]  Rail is preferred due to the challenge of arranging for highway transportation permits and police escorts associated with oversize loads.[146]  Imports must be shipped by rail or truck from the U.S. port of entry to the project site.

U.S. inland transportation costs for shipments average approximately *** percent of total delivered cost for subject imports and domestically produced wind towers.[147]  Ocean freight to the United States is typically more expensive than U.S. inland freight, with the ocean freight share of total delivered costs averaging *** percent for *** imports from Asia.[148]

## VII.   MATERIAL INJURY BY REASON OF SUBJECT IMPORTS [149] [150]

### A.   Volume of Subject Imports

In evaluating the volume of subject imports, section 771(7)(C)(i) of the Tariff Act provides that the "Commission shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant."[151]

We find the volume of subject imports and the increase in volume to be significant, both in absolute terms and relative to consumption and production in the United States.  The volume of subject

---

[138] Tr. at 54. (Cole); CR at VI-14 n.17, PR at VI-7, n.17.

[139] See, e.g., Petitioners' Posthearing Brief, exh 2.

[140] CR at II-31, PR at II-19.

[141] CR at II-24, PR at II-14-15.

[142] CR at V-3, PR at V-3.

[143] CR at V-2, PR at V-1-2.

[144] CR at II-2, PR at II-1; Tr. at 141 (Hazel).

[145] CR at V-2 to V-3, PR at V-2.

[146] CR at V-2, PR at V-1-2.

[147] CR at V-2, PR at V-1-2.

[148] CR at V-2, PR at V-1-2.

[149] Commissioners Pearson, Johanson, and Broadbent have made negative determinations and do not join the remainder of this opinion.  See their Dissenting Views.

[150] Commissioner Pinkert does not join the remainder of this opinion.  See his Separate Views.

[151] 19 U.S.C. § 1677(7)(C)(i).

19

imports measured by quantity increased overall by 41.8 percent from 2009 to 2011.[152]  Subject imports decreased from 646 towers in 2009 to 366 towers in 2010, before increasing to 916 towers in 2011.[153]  The growth in subject imports in interim 2012 relative to interim 2011 was dramatic.  Subject imports totaled 1,257 towers in interim 2012, but just 456 towers in interim 2011.[154]

Subject imports' share of the U.S. market by quantity declined from 15.9 percent in 2009 to 12.7 percent in 2010, before increasing to *** percent in 2011.[155]  Subject imports' share by quantity was *** percent in interim 2011, and *** percent in interim 2012.[156]

The ratio of subject imports to U.S. production was also significant and increased substantially during the period, despite increased U.S. production.  It increased from 31.2 percent in 2009 to *** percent in 2011; it was *** percent in interim 2011 and *** percent in interim 2012.[157]

Demand for wind towers was particularly strong in interim 2012 as a result of the anticipated non-renewal of the PTC.  While apparent U.S. consumption was *** percent higher in interim 2012 than in interim 2011,[158] subject import shipments increased even more sharply and were 192.8 percent greater in interim 2012 than in interim 2011.[159]  By contrast, the domestic industry's market share dropped from *** percent in interim 2011 to *** percent in interim 2012.[160]  Although the domestic industry's market share increased somewhat from 2009 to 2011, it was far lower in interim 2012 than at any prior point during the period of investigation.[161]

At the same time that subject imports were generally increasing, nonsubject imports' share of the market was declining; their share of apparent U.S. consumption decreased from 30.6 percent in 2009 to 27.1 percent in 2010 and to *** percent in 2011.[162]  When demand was peaking in interim 2012 and subject imports were increasing dramatically, nonsubject imports lost a small amount of market share, with their share falling from *** percent in interim 2011 to *** percent in interim 2012.[163]  The increase in subject imports' share of the U.S. market therefore came primarily at the direct expense of the domestic industry rather than nonsubject imports.

We disagree with Respondents that the high levels of subject imports in interim 2012, and the accompanying increase in market share, reflect the domestic industry's inability to supply the market

---

[152] See CR/PR at Table IV-2.

[153] CR/PR at Table IV-2.  We have relied upon U.S. importer questionnaire data to determine import volume because the official import statistics may include some nonsubject merchandise.  CR/PR at IV-1.  Subject imports measured by value decreased from $192.9 million in 2009 to $129.6 million in 2010, and then increased to $284.0 million in 2011.  CR/PR at Table IV-2.  By value, subject imports were $144.9 million in interim 2011 and $357.3 million in interim 2012.

[154] CR/PR at Table IV-2.

[155] CR/PR at Table IV-6.

[156] CR/PR at Table IV-6.  By value, subject imports decreased from 14.8 percent in 2009 to 14.1 percent in 2010 and then increased to *** percent in 2011.  Id.  Subject imports captured *** percent of the U.S. market in interim 2011 and *** percent in interim 2012, based on value.  Id.

[157] CR/PR at Table IV-7.

[158] See CR/PR at Table IV-6.

[159] CR/PR at Table C-1.

[160] By quantity, the U.S. industry's market share increased from 53.6 percent in 2009 to 60.2 percent in 2010, and *** percent in 2011.  CR/PR at Table IV-6.

[161] See CR/PR at Table IV-6.

[162] CR/PR at Table IV-6.

[163] CR/PR at Table IV-6.

JA 000086

during a period of peak demand. Even though the domestic industry may not have been in a position to serve the entire U.S. market during interim 2012,[164] throughout the period of investigation, including during interim 2012, the domestic industry had excess capacity that would have allowed it to increase shipments and fill a greater share of the increased demand. [165] [166]  Indeed, domestic production reported by qualified suppliers *** was lower during interim 2012 than interim 2011.[167]  Nor does the record support Respondents' argument that any nominally available domestic capacity was located too far from relevant wind farm sites to be cost effective.  During interim 2012, *** relied heavily on subject imports for wind projects in Colorado, Kansas and Oklahoma even though Trinity, ***, had production facilities in Iowa and Texas that had excess capacity of ***.[168]  As a result of *** decision to rely on subject imports for wind projects in the Midwest, the installation of imported wind towers into the Midwest increased dramatically during interim 2012.[169]  Similarly GE opted to supply the 338-tower Shepherd's Flat project in Oregon entirely with subject towers even though a U.S. producer had a facility nearby in Washington State and Broadwind offered to build a new facility in Oregon.[170]  While factors such as operational inefficiencies[171] and the expected non-renewal of the PTC and other federal incentives [172] may have played some role in the domestic industry's modest growth in production and shipments during interim

---

[164] See CR/PR at Tables III-3 and IV-2.

[165] The parties agree that the surge of subject imports during 2012 coupled with the non-renewal of the PTC make this portion of the period of investigation most pertinent for assessing material injury.  Foreign Respondents' Prehearing Brief at 47; Petitioners' Prehearing Brief at 57-58.  Whether on an annual, semiannual or monthly basis, the record indicates that the industry had excess capacity during interim 2012.  See CR/PR at Tables III-5 and III-6.  Foreign Respondents argue that because the industry is seasonal, the industry's capacity and capacity utilization information should not be given any weight.  Foreign Respondents' Posthearing Brief at 36. The semiannual and monthly information, however, does not support their argument, and instead indicates that the domestic industry's production was not concentrated in any particular portion of the year.  See CR/PR at Tables III-5 and III-6.

[166] See CR/PR at Tables III-5, III-6 and Figs. E-1 to E-4.

[167] CR at III-18, PR at III-9.  As noted above, moreover, OEMs at times have placed orders with wind tower producers prior to completing the qualification process. Tr at p. 40 (Smith).

[168] See CR/PR at Tables V-2, III-5.

[169] See Table V-1 and V-5.  Although the importance of non-price factors such as available capacity and reliability was disputed by the parties, the record indicates that qualified facilities owned by *** were all operating at modest rates of capacity utilization during interim 2012.  See CR/PR at Table III-5.

[170] While we acknowledge ***, CR at II-4, n.6, PR at II-2, n.6; and V-67, PR at V-7, given the two-year delivery horizon and large number of towers involved, as well as OEMs' occasional decisions to qualify new facilities after those facilities are already producing towers for the OEM, we do not find *** protestations of domestic producers' lack of readiness to produce even part of the project to be persuasive.

[171] The record indicates that operational inefficiencies resulted from Broadwind's production of four different tower types.  CR at III-18, PR at III-9.  Trinity shifted to production of 100 meter wind towers in response to competition from subject imports in the 80 meter segment, leading to reduced production and temporary inefficiencies.  Nevertheless, these inefficiencies cannot account for the extent of the domestic industry's excess capacity during the period of investigation.  CR at III-18 n.33, PR at III-9, n.33; CR at VI-11, PR at VI-5.

[172] In anticipation of reduced demand in 2013 due to the expected non-renewal of federal incentives including the PTC, Trinity reported beginning to convert excess wind tower capacity to capacity for the production of rail cars. CR at III-19, PR at III-9.  Ameron reported that *** CR at III-18, PR at III-9.

2012, the record indicates that the subject imports also played a role in precluding the domestic industry from increasing production to take advantage of the increase in apparent consumption.[173]

For the foregoing reasons, we find that the volume and the increase in volume of subject imports are significant, both in absolute terms and relative to consumption and production in the United States.

### B.  Price Effects of the Subject Imports

In evaluating the price effects of the subject imports, section 771(7)(C)(ii) of the Tariff Act provides that the Commission shall consider whether –

> (I) there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and

> (II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.[174]

The record in these final phase investigations indicates that subject imports and domestically produced wind towers are generally substitutable once made to the same specifications, although other factors such as availability, lead times and transportation costs can limit substitutability with respect to a particular project.[175]  Only a few OEMs purchase wind towers, and subject imports and the domestic like product compete for sales to supply wind projects.[176]  Price or total cost was ranked the single most important factor in purchasing decisions by five of nine purchasers.[177]  Despite steel and transportation costs being substantial, f.o.b. prices are the single largest component of total cost for purchasers.[178]

The Commission typically collects quarterly pricing data on a number of pricing products in order to assess underselling and price trends in the U.S. market.  However, this approach was not used in these investigations given the made-to-order nature of wind towers and the varying processes used by OEMs in purchasing wind towers.[179]  Instead Commission staff obtained pricing data from purchasers, including GE and Siemens, which accounted for both *** of subject imports and purchases of domestically produced wind towers since January 2009.[180]

The OEMs indicated that they do not use a closed bidding process and typically do not solicit multiple bids for a project from wind tower producers.  Siemens indicates that it always looks to the

---

[173] For instance, the record indicates that Trinity had a supply agreement with GE, but GE reduced its tower orders, and instead sourced wind towers from China and Vietnam, reportedly due to lower prices.  Tr. at 81, 122-123 (Cole).

[174] 19 U.S.C. § 1677(7)(C)(ii).

[175] See CR at II-19, PR at II-12; CR at II-31 to II-32, PR at II-19-20.

[176] CR at I-4 n.4, PR at I-3 n.4.

[177] CR at II-24, PR at II-14-15.

[178] CR/PR at Tables V-1 and V-5.

[179] CR at V-4 to V-5, PR at V-3; CR at V-41 to V-42, PR at V-5-6.

[180] CR at V-4, PR at V-3, CR/PR at Tables III-3, V-1 and V-5. ***.  CR at V-5, PR at V-3, CR/PR at Table IV-4.  Siemens provided bid data for subject imports from Vietnam, but it accounted for only approximately *** of subject imports from Vietnam.  Id.  Three additional domestic purchasers supplied information on their purchases of domestically produced wind towers, but they did ***.  See CR/PR at Table V-8.

closest production facility to source its wind towers for wind projects regardless of f.o.b. prices, because the savings on transportation will always result in the best total delivered cost. Siemens claims it only turns to more distant suppliers based on availability, never price.[181] GE generally reaches agreement with producers concerning the amount of capacity the producer can commit to GE.[182] While the majority of wind tower projects are sourced entirely with either domestic or subject towers, both ***.[183]

Purchase price data supplied by OEMs for individual wind projects with both subject and domestic suppliers indicate that the subject imports generally had lower prices than domestic wind towers on an f.o.b. basis.[184] Both Siemens and GE indicate, however, that total delivered price, *i.e.* the price of the wind tower plus delivery, is what is most important to purchasers.[185]

We find that, in most instances, subject imports were priced higher than domestic product when the subject imports and domestic wind towers are compared on the basis of total delivered cost to the purchaser for the same project.[186] For GE's projects when both subject imports and domestic wind towers were used for a wind project, subject imports were priced higher on a total delivered cost basis in *** instances.[187] For Siemens, the delivered cost for the subject imports was higher in *** instances where comparisons are available for wind tower projects supplied by both domestic producers and subject imports.[188] However, the GE and Siemens' projects which were supplied by both subject imports and domestically produced wind towers were a relatively small fraction of the total wind projects. The majority of wind tower projects were entirely supplied by either imports or domestic product.[189] Because the record does not indicate that, at least on a delivered basis, subject imports were underselling domestic wind towers, we do not find evidence of significant underselling.[190]

The available data also do not provide evidence of significant price depressing effects by the subject imports. Price trends are difficult to discern in these investigations. Domestic producers' sales values increased over the period, but the size of wind towers have also increased, thus making unit values

---

[181] Tr. at 141 (Hazel) ("We do not take bids for towers. Because of the logistical problems in moving towers and the expense, we always, let me repeat always, try to buy as many towers as we need for a domestic project from a qualified facility closest to the project.").

[182] CR at V-5, PR at V-4.

[183] See CR/PR at Tables V-1 and V-5.

[184] CR at V-1, PR at V-1. Prices from the U.S. producers are on an f.o.b. ex works basis, and prices of imports are on an f.o.b port of export basis. CR at V-4 n.4, PR at V-3 n.4. We typically compare the U.S. f.o.b. price from its point of shipment in the United States with the f.o.b. price of imports for the first arm's length transaction after the imports have entered the United States. In these investigations, there is no arms length transaction in the United States because the importers are also end users.

[185] See, e.g., Tr. at 156-157 (Dougan).

[186] See CR at V-6, Table V-2 (indicating that when both subject imports and domestic wind towers were used for a wind project by GE ***). Notably, the incremental differentials declined significantly in 2012.

[187] CR at V-6, PR at V-4.

[188] CR at V-42, PR at V-5-6.

[189] For GE, of the 130 total projects, the domestic industry supplied 63 projects exclusively and subject imports supplied 17 projects exclusively. CR at V-5 to V-6, PR at V-4. For Siemens, the domestic industry supplied 21 projects exclusively and subject imports supplied 10 projects exclusively. CR at V-42; PR at V-5-6. Consequently, while the pricing data do not indicate the existence of significant underselling because they do not reflect a competitive bidding process, these data also do not prove the absence of adverse price effects.

[190] Petitioners did not provide sufficiently detailed information for staff to investigate specific lost sales or lost revenue allegations, presumably due to the non-transparent nature of the bidding process. Consequently, there were no confirmed lost sales or revenue allegations. CR at V-67, PR at V-7.

23

unreliable as an indicator of relative price levels.[191] The record does, however, indicate that the incremental cost for the purchase of subject imports for projects supplied by both domestic and subject towers ***.[192] For GE's projects when both subject imports and domestic wind towers were supplied, subject imports had an average incremental cost 28.0 percent higher than domestic towers from 2009-2011, but that margin decreased to 11.2 percent in 2012.[193]

We find that although OEMs ultimately are concerned with total delivered cost, they do not agree to purchase wind towers from the closest available source without regard to f.o.b. pricing. Rather, they negotiate with the domestic producers regarding f.o.b. prices, the largest component of delivered cost.[194] There have also been instances where the OEMs have pressured the domestic producers to renegotiate their supply agreements to set lower prices or alter volumes in light of the availability of low-priced subject imports.[195] The small number of OEMs in the market, the importance to them of price in purchasing decisions, their pattern of negotiating prices with domestic producers, and the availability of alternative sources of supply in the market (the most prominent of which during the latter portion of the period of investigation was subject imports), placed pressure on domestic producers to discipline their prices in order to receive bid solicitations or orders.

With respect to price suppression, we find that the domestic industry's unit cost of goods sold (COGS) increased overall between 2009 and 2011, particularly in the merchant market for wind towers where there is competition with subject imports.[196] The domestic industry's ratio of COGS to net merchant market sales increased during the period, from *** percent in 2009 to *** percent in 2010, and then to *** percent in 2011.[197] This ratio was *** percent in interim 2011 and *** percent in interim 2012.[198] [199] Notwithstanding production and related issues which also increased the U.S. industry's costs to some extent, the elevated ratios during 2011 and interim 2012 coincided with increasing volumes of subject imports, suggesting that the industry was unable to increase its prices sufficiently to cover its costs due to the increasing presence of the subject imports.

---

[191] See CR at I-12 to I-13, PR at I-10, CR/PR at Fig. I-4.

[192] See CR/PR at Table V-2.

[193] CR/PR at Table V-2; CR at V-6, PR at V-4.

[194] See Petitioners' Posthearing Brief, Exhibit 2 (Siemens asking DMI to review conversion costs); Tr. at 31-32 (Cole) (OEMs do not reveal bids but do leverage quotes from other producers to drive f.o.b. prices down); Tr. at 37 (Smith) (OEMs provide target pricing).

[195] CR at II-23, III-11, III-12, PR at II-11-14 and III-7-8. As noted, the record indicates that ***. The shift to *** meter towers reportedly resulted in ***. CR at VI-17 n.28, PR at VI-8 n.28.

[196] Unit COGS for commercial operations were $*** in 2009, $*** in 2010, $*** in 2011, $*** in interim 2011 and $*** in interim 2012. CR/PR at Table VI-1. The domestic industry's net sales values for commercial transfers were $*** in 2009, $*** in 2010, $*** in 2011, $*** in interim 2011 and $*** in interim 2012.

[197] See CR/PR at Table VI-1.

[198] See CR/PR at Table VI-1. With *** transfer values included, the COGS to net sales rose between 2009 and 2011 and remained elevated in interim 2012. The ratio was *** percent in 2009, *** percent in 2010, 89.6 percent in 2011, 97.9 percent in interim 2011 and 94.2 percent in interim 2012. CR/PR at Table VI-2.

[199] We have primarily focused on the merchant market for wind towers because this is where competition with subject imports is most intense. Furthermore, *** which do not necessarily reflect market values. CR at VI-4 n.5, PR at VI-2 n.5. We have, however, also considered the data with ***, but do not find them as probative of the effects of the subject imports as the information reflecting only commercial operations particularly in light of Vestas's decision not to allow Commission staff to verify its transfer pricing data.

24

Given the highly inelastic nature of wind tower demand and the strong demand for wind towers during the period, we would have expected the industry to have been able to increase its prices sufficiently to recover its costs. Instead, we find that the price-suppressing effects of the subject imports limited the domestic industry's ability to recover its costs. The record contains documented evidence of OEMs efforts to negotiate downward producers' f.o.b. pricing.[200] We therefore find that subject imports, despite the lack of evidence of significant underselling, prevented price increases, which otherwise would have occurred, to a significant degree.[201]

For the foregoing reasons, we find that the increasing volumes of subject imports have had significant adverse price effects on the domestic industry.

### C. **Impact of the Subject Imports**[202]

In examining the impact of subject imports, section 771(7)(C)(iii) of the Tariff Act provides that the Commission "shall evaluate all relevant economic factors which have a bearing on the state of the industry."[203] These factors include output, sales, inventories, ability to raise capital, research and development, and factors affecting domestic prices. No single factor is dispositive and all relevant factors are considered "within the context of the business cycle and conditions of competition that are distinctive to the affected industry."[204]

We have carefully examined the performance of the domestic industry producing wind towers. We find that the domestic industry's performance was adversely affected by the subject imports over the period examined and in interim 2012 in particular. As a result of the significant volumes of subject imports during interim 2012, the domestic industry was unable to benefit from the sharp increase in apparent U.S. consumption before the PTC was expected to expire, and it experienced a decline in market share and only a modest increase in production and U.S. shipments. Furthermore, due to the increased presence of subject imports and evidence that OEMs pressure domestic producers to keep f.o.b. prices low or lose sales to subject imports, especially in the Midwest, the industry was unable to increase its

---

[200] As noted, the incremental cost for the purchase of subject imports ***. See CR/PR at Table V-2.

[201] There is no requirement that subject imports be underselling domestically produced wind towers in order to suppress price increases. See e.g., Cemex S.A. v. United States, 790 F. Supp. 290, 299 (Ct. Int'l Trade 1992) ("To require findings of underselling would be inconsistent with the proposition that price suppression or depression is sufficient."), aff'd, 989 F. 2d 1202 (Fed. Cir. 1993); Maine Potato Council v. United States, 613 F. Supp. 1237, 1245 (Ct. Int'l Trade 1985) (higher quality imports may have price suppressing effects notwithstanding their higher price.).

[202] The statute instructs the Commission to consider the "magnitude of the dumping margin" in an antidumping proceeding as part of its consideration of the impact of imports. 19 U.S.C. § 1677(7)(C)(iii)(V). In its final determination of sales at less than fair value for China, Commerce found weighted-average dumping margins of 44.99 percent to 47.59 percent for six specific producer and exporter combinations, and 70.63 percent for all others. CR/PR at Table I-2; 77 Fed. Reg. 75996 (Dec. 26, 2012). With respect to subject imports from Vietnam, Commerce found a weighted average margin of dumping of 51.50 percent for the CS Wind Group producer/exporter group and 58.49 percent for all others. CR/PR at Table I-3; 77 Fed. Reg. 75988 (Dec. 26, 2012).

[203] 19 U.S.C. § 1677(7)(C)(iii); see also SAA at 851 and 885 ("In material injury determinations, the Commission considers, in addition to imports, other factors that may be contributing to overall injury. While these factors, in some cases, may account for the injury to the domestic industry, they also may demonstrate that an industry is facing difficulties from a variety of sources and is vulnerable to dumped or subsidized imports.").

[204] 19 U.S.C. § 1677(7)(C)(iii); see also SAA at 851, 885; Live Cattle from Canada and Mexico, Inv. Nos. 701-TA-386, 731-TA-812-813 (Preliminary), USITC Publication 3155 at 25 n.148 (Feb. 1999).

JA 000091

prices sufficiently to cover its increased costs, resulting in steep declines in operating income, and capital expenditures even with the increase in apparent U.S. consumption.

The domestic industry's trade data reflect very modest increases over the period. The industry's production decreased from 2,069 towers in 2009 to 1,751 towers in 2010 and then increased to *** towers in 2011.[205] Production was *** percent higher in interim 2012, at *** towers, than in interim 2011, at *** towers.[206] The domestic industry's U.S. shipments decreased from 2,057 towers in 2009 to 1,738 towers in 2010, before increasing to *** towers in 2011, and they were higher in interim 2012, at *** towers, than in interim 2011, at *** towers.[207]

Domestic production capacity increased from 3,343 towers in 2009 to 3,898 towers in 2010 and then to *** towers in 2011.[208] Capacity was *** towers in interim 2011 and *** towers in interim 2012.[209] The industry's rate of capacity utilization declined overall, before increasing in interim 2012 relative to interim 2011.[210] It fell from 61.9 percent in 2009 to 44.9 percent in 2010 and then increased to *** percent in 2011. It was *** percent in interim 2011 and *** percent in interim 2012.[211]

The domestic industry's production and related workers increased from 1,616 workers in 2009 to 1,695 workers in 2010 and *** workers in 2011.[212] There were *** production and related workers in interim 2011 and *** production and related workers in interim 2012.[213] Wages paid increased from $85.3 million in 2009 to $94.3 million in 2010 and $*** in 2011.[214] Wages paid were $*** in interim 2011 and $*** in interim 2012.[215] Productivity fell from 0.7 towers produced per 1,000 hours in 2009 to 0.5 towers in 2010 produced per 1,000 hours and then held steady through the remainder of the period.[216]

The domestic industry's share of apparent U.S. consumption increased modestly until interim 2012 when subject imports surged into the market. The domestic industry's market share increased from 53.6 percent in 2009 to 60.2 percent in 2010 and then to *** percent in 2011.[217] The industry's market share, which was *** percent in interim 2011, was much lower, at only *** percent in interim 2012.[218]

The quantity of U.S. producers' commercial net sales decreased from 2009 to 2011 and in interim 2012 relative to interim 2011.[219] Although the value of U.S. producers' net sales increased, this increase was attributable to increased unit values, which, as noted above, reflected in part the higher raw material

---

[205] CR/PR at Table III-3.

[206] CR/PR at Table III-3.

[207] CR/PR at Table III-9. Domestic producers' inventories remained minimal during the period, reflecting the made-to-order nature of the product. CR/PR at Table III-11.

[208] CR/PR at Table III-3.

[209] CR/PR at Table III-3.

[210] CR/PR at Table III-3.

[211] CR/PR at Table III-3.

[212] CR/PR at Table III-13.

[213] CR/PR at Table III-13.

[214] CR/PR at Table III-13.

[215] CR/PR at Table III-13.

[216] CR/PR at Table III-13.

[217] CR/PR at Table IV-6.

[218] CR/PR at Table IV-6.

[219] See CR/PR at Table VI-1 (commercial sales only). When internal transfers by *** are included in addition to commercial sales, the industry increased its sales quantity. See CR/PR at Table VI-2.

JA 000092

costs associated with the shift in product mix toward larger wind towers.[220]  The industry's commercial net sales decreased from $*** in 2009 to $*** in 2010 and then increased to $*** in 2011, and they were $*** in interim 2011, in comparison to $*** in interim 2012.[221]

The domestic industry's operating income and operating margin declined throughout the period.[222]  In the commercial segment of the market, which faced the most direct competition from subject imports, the industry's operating income fell from $*** in 2009 to $*** in 2010. The industry then reported losses of  $*** in 2011, $*** in interim 2011 and $*** in interim 2012.[223]  The industry's operating income margin on commercial sales also declined from *** percent in 2009 to *** percent in 2010, and *** percent in 2011.[224]  The industry's operating income margins continued their downward trend in the interim periods, falling from *** percent of sales in interim 2011 to an even worse *** percent in interim 2012.[225]

The domestic industry's capital expenditures also declined sharply from $*** in 2009 to $*** in 2010, and  $*** in 2009.  Capital expenditures were higher in interim 2011, at $***, than in interim 2012, at $***.[226]

Although the domestic industry's net sales values increased, as discussed previously, the unit COGS and the COGS to net sales ratio increased during the period.  The increase in the COGS to net sales ratio occurred because there was a cost/price squeeze where the domestic industry was unable to raise prices sufficiently to cover costs.  Notwithstanding DMI's impairment charge in interim 2012, the decrease in the industry's operating income largely reflects a progressive contraction of the industry's gross profit margin as increases in net sales values were insufficient to offset increasing costs during the

---

[220] CR/PR at Table VI-1; CR at VI-14; PR at VI-5, VI-7.

[221] CR/PR at Table VI-1.

[222] CR/PR at Table C-1. The industry's operating income on commercial sales and transfers fell from $*** in 2009 to a loss of $*** in 2010. The industry reported operating income of  $*** in 2011, and operating losses of $*** in interim 2011 and $*** in interim 2012.  The industry's operating income margin on commercial sales and transfers also declined from *** percent in 2009 to *** percent in 2010, and *** percent in 2011.  The industry's operating income margins on all sales continued their downward trend in the interim periods, falling from *** percent of sales in interim 2011 to *** percent in interim 2012.  CR/PR at Table C-1.

[223] CR/PR at Table C-2.

[224] CR/PR at Table C-2.

[225] CR/PR at Table C-2.  Respondents argue that the anticipated non-renewal of the PTC led to non-recurring charges during interim 2012 that were unrelated to subject imports.  Siemens's Posthearing Brief at 13-14; Foreign Respondents' Prehearing Brief at 2, 48, 51.  The Commission's practice is to include acquisition or disposition related charges that are properly accounted for in the financial results of the domestic industry in order to obtain a complete picture of the industry.  Pursuant to standard Commission practice, the nature and magnitude of this and other material non-recurring items were identified so that their impact on the industry's financial results could be evaluated.  DMI cited adverse market conditions such as the anticipated non-renewal of the PTC.  CR at VI-20 n.35; PR at VI-10 n.35.  At the time of DMI's impairment in mid-2012, these adverse conditions included the pending non-renewal of the PTC, which presaged reduced demand in 2013, and the elevated levels of subject imports, among other factors.  We acknowledge that there was a notable increase in the industry's SG&A expenses in interim 2012, and corresponding operating loss increase that reflected  the impairment of DMI's U.S. wind tower manufacturing facilities at the end of the period.  However, even with this $*** charge excluded, the industry would ***.  See CR/PR at Table C-2.  We also note that the adverse trends in the domestic industry operating results began in 2011, before this charge was recognized in interim 2012.  Furthermore, while Katana reported that it ***.  CR at VI-20 n.35; PR at VI-10 n.35.

[226] CR/PR at Table VI-6.  Research and development expenses were $*** in 2009, $*** in 2010 and $*** in 2011.  They were higher in interim 2011, at $***, than in interim 2012, at $***.  CR/PR at Table VI-6.

period examined.[227]  Although Respondents argue that the domestic industry was able to pass through its increasing raw material costs to purchasers through the use of escalation clauses, we find that the domestic industry's inability to increase its prices to reflect overall higher costs led to operating losses.[228]

We have considered whether there are other factors that may have adversely affected the domestic industry during the period examined. We have already noted that nonsubject imports had a declining presence during the period 2009 to 2011, and a steady presence when comparing the interim periods.[229] Thus, the *** percentage point increase in subject imports in interim 2012 relative to interim 2011 came almost entirely at the expense of the domestic industry, while nonsubject imports remained a minor factor in the growing U.S. market.[230]

Respondents argue that the domestic industry was unable to supply more wind towers to the U.S. market, particularly during 2012, so the loss in market share should not be attributed to the subject imports.[231] Contrary to Respondents' argument, whether calculated on an annual, semiannual or monthly basis, the record indicates that the domestic industry had excess capacity during the period, including interim 2012 that would have allowed it to increase shipments and fill a greater share of the increased demand.[232]  Nor does the record support Respondent's argument that available domestic capacity was limited to locations too remote from project sites to be economical.  Domestic producer Broadwind built a production facility in Brandon, SD that was never qualified for production by the OEMs despite Broadwind's proven track record qualifying other facilities.[233]  Broadwind also offered to build a production facility near Shepherds Flat, a large wind farm in Oregon installed in 2011 and 2012, but its

---

[227] CR/PR at Table VI-1.

[228] Foreign Producers' Prehearing Brief at 44.  We note that the raw materials component of COGS as a percentage of net sales increased from *** percent in 2009 to *** percent in 2010 and *** percent in 2011.  CR/PR at Table VI-1.  The ratio remained high during the interim periods as well.  See CR/PR at Table VI-1. See CR at VI-18; PR at VI-18 ("The overall increase in the ratio of raw material costs to net sales value is an important factor explaining the overall decline in the industry's overall gross profit during the period.")

[229] See CR/PR at Table IV-5; Fig. IV-2.

[230] See CR/PR at Table C-2.  Foreign Respondents argue that the seasonal nature of this industry means that results for the industry will necessarily be better in the second half of the year. Thus, in their view, interim 2012 data should be discounted. Foreign Respondents' Prehearing Brief at 19-20. We note that at least on commercial operations, the domestic industry performed better in the first half of 2011 than it did in the second half.  CR/PR at Table C-2.  Given the strong growth in demand in the first half of 2012, and the industry's production data which show production fluctuating throughout the year, we do not find any basis for concluding that the industry's interim 2012 results should be accorded less weight.  See CR/PR at Table III-5.

[231] In particular, Respondents argue that domestic producers turned away orders during interim 2012.  Foreign Respondents' Prehearing Brief at 29-31; Siemens's Prehearing Brief at 25-36.

[232]  See CR/PR at Tables III-5 and III-6. As noted above, we do not agree with Foreign Respondents' argument that the seasonal nature of the industry should cause us to give no weight to the domestic industry's annual capacity and capacity utilization information.  Foreign Respondents' Posthearing Brief at 36. The semiannual and monthly information does not support their argument concerning seasonality and instead indicates that the industry's production was not concentrated in any particular portion of the year, nor does it indicate that excess capacity was more prevalent in the "off season."  See CR/PR at Tables III-5 and III-6.

[233] Broadwind completed construction of the Brandon, SD facility in 2010, and it reported in its 2010 10-K that imports of wind towers from Asia were responsible for its decision not to commence production at the plant. CR at VI-22 n.41; PR at VI-11 n. 41. Broadwind operated qualified facilities in Texas and Wisconsin during the period of investigation.  CR/PR at Table III-5.

offer was rejected and the OEM relied on subject imports.[234] Another large producer, Trinity, operated at *** utilization rates during the period at three facilities dedicated to supplying *** in Illinois, Iowa, and Texas and, as noted, *** relied on subject imports for wind projects in the Midwest.[235] ***,[236] ***, resulting in start-up related costs and operating inefficiencies for the company in 2011 ***.[237] Finally, we find that the record does not support Respondents' claim that the exit of multiple domestic production facilities from the industry during 2012 was primarily done in anticipation of the non-renewal of the PTC and other federal incentives and prevented OEMs from sourcing domestic towers for certain projects in 2012 where domestic towers would have been the preferred source. While the looming non-renewal of the federal incentives played a role in these closures, the domestic producers' loss of sales opportunities during the 2012 demand boom accelerated the time lines for streamlining domestic capacity. We therefore find that record contains ample evidence that the presence of the subject imports led to reduced production levels, shipments, capacity utilization and price increases for the domestic industry as the OEMs turned to subject imports rather than rely upon the domestic producers who had nearby unused capacity.[238] [239]

We therefore find that subject import levels have increased significantly, both absolutely and relative to domestic production and consumption, gained significant market share at the expense of the domestic industry, and adversely affected the performance of the domestic industry. The increasing volumes of subject imports resulted in reduced growth in sales volumes and U.S. shipments and suppressed domestic price increases despite a robust growth in demand at the end of the period. Their

---

[234] Broadwind's offer to build a production facility near the Shepherds Flat wind farm presumably would have reduced the OEM's transportation costs for shipping wind towers to the wind project site. Broadwind's offer was rejected by GE. CR at II-4 n.6, PR at II-3 n.6. Katana also was considered as a potential supplier or the Shepherd's Flat project but was rejected. Id.

[235] See CR/PR at Tables III-5 and III-6. Trinity indicated that *** did not provide notice that it would not be honoring the supply agreement and it later learned that the towers were sourced from China and Vietnam because of pricing. Tr. at 81, 122-123 (Cole).

[236] Petitioners' Posthearing Brief, Exhibit 1, at 12-13.

[237] CR at III-18, VI-19; PR at VI-9. See also Siemens's Posthearing Brief at 2-4 (indicating that GE may have breached its contract with Trinity so that GE could purchase subject imports). With long lead times to make other arrangements for unused capacity, a domestic producer cannot easily find other purchasers to use that capacity. CR at II-5, PR at II-2.

[238] Further, as the Commission previously has noted, "there is no short supply provision in the statute" and "the fact that the domestic industry may not be able to supply all of demand does not mean the industry may not be materially injured or threatened with material injury by reason of subject imports." Softwood Lumber from Canada, Inv. Nos. 701-TA-414 and 731-TA-928 (Article 1904 NAFTA Remand) at 108, n. 310 (December 2003). See also, Certain Activated Carbon from China, Inv. No. 731-TA-1103 (Preliminary), USITC Pub. 3852 (May 2006) at 19, n. 134; Certain Orange Juice from Brazil, Inv. No. 731-TA-1089 (Final), USITC Pub. 3838 (March 2006) at 20 n. 143; Certain Lined Paper School Supplies, Inv. Nos. 701-TA-442-443 (Preliminary) and 731-TA-1095-1097 (Preliminary), USITC Pub. 3811 (October 2005) at 23, n. 155; Metal Calendar Slides from Japan, Inv. No. 731-TA-1094 (Preliminary), USITC Pub. 3792 (August 2005) at 9, n. 45 ("To the extent that Respondents claim that the Commission is legally unable to make an affirmative finding of material injury by reason of subject imports because the domestic industry is incapable of supplying domestic demand, they are incorrect.").

[239] Respondents contend that in many instances, the domestic industry could not meet delivery deadlines or were otherwise unreliable. Foreign Respondents' Posthearing Brief at 36-38. We note that the domestic industry only paid ***. CR at VI-21 n.40; PR at VI-11 n.40. Further, the OEMs indicated that they typically chose suppliers based on proximity to the wind project, and in many instances domestic producers were the only suppliers to wind projects suggesting that they were considered reliable sources of supply.

effects have also included lower rates of capacity utilization, as well as declining market share and financial losses.

For the reasons discussed above, we conclude that there is a causal nexus between the subject imports and the poor performance of the domestic industry. Consequently, we find that the domestic industry is materially injured by reason of subject imports.

## VII.    CONCLUSION

For the reasons stated above, we determine that an industry in the United States is materially injured by reason of subject imports of wind towers from China that are sold in the United States at less than fair value and subsidized by the Government of China and subject imports of wind towers from Vietnam that are sold in the United States at less than fair value.

30

## VIEWS OF COMMISSIONER DEAN A. PINKERT

Based on the record in these investigations, I determine that an industry in the United States is threatened with material injury by reason of imports of utility scale wind towers from China that the U.S. Department of Commerce ("Commerce") has determined to be subsidized by the Government of China and sold at less than fair value ("LTFV") and imports from Vietnam that Commerce has determined to be sold at LTFV.[1]

In making these determinations, I join sections I-VI of the Views of the Commission. In regard to section VII.A., however, although I agree that the volume and the increase in volume of subject imports from China and Vietnam were significant in absolute terms during the period examined, I would, as explained below, qualify the finding that those increases were significant relative to consumption and production in the United States. In regard to sections VII.B and C, although I agree with much of the reasoning, including that on underselling and price depression, I do not join the finding of price suppression by reason of the subject imports.[2] Inasmuch as I find neither significant underselling nor significant adverse price effects during the period examined, I am unable to determine that the subject imports are a cause of material injury to the domestic industry. Nevertheless, as I will presently demonstrate, a determination that such imports pose an imminent threat of material injury to the industry is amply warranted on the record of these investigations.

## I.    CUMULATION FOR PURPOSES OF THREAT DETERMINATION

As indicated above, I join section IV of the Views of the Commission in finding that the statutory prerequisites to cumulation are satisfied and that there is a reasonable overlap of competition between imports from China and imports from Vietnam and thus that such imports should be cumulated for purposes of the Commission's determination of material injury. In analyzing threat of material injury, the statute provides that I may exercise discretion in determining whether to cumulate the subject imports.[3] For the reasons discussed below and based on the available evidence, I find similar trends in the imports from the two countries, such that the overlap in competition between imports from China and imports from Vietnam will likely continue into the imminent future. I find that these trends justify cumulation for purposes of my threat determination.

The trends in import volumes from China and Vietnam were similar over the period examined, although their absolute volumes and market shares were different. The volume of imports from both countries decreased from 2009 to 2010, then increased substantially from 2010 to 2011 and was greater in interim 2012 than in interim 2011.[4]

---

[1] Pursuant to 19 U.S.C. § 1673d(b)(4)(B), I further find that I would not have found material injury but for the suspension of liquidation of entries of the subject merchandise.

[2] I am unable to conclude on the basis of the record in these investigations that the subject imports prevented the domestic industry from raising its prices to cover cost increases because (1) underselling was not significant and (2) there is no indication that the subject imports placed a ceiling on domestic prices, whether by means of a price cap or otherwise. Cf. Bottom Mount Combination Refrigerator-Freezers from Korea and Mexico, Inv. Nos. 701-TA-477 and 732-TA-1180-1181 (Final), Pub. 4318 (May 2012), at 36. In regard to the latter, I find it notable that, as explained below, the relationship between subject import pricing and domestic pricing changed significantly over the course of the period examined.

[3] 19 U.S.C. § 1677(7((H).

[4] In finding a similarity in the trends in imports from China and Vietnam, I acknowledge that both the absolute and percentage increases in imports from China in interim 2012 over interim 2011 were much greater than the increases with respect to imports from Vietnam. Nevertheless, imports from both sources trended upward. CR/PR at Tables IV-2 and C-1.

There is only limited information permitting a comparison of the price trends of imports from China with those of imports from Vietnam.[5] This information does not demonstrate any significant dissimilarity in the trends in prices of imports from the two countries, certainly not enough to analyze imports from the two countries separately given their overlap during the period and the similarity in their volume trends.

I further note that, as found with respect to cumulation for purposes of the material injury determination, a major producer in China and a major producer in Vietnam -- CS Wind (China) and CS Wind (Vietnam) -- are related entities, and CS Wind (Vietnam) accounted for *** during the period.[6] These companies have the ability to coordinate their activities with respect to the U.S. market,[7] providing further reason to cumulate imports from China and Vietnam for purposes of my determination regarding threat of material injury.

## II. FACTORS SUPPORTING A DETERMINATION OF THREAT OF MATERIAL INJURY[8]

As discussed above, I find that the volume and the increase in volume of the subject imports from China and Vietnam are significant. For purposes of my determination of threat of material injury, the trend in imports from the two countries toward the end of the period is particularly important.

For most of the period, subject import market share either declined (between 2009 and 2010) or increased with offsetting declines in the market share of imports from nonsubject countries (between 2010 and 2011).[9] Combined reported production capacity in China and Vietnam was increasing, but so too was production, which was primarily destined for the respective home markets and the United States.[10] This situation began to change toward the end of the period, however, as leading importers Siemens and GE worked to ***.[11]

As U.S. demand for wind towers peaked in interim 2012 in anticipation that the Production Tax Credit ("PTC") and the Investment Tax Credit ("ITC") would expire at the end of the year and not be renewed,[12] imports from China and Vietnam grew significantly in terms of both volume and market share. Cumulated U.S. shipments of subject imports were 192.8 percent higher in interim 2012 than in interim 2011. As a share of the U.S. market, cumulated subject imports were *** percentage points higher in interim 2012 than in interim 2011 (***).[13] Most of this surge in market share late in the period came at the expense of the domestic industry, whose market share was ***.

Significantly, purchases and installations of subject imports also increased significantly at the end of the period in the regions of the U.S. market where respondents argue they do not substantially compete.[14] Subject imports sold to the Midwest states grew to *** units in 2011, which was substantially higher than in any prior year, and then surged to *** units in the first six months of 2012. Similarly, in

---

[5] All the pricing data comparing imports from China and Vietnam are from Siemens, and those data are quite limited. GE did not source wind towers from Vietnam. ***, which accounted for "a substantial majority of imports from Vietnam," as well as ***, CR at IV-4, PR at IV-3, provided no pricing data. Siemens reported prices for purchases from both Chinese and Vietnamese sources ***. See Foreign Respondents' Post-Hearing Brief at 34.

[6] CR at VII-11, VII-14, PR at VII-8 and VII-9.

[7] See, e.g., CR at VII-8 n.13, PR at VII-7 n.13  (***).

[8] The statutory threat factors are set forth in 19 U.S.C. § 1677(7)(H).

[9] CR/PR at Table C-1.

[10] CR/PR at Table VII-6.

[11] CR at VII-4 n.7, PR at VII-3 n.7.

[12] See CR at II-11, PR at II-6; Memorandum to the File (Investment Tax Credit).

[13] CR/PR at Table C-1.

[14] See, e.g., Siemens's Post-Hearing Brief at 1, 8-10; Foreign Respondents' Final Comments, at 11-12 & n.43.

32

the Texas/Oklahoma/New Mexico/Arizona area, subject imports grew from their prior peak of *** units in 2010 to *** units in the first six months of 2012.[15]

The trends in subject imports toward the end of the period, both overall and in the inland regions of the U.S. market, speak volumes with respect to the interests and capabilities of subject producers in the imminent future. Not only can subject imports compete in all major regions of U.S. demand, but they are able to increase significantly over a short period, as occurred toward the end of the period in response to the then-expected termination of the PTC and ITC. There is no reason to believe that the subject exporters, having expanded their presence in the U.S. market so significantly, beginning in 2011 and accelerating in 2012, including in the central region of the country where they might be expected not to be fully competitive due to transportation costs and logistical difficulties, would, in the absence of trade relief, relinquish it by not competing in the imminent future to their fullest abilities in all regions of the U.S. market.

Moreover, subject producers increased their capacity significantly between 2009 and 2012. The projected full-year 2012 capacity reported by the responding Chinese and Vietnamese producers was ***,[16] and they have not projected any significant reduction in cumulated capacity in 2013.[17]

Total reported capacity in China and Vietnam in 2011 was *** units, and total reported production was *** units, for a capacity utilization rate of only *** percent.[18] Even in interim 2012, responding producers reported capacity of *** units and production of *** units, for a capacity utilization rate of *** percent.[19] Subject producers projected exporting *** units to the United States in 2013, even without the renewal of the PTC and ITC. Moreover, absent growth in other markets equivalent to the growth in exports to the United States in 2011 and 2012, subject producers projected a *** lower rate of capacity utilization in 2013 than in 2011 or interim 2012.[20] Thus, the Chinese and Vietnamese industries have significant unused capacity for the production of wind towers that they can use to export to the United States in the imminent future.[21] [22]

In considering subject producers' ability to export to the United States in the imminent future, I have also taken into account their end-of-period inventories. Such inventories were significant, particularly in China.[23]

---

[15] CR/PR at Tables V-1 and V-5.

[16] CR/PR at Table VII-6. The growth in production levels during this period was less than *** that of capacity – *** towers.

[17] CR/PR at Table VII-6.

[18] CR/PR at Table VII-6.

[19] Id.

[20] Id.

[21] Indeed, in commenting on Chinese producers' concerns about these investigations, an official of the Chinese Wind Energy Equipment Association noted that Chinese producers "need to open new markets, because there is overcapacity in the {Chinese} domestic market." Petitioners' Post-Conference Brief at Ex. 2.

[22] In making this finding regarding subject producers' capacity, I have taken into consideration that not all producers in the subject countries are qualified to sell wind towers in the U.S. market, CR at VII-3, PR at VII-3, and that some subject producers' production facilities may not be located sufficiently close to a port to feasibly export to the United States. I note, however, that many of those companies are not included in the Commission's foreign producer capacity data because they did not respond to the Commission's questionnaires. Moreover, the companies that did report capacity and capacity utilization data accounted for the great majority of exports to the United States over the period examined, and the capacity available just to those producers, particularly during a period of moderate demand such as that likely to prevail in the imminent future, provides them with the ability to materially harm the domestic industry.

[23] Wind towers are generally made to order, although they are not necessarily custom made, and U.S. importers' end-of-period inventories of subject imports in interim 2012 were not significant. Id. at Table VII-8. Nevertheless, Chinese producers had inventories of 543 wind towers in June 2012 (the end of the data collection period), corresponding to 18.4 percent of their production and 17.5 percent of their shipments in that period, while

(…continued)

Furthermore, subject producers are increasingly export-oriented, making *** percent of their total shipments in 2011 and *** percent of their total shipments in interim 2012 to export markets,[24] and have become more dependent on the United States as an export market. As a share of their total shipments, exports to the United States grew from *** percent in 2009 to *** percent in 2011 and *** percent in interim 2012.[25] Given these facts, it is unlikely that demand in the imminent future in the Chinese and Vietnamese home markets and in third-country markets can absorb the subject producers' excess capacity.

In considering subject producers' ability and likelihood in the absence of trade relief to export significant volumes to the United States in the imminent future, it is especially important to note that demand in the U.S. market in the current year is likely to reflect both the termination of the PTC and ITC at the end of 2012 and their one-year renewal at the beginning of 2013. Because demand should be moderate (albeit increasing) in the near future,[26] it should take a much smaller volume of subject imports to constitute a significant share of the market than it took during the period of heightened demand in 2011 and 2012 leading up to the then-expected end of the PTC and ITC. Given moderate demand, subject producers are likely to compete intensely for U.S. sales in order to better utilize their available capacity. Consequently, for the above reasons, I find that, in the absence of trade relief, imports of the subject merchandise in the imminent future are likely to be significant and to increase significantly, both in absolute terms and relative to consumption, over the low-to-nonexistent levels to which they fell as a result of expectations that the PTC and ITC would not be renewed.[27]

Subject imports are also likely in the absence of trade relief to have an adverse impact on domestic prices in the imminent future. Price is a very important factor in purchasers' sourcing decisions.[28]

The record in these investigations shows that, when delivered prices of the subject imports and domestic wind towers sold for use in the same projects are considered, the prices of the subject imports were generally higher than those of the domestic product.[29] This picture changed toward the end of the period, however. Although the purchaser's average additional cost for the subject imports over the cost of

---

(…continued)
Vietnamese producers held *** wind towers in inventory, which equaled *** percent of their production and *** percent of their shipments. CR/PR at Tables VII-2 and VII-4.

[24] Id. See also Foreign Respondents' Pre-Hearing Brief at 54 (conceding that Chinese wind tower producers are ***).

[25] Id.

[26] CR at II-10, PR at II-7.

[27] See CR/PR at Table VII-9 (showing that no importers had orders for the importation of subject wind towers after July-September 2012). Contrary to respondents' arguments, the absence of future import orders shown in Table VII-9 does not indicate that there can be no imminent increase in subject imports or imminent threat of material injury by reason of such imports. That table reflects the situation at the time that importers responded to the Commission's questionnaire, when the PTC and ITC were expected to terminate at the end of 2012. Obviously, purchasers who depended on the PTC and ITC in ordering wind towers would have been reluctant to place orders until the situation with respect to the PTC and ITC was clarified. Now, with the PTC and ITC renewed only for projects that begin construction by the end of 2013, purchasers are necessarily compelled to act quickly to place orders, likely resulting in intense competition for the reduced volume of sales and likely negatively impacting domestic producers in the imminent time frame. Although testimony at the Commission's hearing indicated that it would likely take six to nine months for purchasers to respond to the renewal of the PTC with new orders (which would in any event be within the imminent future), Hearing Tr. at 80, the relatively short time frame in which purchasers must begin construction of a project to qualify for the PTC and ITC means that orders are likely to be placed on an even more expedited basis.

[28] CR at II-24 to II-26, PR at II-15 to II-16.

[29] CR/PR at Table V-2 (comparing *** delivered costs for subject imports from China and domestic wind towers).

34

the domestic product was 28.0 percent for projects with installation dates between 2009 and 2011, the gap in prices shrank to only 11.2 percent for projects in 2012.[30]

This trend toward converging prices toward the end of the period has significant implications looking forward, given the outlook for moderate demand in 2013. As subject producers seek to maintain a significant volume of imports and share of the U.S. market, they will need to sell at increasingly competitive prices, leading domestic producers to constrain their own pricing. Thus, I find that, in the absence of trade relief, imports of the subject merchandise are likely to continue their downward pricing trend in the imminent future and cause adverse effects on domestic prices.

Having found that, in the absence of trade relief, the volume and increase in volume of subject imports will likely be significant in the imminent future and that such imports will likely result in adverse effects on domestic prices, I further find that the continued and likely intensifying level of competition from subject importers will likely materially injure the domestic industry, which is already struggling and vulnerable to the impact of unfairly traded imports.[31] Particularly in 2012, several domestic producers ceased production, closed plants, or switched to the production of other products.[32] Although the industry increased its production and sales as demand escalated with the pending termination of the PTC and ITC, it lost significant market share and was unable to maintain profitability. Its operating income margin, which was *** percent in 2009, declined to only *** percent in 2011 and *** in interim 2012, even as U.S. consumption of wind towers reached its peak.[33]

The new competitive situation that will prevail with the renewal of the PTC and ITC will place additional pressures upon the domestic industry. Demand in the imminent future is likely to be uncertain and moderate relative to demand in previous years, making it difficult for the domestic industry to regain its footing. The volume of subject imports that would likely enter the U.S. market will contribute significantly to the industry's problems, competing intensely for sales and causing adverse price effects. Limited sales opportunities in a less than robust market will intensify price competition between subject imports and domestic producers, and even a modest volume of subject imports would be likely to result in negative effects on the domestic industry. As a consequence, in the absence of trade relief, the industry is likely in the imminent future to suffer a significant loss of revenues that will cause a further deterioration in its financial condition, as well as declining employment, output, and productivity.

## III.    CONCLUSION

Accordingly, for the reasons discussed above, I determine that an industry in the United States is threatened with material injury by reason of imports of utility scale wind towers from China that are subsidized and sold at LTFV and imports from Vietnam that are sold at LTFV.

---

[30] Id. See also CR/PR at Table V-6.

[31] I have not overlooked the fact that the domestic industry's travails over the period examined may have resulted in part from its own actions and business decisions, as well as the leverage maintained over it by major purchasers. In making a determination of threat of material injury, however, I am looking ahead to the imminent future, in which the industry's vulnerable condition – whatever its causes – is a factor in assessing the likelihood of material injury.

[32] CR at III-1 - III-2, PR at III-1.

[33] CR/PR at Table C-1. This trend was even more pronounced for firms competing in the merchant market. CR/PR at Table C-2.

## DISSENTING VIEWS OF COMMISSIONERS DANIEL R. PEARSON, DAVID S. JOHANSON, AND MEREDITH M. BROADBENT

Based on the record in these investigations, we find that a domestic industry in the United States is neither materially injured nor threatened with material injury by reason of subject imports of utility scale wind towers from China that are subsidized by the Government of China and sold in the United States at less than fair value and subject imports of utility scale wind towers from Vietnam that are sold in the United States at less than fair value.[1]

### I.    NO MATERIAL INJURY BY REASON OF CUMULATED SUBJECT IMPORTS

#### A.    Volume Effects of Subject Imports

Section 771(7)(C)(I) of the Act provides that the "Commission shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant."[2] We do not find the volume of subject imports to be significant.

Our finding on volume flows directly from our understanding of the conditions of competition within this industry. First, as discussed in the majority views, the demand for wind towers depends on the demand for utility scale wind power installations.[3] The demand for such installations is distributed unevenly throughout the United States.[4] Demand tends to be concentrated in the central states, with some additional demand on the West Coast and on islands.[5]

Second, wind towers themselves are large, heavy products and may be as much as 100 meters tall.[6] Moving such products involves considerable planning, logistical support, and high costs.[7] Geography can present significant difficulties. Wind tower purchasers have a stated and apparent preference for sourcing towers from producer locations with the fewest transport difficulties and lowest costs, which generally means sourcing from a producer near the installation.[8] As a result, the domestic industry has concentrated its production facilities in the central states.[9]

---

[1] We join and adopt as our own sections I-VI of the majority Views.

[2] 19 U.S.C. § 1677(7)(C)(i).

[3] CR at II-9, PR at II-5.

[4] CR/PR at Figure III-1 and Table D-2.

[5] CR/PR at Figure III-1 and Table D-2.

[6] CR at I-11-I-12, PR at I-9.

[7] CR at II-2, PR at II-1.

[8] Tr. at 141 (Hazel); CS Wind prehearing brief at 23; Siemens prehearing brief at 4; GE posthearing brief at 4. Domestic producers' offers to build new production facilities close to proposed wind installations suggest that proximity is generally understood to be a strong purchaser preference. Petitioners' posthearing brief at Exh. 1, pp. 21-22.

[9] CR/PR at III-1 and Figure III-1.

JA 000118

Third, wind tower purchasers are typically OEM producers of wind turbines[10] who provide the tower designs[11] and sometimes the raw material for the towers.[12]  Buying practices of the OEMs vary, but the assumption of responsibility for transport and transport cost by OEM purchasers is standard throughout the industry.[13] Producer qualification, by both tower type and facility, is common within the industry and may require three to nine months to complete.[14] Purchases of wind towers from facilities lacking the appropriate qualifications appear rare.[15]

Timely delivery is always valued in this industry, with as many purchasers rating it as "very important" as those who cite product consistency or quality.[16] Purchasers also frequently cite availability, available capacity, and reliability of supply as "very important" factors.[17] Purchase contracts frequently contain liquidated damage clauses to address possible delivery delays, because OEM purchasers themselves may face penalties for late installation or operation.[18] The concern for timeliness and the difficulties of transporting these large items both contribute to purchasers' apparent preference for sourcing towers from a facility close to the project.

These conditions held throughout the period of investigation (POI). However, the period of investigation also included significant swings in apparent consumption. Wind power installations using these utility scale wind towers are generally significant undertakings and sensitive to financing availability.[19] The recent financial crisis had a significant impact on demand for wind towers because poor general financial conditions made financing harder to find for such projects in the first half of the POI.[20]

Demand for wind towers is, however, also sensitive to the availability of both federal and state incentive programs, such as the production tax credit (PTC) and the investment tax credit (ITC).[21] While wind power may have reached grid parity with other energy sources at some times and in some markets,[22] the withdrawal of incentives, or just the expectation of withdrawal, can have significant effects on demand.[23] During the POI, the PTC was set to expire at the end of 2012.[24] In the wind power industry other incentives are available and support demand, but the PTC seems to be the most influential.[25] The pending expiration of the PTC created a firm deadline for new projects to qualify for benefits,[26] which generated unusual demand in the latter part of the POI, particularly in 2012. The PTC had an expiration

---

[10] CR at I-3, PR at I-3.

[11] Siemens prehearing brief at 4; Tr. at 177 (Hazel).

[12] Petitioners' posthearing brief at Exh. 1, p.4.

[13] CR at V-2, PR at V-2. ***. CR at V-2 n.5, PR at V-2 n.5.

[14] CR at II-28-II-29 and nn.49-50, PR at II-17-18 and nn.49-50.

[15] The record contains ***. CR/PR at Table V-5.

[16] CR/PR at Table II-3.

[17] CR/PR at Table II-3.

[18] Tr. at 154, 163 (Dougan), 177-178 (Hazel); GE posthearing brief at 5-6.

[19] CR at II-9, PR at II-5.

[20] CR at II-9-II-10, PR at II-5.

[21] CR at II-10-II-12, PR at II-6-II-7.

[22] CR at II-13, PR at II-8.

[23] CR/PR at Figure II-1.

[24] CR at II-10-II-11, PR at II-6.

[25] Petitioners' prehearing brief at 37-38.

[26] CR at II-11, PR at II-6.

date of December 31, 2012, and applied to projects achieving commercial operation by that date.[27] While the PTC had expired and been renewed in the past, the market was less optimistic late in the POI about a further renewal in the current economic and budget climate.[28]

The expected expiration of the PTC at the end of 2012 affected both demand and typical purchasing patterns. The anticipated expiration of the PTC caused a substantial increase in demand, with apparent consumption up *** percent in 2011 over 2010 and apparent consumption in interim 2012 *** percent higher than in interim 2011.[29] The expected expiration of the PTC also heightened the market's already strong focus on timeliness because late deliveries could imperil not only production schedules or potential profit, but the viability of the projects themselves. As OEMs were concerned with meeting installation deadlines imposed by the PTC expiration, available capacity and the ability to meet tight, specific delivery deadlines became increasingly important relative to more traditional concerns, such as producer proximity.

Also under way during the latter part of the POI was a shift towards taller towers.[30] Not all producers ***[31] and shifting production to taller towers reduces producers' effective capacity.[32]

We have noted the domestic industry's general concentration in the central states. The domestic industry is clustered in the "wind corridor" close to a significant portion of the United States' most promising potential wind utility sites.[33] However, this concentration also means that transportation for wind towers produced in this region to other portions of the United States may pose significant logistical challenges and high costs as well. Transport of towers to the West Coast may be impractical or even logistically impossible, and imports, subject and nonsubject, tend to fill demand on the East and West Coasts and on islands.[34]

Over the period of investigation, the domestic industry's production and shipments followed paths similar to, but less extreme than, the trends exhibited by overall apparent U.S. consumption. As financing became more difficult to obtain in 2010, domestic production and shipments dropped. Greater financing availability and the expected eventual expiration of the PTC led to a significant recovery in both production and shipments in 2011, and production and U.S. shipments were both higher in interim 2012 than in interim 2011.[35]

Subject import volume followed a similar pattern over the POI. There was a significant downturn in subject import volume and market share in 2010 and sharper increases in 2011 and 2012. The increases in volume and market share made by subject imports in 2011 came at the expense of nonsubject imports rather than the domestic industry.[36] In fact, despite changes in subject import volume and market share during the three full years of the POI, the domestic industry was able to increase its market share between 2009 and 2011. It was only in interim 2012 that the domestic industry lost a significant share of the U.S. market.[37]

---

[27] CR at II-10-11, PR at II-6.

[28] Siemens prehearing brief at 13-14.

[29] CR/PR at Table C-1.

[30] CR/PR at Table III-10

[31] CR at III-19, PR at III-9.

[32] Petitioners' posthearing brief at Exh.1, pp. 77-78.

[33] CR/PR at Figure III-1.

[34] CR/PR at Table V-5 (***); Tr. at 55 (Cole); Broadwind site visit notes at 6.

[35] CR/PR at Table C-1.

[36] CR/PR at Table C-1.

[37] CR/PR at Table C-1.

The domestic industry has argued that the record indicates that OEM purchasers have shifted their "baseload" demand to subject import sources.[38] We believe the record indicates just the opposite. As we have noted, the changes in domestic industry production and U.S. shipments tracked the sharp changes in apparent consumption over the POI, both in terms of declines and in increases, but did so in a more moderate fashion.[39] Although the financial meltdown began in late 2008, 2009 was generally a good year for the industry overall, as projects that secured financing before the meltdown were built out. The domestic industry produced 2,069 towers and shipped 2,057 to the domestic market that year. Though 2010 was a difficult one for wind tower demand overall, reductions in domestic industry production and shipments were more modest than in the market overall, and the industry produced 1,751 towers and shipped 1,738 towers to the U.S. market. With greater financing available and the expiration and non-renewal of the PTC and other federal incentives looming, the domestic industry was able to increase its production to *** towers in 2011 and its domestic shipments to the U.S. market to *** towers. In interim 2012, as apparent consumption peaked in advance of the expected non-renewal of federal incentives, the domestic industry produced *** towers and shipped *** to the U.S. market.[40]

In reviewing the domestic industry's actual performance in production and shipments, we are struck by the fact that the domestic industry was generally able to produce and ship a relatively steady volume of towers. Throughout a period that included significant shifts in apparent consumption, wide variances in the financing atmosphere, and uneven pressures caused by the availability of important incentives, the domestic industry's output and shipments remained fairly stable, particularly as compared to the market overall. This meant that the domestic industry's upturn was more muted than that of the overall market, but so was its downturn. This steadiness suggests to us two conclusions. The domestic industry provides the baseload capacity for wind tower consumption and imports absorb the variance. Moreover, the basic stability of their production levels suggests to us that the domestic industry's effective capacity over the POI was approximately *** towers per year under the market conditions prevailing.[41]

The domestic industry has reported production capacity well in excess of that *** tower figure, as well as reporting capacity utilization rates of *** percent in 2011 and *** percent in interim 2012, when, by our conclusions, the industry was apparently operating close to its capacity.[42] We still find that the record suggests that the industry was operating close to its true, effective capacity at the end of the POI.

The expiration and likely non-renewal of the PTC and other incentives at the end of 2012 prompted significant increases in apparent consumption late in the POI. This time period also brought a significant increase in subject imports. But we do not find that the record indicates that these additional volumes of subject imports displaced domestic production and shipments.

We believe that the steadiness of the industry's production and shipments trends reflects the fact that the industry has consistently supplied the baseload capacity and production for the U.S. wind tower market. As we have noted, OEM purchasers have an apparent preference for sourcing towers from producers close to the project to minimize transportation costs and other logistical risks. Given the domestic industry's location in the central states, close to many large wind projects, this preference for local sourcing typically has caused OEM purchasers typically to source a significant portion of their demand from domestic producers.[43]  OEM producers continued to source a significant portion of demand

---

[38] Petitioners' posthearing brief at Exh. 1, pp.1-2.

[39] CR/PR at Table C-1.

[40] CR/PR at Table C-1.

[41] CR/PR at Figure IV-2.

[42] CR/PR at Table C-1.

[43] During the POI, the percentage of domestic production capacity qualified to produce for *** increased from *** percent of total reported domestic capacity in 2009 to *** percent by the end of the POI. CS Wind final

(continued...)

40

from domestic producers in 2011 and interim 2012, explaining the relative steadiness in shipments by the domestic industry. But a significant share of that additional, time-sensitive demand was satisfied by subject imports.

The record suggests that OEM purchasers turned to subject imports because the domestic industry supplied as many new towers as it could under the unique conditions that held late in the POI. The domestic industry's actual shipments at that time were in line with or above its recent performance. The record contains considerable evidence that OEM purchasers encountered many difficulties obtaining needed towers from the domestic industry for deliveries in 2012. OEM purchasers seeking deliveries for 2012 were regularly told that ***. The allegations involve ***.[44] Moreover, the allegations ***.[45]

Petitioners have admitted that, during the latter stages of the POI, they were often not able to provide the requisite number of towers sought by OEM purchasers within the purchasers' requested time frames. They assert that they offered alternative production schedules, facilities, or other plans to accommodate OEM requests.[46] These admissions suggest that some supply difficulties existed in the domestic industry during this time period and that OEMs had to look elsewhere to secure adequate supply during this unusual period of demand that was both high and very time-sensitive. Available capacity, or lack thereof, acted as a limit on substitutability during this time period. Capacity that was not qualified or was not available at a time that would allow completion before the deadline was effectively not substitutable for capacity that was available and qualified.[47] It also suggests that the industry did not have significant amounts of effectively available capacity in 2011 and 2012, as they reported in their questionnaires.

We have noted a general preference on the part of OEMs to source close to projects. During peak demand late in the POI, OEM purchasers took delivery of a significant volume of subject imports for projects in the central states, the region in which the domestic industry has the greatest natural advantages and has typically dominated.[48] Many of these projects used both domestic and subject imports, however, suggesting that OEMs were using every available source to fill demand.[49] Moreover, subject imports frequently came with higher total delivered costs, borne by the purchasers.[50] The willingness on the part of the OEMs to pay higher total delivered costs for subject imports while still purchasing significant

---

[43](...continued)

comments at 4. The qualification process can be long and is not costless for OEM purchasers. CR at II-28-II-29 nn.49-50, PR at II-17 nn.49-50. Investing in increased qualified domestic capacity over the POI suggests that OEM purchasers wished to maximize their domestic purchasing opportunities even though subject imports were available.

[44] CS Wind prehearing brief at 30-31, citing purchaser questionnaire responses; GE posthearing brief at 3-5. Purchasers also reported quality problems. CR at II-27, PR at II-17.

[45] CS Wind prehearing brief at 30-31, citing purchaser questionnaire responses.

[46] Petitioners' posthearing brief at Exh. 1, pp. 26-27.

[47] Petitioners have argued that OEM purchasers have been willing to allow production and qualification to run concurrently. Petitioners' posthearing brief at Exh. 1, pp.23-24. However, the record includes only ***. CR/PR at Table V-5 (***).

Petitioners have also noted offers by domestic producers to build new facilities to satisfy specific OEM location demands. Petitioners' posthearing brief at Exh. 1, pp.21-22. However, we have already noted the unusual time constraints affecting the market during the period of strongest demand late in the POI. Petitioners have indicated that one facility was ***, but elsewhere admit that ***. Petitioners' posthearing brief at Exh. 1, pp.22-23, ***. Given the need to meet the PTC deadline, and OEM purchasers' apparent wariness about taking delivery from facilities that had not been qualified, construction of new facilities was unlikely to be satisfactory to OEM purchasers.

[48] CR/PR at Tables V-2 and V-5.

[49] See, e.g., CR/PR at Table V-1, particularly ***).

[50] CR/PR at Tables V-1, V-2, V-5, and V-6. We discuss our pricing comparisons more fully in the following section.

41

quantities of domestic towers (sometimes for the same projects) suggests that OEM purchasers chose subject imports because domestic producers were simply not able to supply purchasers with the requisite number of towers within the required timeframe.

We are mindful that ***.[51] ***.[52] ***.[53] Indeed, ***.[54] The total volume of purchases of domestically produced towers, combined with the apparent difficulties experienced by *** OEM purchasers in getting domestic supply in 2012, suggest that the domestic industry was in fact operating close to its effective capacity under the conditions existing late in the POI.

As a final matter, we note that petitioners devoted considerable attention to Shepherds Flat, a large project in Oregon, with turbines supplied by GE. All wind towers used at this project, installed in 2011 and 2012, came from a single subject producer in China, although a domestic producer had a facility in Washington and another producer offered to build a new facility nearby.[55] The project was significant, both in terms of electrical output and in the number of towers.[56] We do not agree, however, with petitioners that the Shepherds Flat project represented a significant lost sales opportunity for the domestic industry. We note that there was little effective operating domestic capacity within a reasonable distance,[57] and the logistics of transporting from the central region to Oregon were admittedly difficult.[58] No domestic producer was qualified at that time to build towers to suit the turbine used, which had not been used in the United States prior to Shepherds Flat and has not been used since.[59] The record does not indicate that the domestic industry could have supplied the project within the time and logistical constraints.

We acknowledge that the volume of subject imports, particularly in the last months of the POI, may appear significant, both absolutely and relative to the domestic industry's production and capacity. Under the conditions of competition specific to the industry and this timeframe, however, the record suggests that the domestic industry was operating close to its effective capacity. During the latter half of the POI, subject imports filled demand that was itself inflated and accelerated by the likely expiration of the PTC and other federal incentives, but subject imports did not displace significant amounts of domestic production or sales. We thus do not find subject import volume to be significant.

## B.    Price Effects of Subject Imports

Section 771(C)(ii) of the Act provides that, in evaluating the price effects of subject imports, the Commission shall consider whether – (I) there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and (II) the effect of imports of such merchandise otherwise depresses

---

[51] CR at III-11-III-13, PR at III-7-III-8.

[52] CS Wind prehearing brief at 30-31, citing purchaser questionnaire responses.

[53] Purchaser questionnaire responses of ***; Siemens prehearing brief at 26-35.

[54] Purchaser questionnaire response of ***.

[55] Petitioners' posthearing brief at Exh. 1, pp.22-23.

[56] CR at V-65, PR at V-7.

[57] CR/PR at III-1 and Figure III-1.

[58] Tr. at 55 (Cole). The proximity of the producer's location to the site was of recognized importance since one domestic producer offered to build a plant near the site to reduce transportation concerns. CR at II-4 n.6, PR at II-2 n.6.

[59] GE posthearing brief at 1-2.

42

prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.[60]

We do not find that significant price underselling has occurred, nor do we find that subject imports significantly depressed domestic prices or suppressed price increases which would have otherwise occurred. As we noted above, subject imports typically filled OEM purchasers' variable demand and often oversold the domestic like product.

At the outset, we must choose what pricing data to consider. At petitioners' own request, the Commission sought project-level bid data from major OEM purchasers.[61] Petitioners now argue for something more closely approaching the Commission's usual underselling analysis, wherein the Commission evaluates average unit values gathered on a quarterly basis for specific products within the category.[62] Petitioners have provided such comparisons, albeit on an annual basis rather than a quarterly one, using F.O.B. prices.[63] These comparisons shows significant underselling.[64]

We do not find the comparison suggested by petitioners to be the appropriate method for considering whether underselling occurred. The F.O.B. price is indeed the price agreed upon between producers and purchasers, but in this industry OEM purchasers are responsible for transportation costs.[65] And transportation costs are, as noted above, quite significant. Inland transportation costs for domestically produced towers ranged from 3.0 percent to 42.9 percent of total delivered cost, with an average of *** percent.[66] For towers imported from Asia, U.S. inland transportation costs ranged between 4.2 and 25.6 percent of total delivered cost, with an average of *** percent. Ocean freight ranged from 15.3 to 35.3 percent of total delivered cost.[67] "Price/total cost" was cited as the most important factor in purchasing decisions by a majority of responding purchasers.[68] "U.S. transportation costs" were cited as "very important factor" in purchasing decisions by all responding purchasers, while a majority cited "transportation costs to the U.S." as a very important factor.[69] In light of these costs, the difficulties inherent in moving such large items, and OEM purchasers' consistent responsibility for these costs,[70] we do not find a price comparison that ignores such costs to be a reliable indication of price competition between subject and domestic wind towers. If the F.O.B. price alone were the relevant comparison and the true basis for purchasers' decisions, it is difficult to see how the domestic industry could have made any sales during the POI, much less increase its sales.

Given these considerations, we have relied primarily on the bid data supplied by *** for our pricing analysis.[71] *** purchased towers from both domestic producers and subject producers for use in

---

[60] 19 U.S.C. § 1677(7)(C)(ii).

[61] Petition at 38.

[62] Petitioners' posthearing brief at 11.

[63] Petitioners' posthearing brief at Exh. 1, pp. 35-41 and Exh. 5.

[64] Petitioners' posthearing brief at Exh. 5.

[65] CR at V-2, PR at V-2. The exception is ***. Id. at n.5.

[66] CR at V-2, PR at V-1-V-2.

[67] CR at V-2, PR at V-2.

[68] CR/PR at Table II-2.

[69] CR/PR at Table II-3.

[70] Petitioners have suggested that OEM purchasers can pass increases in transportation costs onto the OEM purchasers' customers. The record contains no evidence of OEMs passing through increased or unexpected transportation costs. CS Wind posthearing brief at 9, GE posthearing brief at 5.

[71] We note that petitioners have argued that the bid data *** do not comply with the Commission's request. Petitioners' posthearing brief at Exh. 1, pp. 32-34. We find that the bid-type data supplied by *** do comply with

(continued...)

the same installations, and the bid data for those purchases provide a direct comparison of the total prices paid OEMs for both domestic and imported towers. We find these comparisons to be particularly probative, as the towers are similar not only in physical dimensions but in time and location as well.  ***. In ***.[72] Total incremental costs incurred by *** over the POI related to purchasing subject imports rather than domestically produced towers ***. Total incremental costs for ***.[73] ***.[74] ***.[75] In our view, the most direct price comparisons available to the Commission show no evidence of significant underselling by subject imports.

We turn then to a consideration of price depression. The record does not support a finding that domestic prices were depressed during the POI. Specifically, average unit values for domestically produced towers rose significantly over the POI, rising by *** percent between 2009 and 2011. Average unit values for domestic shipments in interim 2012 were *** percent higher than those in interim 2011.[76] Net sales AUVs also rose over the POI.[77]

The domestic industry did experience an apparent cost-prize squeeze over the POI. However, changes in the ratio industry's cost of goods sold to sales (COGS/sales) did not correlate either with low pricing by subject imports or with increasing volumes or market shares of subject imports. As noted above, we do not find underselling by subject imports. The domestic industry's COGS/sales ratio increased between 2009 and 2010, which is when subject import volume and market share declined. Moreover, when the volumes and market share of subject imports increased in 2011, the industry's COGS/net sales ratio actually improved. Finally, the ratio in interim 2012 was lower than in interim 2011, although in interim 2012 subject imports gained their largest amount of market share during the period.[78] In our view, all of this indicates that there was not a correlation between subject import volumes and any cost-price squeeze experienced by the domestic industry.

We believe that the lack of apparent price effects reflects a critical condition of competition in the market. In our view, the market for wind towers is not structured in such a way that subject import prices have the ability directly to influence prices for domestically produced wind towers. *** together account for *** of apparent domestic consumption of wind towers.[79] Each, however, approaches tower acquisition in a different manner. ***.[80] ***.[81] ***[82] ***.[83] The record suggests that *** acquired

---

[71](...continued)
our request.

[72] The ***. CR/PR at Table V-2.

[73] CR/PR at Table V-2.

[74] CR/PR at Table V-6. ***. Id.

[75] CR/PR at Table V-6.We note that a comparison of f.o.b. prices for domestically produced towers and c.i.f. costs for subject imports (removing U.S. transportation costs for both) still shows significant rates of overselling by subject imports across the entire period. CR/PR at Tables V-3 and V-7.

[76] CR/PR at Table C-1. AUVs may have increased over the POI in part because of the shift to larger towers, but domestic producers still shipped a large number of smaller towers. CR/PR at Table III-10.

[77] CR/PR at Table C-1. While we do not rely on the F.O.B. price comparisons compiled by petitioners, we do note that this pricing data ***. Petitioners' posthearing brief at Exh. 5.

[78] CR/PR at Table C-1. We note that the COGs/sales ratio for interim 2011 was significantly higher than the ratio for the full year 2011, suggesting that there might be some seasonality at work.

[79] CR at I-4 n.4, PR at I-3 n.4.

[80] CR at V-5, PR at V-3.

[81] CR at V-41, PR at V-5. Petitioners have argued that *** does engage in competitive bidding and that it uses information gained through this process to place price pressure on domestic producers. Petitioners' posthearing brief at Exh. 1, pp. 31-32 and Exhs. 2 and 8. The e-mails soliciting bids ***. Petitioners' posthearing brief at Exh. 8 and CR/PR at Table V-5. Petitioners have also offered another e-mail *** to show evidence of price pressure. ***. ***.

(continued...)

towers using the methods described, although most OEM purchasers appeared to be scrambling to obtain sufficient towers in 2012, but that none of the OEM purchasers used subject pricing as a way of gaining price concessions from domestic producers.

Given the structure of the market and OEM purchasing practices, we do not find evidence that prices for subject imports suppressed prices for the domestic like product, and we also find that subject imports did not undersell the domestic like product to a significant degree, nor did subject import prices depress the prices for the domestic like product.

### C.    Impact of Subject Imports[84]

Section 771(7)(C)(iii) of the Act provides that the Commission, in examining the impact of the subject imports on the domestic industry, "shall evaluate all relevant economic factors which have a bearing on the state of the industry."[85]  These factors include output, sales, inventories, capacity utilization, market share, employment, wages, productivity, profits, cash flow, return on investment, ability to raise capital, research and development, and factors affecting domestic prices.  No single factor is dispositive and all relevant factors are considered "within the context of the business cycle and conditions of competition that are distinctive to the affected industry."[86]

The condition of the domestic industry improved in most significant respects over the course of the POI.[87]  For example, the industry's capacity increased between 2009 and 2011. Its production levels were higher in 2011 than in 2009 and were higher in interim 2012 than in interim 2011. The industry's domestic shipment quantity increased between 2009 and 2011 and was higher in interim 2012 than interim 2011. The value of the industry's shipments increased by *** percent between 2009 and 2011, and the value of the industry's shipments was *** percent higher in interim 2012 than in interim 2011. The number of production and related workers was up *** percent between 2009 and 2011, and industry

---

[81](...continued)
Petitioners' posthearing brief at Exh. 2. We do not find that either of these exhibits support a finding of price suppression by way of subject imports.

[82] CR at III-11, PR at III-8.

[83] CR at III-24, PR at III-11, CR/PR at Table III-5.

[84] The statute instructs the Commission to consider the "magnitude of the dumping margin" in an antidumping proceeding as part of its consideration of the impact of imports. 19 U.S.C. § 1677(7)(C)(iii)(V).  In its final determination of sales at less than fair value for China, Commerce found weighted-average dumping margins of 44.99 percent to 47.59 percent for six specific producer and exporter combinations, and 70.63 percent for all others. CR at I-2, PR at I-2; 77 Fed. Reg. 75996 (Dec. 26, 2012). With respect to subject imports from Vietnam, Commerce found a weighted average margin of dumping of 51.50 percent for the CS Wind Group producer/exporter group and 58.49 percent for all others. CR/PR at Table I-3; 77 Fed. Reg. 75988 (Dec. 26, 2012).

[85] 19 U.S.C. § 1677(7)(C)(iii); see also SAA at 851 and 885 ("In material injury determinations, the Commission considers, in addition to imports, other factors that may be contributing to overall injury.  While these factors, in some cases, may account for the injury to the domestic industry, they also may demonstrate that an industry is facing difficulties from a variety of sources and is vulnerable to dumped or subsidized imports.")

[86] 19 U.S.C. § 1677(7)(C)(iii); see also SAA at 851, 885; Live Cattle from Canada and Mexico, Invs. Nos. 701-TA-386, 731-TA-812-813 (Prelim.), USITC Pub. 3155 at 25 n.148 (Feb. 1999).

[87] Petitioners argued both for excluding *** from the domestic industry and also for excluding ***. Petitioners' prehearing brief at 14-15. We do not exclude *** from the domestic industry as a related party, and we rely on domestic industry data which includes data from ***. CR/PR at Table C-1. We note that ***. CR/PR at Table VI-2. ***. CR/PR at VI-1 n.1. We have declined to exclude *** from the domestic industry or to focus exclusively on the commercial market for wind towers, or to take an adverse inference against ***. ***. We therefore rely on and cite to Table C-1 of the staff report and other tables reflecting data for ***.

employment was *** percent higher in interim 2012 than in interim 2011.[88] Average unit values of U.S. shipments increased significantly over the POI.[89]

Other industry indicators turned downward over the POI. Capacity utilization was lower in 2011 than in 2009, though utilization in interim 2012 was higher than in interim 2011. Productivity declined by *** percent between 2009 and 2011, and it was *** percent lower in interim 2012 than in interim 2011.[90] The cost of goods sold rose significantly over the POI and expenses for SG&A rose even more significantly, up *** percent between 2009 and 2011 alone. The domestic industry had a healthy profit margin in 2009, had a small operating loss in 2010, and a very modest positive operating margin in 2011. The industry showed an operating loss in interim 2012, however, and its operating margin in interim 2012 was worse than in interim 2011.[91]

These downturns do not, however, correlate with changes in subject import volumes or pricing that indicate that material injury was caused by reason of subject imports. For example, the industry's capacity utilization fell in 2010 when subject import volumes and market share were declining and then improved in 2011 when subject import volumes and market share were increasing. The industry's capacity utilization rate was higher in interim 2012 than in interim 2011 even though subject import volume and market share increased considerably. The industry's capacity utilization rates did not decline as subject import volumes rose. The domestic industry's COGS/sales ratio rose in 2010 when subject imports' presence in the U.S. market was declining, and the ratio improved in 2011 when subject import volume rose. Moreover, the COGS/sales ratio in interim 2012 was down from interim 2011, even though subject import volume in interim 2012 was well above interim 2011 levels.[92] The changes in the industry's operating income levels showed a similar lack of correlation with changes in subject import volumes.

The lack of correlation between trends for these indicators and for subject import volume and pricing is not surprising, given our earlier findings. The record suggests that the domestic industry met the baseload demand for OEM purchasers' wind tower needs during the POI, and the industry's production and sales followed general market trends. Subject imports served specific geographic markets that the bulk of the domestic industry could not meet without significant logistical difficulties and also served the excess demand generated by the expected non-renewal of the PTC and other federal incentives at the end of 2012. The record also does not suggest a strong relationship between prices for subject imports and the domestic like product or significant underselling by subject imports. Consequently, we find that subject imports did not have a significant adverse impact on the domestic industry.

For all the foregoing reasons, we conclude that an industry in the United States is not materially injured by reason of imports of utility scale wind towers from China found to have been subsidized by the Government of China and sold in the United States at LTFV and imports of utility scale wind towers from Vietnam found to have been sold in the United States at LTFV.

## II.    NO THREAT OF MATERIAL INJURY BY REASON OF SUBJECT IMPORTS

Section 771(7)(F) of the Tariff Act directs the Commission to determine whether the U.S. industry is threatened with material injury by reason of the subject imports by analyzing whether "further dumped or subsidized imports are imminent and whether material injury by reason of imports would

---

[88] CR/PR at Table C-1.

[89] CR/PR at Table C-1.

[90] We find the decline in productivity, while not well correlated with subject import trends, particularly probative, given the widespread reports of limited available domestic capacity during the latter part of the POI.

[91] CR/PR at Table C-1.

[92] CR/PR at Table C-1.

occur unless an order is issued or a suspension agreement is accepted."[93]  The Commission may not make such a determination "on the basis of mere conjecture or supposition," and considers the threat factors "as a whole" in making its determination whether dumped or subsidized imports are imminent and whether material injury by reason of subject imports would occur unless an order is issued.[94]  In making our determination, we consider all statutory threat factors that are relevant to these investigations.

Under section 771(7)(H) of the Tariff Act, the Commission may "to the extent practicable" cumulatively assess the volume and price effects of subject imports from all countries as to which petitions were filed on the same day if the requirements for cumulation in the material injury context are satisfied.[95] As detailed above, the requirements for cumulation in the material injury context are satisfied. No party has argued against cumulation for our threat analysis or suggested that the conditions of competition likely to confront subject imports from China and subject imports from Vietnam will likely different to a significant degree in the imminent future. We therefore exercise our discretion to consider subject imports from China and Vietnam on a cumulated basis for purposes of our threat analysis.

We note that the industry in China in particular is large, with a total capacity that exceeds total U.S. demand.[96] Moreover, the industries in both China and Vietnam rely on exports to a significant degree.[97] Furthermore, producers in both China and Vietnam have framework supply agreements with OEM purchasers or parent firms that operate in the United States.[98] Finally, the volume of subject imports increased significantly very late in the POI.[99] [100]

However, we find no evidence on the record suggesting that the existing patterns of trade will continue.[101] The domestic industry is likely to continue to supply the baseload demand for the domestic industry, while subject imports will absorb most of the variance in demand as well as supplying markets not easily reached by the domestic industry for logistical reasons. Given the very late extension of the PTC and other federal incentives and the time lag inherent in planning and erecting a large wind installation, demand for wind towers in the imminent future is likely to be somewhat depressed from high 2012 levels. This suggests that, as in 2010, subject import volume will decline more relative to total demand than domestic shipments. The record does not indicate that the conditions that limited the price effects of subject imports on domestic like product prices are likely to change.

Inventories on hand in the U.S. are modest,[102] and there were no orders reported for subject imports for delivery after the third quarter of 2012.[103] While there is significant capacity in China, much of it is not yet qualified to produce for the U.S. market or is otherwise inconveniently located to serve the

---

[93] 19 U.S.C. § 1677(7)(F)(ii).

[94] 19 U.S.C. § 1677(7)(F)(ii).

[95] 19 U.S.C. § 1677(7)(H).

[96] CR/PR at Table VII-1.

[97] CR/PR at Tables VII-2 and VII-4.

[98] CR at VII-8 n.13 and VII-13 n.24, PR at VII-7 n.13 and VII-9 n.24.

[99] CR/PR at Table IV-2.

[100] We note that the Department of Commerce has found countervailable subsidies provided by the Government of China to wind tower producers in that country. CR/PR at Table I-1. We have taken these subsidies into consideration in making our determination and do not find that the presence of these subsidies alters our determination.

[101] We note that the recent extension of the PTC requires only that construction start as of December 31, 2013, which is a significant change from the prior PTC that required commercial operation by the expiration date. CR at II-10 n.19, PR at II-6 n.19; CS Wind final comments at 1 n.1. The ITC was also renewed. CR at II-11, PR at II-6.

[102] CR/PR at Table VII-8

[103] CR/PR at Table VII-9.

U.S. market.[104] Producers have framework supply agreements with OEM purchasers or their parent companies, but the framework agreements do not require specific purchase levels or shipments to the United States.[105] Some of these framework agreements were in place during the POI but did not change the basic relationship of subject imports to the U.S. market. The industries in both China and Vietnam depend to varying degrees on exports, and global demand may not be expanding greatly in the imminent future, but no barriers to imports from either country exist in any market.[106] Framework agreements with multinational OEM purchasers may give those producers greater access to other export markets.

We conclude that the domestic industry is not threatened with material injury by reason of subject imports.

## CONCLUSION

For the foregoing reasons, we conclude that there is no reasonable indication that the domestic industry producing utility scale wind towers is  materially injured or threatened with material injury by reason of imports of towers from China that are subsidized by the Government of China and sold at less than fair value or towers from Vietnam that are sold in the United States at less than fair value.

[104] CR at VII-3-VII-4 and Table VII-1; PR at VII-3 and Table VII-1.

[105] CR at VII-8 n.13 and VII-13 n.24; PR at VII-7 n.13 and VII-9 n.24.

[106] CR at VII-18, PR at VII-10.

48

**Baker Hostetler**

Baker&Hostetler LLP

Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304

T  202.861.1500
F  202.861.1783
www.bakerlaw.com

Elliot J. Feldman
direct dial  202.861.1679
EFeldman@bakerlaw.com

December 7, 2012

**VIA EDIS AND HAND DELIVERY**

INVESTIGATION NOS.: 701-TA-486 and
731-TA-1195-1196 (FINAL)
TOTAL PAGES: 130
**PUBLIC VERSION**

The Honorable Lisa R. Barton
Acting Secretary to the Commission
United States International Trade Commission
500 E Street, S.W.
Washington, D.C.  20436

Re:    *Utility Scale Wind Towers from the People's Republic of China and
       the Socialist Republic of Vietnam:* Submission of Siemens Energy,
       Inc.'s Public Version of Pre-Hearing Brief

Dear Ms. Barton:

On behalf of Siemens Energy, Inc. and Siemens Power Generation ("Siemens"),
we are filing an original via EDIS and submitting four copies of the public version of the
Pre-hearing Brief in the above referenced investigations.  Please contact us should you
have any questions.

Respectfully submitted,

Elliot J. Feldman
*Counsel for Siemens Energy, Inc. and
Siemens Power Generation*

Enclosure

**JA 000179**

BEFORE THE
UNITED STATES INTERNATIONAL TRADE COMMISSION

_____

PUBLIC VERSION

_____
)
In the Matter of:                                    )
                                                          )     Investigation Nos. 701-TA-486,
                                                          )     731-TA-1195-1196
UTILITY SCALE WIND TOWERS             )     (Final Injury Determination)
FROM CHINA AND VIETNAM               )
                                                          )
_____)

PRE-HEARING BRIEF OF
SIEMENS ENERGY, INC. AND
SIEMENS POWER GENERATION

Submitted by:

Elliot J. Feldman
Michael S. Snarr
BAKER HOSTETLER
1050 Connecuticut Avenue, N.W.
Washington, D.C.  20036
Tel: 202-861-1679
Fax: 202-861-1783
efeldman@bakerlaw.com
msnarr@bakerlaw.com


Counsel for Siemens Energy, Inc.
and Siemens Power Generation

Date submitted:  December 6, 2012

1

**PUBLIC VERSION**

[



                                                            ]

3.       [          ] Production Capacity Issues

[

**PUBLIC VERSION**

]

[

33

34

---

[33] *See* Ex. 10.
[34] [

]

# PART I:  INTRODUCTION

## BACKGROUND

These investigations result from a petition filed with the U.S. Department of Commerce ("Commerce") and the U.S. International Trade Commission ("USITC" or "Commission") by Broadwind Towers, Inc., Manitowoc, WI; DMI Industries, Fargo, ND; Katana Summit LLC, Columbus, NE; and Trinity Structural Towers, Inc., Dallas, TX, on December 29, 2011, alleging that an industry in the United States is materially injured and threatened with material injury by reason of subsidized and less-than-fair-value ("LTFV") imports of utility scale wind towers ("wind towers")[1] from China and LTFV imports of wind towers from Vietnam.  Information relating to the background of the investigations is provided below.[2]

| Effective date | Action |
|---|---|
| December 29, 2011 | Petition filed with Commerce and the Commission; institution of the Commission's investigation (77 FR 805, January 6, 2012) |
| January 24, 2012 | Commerce's notices of initiation (78 FR 3440 and 3447) |
| February 13, 2012 | Commission's preliminary determination (77 FR 9700, February 17, 2012) |
| June 6, 2012 | Commerce's preliminary countervailing duty determination (77 FR 33422) |
| August 2, 2012 | Commerce's preliminary LTFV determinations, China (77 FR 46034) and Vietnam (77 FR 46058) |
| August 2, 2012 | Scheduling of final phase of Commission investigations (77 FR 50715, August 22, 2012) |
| December 13, 2012 | Commission's hearing[1] |
| December 24, 2012 | Commerce's final determinations (77 FR 75978, 75984, and 75992, December 26, 2012) |
| January 18, 2013 | Commission's vote |
| February 8, 2013 | Commission's determinations transmitted to Commerce |
| [1] A list of witnesses appearing at the hearing is presented in app. B. | |

## STATUTORY CRITERIA AND ORGANIZATION OF THE REPORT

### Statutory Criteria

Section 771(7)(B) of the Tariff Act of 1930 (the "Act") (19 U.S.C. § 1677(7)(B)) provides that in making its determinations of injury to an industry in the United States, the Commission--

---

[1] See the section entitled "The Subject Merchandise" in Part I of this report for a complete description of the merchandise subject to these investigations.

[2] Pertinent *Federal Register* notices are referenced in app. A and may be found at the Commission's website (www.usitc.gov).

*shall consider (I) the volume of imports of the subject merchandise, (II) the effect of imports of that merchandise on prices in the United States for domestic like products, and (III) the impact of imports of such merchandise on domestic producers of domestic like products, but only in the context of production operations within the United States; and. . . may consider such other economic factors as are relevant to the determination regarding whether there is material injury by reason of imports.*

Section 771(7)(C) of the Act (19 U.S.C. § 1677(7)(C)) further provides that--

*In evaluating the volume of imports of merchandise, the Commission shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States is significant.*
*. . .*
*In evaluating the effect of imports of such merchandise on prices, the Commission shall consider whether. . .(I) there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and (II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.*
*. . .*
*In examining the impact required to be considered under subparagraph (B)(i)(III), the Commission shall evaluate (within the context of the business cycle and conditions of competition that are distinctive to the affected industry) all relevant economic factors which have a bearing on the state of the industry in the United States, including, but not limited to*
*. . . (I) actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity, (II) factors affecting domestic prices, (III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment, (IV) actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the domestic like product, and (V) in {an antidumping investigation}, the magnitude of the margin of dumping.*

**Organization of Report**

Part I of this report presents information on the subject merchandise, subsidy/dumping margins, and domestic like product. Part II of this report presents information on conditions of competition and other relevant economic factors. Part III presents information on the condition of the U.S. industry, including data on capacity, production, shipments, inventories, and employment. Parts IV and V present the volume of subject imports and pricing of domestic and imported products, respectively. Part VI presents information on the financial experience of U.S. producers. Part VII presents the statutory requirements and information obtained for use in the Commission's consideration of the question of threat of material injury as well as information regarding nonsubject countries.

## MARKET SUMMARY

Wind towers are vertical support components of utility scale wind turbines used in electrical power generation projects.  As of June 2012, 13 firms are reported to have steel wind tower manufacturing capabilities in the United States.  The leading U.S. producers of wind towers are DMI Industries ("DMI"), Trinity Structural Towers ("Trinity"), and Vestas Towers America ("Vestas Towers"), while leading producers of wind towers outside the United States include Chengxi Shipyard Co. ("Chengxi"), CS Wind Tech Co. ("CS Wind (China)"), and Harbin Hongguang Boiler General Factory Co. ("Harbin Hongguang") of China, as well as CS Wind Vietnam Co. ("CS Wind (Vietnam)") of Vietnam.  The leading U.S. importers of wind towers from China are ***, while the leading importers of wind towers from Vietnam are ***.  Leading importers of wind towers from nonsubject countries (primarily Canada, Indonesia, Korea, and Mexico) include ***.  U.S. purchasers of wind towers are typically wind turbine original equipment manufacturers ("OEMs").  OEMs generally design the wind turbines, sell them under their own name, and, at a minimum, produce the nacelles in-house.  OEMs may produce the towers in-house or source them from outside suppliers.[3]  The leading OEMs in the U.S. market in 2011 include GE, Vestas Wind, Siemens, Suzlon, Mitsubishi Power, Nordex, and Clipper.[4]

Apparent U.S. consumption of wind towers totaled *** wind towers ($***) in 2011.  U.S. producers' U.S. shipments of wind towers totaled *** wind towers ($***) in 2011, and accounted for *** percent of apparent U.S. consumption by quantity and *** percent by value.  U.S. imports from subject sources totaled 861 wind towers ($265.9 million) in 2011 and accounted for *** percent of apparent U.S. consumption by quantity and *** percent by value.  U.S. imports from nonsubject sources totaled 475 wind towers ($155.9 million) in 2011 and accounted for *** percent of apparent U.S. consumption by quantity and *** percent by value.

## SUMMARY DATA AND DATA SOUCES

A summary of data collected in these investigations is presented in appendix C.  Except as noted, U.S. industry data are based on questionnaire responses of six firms that accounted for the substantial majority of U.S. production of wind towers during 2011.  U.S. imports are based on importer questionnaire responses that accounted for virtually all imports from China and Vietnam and a large majority of U.S. imports from nonsubject sources.  Data regarding the industries in China and Vietnam are based on foreign producer questionnaire responses and published sources.

## PREVIOUS AND RELATED INVESTIGATIONS

Wind towers have not been the subject of any prior countervailing or antidumping duty investigations in the United States.  Wind towers have been the subject of Commission staff research.[5]

---

[3] Petition, exh. I-4, p. 3.

[4] GE represented 29.5 percent of U.S. wind turbine installations in 2011, Vestas Wind 28.9 percent, Siemens 18.1 percent, Suzlon 4.9 percent, Mitsubishi Power 4.7 percent, Nordex 4.2 percent, Clipper 3.8 percent, REpower 2.5 percent, and Gamesa 2.2 percent.  American Wind Energy Association ("AWEA"), *U.S. Wind Industry Fourth Quarter 2011 Market Report, January 2012*, http://www.awea.org/learnabout/publications/reports/AWEA-US-Wind-Industry-Market-Reports.cfm.

[5] The following publications are on the Commission's website: Andrew David, "Shifts in U.S. Wind Turbine Equipment Trade in 2010," USITC Executive Briefings on Trade, May 2011; Andrew David, "Impact of Wind Energy Installations on Domestic Manufacturing and Trade," No. ID-02, July 2010; Andrew David, *Wind Turbines: Industry and Trade Summary*, Office of Industries Publication ITS-02, June 2009; Andrew David, "Growth in Wind

(…continued)

On June 9, 2010, the United Steelworkers filed a petition under Section 301 of the Trade Act of 1974 alleging that the Chinese government employed a wide range of World Trade Organization ("WTO")-inconsistent practices that unfairly benefited Chinese producers in the renewable energy sector, including producers of wind energy products.[6]  In response to the petition, the United States Trade Representative ("USTR") initiated an investigation on October 15, 2010.  On December 22, 2010, the United States requested WTO Dispute Settlement Consultations concerning a program known as the Special Fund for Wind Power Manufacturing.[7]  Following WTO consultation on February 16, 2011, USTR announced on June 7, 2011, that China had ended certain wind power equipment subsidies.[8]  On June 17, 2012, China filed a complaint with the WTO on countervailing and antidumping measures applied to a wide range of products, including wind towers, exported by China to the United States.[9] [10]

## NATURE AND EXTENT OF SUBSIDIES AND SALES AT LTFV

### Subsidies

On December 26, 2012, Commerce published a notice in the *Federal Register* of its final determination of countervailable subsidies for producers and exporters of wind towers from China.[11] [12]  Table I-1 presents Commerce's findings of subsidization of wind towers in China.

---

(…continued)

Turbine Manufacturing and Trade," USITC Executive Briefings on Trade, March 2009.  David, Andrew and Dennis Fravel, "U.S. Wind Turbine Export Opportunities in Canada and Latin America," No. ID-032, July 2012.

[6] USW Files Trade Case to Preserve Clean, Green Manufacturing Jobs in America, " USW press release, June 9, 2010, found at http://www.usw.org/media_center/releases_advisories?id=0327, and "United States Launches Section 301 Investigation into China's Policies Affecting Trade and Investment in Green Technologies," USTR, October 15, 2010, found at http://www.ustr.gov/about-us/press-office/press-releases/2010/october/united-states-launches-section-301-investigation-c, retrieved on January 9, 2012.

[7] USTR determined that "under this program, China appears to provide subsidies that are prohibited under WTO rules because the grants awarded under the program seem to be contingent on Chinese wind power equipment manufacturers using parts and components made in China rather than foreign-made parts and components."  "United States Requests WTO Dispute Settlement Consultations on China's Subsidies for Wind Power Equipment Manufacturers," USTR, December 22, 2010, found at http://www.ustr.gov/about-us/press-office/press-releases/2010/december/united-states-requests-wto-dispute-settlement-con, and WTO, dispute settlement, "China — Measures concerning wind power equipment," found at http://www.wto.org/english/tratop_e/dispu_e/cases_e/ds419_e.htm, retrieved on January 9, 2012.

[8] "China Ends Wind Power Equipment Subsidies Challenged by the United States in WTO Dispute," USTR, June 7, 2011, found at http://www.ustr.gov/about-us/press-office/press-releases/2011/june/china-ends-wind-power-equipment-subsidies-challenged, retrieved on January 9, 2012.

[9] *China files dispute against US countervailing and anti-dumping measures*, WTO, June 17, 2012, found at http://www.wto.org/english/news_e/news12_e/ds449rfc_17sep12_e.htm.

[10] The measures at issue in the request include Public Law 112-99 "An act to apply the countervailing duty provisions of the Tariff Act of 1930 to nonmarket economy countries, and for other purposes" signed by President Obama on March 13, 2012.  This law provides for the application of countervailing duty provisions of the Tariff Act to imports from countries that the United States designates as non-market economies (such as China), and applies to, among others, all countervailing duty proceedings initiated on or after November 20, 2006.

[11] *Utility Scale Wind Towers From the People's Republic of China:  Final Affirmative Countervailing Duty Determination*, 77 FR 33422, December 26, 2012.

[12] Commerce determined the following programs to be counteravailable:
(1) Policy Lending to the Renewable Energy Industry
(2) Two Free, Three Half Program for FIEs
(3) Income Tax Benefits for FIEs Based on Geographic Location
(4) Enterprise Income Tax Law, Research and Development Program

(…continued)

**Table I-1**
**Wind towers:  Commerce's final subsidy determination with respect to imports from China**

| Entity | Final countervailable subsidy margin (*percent*) |
|---|---|
| CS Wind China Co., Ltd., CS Wind Tech (Shanghai) Co., Ltd., and CS Wind Corporation (collectively, CS Wind) | 21.86 |
| Titan Wind Energy (Suzhou) Co., Ltd. (Titan Wind), Titan Lianyungang Metal Products Co. Ltd. (Titan Lianyungang), Baotou Titan Wind Energy Equipment Co., Ltd. (Titan Baotou), and Shenyang Titan Metal Co., Ltd. (Titan Shenyang) (collectively, Titan Companies). | 34.81 |
| All others | 28.34 |
| Source:  77 FR 75978, December 26, 2012. | |

## Sales at LTFV

On December 26, 2012, Commerce published a notice in the *Federal Register* of its final determination of sales at LTFV with respect to imports from China[13]  and Vietnam.[14]  Tables I-2 and I-3 present Commerce's dumping margins with respect to imports of wind towers from China and Vietnam.

**Table I-2**
**Wind towers:  Commerce's final weighted-average LTFV margins with respect to imports from China**

| Exporter | Producer | Final dumping margin (*percent*) |
|---|---|---|
| Chengxi Shipyard Co., Ltd | Chengxi Shipyard Co., Ltd | 47.59 |
| Titan Wind Energy (Suzhou) Co., Ltd | Titan (Lianyungang) Metal Product Co., Ltd | 44.99 |
| Titan Wind Energy (Suzhou) Co., Ltd | Titan Wind Energy (Suzhou) Co., Ltd | 44.99 |
| CS Wind Corporation | CS Wind China Co., Ltd | 46.38 |
| Guodian United Power Technology Baoding Co., Ltd | Guodian United Power Technology Baoding Co., Ltd | 46.38 |
| Sinovel Wind Group Co., Ltd | Sinovel Wind Group Co., Ltd | 46.38 |
| All others | | 70.63 |
| Source:  77 FR 75992, December 26, 2012. | | |

(…continued)
  (5)  Import Tariff and Value Added Tax Exemptions for Use of Imported Equipment
  (6)  Provision of HRS for LTAR
  (7)  Provision of Electricity for LTAR
  (8)  Support Funds for Construction of Project Infrastructure Provided by Administration Commission of LETDZ
  (9)  Award for Good Performance in Paying Taxes
  (10) Award for Taicang City to Support Public Listing of Enterprises
  (11) Awards for Taicang City to Promote Development of Industrial Economy for the Three-year Period of 2010 to 2012
  (12) Special Funds for Development of Science and Technology
  (13) Award for Baotou Rare Earth High and New Technology Industrial Development and
  (14) Zone for Excellent Construction Projects.
*Countervailing Duty (CVD) Investigation: Utility Scale Wind Towers (Wind Towers) from the People's Republic of China (the PRC)- Issues and Decision Memorandum for the Final Determination*, December 17, 2012.
    [13] *Utility Scale Wind Towers From the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 77 FR 75992, December 26, 2012.
    [14] *Utility Scale Wind Towers From the Socialist Republic of Vietnam:  Final Determination of Sales at Less Than Fair Value*, 77 FR 75984, December 26, 2012.

**Table I-3**
**Wind towers:  Commerce's final weighted-average LTFV margins with respect to imports from Vietnam**

| Exporter | Producer | Final dumping margin (*percent*) |
|---|---|---|
| The CS Wind Group (CS Wind Vietnam Co., Ltd. and CS Wind Corporation | The CS Wind Group | 51.50 |
| All others | | 58.49 |
| Source:  77 FR 75984, December 26, 2012. | | |

# THE SUBJECT MERCHANDISE

## Commerce's Scope

Commerce has defined the scope in this proceeding as follows:[15]

*{C}ertain wind towers, whether or not tapered, and sections thereof.  Certain wind towers are designed to support the nacelle and rotor blades in a wind turbine with a minimum rated electrical power generation capacity in excess of 100 kilowatts (''kW'') and with a minimum height of 50 meters measured from the base of the tower to the bottom of the nacelle (i.e., where the top of the tower and nacelle are joined) when fully assembled.*

*A wind tower section consists of, at a minimum, multiple steel plates rolled into cylindrical or conical shapes and welded together (or otherwise attached) to form a steel shell, regardless of coating, end-finish, painting, treatment, or method of manufacture, and with or without flanges, doors, or internal or external components (e.g., flooring/ decking, ladders, lifts, electrical buss boxes, electrical cabling, conduit, cable harness for nacelle generator, interior lighting, tool and storage lockers) attached to the wind tower section.  Several wind tower sections are normally required to form a completed wind tower.*

*Wind towers and sections thereof are included within the scope whether or not they are joined with nonsubject merchandise, such as nacelles or rotor blades, and whether or not they have internal or external components attached to the subject merchandise.*

*Specifically excluded from the scope are nacelles and rotor blades, regardless of whether they are attached to the wind tower. Also excluded are any internal or external components which are not attached to the wind towers or sections thereof.*

---

[15] *Utility Scale Wind Towers From the People's Republic of China:  Final Affirmative Countervailing Duty Determination*, 77 FR 75978, December 26, 2012.

**Tariff Treatment**

Based upon the scope set forth by Commerce, information available to the Commission indicates that the merchandise subject to these investigations is imported under the statistical reporting numbers 7308.20.0020 or 8502.31.0000 of the Harmonized Tariff Schedule of the United States (HTSUS).[16] 7308.20.0020 has a general duty rate of free and statistical reporting number 8502.31.0000 has a general rate of 2.5 percent ad valorem.[17]

## THE PRODUCT

### Description and Applications

Wind turbines consist of three main components–the nacelle, rotor, and tower.  The nacelle houses the wind turbine's main power generation components (i.e., the gearbox, generator, and other components), while the rotor typically consists of three blades and the hub (figure I-1).  The nacelle sits on top of a tower, which is typically a tubular steel tower for utility-scale wind turbines.[18]

**Figure I-1**

**Utility-scale wind turbine**



Source: Photo courtesy of DOE/NREL, credit Dennis Schroeder.

---

[16] Prior to 2011, subject goods were imported under statistical reporting number 7308.20.0000.  Wind towers are classified under statistical reporting number 7308.20.0020 when imported as a tower or tower section(s) alone. Wind towers imported as part of a wind turbine with an appropriate number of nacelles and rotor blades are believed to be imported under subheading 8502.31.00, which covers wind-powered electric generating sets.

[17] The product description, and not the HTSUS classification, is dispositive of whether the merchandise imported into the United States is included in the scope of the investigations.

[18] Petition, pp. 6–7 and exh. I-4, p. 2.

Wind turbines convert the energy from wind to electrical energy.[19]  Wind turbines have capacities ranging from less than 1 kilowatt ("kW") to several megawatts ("MW," equivalent to 1,000 kW).  Utility-scale wind turbines are considered to be those with a capacity of more than 100 kW, according to petitioners.[20]  Utility-scale wind turbine sizes have increased over time, with the average capacity of a wind turbine installed in the United States increasing from 0.72 MW in 1998–99 to 1.97 MW in 2011 (figure I-2).[21]  Wind turbines installed in the United States are usually between 1.0 and 3.0 MW in size (the largest turbine installed in the United States in 2011 was 3.0 MW).[22]  There are still installations of wind turbines between 100 kW and 1 MW in size, but these wind turbines account for a small share of the utility-scale market.[23]

**Figure I-2**
**Average capacity of wind turbines installed in the United States, 1998-2011**

Source: Petitioners' prehearing brief, exh. 31, Wiser, Ryan and Mark Bolinger, *2011 Wind Technologies Market Report*, U.S. Department of Energy, August 2012, p. 24.

Wind turbines can be installed individually or as part of a larger wind project (also known as a wind farm).  Installations of one to two turbines are often, but not exclusively, for on-site use by entities such as towns and universities.  Installations of wind turbines for utilities and independent power producers[24] can be a single turbine, but more commonly range from several turbines to more than 100.[25]

---

[19] U.S. Department of Energy, Office of Energy Efficiency and Renewable Energy Web site, http://www1.eere.energy.gov/wind/wind_how.html (accessed November 14, 2012).

[20] Petition, p.1, fn. 1.

[21] Petitioners' prehearing brief, exh. 31, Wiser, Ryan and Mark Bolinger, *2011 Wind Technologies Market Report*, U.S. Department of Energy, August 2012, p. 24.

[22] Petition, p. 7 and American Wind Energy Association (AWEA), *U.S. Wind Industry Fourth Quarter 2011 Market Report*, January 2012, pp. 8–16, http://www.awea.org/learnabout/publications/reports/upload/4Q-2011-AWEA-Public-Market-Report_1-31.pdf.

[23] Petition, exh. I-6, p. 30.

[24] An independent power producer is an entity that primarily produces power for sale on the wholesale market.  It is not a utility, does not own electricity transmission, and does not have a designated service area.  EIA Web site, "Electric Power Industry Overview 2007," http://www.eia.gov/cneaf/electricity/page/prim2/toc2.html (accessed January 22, 2012).

The largest wind project in the United States is the 845 MW Shepherds Flat wind project, which uses 338 turbines.[26]  Wind projects and wind turbines, including towers, have a life expectancy of at least 20 years.[27]

Wind turbines can also be installed offshore.  There is a substantial offshore market in Europe, but the United States does not yet have any off-shore wind turbine installations.[28]  The first pilot project in the United States is currently projected to be installed in 2013 or 2014.[29]

**Physical Characteristics of Towers**

Wind turbine towers for utility-scale wind turbines are generally tubular steel towers (figure I-3).[30]  They consist of multiple sections that are placed on a foundation and assembled at the project site, with the complete tower height generally ranging from 60 to more than 100 meters (197 to more than 328 feet), as measured from the base of the tower to the hub.[31]  The base of the tower can be up to 4.5 meters (15 feet) in diameter, but varies with tower size.  Smaller towers tend to have a smaller diameter base.[32]  The tower typically is tapered so that the diameter at the top is smaller than the diameter at the base.[33]  The tower comprises about two-thirds of the 200 to 400 short ton weight of the complete turbine, with steel comprising 98 percent of the tower weight (including the foundation).[34]  At the base of the tower is a door that allows entry to the tower, inside of which are tower internals such as platforms, ladders, lighting, lifts, and cabling.[35]

(…continued)

[25] Petition, exh. I-6, p. 34 and exh. I-28; AWEA, *U.S. Wind Industry Year-End 2010 Market Report*, January 2011, http://www.awea.org/learnabout/publications/reports/AWEA-US-Wind-Industry-Market-Reports.cfm.

[26] Petition, exh. I-23, I-24, I-25, I-26, and I-31.

[27] Petition, exh. I-4, p. 14, 24, and 27; conference transcript, p. 80 (Cole) and 97 (Feldman).

[28] European Wind Energy Association ("EWEA"), *Wind in Power: 2010 European Statistics*, February 2011, p. 9; petition, exh. I-6, p. iv.

[29] Davidson, Ros, "US Inches Forward but Still Lacks Momentum," *Windpower Monthly Magazine*, June 1, 2012, http://www.windpowermonthly.com/news/indepth/1134083/US-inches-forward-lacks-momentum/.

[30] Petition, exh. I-4, p. 2.

[31] Petition, pp. 7, 15–16, and fn. 25.

[32] Conference transcript, pp. 66–67 (Janda).

[33] Petition, exh. I-4, p. 5.

[34] AWEA, BlueGreen Alliance, and United Steelworkers, *Winds of Change*, June 2010, p. 20, http://www.awea.org/learnabout/publications/upload/BGA_Report_062510_FINAL.pdf; U.S. Department of Energy, Office of Energy Efficiency and Renewable Energy, *20% Wind Energy by 2030*, p. 63, http://www.nrel.gov/docs/fy08osti/41869.pdf.

[35] Petition, p. 11 and exh. I-4, p. 5; conference transcript, p. 27 (Janda).

**Figure I-3**
**Wind towers:  Installed wind turbines**



Source:  Courtesy DOE/NREL, credit Iberdrola Renewables.

Wind tower heights have increased over time, with the average hub height of turbines installed in the United States increasing from 55.7 meters (183 feet) in 1998–99 to 78.9 meters (259 feet) in 2009 and 81.0 meters (266 feet) in 2011 (figure I-4).  In 2011, towers from 80 to 89.99 meters accounted for *** of the towers installed (figure I-5). Tower heights are continuing to increase, with some companies introducing wind turbines with towers more than 100 meters high.[36]  Taller towers offer advantages because they allow the use of longer blades and access to better wind resources at higher altitudes.[37]

---

[36] Petition, p. 7; Vestas, "V112 3.0 MW Onshore," brochure, http://www.vestas.com/en/wind-power-plants/procurement/turbine-overview/v112-3.0-mw.aspx; Wiser, Ryan and Mark Bolinger, *2011 Wind Technologies Market Report*, U.S. Department of Energy, August 2012, data file, http://emp.lbl.gov/sites/all/files/lbnl-5559e-data.xls; ***.

[37] Mark Jaffe, "For Taller Wind Turbines, Generating Power is a Breeze," *The Denver Post*, December 25, 2011, http://www.denverpost.com/business/ci_19612999; Ehren Goossens, "GE Acquires Wind Tower Systems to Build Taller Wind Turbine Towers," *Bloomberg*, February 11, 2011, http://www.bloomberg.com/news/2011-02-11/ge-buys-wind-tower-systems-to-build-taller-wind-turbine-towers.html.

**Figure I-4**
**Average hub heights of wind turbines installed in the United States, 1998–2011**



Source: Wiser, Ryan and Mark Bolinger, *2011 Wind Technologies Market Report*, U.S. Department of Energy, August 2012, data file, http://emp.lbl.gov/sites/all/files/lbnl-5559e-data.xls.

**Figure I-5**
**Hub height of wind turbines installed in 2011**

*        *        *        *        *        *        *

  While tubular steel towers are the most common design for utility-scale wind turbines, other tower technologies are being used or are under development, often as a result of the increasing size of wind turbines.  Currently, these other tower designs account for a very small percentage of the broader tower market.[38]  Two types of alternative towers that have been used in the U.S. market are lattice mast towers and concrete towers.

  Lattice wind towers, with four legs and interconnecting steel tubes, were commonly used in the utility-scale segment of the U.S. wind industry in the 1980s and, though not accounting for a substantial share of the U.S. market today, lattice towers more than 100 meters have been used in Europe.[39]  A similar technology, space-frame towers, is in development for utility-scale wind turbine towers.  Space frame towers have "a highly optimized design of five custom-shaped legs and interlaced steel struts" covered by "a non-structural, architectural fabric."  The use of this fabric "mimics the aesthetics of tubular towers and addresses concerns over avian perching and mortality."[40]

---

[38] Conference transcript, p. 69 (Cole, Janda, and Barczak); hearing transcript, p. 129–130 (Smith).

[39] O'Brian, Heather, "Towers - The Next Area for Innovation?" *Windpower Monthly*, April 1, 2012, http://www.windpowermonthly.com/news/indepth/1124461/Towers---next-area-innovation; *Renewable Energy World*, "Altamont Pass Report Encourages Wind Farm Changes," August 17, 2004, http://www.renewableenergyworld.com/rea/news/article/2004/08/altamont-pass-report-encourages-wind-farm-changes-11750.

[40] Petition, exh. I-10; U.S. Department of Energy, Office of Energy Efficiency and Renewable Energy, *Wind Turbine Towers Establish New Height Standard and Reduce Cost of Wind Energy*, http://www1.eere.energy.gov/office_eere/pdfs/wind_tower_systems_sbir_case_study_2010.pdf; Higgins, Mark,

(…continued)

Tubular concrete wind turbine towers are used outside the United States, including in Canada, where Enercon—which commonly uses concrete towers—has a presence. The first concrete tower was not installed in the United States until 2012 and currently they are not widely used in the United States. Some companies, including one in the United States, also produce concrete tower base sections on top of which a steel tower can be added. These towers are known as concrete-steel hybrid towers. Hybrid towers are used in Europe, but there are no known installations of these towers in the United States.[41]

Siemens has reportedly installed a prototype of a steel shell wind turbine tower in Europe and, as of April 2012, was reportedly building a project with this type of tower. Steel shell towers are polygonal rather than tubular in shape, with individual pieces of plate that are bolted together, and have "a thinner material thickness and larger diameter than the prevalent towers on the market."[42]

## Manufacturing Processes[43]

Wind towers are produced to the specifications of each individual OEM, and each OEM typically has multiple tower designs. The wind turbine model and characteristics of the project site dictate which tower design will be used in a particular wind project.[44]

Wind towers are made from discrete steel plate, which is purchased by the tower manufacturer and is typically 3 meters (10 feet) wide, 12 meters (40 feet) long, and 0.5 to 2 or more inches thick. Plate thickness is related to the rotor diameter, weight, and design approach, with some OEMs using lighter towers. The plate at the base of the tower is the thickest and it decreases from the base to the top.  ***.[45]

---

(…continued)
"Small Business Innovation Research Grant Helps Propel Innovative Wind Energy Small Business," March 11, 2011, http://energy.gov/articles/small-business-innovation-research-grant-helps-propel-innovative-wind-energy-small-business.

[41] The U.S. company that makes these concrete tower bases has not yet started commercial production. Hearing transcript, pp. 129–130 (Smith) and pp. 219–220 (Revak); *The Gazette*, "Acciona to Introduce Concrete Towers for Wind Turbines," August 18, 2011, http://thegazette.com/2011/08/18/acciona-to-introduce-concrete-towers-for-wind-turbines; Tindall, "Raising Wind Turbines to a Whole New Level," Atlas CTB brochure, http://www.atlasctb.com/pdfs/atlasctbbrochure.pdf; North American Windpower, "Construction Begins On Iowa Project Featuring 100-Meter Concrete Tower," July 24, 2012, http://www.nawindpower.com/print.php?plugin:content.10168; Kessler, Richard A., "Enercon to Build Second Canadian Concrete Tower Plant," *Recharge*, October 16, 2012, http://www.rechargenews.com/regions/north_america/article325330.ece; Enercon Web site, http://www.enercon.de/en-en/755.htm (accessed November 7, 2012); O'Brian, Heather, "Towers - The Next Area for Innovation?" *Windpower Monthly*, April 1, 2012, http://www.windpowermonthly.com/news/indepth/1124461/Towers---next-area-innovation.

[42] Hearing transcript, p. 220 (Revak); de Vries, Eize, "Close up – Siemens's Prototype Steel Shell Tower," *Windpower Monthly*, April 26, 2012, http://www.windpowermonthly.com/news/1129016/Close---Siemens-prot; Andresen Towers, "Next Generation Wind Turbine Towers," brochure, http://www.windpower.org/download/1563/Andresen_towers_brochure.pdf (accessed November 7, 2012).

[43] This discussion will focus on the production process for tubular steel towers.

[44] Conference transcript, pp. 8 (Price), 68 (Janda), and 104–106 (Hauer); hearing transcript, pp. 111 (Cole) and 190–191 (Revak).

[45] Field notes, November 30, 2012.

***.[46]  The plate is typically made either to a U.S. specification (such as A36, A572-50, or A709 Grades 36 and 50) or a European specification (such as 10025 Grades S235, S275, and S355) and is commonly produced in steel mills globally.[47]  ***.[48]

In the first step[49] in the production process, steel plate is received, checked for quality, and cleaned (figure I-6).  A plasma and/or oxygen acetylene cutter is used to shape each plate, and then the edges of the plate are beveled.

The plate is next moved to a roller, a machine that rolls it into a cylindrical or conical shape.  The longitudinal seam of the rolled plate is then welded, creating what is known as a can.  ***.[50]  The quality of the weld is checked through ultrasonic testing.  ***.[51]  A flange (through which bolts can be inserted during tower assembly) is then welded on to the cans that will be at the top and bottom of each tower section.

The individual cans are then welded together, creating a tower section.[52]  The welds are again checked, and brackets, clips, and lugs to which internals can be attached are welded to the interior of the tower.  A door is added to the base section by cutting an opening for the door, welding a frame to the tower, and attaching a door.  ***.[53]

The tower sections are next blasted with grit to eliminate debris and create a rough surface that improves the paint adherence.  Portions of the tower surface may next be metalized[54] to reduce rust and corrosion.  Towers are then painted with one or more layers on the interior and two or more layers on the exterior.  It takes about 12 hours to paint and cure a tower section.  The internals are then added and the tower undergoes a quality control process.

---

[46] Field notes, November 30, 2012.

[47] Conference transcript, pp. 58–59, 68, and 74 (Janda); petition, p. 11; ArcelorMittal USA, "Plate: Wind Tower Applications," http://www.arcelormittal.com/NA/plateinformation/documents/en/Inlandflats/ProductBrochure/ARCELORMITTAL%20WIND%20TOWER%20BROCHURE%20FOR%20POSTING%20ON%20INTERNET.pdf, accessed January 31, 2012.

[48] Field notes, November 30, 2012.

[49] Discussion of the production process is based on sources cited below and petition, pp. 8–11; conference transcript, pp. 22–27 (Janda); Dongkuk S&C brochure, www.dongkuksnc.co.kr/movie/DONGKUKS&C_ENGLISH.PDF; Gamesa Web site, http://www.gamesacorp.com (accessed January 4, 2012); Kousa International Web site, http://www.kousainternational.com/tower.html (accessed January 4, 2012); Win&P Web site, http://www.winnp.co.kr (accessed January 9, 2012).

[50] Field notes, November 30, 2012.

[51] Field notes, November 30, 2012.

[52] A typical tower consists of 30 to 40 cans. The tower sections vary in length and depend on the height of the tower and number of sections. A taller tower does not necessarily require longer sections as the section lengths for an 80 meter tower that uses three sections can be longer than a 100 meter tower that uses five sections. Petition, p. 9; conference transcript, p. 67 (Janda).  However, a 100 meter tower will be substantially heavier overall.  Petitioners' posthearing brief, exh. 2, p. 4.

[53] Field notes, November 30, 2012.

[54] Metalizing is "a thermal spray process that involves vaporizing zinc and aluminum alloy wire to impinge it upon the blasted profile steel surface."  Conference transcript, p. 26 (Janda).

**Figure I-6**
**Wind towers:  Production process**

| | |
|---|---|
| Materials Reception | • Heavy gauge steel plate is received, checked, and cleaned. |
| Cutting | • The steel plates are cut to the appropriate shape. |
| Beveling | • The plate edges are beveled. |
| Bending (aka Rolling or Shaping) | • The plates are put into a machine that bends or rolls them into a conical or cylindrical shape. |
| Longitudinal Welding | • The plate is moved to a welding station where it is welded, creating a "can." |
| Flange welding | • Flanges are welded to the end of the cans that will be at the top and bottom of the tower section. |
| Section Welding | • Multiple cans are then welded together, forming a tower section. |
| Bracket Welding | • Flanges are welded to the ends of the tower sections, then brackets, clips, and lugs to attach internals are added. |
| Door Addition | • An opening for the door is cut into the tower, a frame welded on, and a door attached. |
| Metallizing and Shot Blasting | • The tower is shot blast with grit to improve the paint's adherence and certain tower sections are coated to avoid rusting and corrosion. |
| Painting and Drying | • One or more coats of paint are added to the inside of the tower and two or more to the exterior. |
| Internals | • The internals are then added to the tower. |
| Quality Control | • The tower undergoes a quality control process. |
| Packaging and Shipping | • The ends of the tower are covered and it is moved to storage or shipped to the project site. |

Source:  Petition, pp. 8–11; conference transcript, pp. 22–27 (Janda);  Dongkuk S&C brochure, www.dongkuksnc.co.kr/movie/DONGKUKS&C_ENGLISH.PDF; Gamesa Web site, http://www.gamesacorp.com (accessed January 4, 2012); Kousa International Web site, http://www.kousainternational.com/tower.html (accessed January 4, 2012); Win&P Web site, http://www.winnp.co.kr (accessed January 9, 2012).

The end of each tower section is covered with a tarp, and then moved to the storage area. Shipment of the towers to the wind project site is usually handled by the customer.  ***.[55]  Towers are usually shipped from U.S. producers' plants by either truck or rail, though barges can also be used to ship towers (figure I-7).[56]  ***.[57]

**Figure I-7**
**Wind towers:  Shipment by truck**



Source:  Photo courtesy of DOE/NREL, credit Jim Green.

At the project site, the base section of the tower is lifted by a crane and lowered straight down onto the foundation,[58] going over a power unit that sits in the base of the tower (figure I-8).  The flange at the base of the tower is attached to the foundation, then the next section of the tower is added and the flanges at each end of the tower sections are bolted together with large structural nuts and bolts.  Once all sections of the tower are constructed, the nacelle is added and then the rotor attached to the nacelle.[59]

---

[55] Field notes, November 30, 2012.

[56] Some of the largest tower sections may be too large to be shipped by rail and may need to be shipped by truck. Conference transcript, pp. 27 (Janda), 48 (Cole), 56–57 (Cole), 66 (Janda, Barczak, and Cole), and 142 (Hauer); Windpower Engineering, "When is a barge faster than a truck?" October 5, 2011, http://www.windpowerengineering.com/construction/when-is-a-barge-faster-than-a-truck; Thomas Baldwin, "Cost Creep in Logistics," Presentation at Windpower 2011, Anaheim, CA, May 25, 2011.  See Part V for additional information.

[57] Field notes, November 30, 2012.

[58] ***.  Field notes, November 30, 2012.

[59] Petition, pp. 9 and 26; conference transcript, p. 144 (Revak); AWEA Web site, http://www.awea.org/issues/supply_chain/Anatomy-of-a-Wind-Turbine.cfm (accessed January 24, 2012). See also figure I-5.

**Figure I-8**
**Wind towers: Turbine installation**



Source: Photos courtesy of DOE/NREL, credit First Wind (top), Patrick Corkery (center), and Todd Spink (bottom).

# DOMESTIC LIKE PRODUCT ISSUES

The Commission's decision regarding the appropriate domestic product(s) that are "like" the subject imported product is based on a number of factors including: (1) physical characteristics and uses; (2) common manufacturing facilities and production employees; (3) interchangeability; (4) customer and producer perceptions; (5) channels of distribution; and (6) price. Information regarding these factors is discussed below.

For the purposes of its determinations in the preliminary phase of these investigations, the Commission found "a single domestic like product that is coextensive with the scope of the investigations."[60] The petitioners contend that the Commission should define the domestic like product as co-extensive with the scope in these investigations.[61] Respondent foreign producers also propose that the Commission define the domestic like product as co-extensive with the scope in these investigations.[62] Respondent Siemens proposes that wind towers for Siemens be treated as a separate domestic like product.[63]

## Physical Characteristics and Uses

Respondent Siemens argues that wind towers, whether build for Siemens or not, in general serve the same functions and have similar appearances. However, since each wind tower is custom built to order, once built they are unlike other wind towers. A wind tower ordered by Siemens and built to its unique proprietary specifications, is unlikely to have been made by another producer, nor will a producer have a wind tower that would substitute for the wind tower.[64]

The petitioners contend that even though each OEM has different specifications, wind towers share a number of common physical characteristic and perform the same function. All wind towers are produced from steel plate that are welded into cans and cones, which are joined together to form sections. Moreover, all wind towers are built to a number of standards, including standards for steel, welding, coating, and quality inspection. While individual OEMs may differ in certain standards specifications by adding additional requirements, the standards are general to the industry and have been adopted by most manufacturers.[65]

## Manufacturing Facilities and Production Employees

Wind towers manufactured for Siemens are produced by manufacturers licensed and qualified by Siemens. Siemens notes that while the same manufacturing facilities and production employees are used to produce other wind towers, a Siemens specialist is placed onsite to supervise and monitor the production of the Siemens wind towers.[66] Petitioners argue that regardless of the OEM specifications, wind towers are produced in similarly dedicated facilities with similar employees.[67]

---

[60] *Utility Scale Wind Towers from China and Vietnam*, USITC Publication 4304, February 2012, p. 8.
[61] Petitioners' prehearing brief, p. 5.
[62] Respondent foreign producers' prehearing brief, p. 11.
[63] Respondent Siemens's prehearing brief, pp. 53-58 and hearing transcript, pp. 215-216 and 243 (Feldman).
[64] Respondent Siemens's prehearing brief, pp. 54-55.
[65] Petitioners' postconference brief, Exh. 1, p. 13 and conference transcript, pp. 87-88 (Cole and Janda).
[66] Respondent Siemens's prehearing brief, p. 55.
[67] Petitioners' postconference brief, Exh. 1, p. 14.

## Interchangeability

Respondent Siemens contends that wind towers manufactured for Siemens are not interchangeable or substitutable with wind towers manufactured for anyone else.[68] Petitioners note that wind towers are custom-designed for OEM turbine manufacturers' specific requirements, and are not interchangeable with other products, but are fungible between manufacturers within a particular OEM specification.[69]

## Customer and Producer Perceptions

Siemens argues that both the customer and the producers perceive that a wind tower produced for Siemens is unique and unlike towers built for anyone else.[70] Petitioners do not directly address the perceptions of Siemens towers and other wind towers, but note that wind towers are perceived as a distinct product category for use in wind turbine power generations units.[71]

## Channels of Distribution

Siemens argues that while the channels of distribution may be parallel with the channels of distribution for other OEMs, the wind towers sold to Siemens are unique and are delivered directly and only to Siemens ex works.[72] Petitioners note that wind turbines, whether produced for Siemens or for another firm, are primarily sold to OEM turbine manufacturers.[73]

## Price

Siemens contends that the price that it pays for wind towers is related only to business with Siemens and is based on location, timing, and specifications for a particular project. Moreover, there is no price competition between wind towers produced for Siemens and other wind towers, because the basis for Siemens' purchase of wind towers has no relationship whatsoever to what another OEM may be paying for towers. Furthermore, while wind tower manufacturers provide guidance on anticipated general prices at the beginning of each year, each project will lead to a difference price and each OEM will have different terms and conditions.[74] Petitioners did not specifically address the factor of price.

---

[68] Respondent Siemens's prehearing brief, p. 54.
[69] Petitioners' postconference brief, Exh. 1, p. 14 and hearing transcript, pp. 17 and 134 (DeFrancesco).
[70] Respondent Siemens's postconference brief, p. 38.
[71] Petitioners' postconference brief, Exh. 1, p. 14.
[72] Respondent Siemens's postconference brief, pp. 37-38, and prehearing brief, p. 55.
[73] Petitioners' postconference brief, Exh. 1, p. 14 and conference transcript, p. 31 (Barczak).
[74] Respondent Siemens's postconference brief, pp. 38-39.

# PART II:  CONDITIONS OF COMPETITION IN THE U.S. MARKET

## U.S. MARKET CHARACTERISTICS

Utility scale wind towers are a component of utility scale wind turbine electrical power generating units.  They are normally tubular steel structures upon which the other major wind turbine components such as rotor blades and nacelles are mounted.[1]  As discussed in more detail in Parts I, III, and IV, wind towers have become taller and heavier in recent years, supporting larger nacelles and rotor blades which generate a greater amount of electricity per wind turbine.  Demand for wind towers is derived from the demand for wind turbines which is in turn derived from the demand for wind-generated electric power.  Demand is affected by a number of factors including energy prices, government incentives, and financing availability.  Most U.S.-produced wind towers are sold commercially, while most subject and nonsubject imports are internally consumed.  The capacity of domestic wind tower producers has increased since 2009, but recently the majority of producers have decreased production, laid off workers, and plan to alter their product mix or shut down completely.

## CHANNELS OF DISTRIBUTION

A substantial majority of U.S.-produced wind towers sold in the United States are shipped to unrelated end users.  ***, however, utilizes its wind tower production internally to produce wind turbines. The vast majority of imported wind towers are internally consumed.

## GEOGRAPHIC DISTRIBUTION

U.S. producers and importers were asked to report the geographic areas in the United States served by their shipments of wind towers.  The three responding producers that sell wind towers reported that approximately half of their towers were sold to the Midwest (*** towers *** in January 2009-June 2012), *** were sold to the Pacific Coast, *** to the Mountain region, *** to the Central Southwest, *** to the Northeast, and *** were sold to the non-contiguous United States.[2]  Part III presents the locations of U.S. wind tower production facilities.

Importers reported shipping imported Chinese wind towers to all U.S. geographic regions in 2011, whereas imports from Vietnam were shipped to all regions in the contiguous United States except for the Southeast.  Importers of nonsubject wind towers reported shipping in every region, though they shipped only a minimal percentage to the Southeast and the non-contiguous United States.

Because of the logistic complexity of overland shipping, U.S. producers with facilities in the interior of the country and their customers often face very high transportation costs relative to imported product for those sites located near the Atlantic and Pacific Coasts, and to areas outside of the continental United States.  Similarly, importers often face very high transportation costs when shipping inland (see Part V).

Respondent Siemens contends that the majority of subject imports were shipped to the Pacific Coast, whereas most projects in the Midwest were supplied by domestic producers.[3]  Petitioners contend that there is not a strict delineation, as subject wind towers are shipped to Texas and the Midwest, while ***.[4]

---

[1] Petitioners' postconference brief, p. 6.

[2] These data are approximations based on percentages of shipments sold to each region, and only include data for three responding producers.  Three producers did not list percentages for the destination regions of their towers.

[3] Respondent Siemens's posthearing brief, exhs. 1 and 2.

[4] Petitioners' posthearing brief, p. 9.

II-1

## SUPPLY AND DEMAND CONSIDERATIONS

### U.S. Supply

**Domestic Production**

Based on available information, U.S. producers have the ability to respond to changes in demand with large changes in the quantity of shipments of wind towers to the U.S. market, provided that scheduling and commitments allow that capacity to be utilized. The main contributing factor to this degree of responsiveness of supply is substantial excess capacity. However, given the state of uncertainty surrounding the future of government incentive programs and the shuttering of domestic facilities, that excess capacity may be declining currently.

*Industry capacity*

Responding U.S. producers' production capacity increased throughout 2009-11, rising from 3,343 units in 2009 to *** units in 2011, but was *** units in January-June 2012 compared with *** units in January-June 2011. During 2009-11, capacity utilization rates ranged from a high of 61.9 percent in 2009 to a low of 44.9 percent in 2010. During January-June 2012, the capacity utilization rate was *** percent, compared with *** percent in January-June 2011. Though production was higher in the first half of 2012 than in the first half of 2011, U.S. producers have scaled back production and most have begun to shutter facilities or change production to alternative products such as railcars in the second half of 2012.[5]

One U.S. producer, ***, reported that it has declined to bid or has been unable to supply wind towers only in situations when short-term requirements have exceeded the sustainable capacity that *** has had in place at the time. *** reported that it had temporary production challenges which reduced available capacity in late 2010 and early 2011. In addition, U.S. producer *** noted that it has decided not to compete for sales in certain instances where it cannot meet Chinese or Vietnamese prices.

Despite production capacity utilization rates of no more than 61.9 percent since 2009, purchasers reported being unable to secure capacity for the production of wind towers from domestic producers. A majority of purchasers (***) reported that they were unable to purchase wind towers from producers because of lack of capacity.[6] Purchasers reported capacity constraints for wind towers produced by Broadwind, DMI, Martifer-Hirschfeld, Katana, and Trinity (both in the United States and Mexico). A representative for Broadwind testified that it has " never turned away a reasonable request for an order, and that goes for price and/or delivery," with an "unreasonable" request being one "if the target price is unreasonable and also if we had already committed that capacity or if the timeline was just too tight to meet, if the schedule was too tight."[7]

***.

***.

In addition, some purchasers have reportedly experienced delivery delays. Seven purchasers reported delivery issues for wind towers that resulted in additional expenses or lost revenue for the purchasers. ***. ***. ***. ***. ***.

Domestic producers have noted that OEMs which do not purchase the entirety of the previously committed volume has reduced producers' capacity utilization. Without sufficient lead time to make

---

[5] Information on plant closures, expansions, and/or openings is presented in Part III.

[6] In addition, ***. Among the other purchasers, *** did not provide an answer, and *** reported "N/A" or "Not applicable."

[7] Hearing transcript, pp. 53 and 119 (Smith).

other arrangements for that capacity, other purchasers are not able to use that capacity to fulfill their commitments, having already secured alternate sourcing.[8]

### Alternative markets

During 2009-11, exports as a share of total shipments were low, increasing from *** percent in 2009 to *** percent in 2011.  The share also was higher in interim 2012 (*** percent) compared with interim 2011 (*** percent).  Only two producers, ***, reported exports.

### Inventory levels

Inventories are typically low in this industry since wind towers are typically either produced to order for specific end users or are assigned a project before manufacturing is complete.  The ratio of inventories to total shipments decreased irregularly from *** percent in 2009 to *** percent in 2011.  Since wind towers are typically not installed in the winter months in northern states, inventories were higher in the middle of the year than at the end of the year.  At the end of January-June 2012, the ratio was *** percent, compared with *** percent in January-June 2011.

### Production alternatives

One of the responding U.S. producers (***) reported that it produces other products on the manufacturing equipment used to make wind towers while engaged in the manufacture of wind towers.  Also, Trinity will be shifting some production to produce railcars.[9]

## Foreign Supply

## Subject Imports from China

Based on available information, the responding Chinese producers have the ability to respond to changes in demand with moderate to large changes in the wind towers shipped to the U.S. market.  The main contributing factor to this degree of responsiveness of supply is substantial excess capacity.

### Industry capacity

Chinese producers reported increasing production capacity from 2,475 units in 2009 to 3,455 units in 2011.  During 2009-11, their annual capacity utilization rates ranged from a low of 66.2 percent in 2010 to a high of 76.3 percent in 2009.  The capacity utilization rate was 83.2 percent in January-June 2012, compared with 71.4 percent in January-June 2011.  Chinese producers projected a capacity utilization rate of 66.6 percent for full-year 2012 and 57.9 percent in 2013.

---

[8] Petitioners' posthearing brief, exh. 1, p. 25.

[9] "Katana Summit adds to US tower woe," Wind Power Monthly, September 14, 2012, found at http://www.windpowermonthly.com/news/1149967/Katana-Summit-adds-US-tower-woe/, retrieved November 15, 2012.

*Alternative markets*

During 2009-11, Chinese producers' home market shipments increased from *** percent of total shipments in 2009 to *** percent in 2010 before decreasing to *** percent in 2011. Shipments to the home market were substantially lower in interim 2012 than in interim 2011 (*** percent compared with *** percent). Home market shipments are projected to account for *** percent of total shipments in 2012, and *** percent in 2013. The lower level of home market shipments in 2012 was offset by an increased number of shipments to the United States. In the first half of 2011, Chinese producers shipped *** units to the United States; in the second half of 2011, *** units, and in the first half of 2012, *** units. For the second half of 2012, Chinese producers project selling only *** towers to the U.S. market. Exports to markets other than the United States were relatively modest during 2009-11, ranging from a low of *** percent of total shipments in 2010 to a high of *** percent in 2009. In interim 2011, they accounted for *** percent, whereas in interim 2012, they accounted for *** percent. They are projected to increase to *** percent during 2012, and *** percent in 2013.

*Inventory levels*

During 2009-11, the Chinese producers' ratio of inventories to total shipments increased from a low of *** percent in 2009 to a high of 26.1 percent in 2011.[10] During interim 2012, the ratio was 17.5 percent, which was lower than the 21.3 percent in interim 2011. The ratio is projected to decline to 15.5 percent for full-year 2012 and to 9.7 percent for 2013.

*Production alternatives*

No Chinese producers produce or plan to produce other products using the same manufacturing line or the same manufacturing equipment used to make utility wind towers.

**Subject Imports from Vietnam**

Based on available information from two producers, CS Wind (Vietnam)[11] and UBI Tower Sole Member Limited Liability Company ("UBI"), the Vietnamese industry has the ability to respond to changes in demand with moderate changes in the wind towers shipped to the U.S. market. The main contributing factors to this degree of responsiveness of supply are ***.

*Industry capacity*

The producers in Vietnam reported an annual production capacity increase, from *** units in 2009 to *** units in 2010 with the opening of UBI, but decreasing to *** units in 2011. Capacity remained unchanged from the first half of 2011 to the first half of 2012 (*** units). During 2009-11, capacity utilization rates decreased from *** percent in 2009[12] to *** percent in 2010 before increasing to *** percent in 2011. The Vietnamese producers' capacity utilization rate was *** percent in January-June 2012, compared with *** percent in January-June 2011. The producers in Vietnam projected a capacity utilization rate of *** percent for full-year 2012, and *** percent in 2013.

---

[10] These inventories are items that have already been sold that are awaiting shipment by customers. Email from ***.

[11] ***.

[12] At this point, CS Wind (Vietnam) was the sole Vietnamese firm that reported production.

*Alternative markets*

CS Wind (Vietnam) ***, but ***.  Since that year, however, ***.  During 2009-11, the producers in Vietnam reported that their exports to non-U.S. markets increased from *** percent of total shipments in 2009 to *** percent in 2010, but decreased slightly to *** percent in 2011.  During interim 2012, such exports accounted for *** percent, compared with *** percent in interim 2011.  They are projected to be *** percent in 2012 and *** percent in 2013.

*Inventory levels*

During 2009-11, the Vietnamese producers' ratio of inventories to total shipments increased from *** percent in 2009 to a period-high of *** percent in 2010 before decreasing to *** percent in 2011.  During the first half of 2012, it was lower (*** percent) than in the first half of 2011 (*** percent). The ratio is projected to be *** percent for full-year 2012 and *** percent for 2013.

*Production alternatives*

CS Wind reported that *** on the same manufacturing equipment used to produce wind towers. The firm attributed this ***.  UBI reported that *** using the same manufacturing equipment used to produce wind towers.

## U.S. Demand

The demand for wind towers is derived from the demand for wind turbines.  During 2009-11, U.S. shipments of wind turbines declined from ***[13] MW in 2009 to ***[14] MW in 2010, but increased to *** MW in 2011.[15]  Total wind turbine shipments are not available for 2012, but, as discussed in the next section, installations are projected to exceed 2009 levels.  In general, the U.S. wind market is driven by a number of factors, including electricity demand, natural gas prices, electricity prices (related in part to natural gas prices and electricity demand), availability of project financing, availability of electricity transmission, and state and federal government policies.[16]  Since 2009, a decline in the price of natural gas, lower electricity prices due to factors such as decreased economic activity and increased natural gas production, more restricted financing, transmission constraints, and the implementation of new federal government policies and the anticipated expiration at the end of 2012 have contributed to fluctuations in the wind market.[17]  Despite the increase in wind turbine shipments in 2011 over 2010, the installed

---

[13] *World Market Update 2009,* March 2010, p. 113.

[14] *World Market Update 2010,* March 2011, p. 129.

[15] *World Market Update 2011,* March 2012, p. 159.

[16] When asked specifically whether certain items affect the wind tower market, all responding producers, importers, and purchasers answered "yes" with respect to federal or state governmental policies.  Four of 5 responding U.S. producers, all responding importers and purchasers answered "yes" with respect to the natural gas market.  Two of 5 U.S. producers, 8 importers, and 9 purchasers answered "yes" with respect to changes in the availability of financing.

[17] Petition, pp. 27–30, exh. I-4, pp. 25–30, exhibits I-6, I-39, and I-40; conference transcript, pp. 156–157 (Revak); petitioners' postconference brief, exh. 2; respondents' postconference brief, pp. 11–12, exh. 2; Andrew David, "Shifts in U.S. Wind Turbine Equipment Trade in 2010," USITC Executive Briefings on Trade, June 2011, http://www.usitc.gov/publications/332/executive_briefings/wind_EBOT_commission_review_final2.pdf.  Four of five responding U.S. producers and five of eight responding importers reported that the market is subject to business cycles or conditions of competition distinct to wind towers, most of whom noted these conditions affecting the industry.  In addition, weather conditions were noted to frequently affect the transportation and construction of wind

(continued...)

capacity was substantially lower than installed capacity during 2009.  The overall decline in the market has been attributed to the effects of the recession, a lack of project financing, lower energy demand, and lower natural gas prices, a competing energy product.[18]

The overall U.S. demand for wind towers is likely relatively insensitive to changes in price, due to the lack of close substitutes, and the relatively low cost of wind towers as a share of the final cost of wind turbines.

**Government Incentives**

At the federal level, the then-scheduled expiration of certain programs at the end of 2012 drove a high level of wind project construction in 2012 and has reduced expected demand after 2012.  The recently-passed legislation that averted the "fiscal cliff" restored the production tax credit ("PTC") for another year,[19] though its effect may be muted in 2013 and may not even be felt until 2014.  Several available tax credits have contributed to the growth of the wind market in the United States.  The PTC is a credit of 2.2 cents per kilowatt-hour for the first ten year of operation of a wind turbine.  The PTC was first passed in the Energy Policy Act of 1992.  The PTC has been allowed to lapse several times since it first went into effect, although it has been periodically renewed.  In the years in which it was allowed to lapse, there were substantial declines in wind tower installations (figure II-1).  It is scheduled to expire again at the end of 2013, with eligibility based on construction.

Similarly, under the American Recovery and Reinvestment Act of 2009, wind projects are eligible for the 30 percent investment tax credit ("ITC") if completed by the end of 2012.  Firms could also opt for a cash grant equal to the amount of the ITC.  To be eligible for the grant (for which the deadlines were extended in 2010), projects must have started construction before the end of 2011, and must be in commercial operation by the end of 2012.  Like the PTC, the ITC was renewed for 2013.  While the PTC, ITC, and cash grants have encouraged substantial wind installations in the United States and the high level of activity in 2012 (with 4,728 MW installed in the first three quarters of 2012 and another 8,430 MW under construction), the expected expiration of these tax credits could lead to a substantial decline in installations.[20]

Wind projects have also benefitted from various levels of accelerated depreciation, with wind projects completed in 2012 eligible for 50 percent bonus depreciation.[21]

---

[17] (...continued)
towers, as little development takes place in northern states during the colder months.  Conference transcript, p. 40 (Barczak).

[18] *USITC Executive Briefings on Trade*, June 2011. The wellhead price for natural gas decreased by more than 50 percent between January 2008 and October 2010.  Energy Information Administration, www.eia.doe.gov, information retrieved January 25, 2012.

[19] The legislation contains language that extends the PTC to projects that have started construction, not projects that are completed, which will allow for the effects to last beyond one year.  "U.S. Tax-Credit Extension May Boost Stalled Wind Industry," Bloomberg.com, found at http://www.bloomberg.com/news/2013-01-03/u-s-tax-credit-extension-may-boost-stalled-wind-industry.html, retrieved January 4, 2013.

[20] Petition, pp. 31-32, 48, exh. 1-6, pp. 61-62, exh. 1.4, p. 27, and exh. I-39; American Wind Energy Association ("AWEA"), U.S. Wind Industry Third Quarter 2012 Market Report, October 17, 2012, p. 1, http://www.awea.org/learnabout/publications/reports/upload/3Q2012-Market-Report_Public-Version.pdf; Conference transcript, pp. 9 (Price) and 94 (Cole), respondents' postconference brief, pp. 11-12.  *See also* Sec. 407 of the American Taxpayer Relief Act of 2012, EDIS doc. 500751.

[21] Petition, exh. 1-6, p. 61.

**Figure II-1**
**Wind towers:  Annual U.S. wind turbine installations and lapses in the production tax credit (PTC)**



Note.--Production tax credit lapses are years when the production tax credit expired before it was renewed. It is not known whether all projects under construction were completed in 2012.

Source:  AWEA, U.S. Wind Industry Fourth Quarter 2011 Market Report, January 2012, p. 3, http://www.awea.org/learnabout/publications/reports/upload/4Q-2011-AWEA-Public-Market-Report_1-31.pdf; AWEA, Annual Wind Industry Report Year Ending 2008, April 2009, p. 4, http://www.awea.org/learnabout/publications/upload/AWEA-Annual-Wind-Report-2009.pdf; Petition, exh. I-39.

In addition to tax credits, wind projects have been eligible for the U.S. Department of Energy ("DOE") loan guarantee program and several projects, including the 846 MW Shepherds Flat Project in Oregon, received loan guarantees.  The projects were required to start construction by September 30, 2011.[22]

At the state level, renewable portfolio standards ("RPS"), which mandate that a certain percentage of electricity is from renewable sources by a particular date, have also contributed to the growth of wind installations.  As of January 2012, 29 states, the District of Columbia, and Puerto Rico had mandatory RPS, while 8 states had voluntary goals.  These policies would likely continue to drive at least some level of installations going forward in the absence of, or uncertainty surrounding, federal government policies.  Nonetheless, the uncertainty sregarding the PTC contributed to projections by consulting firms that wind installations would be less than 3 GW in 2013, compared with more than 6 GW in 2011 and a possible 13 GW in 2012.[23]

---

[22] Petition, exh. 1-6, p. 62.

[23] Database of State Incentives for Renewable Energy, "RPS Policies," January 2012, http://www.dsireusa.org/summarymaps/index.cfm?ee=1&RE=1; conference transcript, pp. 156-157 (Revak);petition, exh. I-6, pp. 62-63; David, Andrew, and Dennis Fravel, "U.S. Wind Turbine Export Opportunities in Canada and Latin America," U.S. International Trade Commission, Office of Industries Working Paper No. ID-032, July 2012, http://www.usitc.gov/publications/332/working_papers/ID-032_final.pdf.

**Electricity/Natural Gas Prices**

As noted above, two of the factors affecting wind turbine demand are electricity prices and demand.  U.S. electricity demand peaked in 2007 and declined sharply in 2009 due to the recession (figure II-2).  While demand has since rebounded, it remains below 2007 levels.[24]  On a national basis, prices for wind-generated electricity were, on average, lower than wholesale electricity prices during 2005-08.  This changed starting in 2009 due to rising wind power prices and a substantial decline in wholesale power prices (figure II-3).  However, this national comparison does not reflect significant regional variations in wind power prices and wholesale electricity prices that may impact the competitiveness of wind-generated electricity.  It is also based on cumulative wind projects installed and does not reflect the price competitiveness of projects currently under construction.  Figure II-3 shows prices rising through 2011, but this largely reflects power purchase agreements ("PPAs") signed in earlier years when wind turbine prices were higher.  Average capacity-weighted PPA prices declined from $72/megawatt hour (MWh) for those signed in 2009 to $50/MWh in 2010 and $35/MWh in 2011 (figure II-4).[25]  The authors of one study noted that "PPA prices in the $30-$40/MWh range - currently achievable (at least with the PTC) in many parts of the interior U.S. - are fully competitive with the range of wholesale power prices seen in 2011."[26]

**Figure II-2**
**U.S. retail electricity sales, 2001-11**



Note.--2011 data are preliminary.

Source: U.S. Energy Information Administration, Annual Energy Review 2011, p. 221, http://www.eia.gov/totalenergy/data/annual/pdf/sec8_5.pdf.

---

[24]  U.S. Energy Information Administration, Annual Energy Review 2011, p. 221, http://www.eia.gov/totalenergy/data/annual/pdf/sec8_5.pdf.

[25] Wiser, Ryan and Mark Bolinger, 2011 Wind Technologies Market Report, U.S. Department of Energy, August 2012, pp. 48-56.

[26] Wiser, Ryan and Mark Bolinger, 2011 Wind Technologies Market Report, U.S. Department of Energy, August 2012, p. 52.

**Figure II-3**
**Wholesale electricity prices and estimated wind-generated electricity prices**



Note.-- Wind generated electricity prices include the production tax credit.  Includes wind projects built during 1998-2011.

Source: Wiser, Ryan and Mark Bolinger, 2011 Wind Technologies Market Report, U.S. Department of Energy, August 2012, data file, http://emp.lbl.gov/sites/all/files/lbnl-5559e-data.xls.

**Figure II-4**
**PPA prices for wind-generated electricity by date of PPA signing**



Note.--The size of the bubble represents the project capacity.

Source: Above chart from Wiser, Ryan and Mark Bolinger, 2011 Wind Technologies Market Report, U.S. Department of Energy, August 2012, p. 52.

**JA 000326**

Part of the decline in electricity prices has been driven by a decrease in natural gas prices. Since 2009, U.S. natural gas prices have declined as more shale gas has been extracted (see figure II-5). U.S. producers stated that natural gas and wind towers/turbines have a complementary relationship, and point to the fact that wind turbine installations have increased while natural gas prices declined. Importers and purchasers, however, stated that the decrease in the price of natural gas, and the concomitant decrease in electricity prices have created downward pressure on wind turbine/tower prices and demand. *** stated that "the variable cost of generation is what sets the wholesale price of electricity in the market and the current low natural gas prices have resulted in a significant drop in power prices in the U.S. The lower electricity prices present challenges for wind developers to obtain Power Purchase Agreements (PPAs) that make their projects profitable and feasible without the government incentives."

**Figure II-5**
**Natural gas: U.S. industrial price, January 2009-September 2012**



Source: U.S. EIA, found at http://www.eia.gov/dnav/ng/hist/n3035us3m.htm, retrieved January 4, 2013.

**Demand Perceptions**

When asked how U.S. demand for wind towers had changed since January 1, 2009, the majority of questionnaire respondents reported that demand had fluctuated (table II-1). Among five responding producers, three reported that it had fluctuated and two reported that demand had decreased. Among nine responding importers, three reported that demand had fluctuated and four reported that it had decreased.[27] Among nine responding purchasers, six reported that demand had fluctuated since 2009. Demand factors cited by firms included the PTC, the costs of competing energy generation sources, and the recession.

Nearly all U.S. producers, importers, and purchasers indicated that they believe demand for wind towers will decrease in 2013. Four of five domestic producers also expect declining demand in 2014, whereas, among importers and purchasers, the same number believe demand will increase as those that believe demand will decrease.

With respect to demand outside the United States, three importers and three purchasers reported increasing demand since 2009, two importers noted no change in demand, one producer and one importer noted decreasing demand, and one producer, two importers, and four purchasers noted fluctuating demand. A number of countries have domestic content requirements for wind towers, including

---

[27] Firms reporting that demand has "fluctuated" may be noting that after declining in 2010, installation of wind towers increased during 2011 and the interim period in 2012.

**Table II-1**
**Wind towers:  Firms' perceptions regarding demand**

| Item | Number of firms reporting | | | |
|---|---|---|---|---|
| | Increase | No change | Decrease | Fluctuate |
| **Demand in the United States** | | | | |
| **Since 2009:** U.S. producers | 0 | 0 | 2 | 3 |
| Importers | 1 | 1 | 4 | 3 |
| Purchasers | 2 | 0 | 1 | 6 |
| **2012:** U.S. producers | 0 | 0 | 5 | 0 |
| Importers | 1 | 5 | 3 | 0 |
| Purchasers | 2 | 2 | 5 | 0 |
| **2013:** U.S. producers | 0 | 1 | 4 | 0 |
| Importers | 0 | 1 | 7 | 2 |
| Purchasers | 0 | 1 | 8 | 0 |
| **2014:** U.S. producers | 0 | 1 | 4 | 0 |
| Importers | 3 | 0 | 3 | 3 |
| Purchasers | 4 | 0 | 4 | 1 |
| **Demand outside the United States** | | | | |
| **Since 2009:** U.S. producers | 0 | 0 | 1 | 1 |
| Importers | 3 | 2 | 1 | 2 |
| Purchasers | 3 | 0 | 0 | 4 |
| **2012:** U.S. producers | 0 | 3 | 1 | 0 |
| Importers | 1 | 3 | 1 | 3 |
| Purchasers | 1 | 4 | 1 | 1 |
| **2013:** U.S. producers | 0 | 4 | 0 | 0 |
| Importers | 3 | 2 | 0 | 3 |
| Purchasers | 3 | 1 | 1 | 1 |
| **2014:** U.S. producers | 0 | 4 | 0 | 0 |
| Importers | 2 | 3 | 0 | 4 |
| Purchasers | 2 | 2 | 1 | 1 |
| Source:  Compiled from data submitted in response to Commission questionnaires. | | | | |

Argentina, Brazil, Canada, China, Croatia, India, South Africa, Spain, and Ukraine.[28]  With respect to expected demand outside the United States in 2013 and 2014, only one purchaser projects decreasing demand, compared with a plurality of firms that expect demand in the United States to decline, particularly in 2013.

---

[28] Petitioners' posthearing brief, exh 1, pp. 64-67.

**Apparent Consumption**

Following the trend in wind turbine shipments and installations, apparent U.S. consumption of wind towers decreased irregularly, from 3,843 units in 2009 to 2,887 units in 2010 and *** units in 2011. During January-June 2012, apparent U.S. consumption was *** units, compared with *** units in January-June 2011, possibly reflecting increased demand due to the then-pending expiration of government incentives at the end of 2012.

**Seasonality**

Respondents alleged that demand for wind tower installations is seasonal, with the majority (***) of installations occurring in the five months (inclusive) of June through October.[29]  Petitioners responded, however, that installations may be seasonal but production is not.[30]

**Substitute Products**

The majority of U.S. producers (3 of 4), importers (6 of 9), and purchasers (6 of 9) reported that there are no substitutes for wind towers.  A few firms cited lattice (truss or framework) towers, concrete towers, hybrid towers, space frame towers, and segmented steel towers as possible substitutes.

**Cost Share**

Most responding purchasers (6 of 8) estimated that the cost of wind towers as a share of the total cost of wind turbines ranged between 15 and 30 percent.[31]

## SUBSTITUTABILITY ISSUES

The degree of substitution between domestic and imported wind towers depends upon such factors as relative prices, quality (e.g., grade standards, reliability of supply, etc.), and conditions of sale (e.g., price discounts/rebates, lead times between order and delivery dates, payment terms, product services, etc.).  Based on available data, staff believes that there is some substitutability between U.S.-produced wind towers and imports from China and Vietnam.[32]  However, the towers requested by end users can have unique specifications.

### Purchaser Characteristics

Purchaser questionnaires were sent to those firms receiving producer and importer questionnaires. Questionnaire responses were received from 14 firms, with 9 reporting that they had purchased wind towers since January 1, 2009.[33]   Seven of these nine also reported being importers of wind towers.[34]

---

[29] Respondent Siemens's prehearing brief, pp. 21 and 24, and respondent foreign producers' prehearing brief, pp. 19-21 and exhibit 2.

[30] Hearing transcript, p. 112 (DeFrancesco).

[31] In contrast, ***.

[32] Depending on the OEM, competition could be limited to qualified suppliers.

[33] In addition, five firms reported they had not purchased wind towers since January 1, 2009.  Not all purchasers responded to all questions.  Responses are compiled and presented only for those that provided an answer to a given question.  Firms responding that they had not purchased wind towers were ***.  Those that indicated they had

(continued...)

Seven reported that they are OEM end users, two reported they were a different type of end user, and one (***) reported that it is a "seller of wind turbine generators including towers" to "developers of wind energy projects."[35] [36] These nine purchasers account for the large majority of wind towers purchased and/or transferred in the United States.

On average, purchasers noted contacting an average of three to six suppliers before making a purchase, and do so only when pursuing projects. All nine purchasers reported changes in their purchases of U.S.-produced wind towers since 2009. Specifically, three purchasers decreased their purchases, two increased their purchases, and four noted fluctuating purchases. Among those noting a decline in domestic purchases, *** cited a business decline and U.S. capacity being fully consumed in 2012, *** cited ***, and *** cited a decline in the market for wind turbines. The firms reporting fluctuating purchases attributed changes to changing overall economic activity and a loosening in the credit market. Purchasers buying more U.S. wind towers since 2009 cited sales growth, logistics advantages, customer preference, a change in U.S. sourcing, and an increased number of projects.

Three of nine purchasers bought wind towers imported from China, one purchased wind towers imported from Vietnam, and six purchased from nonsubject countries. Of the firms that reported purchasing imported wind towers, one noted decreasing its purchases of Chinese-made wind towers and two (***) reported fluctuating purchases from China. The sole purchaser of wind towers imported from Vietnam (***) noted *** purchase pattern. Among those purchasers that bought wind towers imported from nonsubject countries, two (***) reported increasing purchases since 2009, three (***) reported a fluctuating pattern of purchases, and one (***) reported a constant level of purchases.

### Knowledge of Country Sources and Suppliers

All nine responding purchasers noted familiarity with wind towers from the United States, whereas five noted familiarity with wind towers imported from China and three noted familiarity with wind towers imported from Vietnam. In addition, 8 purchasers were familiar with wind towers from a variety of nonsubject countries: 6 were familiar with wind towers from Canada; 5 from Korea and Mexico; 3 from Spain; 2 from Brazil, Germany, and Indonesia; and 1 each from Austria, Denmark, India, "multiple European countries," Portugal, and Turkey.

All purchasers except *** noted that they became aware of new suppliers (or supplier locations) of wind towers that had entered the market since January 2009.[37] The most frequently listed new supplier/locations were firms in the United States, Canada, and Mexico, although some Chinese firms were also listed.

All seven responding purchasers reported that they maintained more than one qualified supplier of wind towers at any time, with *** identifying 12 locations/suppliers of wind towers and *** identifying 11.

Most purchasers source wind towers from more than one country. *** buying only from one country is generally due to lower transportation costs to the project site. The only other responding purchaser that only bought from one country, ***, stated that *** "has meant that price differences

---

[33] (...continued)
purchased wind towers include ***.

[34] *** were the only two purchasers which did not report importing wind towers. As a result, there is overlap in tabulations of responses of importers and purchasers.

[35] ***.

[36] No purchaser reported competition with manufacturers or importers of wind towers, as most are wind turbine manufacturers.

[37] *** did note, however, that it did not become aware of new suppliers but did have some new suppliers/locations ship to it.

between purchasing foreign and domestic wind towers have been marginal, so we prefer to source locally. Also, our firm values supporting the local economy by purchasing domestic wind towers."

## Long-Term Supply Agreements

Some purchasers maintain agreements with suppliers that grant them dedicated production capacity at the wind tower production facility.[38] Framework agreements "generally establish the tower volume to be produced/purchased within a specified timeframe, establish specific production and delivery schedules, detail fixed and variable costs for the towers, contain general warranties, and provide for penalties for late delivery. Pursuant to such agreements, OEMs commit to purchase a set volume of towers from the producers over a specified period of time, generally anywhere between one to five years, at a pre-determined price, and in turn, tower producers commit to reserve the necessary capacity in order to deliver the towers within the specified timeframe."[39]

Five purchasers reported that they currently had some sort of long-term arrangement for supply of wind towers. ***.[40] A representative of Trinity testified at the hearing that it "made an effort to accommodate our customer because we believe the demand that was less than the contracted volume was based on some kind of an economic issue or an industry or a market issue, so we did work with our customers and accommodated them several times on several amendments to move that volume out. And basically we did that at no financial penalty to try to help our customer out and maintain the relationship that we had with that customer."[41]

***. Three other purchasersreported that they were currently under long-term contracts, supply agreements, or other similaragreements in which there are minimum purchase quantities or dedicated capacity: ***.

Some foreign producers maintain global supply agreements with OEMs that are producing wind turbines in the United States. ***.[42] ***.[43] Petitioners noted five other purchasing agreements with subject foreign producers in its posthearing brief.[44] Respondent foreign producers noted that ***.[45]

## Factors Affecting Purchasing Decisions

Purchasers were asked a variety of questions to determine what factors influence their decisions when buying wind towers. Information obtained from their responses indicates that several factors are considered important by purchasers, particularly price, quality, available capacity, and on-time delivery.

---

[38] Additional details on these agreements as reported by U.S. and foreign producers appear in Parts III and VII.

[39] Petitioners' posthearing brief, exh. 1, p. 3.

[40] Petitioners' posthearing brief, exh 1, pp. 12-13.

[41] Hearing transcript, p. 128 (Cole).

[42] Respondent Siemens's posthearing brief, answers to Commissioners' questions, pp. 6-7.

[43] Ibid.

[44] Petitioners' posthearing brief, exh 1, p. 14 .

[45] Respondent foreign producers' posthearing brief, p. 26.

**Major Factors in Purchasing**

Purchasers were asked to identify the major factors they considered in deciding from which firm to buy wind towers (table II-2).[46] Five of nine responding purchasers reported that total cost/price was the most important factor, three reported quality as the most important factor, and one firm (***) reported the capacity to produce the towers needed was the most important factor. Overall, price/total cost and quality were the most important factors listed by the most purchasers (8 each), followed by capacity (4), on time delivery/delivery time (4), availability (2), transportation costs (2), industrial experience (1), and location (1).

**Table II-2**
**Wind towers:  Ranking factors used in purchasing decisions, as reported by U.S. purchasers**

| Factor | Number of firms reporting | | | | |
| --- | --- | --- | --- | --- | --- |
| | **First** | **Second** | **Third** | **(Additional)** | **Total** |
| Price/total cost | 5 | 2 | 1 | 0 | 8 |
| Quality | 3 | 3 | 1 | 1 | 8 |
| Capability/capacity to produce | 1 | 1 | 1 | 1 | 4 |
| On time delivery/delivery time | 0 | 2 | 1 | 1 | 4 |
| Availability | 0 | 0 | 2 | 0 | 2 |
| Transportation costs | 0 | 0 | 2 | 0 | 2 |
| Other[1] | 0 | 1 | 1 | 0 | 2 |

   [1] "Other" includes industry experience ranked as the second most important factor and location ranked as third most important factor.

Source:  Compiled from data submitted in response to Commission questionnaires.

Although price/total cost was the most frequently noted most important factor, six of nine purchasers had purchased wind towers from a source that was not the lowest-priced source. Four of the six purchasers did so due to local content requirements, customer contract requirements, and/or customer preferences. One purchased from the United States due to familiarity, lowest overall cost, and a more accessible product throughout the manufacturing process. Purchaser *** stated that when it needs to procure towers ***.[47]

In addition to identifying the three most important factors influencing their purchasing decisions, purchasers were asked to assess the importance of 17 factors in their purchase decisions. As indicated in table II-3, availability and U.S. transportation costs were considered a "very important" factor by all nine responding purchasers. Other factors considered very important by a majority of purchasers include: available capacity, delivery time, product consistency, quality meets industry standards, and reliability of supply (8 each); price, technical support/service, and transportation costs to the United States (7); and delivery terms (6).   In addition to these 17 factors, some purchasers listed other factors as being very important:  financial stability (reported by 2 purchasers), alignment of objectives, ability to understand technical requirements, total delivered cost to customers' site, and expedited agreement of terms as very important factors.  In addition, one purchasers listed "experience" as a "somewhat" important factor.

---

[46] Some purchasers indicated more than three factors.

[47] ***.

**Table II-3**
**Wind towers:  Importance of factors used in purchasing decisions as reported by U.S. purchasers**

| Factor | Number of firms reporting | | |
|---|---|---|---|
| | Very important | Somewhat important | Not important |
| Availability | 9 | 0 | 0 |
| Available capacity | 8 | 1 | 0 |
| Delivery terms | 6 | 3 | 0 |
| Delivery time | 8 | 1 | 0 |
| Discounts offered | 4 | 5 | 0 |
| Extension of credit | 4 | 4 | 1 |
| Minimum quantity requirement | 3 | 4 | 2 |
| Packaging | 0 | 6 | 3 |
| Price | 7 | 2 | 0 |
| Product consistency | 8 | 1 | 0 |
| Product range | 0 | 9 | 0 |
| Quality meets industry standards | 8 | 0 | 1 |
| Quality exceeds industry standards | 4 | 5 | 0 |
| Reliability of supply | 8 | 1 | 0 |
| Technical support/service | 7 | 2 | 0 |
| Transportation cost to the U.S. | 7 | 1 | 1 |
| U.S. transportation costs | 9 | 0 | 0 |
| Source:  Compiled from data submitted in response to Commission questionnaires. | | | |

*Quality*

Purchasers identified the following factors that they consider in determining the quality of a supplier's wind towers:  appearance, certification of standards, dimension of wind turbine generator, experience/reputation, flange flatness, meeting purchasers' specifications, nondestructive testing, on time delivery, ovality, quality control systems, steel plate quality, structural and dimensional integrity, surface treatment/paint/blasting, thickness of steel in relation to weight/size, and weld quality.

Most purchasers reported that wind towers from most countries "usually" met their minimum quality standards (table II-4).

**Table II-4**
**Wind towers:  Number of purchasers reporting frequency of product from country sources meeting their minimum quality standards**

|  | Always | Usually | Sometimes | Rarely or never |
|---|---|---|---|---|
| United States | 2 | 6 | 1 | 0 |
| China | 2 | 3 | 0 | 0 |
| Vietnam | 2 | 0 | 0 | 0 |
| Canada | 2 | 3 | 0 | 1 |
| Korea | 2 | 4 | 1 | 0 |
| Mexico | 2 | 3 | 2 | 0 |
| Other[1] | 3 | 4 | 0 | 0 |

[1] Other includes the following nonsubject countries: Egypt, Spain, Indonesia, and "European suppliers".

Source:  Compiled from data submitted in response to Commission questionnaires.

Seven of nine responding purchasers reported problems with the quality of either domestic or imported wind towers.  Problems were reported for product from DMI, Ameron, Broadwind, Speco, Corindo, Ventower, Windar, SIAG (United States and Germany), Trinity (United States and Mexico), Marsh Industries (Denmark), MabeyBridge (UK), CS Wind (China), and Hitachi (Canada).  Problems were reported with welds and weld testing, disqualified process and operations, quality, delivery, and flanges out of tolerance.

Six purchasers reported how problems were addressed.  ***.  ***.  Other purchasers reported that the issues were covered under warranty;[48] that the issues were normal and have been resolved; or that they charged damages under the contract but that the problems are ongoing.

*Certification/pre-qualification*

Eight of nine responding purchasers reported that they required prequalification or certification for all of their purchases, whereas one (***) required no certification or qualification.  Eight purchasers described their qualification process.  GE[49] provided a detailed explanation of its process, as did Siemens.[50]  Other purchasers reported that qualification included the production facilities, the production process, materials, and the final product.

Qualification requirements mentioned by purchasers included: cleanliness, ability to meet run at rate required, comply with international standards, experience, facility inspections (for safety, technical capability, system and product capability, and financial stability), ISO certification, on time delivery, quality assurance, quality of end product, quality specification, and technical reviews.  The time required for certification ranged from less than 90 days to 270 days, with seven of the eight firms reporting qualification times of between 90 and 180 days.

Five of nine responding purchasers reported that wind tower producers had failed to be certified or had been disqualified, including U.S. producers Broadwind, DMI, Katana, Trinity, and Ventower, as

---

[48] The typical industry warranty is five years.  Petitioners' posthearing brief, exh, 1, p. 7.

[49] GE reported that "***."

[50] Siemens reported that it "***."

well as SIAG (U.S. and Germany), CS Wind (China), Hitachi (Canada), Marsh Industries (Denmark), and MabeyBridge (UK).[51]  Purchasers reported problems with delivery, low levels of production, management, quality, the production process, testing, welding, and disputes over terms.

*Country of origin or producer*

Purchasers were asked how frequently they and their customers made purchasing decisions based on the country of origin or the producer of wind towers (table II-5).  Purchasers indicated that the producer is a more important factor than the country of origin.  Five of nine responding purchasers reported that the producer was  "always" or "usually" a basis for purchasing decisions; however, two firms each reported that the producer was "sometimes" or "never" a factor.  Six of nine responding purchasers reported that they "sometimes" or "never" make purchase decisions based on country of origin.  Both the facility and the country of origin tended to be less important to the purchaser's customers, with eight of nine responding purchasers reporting that their customers "sometimes" or "never" purchased based on facility and all nine reporting that their customers "sometimes" or "never" made purchase decisions based on country of origin.

**Table II-5**
**Wind towers:  Purchaser responses to questions regarding the origin of their purchases**

| Purchaser/customer decision | Always | Usually | Sometimes | Never |
|---|---|---|---|---|
| Purchaser makes purchase decision based on the facility | 3 | 2 | 2 | 2 |
| Purchaser's customers make purchase decision based on the facility | 0 | 1 | 5 | 3 |
| Purchaser makes purchase decision based on country of origin | 1 | 2 | 3 | 3 |
| Purchaser's customers make purchase decision based on country of origin | 0 | 0 | 6 | 3 |
| Source:  Compiled from data submitted in response to Commission questionnaires. | | | | |

Separately, purchasers were asked about the importance of purchasing domestically produced wind towers.  Three purchasers reported that it was required by law for 1 to 5 percent of their sales.  Two purchasers reported that U.S. product was required by some of their customers because of customer preferences, or that local content was requested for financial purposes.  One of these purchasers reported that customer preferences for U.S. product covered *** percent of its sales (the other did not report the share).  Three purchasers (***) reported that U.S. product was preferred for other reasons for 100 percent of sales.[52]  *** preferred domestic product because of cost, mainly marine and overland transportation costs, *** preferred domestic product because it has a qualified reliable producer prepared to sell, and *** preferred domestic product for service, timeliness and close location.[53]

Six of the nine responding purchasers reported that their customers sometimes specifically order wind towers from one country over other sources.  Five firms (***) reported that customers sometimes

---

[51] One purchaser reported that Welcon (Denmark) was also not qualified but this was because of price.

[52] One purchaser reported that U.S. product was preferred for 5 percent of its sales for other reasons but did not report the reasons.

[53] Nonetheless, *** accounted for nearly *** of reported U.S. imports of wind towers in 2011.

preferred U.S.-produced wind towers[54] and one (***) reported that ***. Similarly, six of nine responding purchasers reported that certain grades, types, or sizes of wind towers were available only from a single source and gave similar answers to those given when asked about country preferences.

**Lead Times**

All sales of wind towers by producers are produced to order. Among responding producers, lead times between a customer's order and the dates of delivery ranged from 84 to 140 days. Importers do not typically sell wind towers from China or Vietnam, but rather internally consume them in the production of wind turbines.

**Comparisons of Domestic Products, Subject Imports, and Nonsubject Imports**

All U.S. producers consider imports from the two subject countries to be "always" interchangeable with U.S.-produced wind towers, but responding importers and purchasers were more varied in their assessments (table II-6). Five importers compared domestic and Chinese wind towers, two reported they were "never" interchangeable, and one each reported "always," "frequently," and "sometimes." Of the three importers that compared the U.S. product with imports from Vietnam, one reported that the products are "always" interchangeable, one reported that they are "frequently" interchangeable, and one reported that they are "never" interchangeable. One importer, ***, reported that towers for *** turbines are built to *** specifications, and are interchangeable with other towers built to the same *** specification, regardless of the manufacturer or the country of origin. Another importer, ***, reported that the wind towers that it purchases are never interchangeable with any other wind tower manufactured or delivered for any other purchaser.[55]

A majority of producers reported that differences in factors other than price between U.S.-produced wind towers and imported products from China and Vietnam are "never" significant in their sales of wind towers (table II-7). In contrast, a majority of importers reported that such factors are "frequently" significant. Among purchasers, with respect to China, an equal number of purchasers noted that differences are "always," "frequently," or "sometimes" significant, while with respect to Vietnam, two reported "always" and one reported "frequently." ***. *** reported that the ex-works price of a tower is of very little importance compared to the cost of poor quality and late delivery, and that wind tower suppliers are therefore selected based on their quality and delivery performance rather than simply the ex-works price. Another importer, ***, reported that it subjects all of its suppliers, foreign and domestic, to rigorous qualification and ongoing audit procedures. It reported that all components of a wind turbine must meet quality standards in order to assure safe and reliable operation.

---

[54] One of these firms reported that product could be from the United States or Canada.

[55] *** was the other purchaser that noted that U.S., Chinese, and other imported wind towers are "never" interchangeable.

**Table II-6**
**Wind towers:  Perceived degree of interchangeability of product produced in the United States and in other countries, by country pairs**

| Country pair | U.S. producers | | | | U.S. importers | | | | U.S. purchasers | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | A | F | S | N | A | F | S | N | A | F | S | N |
| U.S. vs. China | 5 | 0 | 0 | 0 | 1 | 1 | 1 | 2 | 2 | 0 | 1 | 2 |
| U.S. vs. Vietnam | 5 | 0 | 0 | 0 | 1 | 1 | 0 | 1 | 1 | 0 | 0 | 1 |
| U.S. vs. Other countries | 5 | 0 | 0 | 0 | 2 | 2 | 1 | 2 | 3 | 1 | 1 | 2 |
| China vs. Vietnam | 4 | 0 | 0 | 0 | 1 | 1 | 0 | 1 | 1 | 0 | 0 | 1 |
| China vs. Other countries | 4 | 0 | 0 | 0 | 1 | 1 | 1 | 2 | 1 | 1 | 1 | 2 |
| Vietnam vs. Other countries | 4 | 0 | 0 | 0 | 1 | 1 | 0 | 1 | 1 | 0 | 0 | 1 |

Note.-- "A" = Always, "F" = Frequently, "S" = Sometimes, and "N" = Never.

Source:  Compiled from data submitted in response to Commission questionnaires.


**Table II-7**
**Wind towers:  Perceived importance of factors other than price between product produced in the United States and in other countries, by country pairs**

| Country pair | U.S. producers | | | | U.S. importers | | | | U.S. purchasers | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | A | F | S | N | A | F | S | N | A | F | S | N |
| U.S. vs. China | 1 | 0 | 1 | 3 | 1 | 3 | 1 | 0 | 2 | 2 | 2 | 0 |
| U.S. vs. Vietnam | 1 | 0 | 1 | 3 | 1 | 2 | 0 | 0 | 2 | 1 | 0 | 0 |
| U.S. vs. Other countries | 1 | 0 | 2 | 2 | 1 | 5 | 1 | 0 | 3 | 3 | 2 | 0 |
| China vs. Vietnam | 1 | 0 | 0 | 3 | 1 | 1 | 1 | 0 | 2 | 0 | 1 | 0 |
| China vs. Other countries | 1 | 0 | 1 | 1 | 1 | 2 | 2 | 0 | 2 | 1 | 3 | 0 |
| Vietnam vs. Other countries | 1 | 0 | 1 | 1 | 1 | 1 | 1 | 0 | 2 | 0 | 1 | 0 |

Note.-- "A" = Always, "F" = Frequently, "S" = Sometimes, and "N" = Never.

Source:  Compiled from data submitted in response to Commission questionnaires.


Purchasers were also asked to compare wind towers produced in the United States, China, and Vietnam on the previously mentioned 17 factors.  As shown in table II-8, the majority of purchasers reported that the U.S. and Chinese products were comparable for six factors, while wind towers produced in the United States were superior with respect to transport costs to the U.S., and Chinese product was superior for available capacity, delivery time, price, and reliability of supply.  The majority of purchasers reported that U.S. and Vietnamese product were comparable for nine factors; the U.S. product was superior with respect to transport costs to the U.S., while the Vietnamese product was superior for available capacity, delivery time, price, quality exceeds industry standards, and reliability of supply.  The majority of responding purchasers reported that product from China was comparable with product from Vietnam for all factors.[56]  In comparing U.S. and nonsubject products, most purchasers indicated that they were comparable for 12 factors; half indicated that they were comparable for available capacity, delivery terms, and price; most reported that U.S. product was superior for technical support and six reported U.S. product was superior for delivery time while five reported that the U.S. product was inferior for delivery time.  Subject and nonsubject products were reported to be comparable for 16 factors, however for transport costs to the U.S., most responses were that subject countries were inferior to nonsubject countries.

---

[56] No purchasers compared the Chinese and Vietnamese technical support/service.

**Table II-8**
**Wind towers:  Comparisons between U.S., China, Vietnam, and other nonsubject wind towers, as reported by U.S. purchasers**

| Factor | U.S. vs China | | | U.S. vs Vietnam | | | China vs Vietnam | | | U.S. vs nonsubject[1] | | | Subject vs nonsubject[2] | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | S | C | I | S | C | I | S | C | I | S | C | I | S | C | I |
| Availability | 0 | 4 | 0 | 1 | 1 | 1 | 1 | 2 | 0 | 2 | 8 | 4 | 0 | 2 | 0 |
| Available capacity | 0 | 1 | 3 | 1 | 0 | 2 | 1 | 2 | 0 | 3 | 7 | 4 | 0 | 2 | 0 |
| Delivery terms | 0 | 2 | 2 | 0 | 3 | 0 | 1 | 2 | 0 | 3 | 7 | 4 | 0 | 2 | 0 |
| Delivery time | 0 | 1 | 3 | 0 | 1 | 2 | 0 | 3 | 0 | 6 | 3 | 5 | 0 | 2 | 0 |
| Discounts offered | 0 | 2 | 2 | 0 | 2 | 1 | 0 | 3 | 0 | 1 | 11 | 2 | 0 | 2 | 0 |
| Extension of credit | 0 | 3 | 1 | 0 | 3 | 0 | 0 | 3 | 0 | 0 | 12 | 2 | 0 | 2 | 0 |
| Minimum quantity requirement | 0 | 2 | 2 | 0 | 2 | 1 | 0 | 3 | 0 | 1 | 12 | 1 | 0 | 2 | 0 |
| Packaging | 0 | 4 | 0 | 0 | 3 | 0 | 0 | 3 | 0 | 1 | 13 | 0 | 0 | 2 | 0 |
| Price[3] | 0 | 0 | 4 | 0 | 0 | 3 | 0 | 2 | 1 | 3 | 7 | 4 | 0 | 2 | 0 |
| Product consistency | 0 | 2 | 2 | 0 | 2 | 1 | 0 | 3 | 0 | 3 | 8 | 3 | 0 | 2 | 0 |
| Product range | 0 | 4 | 0 | 0 | 3 | 0 | 1 | 2 | 0 | 1 | 13 | 0 | 0 | 2 | 0 |
| Quality meets industry standards | 0 | 3 | 1 | 0 | 2 | 1 | 0 | 3 | 0 | 2 | 11 | 1 | 0 | 2 | 0 |
| Quality exceeds industry standards | 0 | 2 | 2 | 0 | 1 | 2 | 0 | 3 | 0 | 2 | 10 | 2 | 0 | 2 | 0 |
| Reliability of supply | 0 | 1 | 3 | 0 | 0 | 3 | 0 | 3 | 0 | 3 | 9 | 2 | 0 | 2 | 0 |
| Technical support/service | 1 | 3 | 0 | 1 | 2 | 0 | 1 | 2 | 0 | 3 | 9 | 2 | 0 | 2 | 0 |
| Transport costs to the U.S. | 3 | 0 | 1 | 2 | 0 | 1 | 0 | 0 | 0 | 8 | 1 | 5 | 0 | 1 | 2 |
| U.S. transportation costs[3] | 1 | 2 | 1 | 1 | 1 | 1 | 0 | 3 | 0 | 0 | 10 | 4 | 0 | 2 | 0 |

[1] A number of firms compared U.S. wind towers and product from more than one nonsubject countries; all their responses are included.

[2] One purchaser provided all the answers for this question.  It reported that Vietnamese transportation cost to the United States was both comparable and inferior to that from nonsubject countries.

[3] A rating of superior means that price/U.S. transportation cost is generally lower.  For example, if a firm reported "U.S. superior," it meant that the U.S. product was generally priced lower than the imported product.

Note.--S=first listed country's product is superior; C=both countries' products are comparable; I=first listed country's product is inferior. Not all purchasers responded for each factor.

Source:  Compiled from data submitted in response to Commission questionnaires.

## ELASTICITY ESTIMATES

This section discusses elasticity estimates for the wind tower industry.  Parties were encouraged to comment on these estimates, if desired, in an appendix to their prehearing briefs.  Petitioners noted that demand for towers is relatively inelastic and the demand for turbines is moderately elastic.[57]

---

[57] Petitioners' prehearing brief, p. 39.

## U.S. Supply Elasticity

The domestic supply elasticity for wind towers measures the sensitivity of the quantity supplied by U.S. producers to changes in the U.S. market price of wind towers. The elasticity of domestic supply depends on several factors including the level of excess capacity, the ease with which producers can alter capacity, producers' ability to shift to production of other products, the absence of inventories, and the possibility of alternate markets for U.S.-produced wind towers. Based on the low production capacity utilization levels, but mitigated by the lack of inventories, a low level of exports, and the relative lack of production alternatives, the U.S. industry presently has a moderate ability to increase shipments to the U.S. market; an estimate in the range of 2 to 4 is suggested.

## U.S. Demand Elasticity

The U.S. demand elasticity for wind towers measures the sensitivity of the overall quantity demanded to a change in the U.S. market price of wind towers. This estimate depends on factors discussed earlier such as the existence, availability, and commercial viability of substitute products and the existence of government incentives, as well as the component share of wind towers in the production of wind turbines. With respect to wind towers, the price elasticity of demand is likely highly inelastic, in the range of -0.1 to -0.4. Demand for wind towers is derived from the demand for electricity and the relative prices of types of electricity generation, which is influenced by a number of factors, including the existence of government policies. The price elasticity of demand for wind turbines is likely to be higher than the price elasticity of demand for wind towers.

## Substitution Elasticity

The elasticity of substitution depends upon the extent of product differentiation between domestic and imported products.[58] Product differentiation, in turn, depends upon such factors as quality, conditions of sale, and factory capability. Different manufacturing locations, whether located domestically or overseas, have different engineering and manufacturing capabilities. Facilities that are unable to build a wind tower that meets the requirements of the purchaser will not be able to win the bidding event and will therefore be uncompetitive. Most U.S. firms reportedly can supply wind towers up to 100 meters, though these facilities are centered in the middle of the United States. Few purchasers indicated a preference for domestic wind towers based on factors such as governmental provisions or customer preferences. Based on available information, the elasticity of substitution between domestic and subject wind towers is likely to be in the range of 2 to 4.

---

[58] The substitution elasticity measures the responsiveness of the relative U.S. consumption levels of the subject imports and the domestic like products to changes in their relative prices. This reflects how easily purchasers switch from the U.S. product to the subject products (or vice versa) when prices change.

# PART III: U.S. PRODUCERS' PRODUCTION, SHIPMENTS, AND EMPLOYMENT

The Commission analyzes a number of factors in making injury determinations (see 19 U.S.C. §§ 1677(7)(B) and 1677(7)(C)). Information on the subsidies and dumping margins was presented in Part I of this report and information on the volume and pricing of imports of the subject merchandise is presented in Part IV and Part V. Information on the other factors specified is presented in this section and/or Part VI and (except as noted) is based on the questionnaire responses of six firms that accounted for the substantial majority of U.S. production of wind towers during the period for which data were collected.[1]

As of June 2012, thirteen companies reported wind tower manufacturing capabilities at eighteen plants in the United States, though some firms that reported production capabilities may not have been actively engaged in wind tower production (figure III-1).[2] In addition, at least one company, Tindall, also reported pilot production of concrete tower base sections. The largest concentration of plants is in the Midwest and Oklahoma/Texas. There also are two plants on the West Coast, two in Colorado, and one in Tennessee.[3] Tindall's pilot production of concrete tower base sections is in Georgia. At least four wind tower plants (Broadwind in Texas, Martifer-Hirschfeld in Texas, Ventower in Michigan, and Vestas in Colorado) opened during January 2009-June 2012. In addition, Broadwind completed construction—but did not open—a plant in South Dakota and Dragon Wind reportedly completed a plant in Colorado, though information is not available on whether Dragon Wind began wind tower production. Based on publicly available information, at least two plants (Trinity in Denton, TX and Tulsa, OK) closed. SIAG Aerisyn filed for reorganization under chapter 11 of the bankruptcy code in April 2012 (following a similar filing by their German parent company), but information is not available on whether it stopped tower production (table III-1). Since July 2012, the number of U.S. producers has declined. Otter Tail sold its DMI plants to Trinity, Katana announced that it is seeking a buyer for its plants and completed the sale of its plant in Nebraska, Trinity announced that it was switching some of its tower plants to railcar production, and Hirschfeld Industries bought Martifer's half of their joint venture and appears to be transitioning to products for the oil and gas industries.

---

[1] These six firms are estimated to account for more than *** percent of U.S. shipments, based on AWEA's total of *** wind turbines shipped in 2011 and data from table C-1 on the quantity of U.S. imports and U.S. producers' domestic shipments. As noted later in Part III, of the remaining firms that did not provide a response, only three are known to have large scale commercial production—Johnson Plate and Tower, SIAG Aerisyn, and Ventower.

[2] Number of firms and production locations does not include Valmont, which can produce towers for turbines up to 660 kW, since the production location(s) for this firm are not available. Conference transcript, pp. 28, 66 (Janda), 38 (Reinhardt), and 40 (Cole); table III-1; Broadwind Energy, "Broadwind Energy Subsidiary Tower Tech Holds Ribbon-Cutting Ceremony at Texas Facility," News release, June 9, 2009, http://www.bwen.com/pdf/44.pdf; DMI Web site, http://www.dmiindustries.com/about/profile.php (accessed January 24, 2012); Katana Summit Web site, http://www.katana-summit.com/contact.htm (accessed January 24, 2012); SMI & Hydraulics Web site, http://smihyd.com/wind-tower-manufacturing/ (accessed January 18, 2012); Valmont Web site, http://www.valmont.com/page.aspx?id=95&pid=107 (accessed January 18, 2012).

[3] Respondent Siemens argues that the wind towers sold to the merchant market, as manifested by installation patterns, are a regional industry where imports do not compete with the domestic product (and consequently cannot injure it). Respondent Siemens's posthearing brief, pp. 1, 8, and 17. However, no regional market has been proposed or defined in these investigations. See Part II of this report for the geographic areas served by U.S. producers and importers, Part III for the locations of U.S. producers, Part IV for the primary ports of entry for U.S. imports, and appendix D for the location of wind tower projects across the United States.

**Figure III-1**
**Wind towers:  Plant locations as of June 2012 and installations 2009–September 2012**

| | | | | | |
|---|---|---|---|---|---|
| A: Ameron | B: Broadwind | DW: Dragon Wind | DM: DMI | J: Johnson Plate & Tower | K: Katana | M: Martifer Hirschfeld |
| S: SIAG Aersyn | SM: SMI & Hydraulics | T: Trinity: | TS: Tubular Structures | VT: Ventower | V: Vestas |

Notes.- -Does not include Valmont as its wind tower production location is not available.  Tindall's plant in Georgia is pilot production of concrete tower bases.  Location of wind tower plants is approximate.

Source:  Conference transcript, pp. 28, 66 (Janda), 38 (Reinhardt), and 40 (Cole); table III-1; Broadwind Energy, "Broadwind Energy Subsidiary Tower Tech Holds Ribbon-Cutting Ceremony at Texas Facility," News release, June 9, 2009, http://www.bwen.com/pdf/44.pdf; DMI Web site, http://www.dmiindustries.com/about/profile.php (accessed January 24, 2012); Katana Summit Web site, http://www.katana-summit.com/contact.htm (accessed January 24, 2012); SMI & Hydraulics Web site, http://smihyd.com/wind-tower-manufacturing/ (accessed January 18, 2012); Valmont Web site, http://www.valmont.com/page.aspx?id=95&pid=107 (accessed January 18, 2012); appendix D.

**Table III-1**

**Wind towers:  Activities affecting U.S. capacity, based on publicly available information, 2009-12**

| Date | Company | Plant location | Description of activity |
|------|---------|----------------|------------------------|
| **2009** | | | |
| January | Trinity | Tulsa, OK | **Plant closing** |
| August | SIAG Aerisyn | Chattanooga, TN | **Announcement:**  Capacity expansion announced.  No information available on whether completed. |
| June | Broadwind | Abilene, TX | **Plant opening** |
| Not available | Ameron International/ National Oilwell Varco | Fontana, CA | **Production expansion/upgrade:**  Completed construction of a new plant that expanded its production capacity. |
| | Dragon Wind | Lamar, CO | **Plant opening** |
| Prior to early 2010 | Johnson Plate & Tower Fabrication | Canutillo, TX | **Plant expansion/upgrade:**  $4 million upgrade to plant. |
| **2010** | | | |
| January | Johnson Plate & Tower Fabrication | Santa Teresa, NM | **Announcement:**  Announced plans for second plant; expansion plan subsequently put on hold. |
| | Tindall | Newton, KS | **Announcement:**  Plan to build a new facility in Newton, KS. |
| 1st Quarter | Broadwind | Brandon, SD | **Plant construction:**  Finished construction of plant, but did not start production. |
| October | Vestas Towers | Pueblo, CO | **Plant opening:**  Opened plant with an annual capacity of up to 1,090 towers. |
| **2011** | | | |
| January | Schuff Steel | Ottawa, KS | **Announcement:**  Announced plans to build wind tower plant. |
| February | Gestamp Worthington Wind Steel | Cheyenne, WY | **Announcement:**  Announced plans to build a wind tower plant with an annual capacity of more than 300 towers per year. |
| 1st Quarter | Martifer-Hirschfeld Energy Systems | San Angelo, TX | **Plant opening:**  Started production at plant with an anticipated annual capacity up to 400 towers. |
| August | Ventower | Monroe, MI | **Plant opening** |
| **2012** | | | |
| April | SIAG Aerisyn | Chattanooga, TN | **Reorganization:**  Filed for reorganization under chapter 11 of the bankruptcy code following similar filing by German parent company. |
| June | DMI/Trinity | West Fargo, ND and Tulsa, OK | **Acquisition:**  Otter Tail entered into definitive agreement to sell DMI plants to Trinity Industries. Transaction for the West Fargo plant was expected to close in November 2012 and for the Tulsa plant in December 2012. |
| June | Katana | Columbus, NE and Ephrata, WA | **Sale or closure announced:**  Announced that it was seeking a buyer and would lay off workers and eventually close its plants if not able to find a buyer. |
| July | Martifer-Hirschfeld Energy Systems | San Angelo, TX | **Ending wind tower production:** Hirschfeld Industries bought Martifer half of joint venture and appears to be transitioning to products for oil and gas industries. |

Table continued on next page.

Table III-1--Continued

**Wind towers: Activities affecting U.S. capacity, based on publicly available information, 2009-12**

| Date | Company | Plant location | Description of activity |
|------|---------|----------------|-------------------------|
| July | Trinity | Not available | **Ending wind tower production:** Announced plan to convert some plants from wind tower production to railcar production in the second half of the year. |
| November | Katana | Columbus, NE | **Sale:** Valmont purchased plant and indicated that it would produce transmission structures at the plant. |
| **Date not available** | | | |
| Not available | Trinity | Denton, TX | **Plant closing** |
| | Tindall | Atlanta, GA | **Plant opening:** Pilot production of concrete tower bases at existing plant in Atlanta, GA. |

Note.--Announcements are only those for plants which are not yet in commercial production and that have not been canceled. Based on publicly available information.

Source: Petitioners' prehearing brief, exh. 1V; Petitioners' postconference brief, exh. 12; *North Platte Bulletin*, "Windmill Manufacturer Builds in Columbus," June 17, 2008, http://www.northplattebulletin.com; Broadwind Energy, Inc., "Form 10-K," annual report for Securities and Exchange Commission, March 16, 2011, p. 15, http://www.bwen.com/Investors_7803.aspx; Vestas, "New Wind Towers Factory in Pueblo, Colo–the World's Largest– Officially Opens for Business," October 12, 2010, http://www.vestas.com/en/media/news/news-display.aspx?action=3&NewsID=2413; Collier, Kiah, "Plant Now in Production," *Standard Times*, February 22, 2011, http://www.gosanangelo.com/news/2011/feb/22/martifer-hirschfeld-expected-to-release-details/?print=1; Schuff International, "Schuff Steel Moving Ahead With Wind Tower Manufacturing Plans," News release, January 7, 2011, http://ir.schuff.com/easyir/prssrel.do?easyirid=4E3E4E2B5A87F2EB&version=live&releasejsp=release_145&prid=706130 ; Karen Zatkulak, "New Jobs Following Aerisyn Acquisition," WTVC, August 24, 2009, http://www.newschannel9.com/articles/aerisyn-983998-plant-taken.html; Ameron International Corp., "Form 10-K," Annual report for Securities and Exchange Commission, January 29, 2010, pp. 8, 22, http://phx.corporate-ir.net/phoenix.zhtml?c=87370&p=irol-sec; Ameron International Corp., "Ameron Wind Towers" brochure, http://www.nov.com/uploadedFiles/Business_Groups/Distribution/Wind_Towers/brochure.pdf (accessed January 18, 2012); *North American Windpower*, "Ventower Marks Opening Of Manufacturing Facility," August 10, 2011, http://www.nawindpower.com/e107_plugins/content/content.php?content.8381; Kolenc, Vic, "A Little Green: El Paso Near Smallest of 'Clean' Economies," *El Paso Times*, July 13, 2011, http://www.elpasotimes.com/news/ci_18465186; Kolenc, Vic, "Wind Tower Production: Canutillo Factory is Ready to Meet Demand," *El Paso Times*, January 24, 2010, http://www.istockanalyst.com/article/viewiStockNews/articleid/3805023; McCurry, John W., "New Heights," *Site Selection Magazine*, November 2011, http://www.siteselection.com/issues/2011/nov/kansas.cfm; Tindall Corp., "Tindall To Build Dedicated Wind Tower Base Plant In Kansas," news release, January 18, 2010, http://www.tindallcorp.com/news/011810.html; Broadwind Energy, "Broadwind Energy Subsidiary Tower Tech Holds Ribbon-Cutting Ceremony at Texas Facility," news release, June 9, 2009, http://www.bwen.com/pdf/44.pdf; Stiles, Mark W., written testimony submitted to the Senate Committee on Environment and Public Works, Business Opportunities and Climate Policy, hearing, May 19, 2009; pp. 4–5, http://epw.senate.gov/public/index.cfm?FuseAction=Files.View&FileStore_id=6985f489-5eea-42f4-91c6-4f29db6dfe25; "Trinity Industries Closes Railcar Plant ," Manufacturing.net, January 29, 2009, http://www.manufacturing.net/news/2009/01/trinity-industries-closes-railcar-plant?menuid=274; North American Windpower, "Construction For RTLC Windtowers Facility Is Under Way," October 2, 2008, http://www.nawindpower.com; Tubular Structures International Web site, http://www.tsitx.com; North American Windpower, "Gestamp, Worthington To Build Wind Tower Manufacturing Facility In Wyoming," February 16, 2011, http://www.nawindpower.com/e107_plugins/content/content.php?content.7358; AWEA, "Windpower Outlook 2010," http://archive.awea.org/pubs/documents/Outlook_2010.pdf; Waller, Matthew, "Martifer Leaves Wind Tower Plant," *San Angelo Standard Times*, July 18, 2012, http://www.gosanangelo.com/news/2012/jul/18/martifer-out-of-hirschfeld-partnership; Otter Tail Corp., "Otter Tail Corporation to Sell DMI Industries' Property, Plant and Equipment to Trinity Industries, Inc.," news release, June 6, 2012, http://www.ottertail.com/press/releasedetail.cfm?ReleaseID=705324; Hussmann, Peter, "Trinity Industries to Convert Some Wind Tower Manufacturing Plants to Rail Car Production," *Newton Independent*, July 26, 2012, http://www.newtonindependent.com/newton_independent/2012/07/trinity-industries-to-convert-some-wind-tower-manufacturing-plants-to-rail-car-production.html; Del Franco, "More PTC Fallout: Katana Summit Will Close If It Doesn't Find A Buyer," *North American Windpower*, June 13, 2012, http://www.nawindpower.com/e107_plugins/content/content.php?content.10388; Katana, "Katana Summit Seeks Buyer for Company," June 11, 2012, http://www.katana-summit.com/pdfs/KatanaPressRelease091112.pdf; Bloomberg Businessweek Web site, http://investing.businessweek.com/research/stocks/private/snapshot.asp?privcapId=30693558 (accessed November 9, 2012); Pare, Mike, "Parent of Chattanooga wind tower maker SIAG Aerisyn is filing for insolvency," *Times Free Press*, March 20, 2012, http://www.timesfreepress.com/news/2012/mar/20/aerisyn-parent-insolvent-chattanooga/?print.

# U.S. PRODUCERS

The Commission sent U.S. producer questionnaires to 17 firms based on information contained in the petition and through independent staff research as to possible U.S. producers of wind towers. Six firms provided useable data on their productive operations, one firm certified that it produced only a limited number of wind towers,[4] none provided incomplete data,[5] two certified that they had not produced wind towers since January 1, 2009,[6] and the remaining nine provided no response. Staff believes that these responses represent a substantial majority of U.S. production of wind towers.[7][8]

Table III-2 lists reporting U.S. producers of wind towers, positions on the petition, their production location(s), related and/or affiliated firms, and share of reported production of wind towers in 2011. No U.S. producers are related to foreign producers of the subject merchandise and one (***) is related to a U.S. importer of the subject merchandise. In addition, one U.S. producer imports the subject merchandise.

---

[4] Hirschfeld Energy Systems, LLC began production of wind towers at its San Angelo, TX facility in early 2011 and ramped up production with the goal of producing up to *** towers annually (with a maximum size of *** meters). This production goal was well below the previously announced goal of 400 wind towers at the time of the projects development in 2008. Hirschfeld Energy System reported ***. Hirschfeld Energy Systems response to Importers' questionnaire and "Martifer makes a milestone," *San Angelo Standard Times*, June 11, 2011, found at http://www.gosanangelo.com/news/2011/jun/11/martifermakes-amileston/, retrieved on September 11, 2012.

[5] ***.

[6] *** reported in the preliminary-phase investigations that while it had not produced wind towers, the firm was trying to enter the U.S. wind tower market. The firm reported that one of the reasons it had not been able to sell any wind towers was that it was unable to compete with lower-priced wind towers imported from China and Vietnam.

[7] In the preliminary phase of these investigations the Petitioners asserted that the questionnaire responses received in the preliminary phase (for which responses were also received in the final phase) represented the vast majority of U.S. production that currently exists, but that there are a number of producers which shut down and have not provided questionnaire responses. Petitioners' postconference brief, Exh. 1, p. 10. Respondents concur that the majority of U.S. production is covered by the questionnaires received. Conference transcript, p. 130 (Feldman) and Respondent foreign producers' postconference brief, p. 4. For additional details, see Petition, Exhibit I-3a.

[8] Of the firms which did not provide questionnaire responses, only three are known to have large scale commercial production, Johnson Plate and Tower, SIAG Aerisyn, and Ventower. Based on the most recent public information available, Johnson Plate and Tower (in July 2011) forecast full year 2011 production of about 100 towers, SIAG Aerisyn produced an estimated 60 towers in 2010 (year in which it became a Vestas qualified supplier), and Ventower expected its cumulative production of wind towers to total 15 by the fall of 2012 (although in 2010 it produced an estimated 60 towers). Sources: Petition, exh. I-3a, Yung, Katherine, "Wind energy in Michigan is 'on the edge of a cliff,'" Detroit Free Press, August 12, 2012, http://www.freep.com/article/20120812/BUSINESS06/308120133/Wind-energy-in-Michigan-is-on-the-edge-of-a-cliff-; Kolenc, Vic, "A Little Green: El Paso Near Smallest of 'Clean' Economies," El Paso Times, July 13, 2011, http://www.elpasotimes.com/news/ci_18465186, and e-mail from ***, January 7, 2012.

**Table III-2**
**Wind towers:  U.S. producers, positions on the petition, U.S. production locations, related and/or affiliated firms, and shares of 2011 reported U.S. production**

| Firm | Position on petition | Production location(s) | Related and/or affiliated firms | Share of 2011 production (*percent*) |
|---|---|---|---|---|
| Ameron Wind Towers | *** | Fontana, CA | None[1] | *** |
| Broadwind Towers, Inc | Petitioner | Manitowoc, WI Abilene, TX Brandon, SD | None[2] | *** |
| DMI Industries, Inc. | Petitioner | West Fargo, ND Tulsa, OK | DMI Canada[3] | *** |
| Katana Summit, LLC | Petitioner | Columbus, NE Ephrata, WA | None[4] | *** |
| Trinity Structural Towers, Inc. | Petitioner | Coleman, TX/Fort Worth, TX Clinton, IL Newton, IA | TIMSA (Mexico)[5] | *** |
| Vestas Towers America, Inc. | *** | Pueblo, CO | Vestas-American Wind Technology (OR) Vestas Towers A/S (Denmark)[6] | *** |
| Total | | | | 100.0 |

[1] Ameron is ***.
[2] Broadwind is ***.
[3] DMI was ***.
[4] Katana is ***.
[5] Trinity is ***.
[6] Vestas Towers is ***.

Source:  Compiled from data submitted in response to Commission questionnaires.

The Commission sought information on the location of U.S. producers' facilities and the impact of prior lapses in the PTC.  The *** responding U.S. producers reported that *** was established subsequent to the prior lapses in the PTC and ***.  The *** of the facilities of these producers was established, at least in part, to supply projected market demand.

***.[9]

***.

## U.S. PRODUCTION, CAPACITY, AND CAPACITY UTILIZATION

### Aggregate Wind Tower Operations

U.S. producers' capacity, production, and capacity utilization data for wind towers are presented in table III-3 and figure III-2.

---

[9] ***.

**Table III-3**
**Wind towers:  U.S. producers' production, capacity, and capacity utilization, 2009-11, January-June 2011, and January-June 2012**

| Item | Calendar year | | | January-June | |
|---|---|---|---|---|---|
| | **2009** | **2010** | **2011** | **2011** | **2012** |
| Capacity (*towers*)[1] | 3,343 | 3,898 | *** | *** | *** |
| Production (*towers*) | 2,069 | 1,751 | *** | *** | *** |
| Capacity utilization (*percent*) | 61.9 | 44.9 | *** | *** | *** |

> [1] ***.
>
> Note.--***.
>
> Source:  Compiled from data submitted in response to Commission questionnaires.

**Figure III-2**
**Wind towers:  U.S. producers' production, capacity, and capacity utilization, 2009-11, January-June 2011, and January-June 2012**

\*        \*        \*        \*        \*        \*        \*

Reported constraints in the manufacturing process for U.S. producers include skilled labor, limitations of capital equipment and building size, and lack of demand (including uncertainty regarding the PTC renewal).

One producer, ***, reported producing other products, specifically *** beginning in 2012, on the same equipment, machinery, and using the same production and related workers employed to produce wind towers.[10]  ***.  *** anticipated continuing to produce *** facility with anticipated completion by the ***.[11]

All of the U.S. producers reported changes in capacity due to acquisitions, relocations, production curtailments, and/or plant closures.  Table III-4 lists these events that have occurred since 2009.

**Table III-4**
**Wind towers:  Changes in the character of U.S. producers' operations since 2009**

\*        \*        \*        \*        \*        \*        \*

### Supply Agreements

Petitioners state that some of the U.S. producers have, now or in the past, framework agreements with OEMs that generally establish the number of wind towers to be produced or purchased within a specified time frame (generally between one and five years), specific production and delivery schedules, detail fixed and variable costs for the wind towers, contain general warranties, and provide for penalties for late deliveries.[12]  Petitioners assert that prior to 2009, sales of wind towers occurred primarily through these framework agreements.  Since 2009, they contend, OEMs have shifted more sales to spot sales,

---

[10] ***.

[11] Trinity 2012 8-K (Q2), exhibit 99.5 and Trinity's response to the U.S. producers' questionnaire.

[12] Petitioners' posthearing brief, exh. 1, p. 2 and hearing transcript, pp. 31-32 (Cole).

although framework agreements remain in place between major OEMs and domestic producers.[13] Moreover, Petitioners assert that the agreements have been subject to renegotiation.[14]

As noted above, the framework agreements detail the specific type and number of wind towers to be produced at specific production facilities over a specified time period. Petitioners note that in doing so, "the producer commits to reserve sufficient capacity to produce the relevant number of towers at the relevant facilities."[15] Three U.S. producers provided information on framework agreements including volume commitments.

***

    ***

    ***.[16]

    ***,[17] ***,[18] ***.[19] ***.[20] [21]

***

    ***,[22] ***.[23] ***

***. This agreement has been renegotiated in ***,[24] ***,[25] and ***.

***

    ***.[26]

### Facility Level Wind Tower Operations

Table III-5 presents U.S. capacity, production, and capacity utilization for each of the U.S. producers' facilities.[27] [28] [29]

---

[13] Petitioners' posthearing brief, exh. 1, p. 1 and hearing transcript, p. 37 (Smith).

[14] Hearing transcript, p. 32 (Cole).

[15] Petitioners' posthearing brief, exh. 1, p. 3.

[16] Petitioners' posthearing brief, exh. 1, pp. 8-10.

[17] ***.

[18] ***.

[19] ***.

[20] ***.

[21] Petitioners' posthearing brief, exh. 1, pp. 11-12.

[22] ***.

[23] ***.

[24] ***.

[25] ***.

[26] E-mail from ***, December 20, 2012.

[27] Also noted in the table are the facilities qualified to produce wind towers in the United States for OEMs, GE Siemens, and Vestas Towers. GE reported that ***. Siemens stated that prior to 2008 the only qualified U.S. producer was Ameron. Since then ***. Vestas Towers reported that ***. E--mail from ***, January 24, 2012, conference transcript, p. 110 (Hauer), Respondent Siemens's postconference brief, Exh. B, e-mail from ***, January 7, 2013, and data submitted in response to Commission questionnaires,

[28] Ameron did not provide useful half-yearly production data for 2009-10, so staff used the ratio of semi-annual production to annual production reported by the responding producers for these periods to estimate Ameron's semi-annual data for 2009-10.

[29] Both Broadwind and Trinity provided capacity, specifically for 2011 and January-June 2012, based on a product mix of different wind towers produced during that period (namely the addition ***). ***.

**Table III-5**
**Wind towers:  U.S. capacity, production, and capacity utilization, semi-annually, by facility, January 2009-June 2012**

\*        \*        \*        \*        \*        \*        \*

U.S. production capacity increased between 2009 and 2011, but was lower in January-June 2012 compared with January-June 2011.  Production capacity increased in 2010 as a result of \*\*\*.  The higher capacity in 2011 was largely due to \*\*\*.  This increase was \*\*\* at \*\*\* and at Broadwind's facility in Brandon, SD.  After not commencing production since the completion of construction in first quarter of 2010, Broadwind initiated the process to sell this facility in the third quarter of 2011.[30]  These \*\*\* in January-June 2012 compared with January-June 2011.

U.S. production increased between 2009 and 2011, albeit with a decline in 2010, and was higher in January-June 2012 compared with January-June 2011.  Each U.S. producer, with the exception of \*\*\*, reported increased overall production between 2009 and 2011, although production in each of the firms' facilities generally fluctuated throughout the period.  Every firm, with the exception of \*\*\*, reported declines in production in 2010 compared with 2009.  Petitioners observed that demand for wind towers declined substantially in 2009 and continued to decrease into 2010 as a result of the financial crisis, which in turn affected domestic wind tower production.[31]  U.S. producer Trinity stated that "orders and deliveries for structural wind towers have been slow since mid-2008 when green energy companies encountered tightened credit markets coupled with lower prices for electricity and natural gas sales."[32] \*\*\* in 2011, while \*\*\* production.  The company reported greater than expected operational inefficiencies with the transition in some of its facilities from 80-meter towers to 100-meter towers.[33]

\*\*\* in January-June 2012 compared with January-June 2011.  \*\*\* reported that \*\*\*.[34] Broadwind reported manufacturing inefficiencies resulting from building four different tower types.[35] Trinity stated that the expiration of the federal wind energy production incentives at the end of 2012 was creating uncertainty resulting in low levels of additional orders for wind towers.  Trinity noted that while long-term contracts continue to provide a foundation of work, the firm remains flexible to accommodate customer production volumes and production mix.[36]  In addition, Trinity stated that in the second quarter of 2012, it had begun to transition excess wind tower capacity to rail car capacity.[37]

\*\*\*, particularly \*\*\*.  The higher overall level of production in January-June 2012 compared with January-June 2011 was at least partially attributed to the increased demand ahead of the pending expiration of the PTC.[38]

Most U.S. producers are able to produce wind towers up to 100 meters, limited by the capabilities of cranes, rolling, or the paint and blast booths.  \*\*\*.

---

[30] Broadwind's response to the U.S. producer's questionnaire and Broadwind 2011 10-Q (Q3), p. 16.

[31] Conference transcript, pp. 32-33 (Barczak), petition, pp. 27-28, and Petitioners' postconference brief, pp. 11-12.  This trend was also noted by respondents.  Respondent foreign producers' postconference brief, p. 11.

[32] Trinity 2010 10-K, p. 9 and Trinity 2011 10-K, p. 10.

[33] Trinity 2011 8-K (Q2), Exhibit 99.5, and Trinity 8-K (Q4), Exhibit 99.5.  \*\*\*.

[34] E-mail from \*\*\*, October 16, 2012.

[35] "Broadwind Energy, Inc. Announces Second Quarter 2012 Results," Broadwind press release, p. 2.

[36] Trinity 2012 8-K (Q1), Exhibit 99.5.

[37] Trinity 2012 8-K (Q2), Exhibit 99.5.

[38] "More PTC Fallout: Katana Summit Will Close If It Doesn't Find A Buyer," North American Wind Power, June 13, 2012, found at http://www.nawindpower.com/e107_plugins/content/content.php?content.10388.

## Monthly Wind Tower Operations

As shown in table III-6 and figure III-3, production reported by the U.S. producers fluctuated during January 2011-June 2012, with all five responding producers increasing production after February 2012.

**Table III-6**
**Wind towers:  U.S. producers' capacity and production, monthly, January 2011 – June 2012**

\*        \*        \*        \*        \*        \*        \*

**Figure III-3**
**Wind towers:  U.S. producers' production, monthly, January 2011 – June 2012**

\*        \*        \*        \*        \*        \*        \*

## 2012/13 Wind Tower Operations

Five U.S. producers' expected production based on the firms' order book is presented in table III-7.[39]  Of the four U.S. producers that reported order book data, all expected production to decrease between the third quarter 2012 and the fourth quarter 2013, with substantial decline after June-December 2012.[40]

**Table III-7**
**Wind towers:  U.S. producers' expected production based on order books, quarterly, July 2012 – December 2013**

\*        \*        \*        \*        \*        \*        \*

Table III-8 presents projected capacity, production, and U.S. shipments of three responding U.S. producers (\*\*\*) under two scenarios: first, if the PTC and other federal and/or state policies that were set to expire at the end of 2012 were renewed, and second, if these policies were not renewed.[41][42]  U.S. producers report that demand in 2013 will be lower primarily as a result of uncertainty regarding the continuation of the PTC.[43][44]  \*\*\*.[45]  \*\*\*.

---

[39] \*\*\*.

[40] \*\*\*.

[41] DMI has signed an asset purchase agreement with Trinity which will close in the fourth quarter of 2012.  "Otter Tail Corporation to Sell DMI Industries' Property, Plant and Equipment to Trinity Industries, Inc.," Ottertail Corporation,  press release, June 6, 2012.  Trinity has stated that it anticipates using one of the three facilities for railcar production and a second for manufacturing storage containers (other facility being in Canada).  Trinity 2012 8-K (Q3), Exhibit 99.3.

[42] Katana is seeking a buyer for its facilities and will cease production in by the end of October.  Moreover, Katana reported that \*\*\*.  Response to staff questions, November 7, 2012, and "More PTC Fallout: Katana Summit Will Close If It Doesn't Find A Buyer," North American Windpower, June 13, 2012, found at http://www.nawindpower.com/print.php?plugin:content.10388.

[43] "Although 2012 wind energy demand is strong, the outlook is expected to weaken considerably in 2013 as the market reacts to the scheduled expiration of the Production Tax Credit that supports the U.S. wind industry."  Broadwind 2012 10-Q (Q3), p. 20;  "…reduced demand for wind towers due to adverse market conditions affecting the industry, including uncertainty regarding renewal or extension of the Federal Production Tax Credit for

(…continued)

**Table III-8**
**Wind towers:  U.S. producers' anticipated capacity, production, and U.S. shipments under two scenarios, 2002-13**

\*          \*          \*          \*          \*          \*          \*

## U.S. PRODUCERS' SHIPMENTS

Data on U.S. producers' shipments of wind towers are presented in table III-9.  One U.S. producer, Vestas Towers, reported internal consumption/transfers to related firms.[46]  U.S. producers' U.S. shipments increased by \*\*\* percent by quantity from 2009 to 2011, and were \*\*\* percent higher in January-June 2012 compared to January-June 2011.  U.S. producers' U.S. shipments, by value, increased by \*\*\* percent from 2009 to 2011, and were \*\*\* percent higher in January-June 2012 compared to January-June 2011.  Average unit values increased during 2009-11 and were higher in January-June 2012 compared with January-June 2011; factors identified by the U.S. producers include underlying input costs, product mix, and the relative level of tolling and non-tolling sales.  See Part VI for more detail.[47]

Two U.S. producers, \*\*\*, reported exporting wind towers.  \*\*\*.

**Table III-9**
**Wind towers:  U.S. producers' shipments, by type, 2009-11, January-June 2011, and January-June 2012**

\*          \*          \*          \*          \*          \*          \*

---

(…continued)
investments in renewable energy resources, which is set to expire at the end of 2012.", "Otter Tail Corporation Announces Second Quarter Earnings," Otter Tail press release, August 6, 2012, found at http://www.ottertail.com/press/releasedetail.cfm?ReleaseID=698471;  "…pending tax credit expiration has caused the wind industry to halt the majority of development for 2013 until government policy is more certain. ", "Katana Summit Seeks Buyer for Company," Katana Press Release, June 11, 2012, found at http://www.katana-summit.com/pdfs/KatanaPressRelease091112.pdf;  "…we see a significant decline in wind tower production in 2013 as the Production Tax Credit seems likely to expire without renewal."  Trinity 2012 10-Q (Q2), exhibit 99.4;  "But because of the potential lapse of the regulatory framework in the U.S., this market will probably go down 80 percent next year {2103}.", "Vestas CEO sees US market down 80 pct in 2013," Reuters, June 11, 2012, found at http://in.reuters.com/article/2012/06/10/vestas-us-market-idINL5E8HA2SO20120610.

[44] The PTC was renewed in January 2013.  In addition, the tax credit to the wind farm projects was extended to wind farms under construction by the end of 2013.  "Wind Gets Production Tax Credit for Another Year With Crucial Language Change," Greentech Media, January 2, 2013, found at http://www.greentechmedia.com/articles/read/Wind-Gets-Production-Tax-Credit-for-Another-Year-With-Crucial-Language-Chan.

[45] Response to staff questions, November 8, 2012.

[46] For the purposes of its determinations in the preliminary phase of these investigations, the Commission found that the captive production provision does not apply.  *Utility Scale Wind Towers from China and Vietnam*, USITC Publication 4304, February 2012, p. 17, fn. 99.  The information collected in these final phase investigations indicate that \*\*\* .  The firm reported that \*\*\* the wind towers were used only for wind turbines and that the firm \*\*\* wind towers to the merchant market.  While the firm was unable to estimate the cost share accounted for by the wind towers in wind turbines, parties have estimated that wind towers typically account for \*\*\* percent of the total cost.  E-mail from \*\*\* December 19, 2012, and Petitioners' prehearing brief, p. 13 and Respondent Siemens's prehearing brief, p. 48.  In addition, as noted in Part II, most purchasers estimated the wind tower share of total cost of a wind turbine between 15 and 30 percent.  As noted in Part I, the tower comprises about two-thirds of the weight of a complete turbine.

[47] \*\*\*.

Table III-10 presents U.S. producers' shipments by size in January-June 2011, July-December 2011, and January-June 2012.[48]  The largest share (*** percent) of wind tower shipments during this period was in the 80-89.9 meter range, with wind towers of 100 or more meters representing the second largest proportion (*** percent).  All but two firms (***) reported U.S. shipments of 100 or more meter wind towers, and three firms (***) reported U.S. shipments of 50 to 79.9 meter wind towers.  Three of the four firms that had U.S. shipments of wind towers of 100 meters of more (***) reported that these represented a larger share of U.S. shipments in January-June 2012 than in January-June 2011.

**Table III-10**
**Wind towers:  U.S. producers' U.S. shipments by size, January-June 2011, July-December 2011, and January-June 2012**

<center>*    *    *    *    *    *    *</center>

<center>

## U.S. PRODUCERS' INVENTORIES

</center>

Wind towers are generally produced to each OEM turbine manufacturer's unique specifications after the specific utility scale power generation wind farm project receives financing and the turbine manufacturer awards the bid to suppliers.  As a result, U.S. producers do not typically produce wind towers for inventory.[49] [50]  Two U.S. producers, ***, reported end-of-period inventories (table III-11).  ***.[51]

**Table III-11**
**Wind towers:  U.S. producers' inventories, 2009-11, January-June 2011, and January- June 2012**

<center>*    *    *    *    *    *    *</center>

<center>

## U.S. PRODUCERS' IMPORTS AND PURCHASES

</center>

U.S. producers' imports and purchases of wind towers are presented in table III-12.[52]  Only one U.S. producer, ***, reported purchases and reported imports by a related firm.  *** stated that "***."

**Table III-12**
**Wind towers:  U.S. producers' U.S. production, imports, and import ratios to U.S. production, 2009-11, January-June 2011, and January-June 2012**

<center>*    *    *    *    *    *    *</center>

---

[48] ***.

[49] Petition, pp. 23-24.

[50] U.S. producers noted that wind towers might be held in storage yards awaiting delivery arrangements, but that the title would have already passed to the OEM.  Conference transcript, pp. 48-49 (Cole, Barczak, and Janda).

[51] ***.

[52] The Petitioners contend that Vestas should be excluded from the domestic industry as a related party.  Hearing transcript, p. 16 (DeFrancesco) and Petitioners' posthearing brief, pp. 6-7.  Respondents argue that Vestas should not be excluded as a related party.  Respondent Siemens's posthearing brief, Commissioner's hearing questions, p. 19, Respondent subject foreign producers' posthearing brief, pp. 47-49, hearing transcript, p. 259 (Marshak).

## U.S. EMPLOYMENT, WAGES, AND PRODUCTIVITY

The U.S. producers' aggregate employment data for wind towers are presented in table III-13. The number of production and related workers ("PRWs") employed by domestic wind tower producers increased between 2009-11, ending in 2011 with *** more PRWs (*** percent higher) than in 2009, and was higher in January-June 2012 compared with January-June 2011.  During 2009-11, one U.S. producer (***) reported a decline in PRWs in each year, three U.S. producers (***) reported increases, and two U.S. producers (***) reported a fluctuating number of PRWs in each year, although ***.  All but two U.S. producers (***) reported a higher number of PRWs in January-June 2012 than in January-June 2011.

During the period for which data were collected, two of the three U.S. producers reporting increases in PRWs opened facilities, although ***.  ***, one of the two U.S. producer to report fluctuating number of PRWs, ***.[53]  *** reported the highest unit labor costs in each period.

**Table III-13**
**Wind towers:  U.S. producers' employment-related data, 2009-11, January-June 2011, and January-June 2012**

       *  *  *  *  *  *  *

---

[53] ***.

# PART IV: U.S. IMPORTS, APPARENT U.S. CONSUMPTION, AND MARKET SHARES

## U.S. IMPORTERS

The Commission issued questionnaires to 46 firms believed to be importers of subject wind towers, as well as to all U.S. producers of wind towers.[1]  Eleven firms submitted useable questionnaires.[2]  These firms accounted for 95.8 percent of total imports from China and 99.8 percent of total imports from Vietnam between January 2009 and December 2010 under HTS subheading 7308.20.0000, a broad category, and 98.6 percent from China and 100 percent from Vietnam between January 2011 and June 2012 under the more specific HTS statistical reporting number 7308.20.0020.[3][4]  Table IV-1 lists all responding or identified U.S. importers of wind towers from China, Vietnam, and other sources, their locations, and their shares of reported U.S. imports, in 2011 (by quantity, i.e., number of towers).

**Table IV-1**
**Wind towers:  U.S. importers, source(s) of imports, U.S. headquarters, and shares of 2011 imports**

| Firm | Headquarters | Source of imports | Share of 2011 imports (*percent*) | | | |
|---|---|---|---|---|---|---|
| | | | China | Vietnam | Other | Total |
| Acciona Windpower North America | West Branch, IA[1] | *** | *** | *** | *** | *** |
| Clipper Windpower | Carpinteria, CA[2] | *** | *** | *** | *** | *** |
| DeWind | Irvine, CA[3] | *** | *** | *** | *** | *** |
| Gamesa Wind US[4] | Langhorne, PA[5] | *** | *** | *** | *** | *** |
| GE Generators (Pensacola) | Pensacola, FL[6] | *** | *** | *** | *** | *** |
| Kousa International | Los Angeles, CA | *** | *** | *** | *** | *** |
| Mitsubishi Power Systems America | Newport Beach, CA | *** | *** | *** | *** | *** |
| Ralls Corporation | Dover, DE | *** | *** | *** | *** | *** |

Table continued on next page.

---

[1] The Commission issued questionnaires to those firms identified in the petition, along with firms that, based on a review of data provided by U.S. Customs and Border Protection ("Customs"), imported more than one percent of total imports under HTS subheading 7308.20.0000 in any one year during 2009-10 and under 7308.20.0020 during 2011-12.

[2] In addition, one firm (***) reported only arranged imports of wind towers from nonsubject sources (after June 2012) and another firm (***) reported only arranged imports of wind towers from China (after June 2012).

[3] One firm (***) reported importing wind towers from nonsubject sources, but did not provide useable data.

[4] Based on data provided by Customs (excluding firms certifying that they had not imported wind towers since January 1, 2009).  All responding firms (including those certifying that they had not imported wind towers since January 1, 2009) represented 97.1 percent of imports from China, 99.8 percent of imports from Vietnam, and 62.2 percent of imports from all other sources during 2009-10 under HTS subheading 7308.20.0000, and 98.6 percent from China, 100 percent from Vietnam, and 81.7 percent from all other sources under HTS statistical reporting number 7308.20.0020 during January 2011–June 2012.

**Table IV-1--*Continued***
**Wind towers:  U.S. importers, source(s) of imports, U.S. headquarters, and shares of 2011 imports**

| Firm | Headquarters | Source of imports | Share of 2011 imports (*percent*) | | | |
|---|---|---|---|---|---|---|
| | | | China | Vietnam | Other | Total |
| REpower USA | Denver, CO | *** | *** | *** | *** | *** |
| Siemens Energy | Orlando, FL[9] | *** | *** | *** | *** | *** |
| Suzlon Wind Energy | Chicago, IL[10] | *** | *** | *** | *** | *** |
| TransCanada Maine Wind Development | Westborough, MA[11] | *** | *** | *** | *** | *** |
| Vasco Winds | Juno Beach, FL | *** | *** | *** | *** | *** |
| Vestas-American Wind Technology | Portland, OR[12] | *** | *** | *** | *** | *** |
| Total | | | 100.0 | 100.0 | 100.0 | 100.0 |

[1] Acciona is ***.
[2] Clipper is ***.
[3] DeWind is ***.
[4] Gamesa also included data for ***.
[5] Gamesa is ***.
[6] GE is ***.
[7] Mitsubishi Power, which ***, has ***.  Mitsubishi Power is ***.
[8] REpower is ***.
[9] Siemens is ***.
[10] Suzlon is ***.
[11] TransCanada is ***.
[12] Vestas Wind is ***.

Note.–Because of rounding, figures may not add to the totals shown.

Source:  Compiled from data submitted in response to Commission questionnaires.

## U.S. IMPORTS

Table IV-2 and figure IV-1 present data for U.S. imports of wind towers from China, Vietnam, and all other sources. Imports from China and Vietnam fluctuated during 2009-11. Overall, imports from China increased by *** wind towers, or *** percent, while imports from Vietnam increased by *** wind towers, or *** percent. Imports from China in January-June 2012 were *** wind towers, or *** percent, higher than in January-June 2011, while imports from Vietnam were *** wind towers, or *** percent, higher in January-June 2012 than in January-June 2011.[5][6] Imports from all other sources declined each year during 2009-11, ending 59.6 percent lower, while imports from all other sources were higher in January-June 2012 compared with January-June 2011.[7] The share of U.S. imports of wind towers, by quantity for which imports from China accounted increased by *** percentage points between 2009 and 2011, while the share for which imports from Vietnam accounted increased by *** percentage points and the share for which imports from nonsubject sources accounted decreased by 30.4 percentage points. The share of imports from China was higher in January-June 2012 compared with January-June 2011, while the share of imports from Vietnam and nonsubject sources was lower.

The average unit value of U.S. imports from China increased between 2009 and 2011, while the average unit value of U.S. imports from Vietnam and from nonsubject sources declined. The average unit value of U.S imports from China was lower in January-June 2012 than in January-June 2011, while the average unit value of U.S. imports from Vietnam and from nonsubject sources was higher. The average unit value of imports from Vietnam and from nonsubject sources was higher than the average unit value of imports from China in 2009, 2010, 2011, and January-June 2012.

Two importers (***) accounted for the vast majority of imports from China during the period for which data were collected, one importer (***) for a substantial majority of imports from Vietnam, and four importers (***) accounted for the vast majority of imports from all other sources.

---

[5] Three importers (***) accounted for the higher level of imports from China in January-June 2012 compared with January-June 2011 and *** accounted for the higher level of imports from Vietnam in January-June 2012 compared with January-June 2011.

[6] The three largest importers, ***, attributed higher levels of imports in 2012 at least partially to the anticipated expiration of the PTC.

[7] The decline in 2010 is largely due to a substantial decrease in imports by ***. The majority of the decline in imports from nonsubject sources in 2011 was accounted for by ***, although this decrease was partially offset by increased imports by ***. *** reported greater imports in January-June 2012 compared with January-June 2011, offsetting the lower imports from *** of the *** other importers of nonsubject imports in those periods.

**Table IV-2**
**Wind towers:  U.S. imports, by sources, 2009-11, January-June 2011, and January-June 2012**

| Source | Calendar year | | | January-June | |
|---|---|---|---|---|---|
| | **2009** | **2010** | **2011** | **2011** | **2012** |
| **Quantity (*towers*)** | | | | | |
| China | *** | *** | *** | *** | *** |
| Vietnam | *** | *** | *** | *** | *** |
|    Subtotal, subject | 646 | 366 | 916 | 456 | 1,257 |
| Nonsubject | 1,175 | 783 | 475 | 246 | 382 |
|   Total | 1,821 | 1,149 | 1,391 | 702 | 1,639 |
| **Value (*$1,000*)[1]** | | | | | |
| China | *** | *** | *** | *** | *** |
| Vietnam | *** | *** | *** | *** | *** |
|    Subtotal, subject | 192,909 | 129,583 | 283,968 | 144,916 | 357,320 |
| Nonsubject | 472,990 | 260,292 | 155,405 | 78,707 | 137,274 |
|   Total | 665,899 | 389,875 | 439,373 | 223,623 | 494,594 |
| **Unit value (*dollars per tower*)[1]** | | | | | |
| China | *** | *** | *** | *** | *** |
| Vietnam | *** | *** | *** | *** | *** |
|    Subtotal, subject | 298,621 | 354,052 | 310,009 | 317,798 | 284,208 |
| Nonsubject | 402,545 | 332,429 | 327,169 | 319,947 | 359,356 |
|   Average | 365,678 | 339,317 | 315,869 | 318,551 | 301,720 |
| **Share of quantity (*percent*)** | | | | | |
| China | *** | *** | *** | *** | *** |
| Vietnam | *** | *** | *** | *** | *** |
|    Subtotal, subject | 35.5 | 31.9 | 65.9 | 65.0 | 76.7 |
| Nonsubject | 64.5 | 68.1 | 34.1 | 35.0 | 23.3 |
|   Total | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| **Share of value (*percent*)** | | | | | |
| China | *** | *** | *** | *** | *** |
| Vietnam | *** | *** | *** | *** | *** |
|    Subtotal, subject | 29.0 | 33.2 | 64.6 | 64.8 | 72.2 |
| Nonsubject | 71.0 | 66.8 | 35.4 | 35.2 | 27.8 |
|   Total | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |

[1] Landed, U.S. port of entry, duty-paid.

Source:  Compiled from data submitted in response to Commission questionnaires.

**Figure IV-1**
**Wind towers:  U.S. imports, by sources, 2009-11, January-June 2011, and January-June 2012**

*　　*　　*　　*　　*　　*　　*

One of the top importers of wind towers from ***, Siemens, reported that it imports as an alternative source to domestic producers.  Siemens reported that prior to late 2009, it had only one qualified domestic producer, Ameron.  Other U.S. producers were qualified in ***, in ***, and in ***.  Siemens also stated that it imports as the domestic producers have not always been reliable suppliers (citing quality issues, failure to deliver, or inability to produce due to insufficient capacity) or did not have adequate geographic coverage (citing inadequate or non-existent qualified domestic production facilities in required geographic locations or inability to deliver to location).[8]

Another top importer of wind towers from ***, GE, reported that while it had *** qualified domestic producers – *** - several other factors are taken into consideration when sourcing wind towers.  These include ***,[9] ***,[10] and ***.[11]

***, the leading importer of subject merchandise from ***, reported that it imports, ***, to ***.  *** further noted that ***.[12]

Of the other top importers of imports from ***, ***.[13]

Table IV-3 presents data for U.S. shipments by size of wind towers imported from China, Vietnam, and all other sources.

---

[8] Respondent Siemens's postconference brief, p. 9; conference transcript, p. 17 (Feldman) and pp. 110-112 (Hauer), Respondent Siemens's prehearing brief, pp. 25-35, and response to U.S. importers' questionnaire.

[9] GE characterized the difference between the delivered price of domestic wind towers and imported wind towers as ***.

[10] GE reported that *** had manufacturing process issues in 2010-11, which resulted in an inability to meet contractual, scheduled shipment commitments.

[11] GE response to the importers' questionnaire.

[12] Vestas Wind response to the importers' questionnaire.

[13] "Frequently Asked Questions," Korindo Wind, found at http://www.korindowind.com/faq, retrieved on January 30, 2012.

IV-5

**Table IV-3**
**Wind towers:  Shipments of U.S. imports by size, January-June 2011, July-December 2011, and January-June 2012**

| Size range | 2011 | | 2012 |
|---|---|---|---|
| | January-June | July-December | January-June |
| **Quantity (*towers*)** | | | |
| **China** | | | |
|   50-79.9 meters | *** | *** | *** |
|   80-89.9 meters | *** | *** | *** |
|   90-99.9 meters | *** | *** | *** |
|   100 or more meters | *** | *** | *** |
|   Total | *** | *** | *** |
| **Vietnam** | | | |
|   50-79.9 meters | *** | *** | *** |
|   80-89.9 meters | *** | *** | *** |
|   90-99.9 meters | *** | *** | *** |
|   100 or more meters | *** | *** | *** |
|   Total | *** | *** | *** |
| **All other sources** | | | |
|   50-79.9 meters | *** | *** | *** |
|   80-89.9 meters | *** | *** | *** |
|   90-99.9 meters | *** | *** | *** |
|   100 or more meters | *** | *** | *** |
|   Total | *** | *** | *** |
| **Total** | | | |
|   50-79.9 meters | 20 | 144 | 14 |
|   80-89.9 meters | 579 | 440 | 1,318 |
|   90-99.9 meters | 0 | 1 | 234 |
|   100 or more meters | 76 | 12 | 71 |
|   Total | 675 | 597 | 1,637 |

Note.—Shipments by size reported by *** did not match (by *** towers) total U.S. shipments of imports in July-December 2011.

Source:  Compiled from data submitted in response to Commission questionnaires.

## NEGLIGIBILITY

The statute requires that an investigation be terminated without an injury determination if imports of the subject merchandise are found to be negligible.[14]  Negligible imports are generally defined in the Tariff Act of 1930, as amended, as imports from a country of merchandise corresponding to a domestic like product where such imports account for less than 3 percent of the volume of all such merchandise imported into the United States in the most recent 12-month period for which data are available that precedes the filing of the petition or the initiation of the investigation.  However, if there are imports of such merchandise from a number of countries subject to investigations initiated on the same day that individually account for less than 3 percent of the total volume of the subject merchandise, and if the imports from those countries collectively account for more than 7 percent of the volume of all such merchandise imported into the United States during the applicable 12-month period, then imports from such countries are deemed not to be negligible.[15]  Imports from China accounted for 49.9 percent of total imports of wind towers by quantity during January 2011-November 2011.[16]  During the same period, imports from Vietnam accounted for 16.1 percent, by quantity, of total U.S. imports of wind towers compiled from official Commerce statistics.[17]

## CUMULATION CONSIDERATIONS

In assessing whether subject imports are likely to compete with each other and with the domestic like product with respect to cumulation, the Commission generally has considered the following four factors:  (1) the degree of fungibility, including specific customer requirements and other quality-related questions; (2) presence of sales or offers to sell in the same geographic markets; (3) common channels of distribution; and (4) simultaneous presence in the market.  Channels of distribution and fungibility (interchangeability) are discussed in Part II of this report.  Additional information concerning geographical markets and simultaneous presence in the market is presented below.[18]

---

[14] Sections 703(a)(1), 705(b)(1), 733(a)(1), and 735(b)(1) of the Act (19 U.S.C. §§ 1671b(a)(1), 1671d(b)(1), 1673b(a)(1), and 1673d(b)(1)).

[15] Section 771(24) of the Act (19 U.S.C. § 1677(24)).

[16] Based on HTS statistical reporting number 7308.20.0020 during January-November 2011 (the period for which data from this relatively narrow category are available).

[17] Based on questionnaire data in the preliminary phase of these investigations for the 12-month period October 2010-September 2011, imports from China accounted for *** percent of total imports of wind towers, by quantity, and imports from Vietnam accounted for *** percent.

[18] Petitioners argued that subject imports from China and Vietnam should be cumulated for purposes of present material injury and threat of material injury.  Petitioner's posthearing brief, exh. 1, pp. 42-52.  The respondent Siemens did not directly address cumulation, but stated that Siemens does not view the Chinese and Vietnamese imports as competing with one another, but rather as complementing the domestic market.  Respondent Siemens's postconference brief, Staff questions and answers, p. 1 and conference transcript, p. 137 (Feldman).  Respondent foreign producers accept the Petitioner's position on cumulation.  Respondent foreign producers' prehearing brief, p. 12.

## Geography

With regard to geographical market overlap, the majority of U.S. importers, particularly the larger importers, reported shipping (or utilizing) wind towers for wind turbine installation in multiple regions throughout the United States. U.S. imports of wind towers from China and Vietnam entered through multiple U.S. ports of entry primarily on the West Coast and Gulf Coast. In 2011 (the last full year for which data is available), the three U.S. ports of entry with the largest volume of imports from China were: (1) Columbia-Snake, OR; (2) Houston-Galveston, TX; and (3) San Diego, CA, and in January-June 2012 those with the largest volume were (1) Houston-Galveston, TX; (2) New Orleans, LA; and (3) Columbia-Snake, OR. The three U.S. ports of entry with the majority of the volume of imports from Vietnam in 2011 were: (1) Port Arthur, TX; (2) Columbia-Snake, OR; and (3) Portland, ME, and in January-June 2012 were (1) Houston-Galveston, TX; (2) Honolulu, HI; and (3) Columbia-Snake, OR.[19] The three U.S. ports of entry with the majority of the volume of imports from all other sources in 2011 were: (1) Columbia-Snake, OR; (2) Laredo, TX; and (3) Los Angeles, CA, and in January-June 2012 were (1) Houston-Galveston, TX; (2) Los Angeles, CA; and (3) New Orleans, LA.[20] Petitioners argue that the imported product, like domestically produced wind towers, is available nationwide. (See Part III of this report for a more detailed accounting of U.S. production locations, production history, and reported capacity).

## Presence in the Market

With regard to simultaneous presence in the market, Petitioners state that imported wind towers from both China and Vietnam have been simultaneously present in the U.S. market along with domestic product during the period examined.[21] Commerce statistics as well as import and bid data submitted to the Commission show that imports from China and Vietnam entered the United States in every year for which data were collected. Table IV-4 presents monthly import data for January 2011-October 2012.[22] U.S. imports of wind towers from China entered in each of these months, while U.S. imports of wind towers from Vietnam entered in 13 of the 22 months through October 2012.

---

[19] Official Commerce statistics. In 2011, 62.9 percent of imports, by quantity (metric tons) from China entered through Columbia-Snake, OR, 22.5 percent through Houston-Galveston, TX, 13.9 percent through San Diego, CA, and 0.7 percent through all other ports of entry. During January-June 2012, 13.4 percent of imports from China entered through Columbia-Snake, OR, 29.5 percent through Houston-Galveston, TX, 21.8 percent through New Orleans, LA, and 35.3 percent through all other ports.

In 2011, 63.7 percent of imports, by quantity (metric tons) from Vietnam entered through Port Arthur, TX, 16.6 percent entered through Columbia-Snake, OR, 10.5 percent through Portland, ME, and 19.7 percent through all other ports of entry. During January-June 2012, 18.3 percent of imports from Vietnam entered through Columbia-Snake, OR, 33.2 percent through Houston-Galveston, TX, 28.6 percent through Honolulu, HI, 18.3 percent through Columbia-Snake, OR, and 20.0 percent through all other ports of entry.

[20] In 2011, 22.6 percent of imports, by quantity (metric tons) from all other sources entered through Columbia-Snake, OR, 22.0 percent entered through Laredo, TX, 15.7 percent through Los Angeles, CA, and 39.7 percent through all other ports of entry. During January-June 2012, 31.9 percent of imports from all other sources entered through Houston-Galveston, TX, 18.2 percent through Los Angeles, CA, 13.6 percent through New Orleans, LA, and 36.3 percent through all other ports of entry.

[21] Petition, pp. 22-23.

[22] Data are presented for January 2011-October 2012 as prior to 2011 imports entered under HTS subheading 7308.20.0000, a broad category that included nonsubject merchandise.

**Table IV-4**
**Wind towers:  U.S. imports, by sources, January 2011-October 2012**

| Source | 2011 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Jan** | **Feb** | **Mar** | **Apr** | **May** | **Jun** | **Jul** | **Aug** | **Sep** | **Oct** | **Nov** | **Dec** |
| **Quantity (*metric tons*)** | | | | | | | | | | | | |
| China | 2 | 3,396 | 7,670 | 6,490 | 13,159 | 13,200 | 3,172 | 15,036 | 12,756 | 9,949 | 10,545 | 6,490 |
| Vietnam | 0 | 0 | 4,452 | 3,498 | 4,259 | 7,597 | 7,647 | 3,228 | 0 | 0 | 0 | 0 |
| Subtotal | 2 | 3,396 | 12,122 | 9,988 | 17,418 | 20,797 | 10,819 | 18,264 | 12,756 | 9,949 | 10,545 | 6,490 |
| All other sources | 1,806 | 589 | 2,861 | 4,370 | 4,887 | 9,899 | 11,162 | 13,304 | 4,919 | 6,600 | 4,656 | 5,349 |
| Total | 1,808 | 3,984 | 14,983 | 14,359 | 22,305 | 30,696 | 21,981 | 31,568 | 17,676 | 16,549 | 15,201 | 11,839 |
| **Value ($1,000)** | | | | | | | | | | | | |
| China | 19 | 7,272 | 16,589 | 14,357 | 27,291 | 28,594 | 10,707 | 29,562 | 30,172 | 18,574 | 19,767 | 11,664 |
| Vietnam | 0 | 0 | 13,204 | 9,912 | 14,973 | 25,667 | 19,005 | 8,597 | 0 | 0 | 0 | 0 |
| Subtotal | 19 | 7,272 | 29,793 | 24,269 | 42,264 | 54,260 | 29,713 | 38,159 | 30,172 | 18,574 | 19,767 | 11,664 |
| All other sources | 9,830 | 4,649 | 5,228 | 9,373 | 13,894 | 25,396 | 26,294 | 31,564 | 7,513 | 14,676 | 10,308 | 12,315 |
| Total | 9,849 | 11,921 | 35,021 | 33,642 | 56,157 | 79,656 | 56,007 | 69,723 | 37,685 | 33,249 | 30,075 | 23,980 |
| | **2012** | | | | | | | | | | | |
| | **Jan** | **Feb** | **Mar** | **Apr** | **May** | **Jun** | **Jul** | **Aug** | **Sep** | **Oct** | **Nov** | **Dec** |
| **Quantity (*metric tons*)** | | | | | | | | | | | | |
| China | 15,509 | 28,629 | 21,745 | 23,842 | 39,265 | 41,043 | 16,722 | 6,851 | 5,127 | 113 | | |
| Vietnam | 2,718 | 0 | 823 | 8,163 | 7,765 | 7,637 | 1,582 | 0 | 0 | 0 | | |
| Subtotal | 18,227 | 28,629 | 22,568 | 32,004 | 47,030 | 48,679 | 18,304 | 6,851 | 5,127 | 113 | | |
| All other sources | 8,942 | 3,313 | 3,529 | 6,677 | 26,392 | 18,267 | 29,390 | 26,497 | 13,602 | 11,879 | | |
| Total | 27,169 | 31,942 | 26,097 | 38,681 | 73,422 | 66,946 | 47,694 | 33,348 | 18,728 | 11,992 | | |
| **Value ($1,000)** | | | | | | | | | | | | |
| China | 31,737 | 56,768 | 45,465 | 58,228 | 89,785 | 75,836 | 45,434 | 16,711 | 12,138 | 397 | | |
| Vietnam | 8,037 | 0 | 2,962 | 22,585 | 19,935 | 16,272 | 2,866 | 0 | 6 | 0 | | |
| Subtotal | 39,774 | 56,768 | 48,427 | 80,813 | 109,720 | 92,107 | 48,299 | 16,711 | 12,144 | 397 | | |
| All other sources | 25,247 | 8,736 | 8,394 | 18,779 | 60,937 | 45,195 | 57,838 | 72,818 | 38,068 | 35,277 | | |
| Total | 65,021 | 65,504 | 56,821 | 99,592 | 170,656 | 137,302 | 106,137 | 89,529 | 50,212 | 35,674 | | |

Note.–Quantity data only available by weight.

Source:  Compiled from official Commerce statistics (HTS statistical reporting number 7308.20.0020).

## APPARENT U.S. CONSUMPTION

Table IV-5 and figure IV-2 present apparent U.S. consumption of wind towers during the period for which data were collected. Figure IV-3 shows the U.S. wind power capacity installation by quarter during January 2009-June 2012. From 2009 to 2011, the quantity of apparent U.S. consumption of wind towers decreased by *** percent, but was *** percent higher in January-June 2012 than in January-June 2011. The value of apparent U.S. consumption from 2009 to 2011 decreased by *** percent but was *** percent higher in January-June 2012 than in January-June 2011. During 2009-11, U.S. producer shipments and U.S. shipments of imports from both China and Vietnam increased, while U.S. shipments of imports from nonsubject sources decreased. In January-June 2012 compared with January-June 2011, U.S. shipments from all sources were higher, although U.S. shipments of imports from China exhibited the greatest increase.

**Table IV-5**
**Wind towers:  U.S. shipments of domestic product, U.S. shipments of imports, and apparent U.S. consumption, 2009-11, January-June 2011, and January-June 2012**

| Item | Calendar year | | | January-June | |
|---|---|---|---|---|---|
| | **2009** | **2010** | **2011** | **2011** | **2012** |
| **Quantity (*towers*)** | | | | | |
| U.S. producers' U.S. shipments | 2,058 | 1,738 | *** | *** | *** |
| U.S. shipments of imports from– | | | | | |
|    China | *** | *** | *** | *** | *** |
|    Vietnam | *** | *** | *** | *** | *** |
|      Subtotal, subject | 610 | 366 | 861 | 429 | 1,256 |
|     Nonsubject countries | 1,175 | 783 | 475 | 246 | 382 |
|      Total U.S. imports | 1,785 | 1,149 | 1,336 | 675 | 1,638 |
| Apparent U.S. consumption | 3,843 | 2,887 | *** | *** | *** |
| **Value ($1,000)** | | | | | |
| U.S. producers' U.S. shipments | 586,131 | 528,149 | *** | *** | *** |
| U.S. shipments of imports from– | | | | | |
|    China | *** | *** | *** | *** | *** |
|    Vietnam | *** | *** | *** | *** | *** |
|      Subtotal, subject | 185,060 | 130,165 | 265,862 | 135,851 | 358,974 |
|     Nonsubject countries | 476,976 | 263,968 | 155,942 | 78,882 | 137,764 |
|      Total U.S. imports | 662,036 | 394,133 | 421,804 | 214,733 | 496,738 |
| Apparent U.S. consumption | 1,248,167 | 922,282 | *** | *** | *** |

Note.--Because of rounding, figures may not add to the totals shown.

Source:  Compiled from data submitted in response to Commission questionnaires.

**Figure IV-2**
**Wind towers:  Apparent U.S. consumption, by sources, 2009-11, January-June 2011, and January-June 2012**

\*        \*        \*        \*        \*        \*        \*

**Figure IV-3**
**Wind towers:  U.S. wind power capacity installations by quarter, Jan-Mar 2009-Apr-June 2012**



Source:  *AWEA U.S. Wind Industry Second Quarter 2012 Market Report*, found at
http://www.awea.org/learnabout/publications/reports/upload/2Q2012_Market_Report_PublicVersion.pdf.

### U.S. MARKET SHARES

U.S. market share data are presented in table IV-6 and figure IV-4.  From 2009 to 2011, U.S. producers' market share, based on quantity, increased by \*\*\* percentage points, while the share accounted for by U.S. imports from subject sources increased by \*\*\* percentage points and the share accounted for by U.S. imports from all other sources fell by \*\*\* percentage points.  The largest changes in market shares in January-June 2012 reflected lower shares for U.S. producers and higher shares for imports from China.

Comparing January-June 2012 to January-June 2011, U.S. producers' market share, based on quantity, was lower by \*\*\* percentage points, while the market share of U.S. imports from subject sources was higher, by \*\*\* percentage points, and the share of U.S. imports from all other sources was \*\*\* percentage points lower.[23]

---

[23] U.S. imports of wind towers from Vietnam accounted for a lower share of the market in January-June 2012 than in January-June 2011.

**Table IV-6**
**Wind towers:  U.S. consumption and market shares, 2009-11, January-June 2011, and January-June 2012**

| Item | Calendar year | | | January-June | |
|---|---|---|---|---|---|
| | 2009 | 2010 | 2011 | 2011 | 2012 |
| Quantity (*towers*) | | | | | |
| Apparent U.S. consumption | 3,843 | 2,887 | *** | *** | *** |
| Value (*$1,000*) | | | | | |
| Apparent U.S. consumption | 1,248,167 | 922,282 | *** | *** | *** |
| Share of quantity (*percent*) | | | | | |
| U.S. producers' U.S. shipments | 53.6 | 60.2 | *** | *** | *** |
| U.S. shipments of imports from– | | | | | |
| China | *** | *** | *** | *** | *** |
| Vietnam | *** | *** | *** | *** | *** |
| Subtotal, subject | 15.9 | 12.7 | *** | *** | *** |
| Nonsubject countries | 30.6 | 27.1 | *** | *** | *** |
| Total U.S. imports | 46.4 | 39.8 | *** | *** | *** |
| Share of value (*percent*) | | | | | |
| U.S. producers' U.S. shipments | 47.0 | 57.3 | *** | *** | *** |
| U.S. shipments of imports from– | | | | | |
| China | *** | *** | *** | *** | *** |
| Vietnam | *** | *** | *** | *** | *** |
| Subtotal, subject | 14.8 | 14.1 | *** | *** | *** |
| Nonsubject countries | 38.2 | 28.6 | *** | *** | *** |
| Total U.S. imports | 53.0 | 42.7 | *** | *** | *** |

Note.–Because of rounding, figures may not add to the totals shown.

Source:  Compiled from data submitted in response to Commission questionnaires.

**Figure IV-4**
**Wind towers:  Share of apparent consumption, by quantity of U.S. shipments of domestic product and of imports, 2009-11, January-June 2011, and January-June 2012**

\*        \*        \*        \*        \*        \*        \*

## RATIO OF IMPORTS TO U.S. PRODUCTION

Table IV-7 presents data on the ratio of U.S. imports to U.S. production.  The ratio of U.S. imports from China to U.S. production increased by *** percentage points between 2009 and 2011, while imports from Vietnam increased by *** percentage points, and imports from all other sources declined by *** percentage points.  Comparing January-June 2012 to January-June 2011, the ratio of U.S. imports from China to U.S. production was higher by *** percentage points, imports from Vietnam were higher by *** percentage point, and imports from all other sources were higher by *** percentage points.

IV-12

**Table IV-7**
**Wind towers:  Ratio of U.S. imports to U.S. production, 2009-11, January-June 2011, and January-June 2012**

| Item | Calendar year | | | January-June | |
|---|---|---|---|---|---|
| | **2009** | **2010** | **2011** | **2011** | **2012** |
| **Quantity (*towers*)** | | | | | |
| U.S. production | 2,069 | 1,751 | *** | *** | *** |
| U.S. imports from– | | | | | |
|    China | *** | *** | *** | *** | *** |
|    Vietnam | *** | *** | *** | *** | *** |
|      Subtotal, subject | 646 | 366 | 916 | 456 | 1,257 |
|    Nonsubject countries | 1,175 | 783 | 475 | 246 | 382 |
|     Total imports | 1,821 | 1,149 | 1,391 | 702 | 1,639 |
| **Ratio of U.S. imports to production (*percent*)** | | | | | |
| U.S. imports from– | | | | | |
|    China | *** | *** | *** | *** | *** |
|    Vietnam | *** | *** | *** | *** | *** |
|      Subtotal, subject | 31.2 | 20.9 | *** | *** | *** |
|    Nonsubject countries | 56.8 | 44.7 | *** | *** | *** |
|     Total imports | 88.0 | 65.6 | *** | *** | *** |

Note.--Because of rounding, figures may not add to the totals shown.

Source:  Compiled from data submitted in response to Commission questionnaires.

# PART V:  PRICING AND RELATED INFORMATION

## FACTORS AFFECTING PRICES

### Raw Material Costs[1]

Raw materials account for a substantial share of the cost-of-goods sold ("COGS") for wind towers.  During 2009-11, raw materials accounted for between *** and *** percent of the COGS annually.  During January-June 2012, they accounted for approximately *** percent of the COGS, compared with approximately *** percent in January-June 2011, despite somewhat lower prices for steel plate, the principal raw material used in making wind towers.[2]  As shown in figure V-1, the price of steel plate declined in early 2009 (after previously having been at nearly $1,500 per short ton as recently as September 2008) to reach period-low levels in April and May 2009 before recovering during the next two years.  Since early 2011, however, the price of steel plate has been generally declining.

**Figure V-1**
**Steel plate:  Monthly average prices, January 2009-December 2012**



Note.--ASTM A36 commercial quality plate, in thickness between 3/8 of an inch and 2 inches, width between 72 and 120 inches, and length between approximately 240 and 720 inches.

Source:  American Metal Market, effective January 3, 2013.

### Transportation Costs

Shipping costs account for a substantial share of the total delivered cost of wind towers.  Based on data provided by ***, U.S. inland transportation costs for shipments originating in the United States ranged between 3.0 and 42.9 percent of the total delivered cost of the wind towers (averaging ***

---

[1] COGS were equivalent to at least *** percent of the total net sales value in each year or interim period.

[2] This pattern is due in part to a shift in the amount of tolling at the end of the period.  *See* Part VI  (p. VI-5 and table VI-3 (note 2)) for additional detail.

JA 000368

percent), and U.S. inland transportation costs for wind towers imported from Asia ranged between 4.2 and 25.6 percent (averaging *** percent).[3]  Ocean freight to the United States is typically more expensive than U.S. inland freight, with the share of total delivered costs ranging from 15.3 to 35.3 percent, and averaging *** percent for *** imports from Asia ***.  Inland transportation costs for orders shipped from Canada ranged between 13.1 and 41.7 percent, with an average of *** percent.

Three U.S. producers provided information on shipping distances for wind towers from their production facilities.  All three responding producers and three of four responding importers reported that all or a majority of their wind towers were shipped distances of less than 1,000 miles from their facilities in 2011.[4]  ***, in contrast, reported that *** percent of its imported wind towers were shipped more than 1,000 miles.  In most cases, purchasers arrange and pay for shipping.[5]  In general, wind towers are shipped over land via truck and rail.  Siemens reported that "***."

## PRICING PRACTICES

### Pricing Methods

Final prices of wind towers are most commonly determined through transaction-by-transaction negotiations and contracts resulting from competition.  Prices are decided upon at the time of contracting the project or at some prior time.  Among four responding U.S. producers, three reported that they use a combination of transaction-by-transaction negotiations and contracts and one relies entirely on transaction-by-transaction negotiations.  Importers *** reported that they use transaction-by-transaction negotiations.[6]  Three of four responding U.S. producers reported that they sell wind towers on an f.o.b. basis (typically on an ex-works basis).[7]

U.S. producers sell wind towers on both a spot and a contract basis.  The producers' short term contracts range from three to six months with fixed prices and quantities.  Most producers' short-term contracts do not allow price renegotiation during the contract period, except those with ***.  No producer noted using meet-or-release provisions.  U.S. producers' Long-term contracts are typically for periods of two years or more.  Both prices and quantities are fixed, though prices may be renegotiated at certain times during the contract period.  Again, no producer noted using meet-or-release provisions.

### Sales Terms and Discounts

Among four responding producers, one reported that it provides quantity discounts on sales of wind towers, one reported that it provides discounts on a case-by-case basis, and the other two reported that they do not provide such discounts. Among importers, five noted not having a discount policy, whereas *** gives discounts on a transaction-by-transaction basis based on history, volume, geography, and commercial terms.[8]

---

[3] ***.

[4]  *** stated that ***.

[5] ***, arranges transportation for the wind towers it produces.

[6]  *** is the only importer which reported commercial sales of wind towers and did not submit a purchaser's questionnaire.  ***.

[7]  None of the responding importers reported stand alone sales of wind towers from China or Vietnam.

[8]  Despite *** importers not selling wind towers commercially as an item separate from a wind turbine, six importers responded to this question.

## PRICE DATA

Since sales agreements for wind towers are largely determined for specific wind turbine projects, purchasers were asked to submit information on all projects initiated, delivered, or ordered since January 1, 2009.[9]  Five purchasers provided data.  Since these data can be project-specific, the Commission requested data separately for each event, as if they were put out for bidding.  ***, however, reported that they do not use bid competition to determine their suppliers.  Each maintains its own manner of wind tower procurement.

GE and Siemens, the ***, which together have accounted for *** of all imports from China and Vietnam since January 2009, presented bid-type information in alternative forms.  In addition, *** also supplied the Commission with some data regarding their purchases of wind towers.  The results are discussed separately for GE and Siemens and presented as a whole for the three smaller purchasers.  GE and Siemens accounted for *** imports from China.  Siemens accounted for *** of imports from Vietnam (***), but Vestas (which ***) accounted for *** of such imports during January 2009-June 2012.

### GE's Projects

GE reported that its method of procuring wind towers is based more on a logistical model than on a project-specific model.  It stated that "***."  ***.  As a result, GE did not report reasons why the chosen suppliers were awarded the supply contracts.  GE further noted that "***."[10]   GE typically purchases via ***.[11]

Table V-1 includes selected data for each of GE's projects.  The data span 130 domestic wind tower projects.  Since transportation costs account for a large portion of the total cost of the finished wind tower, GE relies on the delivered cost rather than the f.o.b. cost.

**Table V-1**
**Wind towers:  Selected data regarding GE's purchases since 2009**

\*        \*        \*        \*        \*        \*        \*

The domestic industry (either via one producer or multiple producers) supplied *** of the 130 domestic wind tower projects completely.  Imported Chinese wind towers supplied *** projects completely and nonsubject sources (***) supplied *** projects in their entirety.  ***.  Twenty projects were supplied by a combination of domestic wind towers and those imported from China, *** were supplied by a combination of domestic wind towers and wind towers from nonsubject sources, and *** projects were supplied by a combination of domestic wind towers and those imported from China and nonsubject countries.  In all, ***.

---

[9] The requested data included the project name, project location, order/RFQ month and year, delivery month and year, the number of towers, megawatts per tower, height of tower (meters), bidder name, bidder location (country or state), initial f.o.b. quote per tower (dollars), final f.o.b. quote per tower (dollars), final f.o.b. quote per tower (dollars per short ton), ocean freight and duties (dollars), inland transport costs (dollars), final delivered cost (dollars), number of towers awarded, services included in bid, and reason(s) for winning/losing bid, including non-price factors.

[10] E-mails from ***.  ***.

[11] ***.

Among the 130 projects, GE submitted usable, comparable pricing data for 24 projects that for which it used both domestically sourced wind towers and those imported from China.[12] [13] These 24 projects accounted for *** units, and account for $*** of purchases.[14]  Comparative delivered costs of these 24 projects are summarized in table V-2.  In 23 of 24 comparisons, the delivered cost of the towers was higher for those supplied from China than those supplied by U.S. producers, with an incremental cost to GE for procuring towers from China of $***.[15]  In *** of the *** comparisons located near the Pacific Coast, the delivered Chinese price was lower than the domestic price; *** in which the Chinese delivered price was lower.  The incremental cost of using imported wind towers on those 24 projects instead of domestic wind towers ranged between negative 2.0 percent (*i.e.*, the Chinese price below the U.S. price) and positive 54.5 percent.  The average incremental cost per imported Chinese tower for projects with installation beginning in 2009 through 2011 was 28.0 percent (***), but decreased to 11.2 percent in 2012 (***).

**Table V-2**
**Wind towers:  Comparisons of GE's delivered costs for domestic and subject product**

\*        \*        \*        \*        \*        \*        \*

Similarly, table V-3 compares the f.o.b. prices for these 24 projects (f.o.b. ex-works price for domestic wind towers and c.i.f. price for imported wind towers).  For these 24 projects, the c.i.f. price of wind towers imported from China was higher in 16 of 24 comparisons, with the incremental cost ranging from negative 12.5 to positive 44.3 percent across all 24 projects.  In total, the incremental cost to GE for procuring towers from China was $*** for the projects, ***.  The average incremental cost per imported Chinese tower for projects with installation beginning in 2009 through 2011 was 28.3 percent, but was negative 2.1 percent in 2012. Respondent foreign producers included a regional incremental analysis, breaking the projects in to Central and Pacific zones.[16]

**Table V-3**
**Wind towers:  Comparisons of GE's domestic producer f.o.b. costs and subject product from China c.i.f. costs**

\*        \*        \*        \*        \*        \*        \*

In the preliminary phase of these investigations, GE presented bid-type data in a different manner. It presented bid data on an f.o.b. basis by different types of towers for various, not specified delivery points.  These data are presented on a product-specific basis in Appendix F.  GE procures manufacturing capacity for a select number of wind tower models.  GE's data cover 18 separate part numbers and up to 14 types of wind towers.[17]  Petitioners argued that the f.o.b. product-specific data are the most relevant data to be used for pricing comparisons because f.o.b. prices are the only prices that are negotiated and

---

[12] For one additional project, ***, GE did not provide complete pricing data; it provided data for only one of the countries.

[13] Data presented in **bold** in table V-1 are projects that were supplied by both domestic and subject sources.

[14] This total does not include nonsubject units and total value is on a delivered basis.

[15] The incremental cost is equal to the number of towers imported from China multiplied by the difference between the cost of those imported towers and the cost of the towers on the same project that were sourced from U.S. producers.

[16] Respondent foreign producers' posthearing brief, pp. 22-35.

[17] Some of the description of the types, however, were extremely similar, ***.

account for the majority of the delivered price.[18]  Respondent Siemens and the respondent foreign producers stated that the correct price to analyze is the delivered price due to the magnitude and the logistical difficulties in arranging delivery.[19] Respondent foreign producers further argued that if delivered prices are not important, domestic producers would not have agreed to build new facilities adjacent to installation sites.[20]

### GE's Estimated Delivered Costs

GE provided estimates of the delivered costs by suppliers of wind towers shipped to Kansas, Oklahoma, Colorado, California, and Oregon for certain suppliers for the projects are presented in table V-4.  These data show that because of high transportation costs, the delivered costs of domestically produced wind towers at locations in the interior of the United States are sometimes lower than those of imported wind towers, even in cases where the Chinese f.o.b. import prices are lower than U.S. producers' ex-works prices.

**Table V-4**
**Wind towers:  GE's estimated landed costs by supplier in specified locations**

\*        \*        \*        \*        \*        \*        \*

### Siemens's Projects

Siemens does not use bidding competition to procure wind towers.  A representative testified that "We do not take bids for towers.  Because of the logistical problems in moving towers and the expense, we always, let me repeat always, try to buy as many towers as we need for a domestic project from a qualified facility closest to the project."[21]  Siemens employs a business model of accepting custom designs and orders, ordering for specific projects, and ordering wind towers only upon completion of a purchase order by a wind farm or utility.[22]  Siemens reported purchase data for 42 wind tower projects with delivery dates starting in 2009.  Table V-5 contains selected data regarding these transactions.

Siemens noted in its purchaser questionnaire response that its "\*\*\*."  \*\*\*.  A representative for Siemens testified at the hearing that it does not quote competitors' prices during its closed bid process.[23]  Petitioners disagreed with this assessment and submitted an e-mail that from Siemens \*\*\*.[24]

The domestic industry (either via one producer or multiple producers) supplied \*\*\* of the 42 domestic wind tower projects completely.  Imported Chinese wind towers supplied \*\*\* projects completely, and imported Vietnamese and nonsubject country wind towers each supplied \*\*\* projects

---

[18] Hearing transcript, p. 62 (Pickard), and Petitioners' posthearing brief, exh. 1, pp. 32-41.

[19] Respondent foreign producers' posthearing brief, pp. 7 and 22-31, and hearing transcript, pp. 197 and 227 (Hazel).

[20] Respondent foreign producers' posthearing brief, p. 7.

[21] Hearing transcript, p. 141 (Hazel).

[22] E-mail from \*\*\*.  Petitioners disagreed with this assessment, contending that these towers are not custom, made-to-order items, but rather consistent model numbers and change with the evolution of technology.  Hearing transcript, pp. 58-59 (DeFrancesco) and 61 (Pickard).  In their posthearing brief, however, Petitioners noted that wind towers are large, made-to-order items (pp. 32-34).

[23] Hearing transcript, pp. 182-83 (Hazel).

[24] Petitioners' posthearing brief, exh. 2.  \*\*\*.  OEMs may pay for the material (steel plates and flanges) themselves and also pay a conversion cost to the wind tower manufacturer.  Petitioners' posthearing brief, exh. 1, p. 4 and respondent Siemens's posthearing brief, p. 20.

completely.  Among the remaining *** projects, the following source combinations supplied the purchased wind towers:  United States and China (2); United States and a nonsubject country (2); United States, Vietnam, and a nonsubject country (1); United States, China, Vietnam, and a nonsubject country (1); China and Vietnam (1); and China and a nonsubject country(1).   Among these 42 projects, there were *** instances where Siemens received pricing quotations that did not end up with the potential supplier receiving any wind tower orders.[25]

In the 17 cases where quotes were received from subject producers and one or more U.S. producers, the Chinese and Vietnamese f.o.b. quotes per unit (at the foreign port) were consistently lower than the U.S. producers' f.o.b. quotes.[26]  However, the Chinese delivered prices were higher in 7 of 10 instances and the Vietnamese delivered prices were higher in 5 of 7 instances.  Comparisons of prices for projects where both domestic and subject product were purchased are detailed in tables V-6 (delivered prices) and V-7 (domestic f.o.b. ex works prices and import c.i.f. prices).  The reasons for awarding bids shown in table V-5 are discussed separately below, by project, for each of the years 2009 through 2012.

**Table V-5**
**Wind towers:  Selected data regarding Siemens' purchases since 2009**

*        *        *        *        *        *        *

**Table V-6**
**Wind towers:  Comparisons of Siemens's delivered costs for domestic and subject product**

*        *        *        *        *        *        *

**Table V-7**
**Wind towers:  Comparisons of Siemens's f.o.b. ex works costs for domestic and c.i.f. costs for subject product**

*        *        *        *        *        *        *

**Projects with 2009 delivery dates**

***.  Details of these *** projects are incorporated into table V-5.

**Projects with 2010 Delivery Dates**

Siemens provided data regarding *** projects, which are incorporated into table V-5.  For  ***.

---

[25] Details of these situations are presented in table V-5.  However, these quotations may be different from what a final price would have been, based on fluctuations in the price of steel, internals, and flanges.  Accordingly, initial quotes for a tower may differ from the final purchase price.  E-mail from ***.  Where possible, final purchase prices are presented in table V-5.

[26] Quotes may not have been received contemporaneously.  Specifically Siemens noted ***. ***.  Data presented in **bold** in table V-5 are projects that were supplied by both domestic and subject sources.

**Projects with 2011 Delivery Dates**

Siemens provided data regarding *** projects with deliveries beginning in 2011.  These data are presented in table V-5. For ***.

\*        \*        \*        \*        \*        \*        \*

**Projects with 2012 Delivery Dates**

Siemens provided data regarding *** projects with deliveries beginning in 2012.  These data are incorporated into table V-5.  ***.

\*        \*        \*        \*        \*        \*        \*

**Other Purchasers' Projects**

Data for three other smaller purchasers (***) are presented in table V-8.  One other purchaser, ***, noted that it did purchase *** U.S.-produced wind towers since 2009, however, ***.[27]

Presented in table V-8 are selected data for the projects of the three smaller purchasers.

**Table V-8**
**Wind towers: Selected data regarding smaller purchasers' purchases since 2009**

\*        \*        \*        \*        \*        \*        \*

**LOST SALES AND LOST REVENUES**

The petitioning firms did not provide sufficient detailed information for staff to investigate specific lost sales or lost revenue allegations.  They asserted, however, that they lost to imports from China and Vietnam.[28]  ***.

At the conference and in their postconference brief, Petitioners alleged losing a major sale known as the Shepherds Flat project, a wind farm by GE which required 338 wind towers.  Petitioners argued that U.S. producers were substantially underbid by Chinese producers.

GE ***.[29]   According to GE, ***.

---

[27] ***.

[28] Petition, p. 44.

[29] Brief written statement by *** dated January 24, 2012.

# PART VI: FINANCIAL EXPERIENCE OF THE U.S. PRODUCERS

## BACKGROUND

Five U.S. producers reported usable financial results on their operations on wind towers.[1]  U.S. producers reflect a range of organizational structures with wind tower activity generally representing one among several business segments.[2]  As outlined previously in Part III of this report, the operations of the U.S. wind tower industry during the period examined reflect a number of changes:  the entry of a new U.S. producer, the addition of new plants and/or capacity to existing operations, related start-up activity, acquisition/merger, the introduction of new/larger tower designs, reduced plant operations/idling, and decisions to redeploy capacity and/or exit the wind tower market entirely.  The extent to which these changes are reflected in the U.S. industry's financial results is discussed below.

## OPERATIONS ON WIND TOWERS

The income-and-loss data for operations on wind towers are divided into two categories:  commercial sales only (table VI-1) and commercial sales and transfers/internal consumption (table VI-2) (see footnote 1).  Table VI-3 presents selected company-specific financial information.  Variance analyses of the financial results of wind tower operations (commercial sales only and commercial sales and transfers/internal consumption) are presented in table VI-4 and table VI-5, respectively.[3]

---

[1] All U.S. producers reported on the basis of generally accepted accounting principles ("GAAP") with annual financial results reported for calendar-year periods.  \*\*\*.  USITC auditor notes (final).

Vestas Towers, which began U.S. wind tower production in 2010, is the only U.S. producer whose overall operations are vertically integrated.  As noted in Part III of this report, \*\*\*.  January 24, 2012 e-mail with attachments from counsel for Vestas Towers to USITC auditor.

Trinity and Vestas Towers were selected for verification and notified on November 1, 2012.  Trinity's verification was conducted on December 10-11, 2012, with changes pursuant to verification reflected in this and other affected sections of the final staff report.  Staff verification report, Trinity, pp. 2-3.  In response to staff's e-mail regarding its selection for verification, counsel for Vestas Towers informed staff that the company declined to be verified.  November 6, 2012 e-mail from counsel for Vestas Towers to USITC auditor.  Because Vestas Towers' financial results for its captive production cannot be verified, staff has presented the industry's financial results using the following formats:  commercial sales only, which includes all U.S. producers except Vestas Towers, and commercial sales and transfers/internal consumption, which also includes the captive production of Vestas Towers.  This format is also presented in table C-2.

[2] Based on public financial information, Broadwind's overall operations consist of three reportable segments:  Towers, Gearing, and Services.  Broadwind 2011 10-Q (Q3), p. 14.  The parent company of DMI (Otter Tail Corp.) is made up of six reportable segments:  Electric, Wind Energy, Manufacturing, Construction, Plastics, and Health Services.  Otter Tail 2011 10-Q (Q3), p. 11.  Trinity's overall operations consist of five reportable segments:  the Rail Group, the Construction Products Group, the Inland Barge Group, the Energy Equipment Group, and the Railcar Leasing and Management Services Group.  Trinity 2011 10-Q (Q3), p. 8.

[3] The Commission's variance analysis is calculated in three parts:  sales variance, COGS variance, and sales, general and administrative ("SG&A") expenses variance.  Each part consists of a price variance (in the case of the sales variance) or a cost variance (in the case of the COGS and SG&A variances) and a corresponding volume (quantity) variance.  The sales or cost variance is calculated as the change in unit price/cost times the new volume, while the volume variance is calculated as the change in volume times the old unit price/cost.  Summarized at the bottom of the variance analysis table, the price variance is from sales, the net cost/expense variance is the sum of those items from COGS and SG&A, respectively, and the net volume variance is the sum of the sales, COGS, and SG&A volume variances.  Since a stable overall product mix enhances the utility of the Commission's variance analysis, it should be noted that wind tower product mix, as indicated in the <u>Revenue</u> section of this part of the

(continued...)

**Table VI-1**
**Wind towers (commercial sales only):  Results of operations, 2009-11, January-June 2011, and January-June 2012**

       *  *  *  *  *  *  *

### Revenue

  As shown in table VI-1, commercial sales only revenue declined between 2009 and 2010 followed by an increase in 2011.[4]  The *** increase in commercial sales and transfers/internal consumption (table VI-2) in 2011 reflects Vestas Towers' transition from start-up operations in 2010 to more full-scale operations.[5]  With the exception of Trinity, which reported ***,[6] the company-specific pattern of sales volume generally followed the same directional trend during the full-year period, but was mixed during the interim period.[7]  Notwithstanding similarities in directional trend, the magnitude of period-to-period changes in company-specific sales volume varied; e.g., the *** increase in sales volume

---

[3](...continued)
report, was not static during the period.  Also and while indicating that average values (i.e., a primary factor in the Commission's variance analysis) have probative value, Petitioners noted in their postconference brief that average values should be interpreted with caution and that "{d}ue to the limited number of units sold, significant differences in per-unit values for sales, costs, and expenses can emerge due to product mix (e.g., tower height, power rating), shipment timing (when contracted, when shipped), and differences in circumstances of sale."  Petitioners' postconference brief, Exh. 1, pp. 26-27.  With respect to the variance analysis of commercial sales and transfers/internal consumption (table VI-5), variances for 2009-11 and 2009-10 are not presented due to the entry of Vestas Towers in 2010 and its impact on the continuity of period-to-period volume and average values/costs.

[4] Wind tower revenue is recognized primarily when wind tower production is completed and title has transferred to the customer.  January 24, 2012 e-mail with attachments from counsel for Vestas Towers to USITC auditor.  Petitioners' postconference brief, Exh. 1, p. 26.  ***.  Ibid.

 While the majority of reported wind tower sales, regardless of revenue recognition method, reflects the value of the entire wind tower, a portion of ***.  January 24, 2012 e-mail with attachments from counsel for Petitioners to USITC auditor.  ***.  Trinity response to U.S. producer questionnaire, question II-5.  ***.

[5] Unlike the other U.S. producers, whose revenue primarily reflects sales to unrelated turbine manufacturers, ***.  January 24, 2012 e-mail with attachments from counsel for Vestas to USITC auditor.  In response to a transfer-valuation question raised by staff during the final phase of these investigations, Vestas Towers stated that ***.  October 29, 2012 e-mail with attachments from Vestas Towers to USITC auditor.

[6] Consistent with its pattern of sales volume reported in table VI-3, Trinity's second quarter 2012 10-Q stated that "{o}rders for structural wind towers have been slow since mid-2008 when energy development companies encountered tightened credit markets, lower demand for electricity, and heightened competition arising from declining natural gas prices and imports from foreign manufacturers."  Trinity 2012 10-Q (Q2), p. 24.

[7] In addition to other factors affecting the pattern of overall wind tower revenue, the relevant segment revenue of Broadwind, DMI (parent company Otter Tail Corp.), and Trinity were all reportedly impacted to varying degrees by lower wind tower sales/production levels in 2010.  Broadwind 2010 10-K, p. 31.  Otter Tail 2010 10-K, p. 47.  Trinity 2010 10-K, p. 27.  Similarly, higher reported wind tower sales/production volume in 2011 is consistent with relevant segment results and other public information.  Otter Tail 2011 10-K, p. 45.  Broadwind 2011 10-K, p. 32.  The mixed pattern of sales volume in interim 2012 compared to interim 2011 is also generally consistent with segment information:  (increasing sales volume) Otter Tail 2012 10-Q (Q2), p. 39; (decreasing sales volume) Broadwind 2012 10-Q (Q2), p. 24 and Trinity 2012 10-Q (Q2), p. 28.

**Table VI-2**
**Wind towers (commercial sales and transfers/internal consumption):  Results of operations, 2009-11, January-June 2011, and January-June 2012**

| Item | Fiscal year | | | January-June | |
|---|---|---|---|---|---|
| | 2009 | 2010 | 2011 | 2011 | 2012 |
| Quantity (*towers*) | | | | | |
| Total net sales quantity | *** | *** | 2,072 | 969 | 1,092 |
| Value (*$1,000*) | | | | | |
| Total net sales value | *** | *** | 766,495 | 307,139 | 470,754 |
| Cost of goods sold: | | | | | |
|   Raw materials | *** | *** | 475,726 | 193,197 | 323,934 |
|   Direct labor | *** | *** | 75,855 | 38,363 | 43,144 |
|   Other factory costs | *** | *** | 135,499 | 69,267 | 76,316 |
|     Total cost of goods sold | *** | *** | 687,080 | 300,827 | 443,394 |
| Gross profit or (loss) | *** | *** | 79,415 | 6,312 | 27,360 |
| Total SG&A expenses[1] | *** | *** | 65,286 | 28,774 | 70,751 |
| Operating income or (loss) | *** | *** | 14,129 | (22,462) | (43,391) |
| Interest expense | *** | *** | 15,894 | 7,864 | 9,624 |
| Other expenses[2] | *** | *** | (84) | (23) | (258) |
| Other income items | *** | *** | 2,149 | 718 | 736 |
| Net income or (loss) | *** | *** | 468 | (29,585) | (52,021) |
| Depreciation/impairment | *** | *** | 38,041 | 20,036 | 17,893 |
| Estimated cash flow from operations | *** | *** | 38,509 | (9,549) | (34,128) |
| Ratio to net sales (*percent*) | | | | | |
| Raw material | *** | *** | 62.1 | 62.9 | 68.8 |
| Direct labor | *** | *** | 9.9 | 12.5 | 9.2 |
| Other factory costs | *** | *** | 17.7 | 22.6 | 16.2 |
|   Cost of goods sold | *** | *** | 89.6 | 97.9 | 94.2 |
| Gross profit or (loss) | *** | *** | 10.4 | 2.1 | 5.8 |
| SG&A expenses[1] | *** | *** | 8.5 | 9.4 | 15.0 |
| Operating income or (loss) | *** | *** | 1.8 | (7.3) | (9.2) |
| Net income or (loss) | *** | *** | 0.1 | (9.6) | (11.1) |

Table continued on next page.

**Table VI-2--*Continued***
**Wind towers (commercial sales and transfers/internal consumption):  Results of operations, 2009-11, January-June 2011, and January-June 2012**

| Item | Fiscal year | | | January-June | |
|---|---|---|---|---|---|
| | **2009** | **2010** | **2011** | **2011** | **2012** |
| **Ratio to cost of goods sold (*percent*)** | | | | | |
| Raw material | *** | *** | 69.2 | 64.2 | 73.1 |
| Direct labor | *** | *** | 11.0 | 12.8 | 9.7 |
| Other factory costs | *** | *** | 19.7 | 23.0 | 17.2 |
| **Unit value (*dollars per tower*)** | | | | | |
| Total net sales[3] | *** | *** | 369,930 | 316,965 | 431,093 |
| Cost of goods sold: | | | | | |
|   Raw material | *** | *** | 229,597 | 199,378 | 296,643 |
|   Direct labor | *** | *** | 36,610 | 39,590 | 39,509 |
|   Other factory costs | *** | *** | 65,395 | 71,483 | 69,886 |
|     Total cost of goods sold | *** | *** | 331,602 | 310,451 | 406,038 |
| Gross profit or (loss) | *** | *** | 38,328 | 6,514 | 25,055 |
| SG&A expenses[1] | *** | *** | 31,509 | 29,695 | 64,790 |
| Operating income or (loss) | *** | *** | 6,819 | (23,181) | (39,735) |
| **Number of producers reporting** | | | | | |
| Operating losses | *** | *** | 3 | 4 | 3 |
| Data | *** | *** | 5 | 5 | 5 |

[1] DMI's impairment of its U.S. wind tower manufacturing facilities is included in interim 2012 SG&A expenses (see footnote 35).

[2] Broadwind's $13.3 million impairment charge in fourth quarter 2010, which was specifically related to the company's Brandon, SD plant (Broadwind 2010 10-K, p. 15), is reported in the "other expenses" line item of this table (see footnote 41).

[3] Average values between 2009 and 2010 are less directly comparable since Vestas Towers did not have U.S. wind tower production operations in 2009.

Source:  Compiled from data submitted in response to Commission questionnaires.

between 2010-11 was reported by *** (*** percent) and by *** (*** percent) in interim 2012 compared to interim 2011.[8]

    As also shown in table VI-3 and with respect to producers with operations during the relevant periods, the majority of U.S. producers reported the same directional trend in average sales value: negative between 2009-10 and then positive between 2010-11 and interim 2011-12.  As described by U.S. producers, the pattern of company-specific changes in average sales value, in part, reflects variations in

---

[8] *** with public information describing increases in the company's wind tower sales activity in 2011 and interim 2012.  *Katana Summit rebounds* (article dated August 11, 2011), The Columbus Telegram, retrieved at columbustelegram.com on August 2, 2012.  *Unknowns buffet wind industry* (article dated April 22, 2012), The World-Herald, retrieved at omaha.com on August 2, 2012.  As noted previously and with respect to the pattern of its sales volume, Vestas Towers began U.S. wind tower operations in 2010.

**Table VI-3**
**Wind towers (commercial sales and transfers/internal consumption):  Results of operations, by firm, 2009-11, January-June 2011, and January-June 2012**

*        *        *        *        *        *        *

**Table VI-4**
**Wind towers (commercial sales only):  Variance analysis of financial results, 2009-11, January-June 2011, and January-June 2012**

*        *        *        *        *        *        *

product mix, as well as changes in primary input costs.[9]  ***, which reported a *** in its interim 2012 average sales value compared to interim 2011, largely attributed this pattern to an increase in ***, as well as a shift in product mix to taller towers.[10]  Similarly, ***, which also reported *** in its average sales value, indicated that this pattern, at least in part, reflects a shift in product mix as the company produced/sold taller *** meter towers after reportedly being priced out of the *** meter tower market by subject imports.[11]  *** also attributed changes in its average sales value to product mix, as well as changes in underlying prices in order to pass through higher raw material costs.[12]  In addition to noting that its prices were impacted by subject imports, *** stated that its averages sales value was impacted by both OEM designs and changes in the cost of important inputs such as steel.  By way of example, ***.[13]

### Cost of Goods Sold and Gross Profit or (Loss)

As described previously in this report, while discrete steel plate represents the single most important wind tower raw material cost, raw materials also include other items such as forgings, electrical and mechanical components, and paint.[14]  During the period examined and with respect to commercial sales only (see table VI-1), the cost of raw materials ranged from a low of *** percent of total COGS in 2010 to a high of *** percent in both 2009 and interim 2012.[15]  As shown in both table VI-1 and table VI-2, average raw material cost and sales value shared the same directional trend which, at least in part,

---

[9] See, e.g., Broadwind's 2010 10-K which states that "{t}he decrease in revenues was primarily attributable to an 18% decline in our Towers' segment revenue due mainly to a reduction in the price of the steel component included in the overall tower section price compared to the prior year."  Broadwind 2010 10-K, p. 29.

[10] ***.

[11] October 24, 2012 *** response to USITC auditor follow-up questions.

[12] October 31, 2012 *** response to USITC auditor follow-up questions.

[13] October 24, 2012 *** response to USITC auditor follow-up questions.

[14] Conference transcript, p. 24, pp. 25-26, p. 27 (Janda).

[15] Inclusive of Vestas Towers (see table VI-2), raw material costs ranged from *** percent of total COGS in interim 2011 to *** percent of total COGS in interim 2012.  For the period it had operations, Vestas Towers reported the ***.  Vestas Towers U.S. producer questionnaire, responses to III-7 and III-8.  ***.  Staff verification report, Trinity, pp. 7-8.

VI-5

**Table VI-5**
**Wind towers (commercial sales and transfers/internal consumption):  Variance analysis of financial results, 2009-11, January-June 2011, and January-June 2012**

| Item | Fiscal year | | | Jan.-June |
|---|---|---|---|---|
| | **2009-11** | **2009-10** | **2010-11** | **2011-12** |
| *Value ($1,000)* | | | | |
| Total net sales: | | | | |
| Price variance | (¹) | (¹) | *** | 124,628 |
| Volume variance | (¹) | (¹) | *** | 38,987 |
| Total net sales variance | (¹) | (¹) | *** | 163,615 |
| Cost of sales: | | | | |
| Raw materials: | | | | |
| Cost variance | (¹) | (¹) | *** | (106,214) |
| Volume variance | (¹) | (¹) | *** | (24,523) |
| Net raw material variance | (¹) | (¹) | *** | (130,737) |
| Direct labor: | | | | |
| Cost variance | (¹) | (¹) | *** | 89 |
| Volume variance | (¹) | (¹) | *** | (4,870) |
| Net direct labor variance | (¹) | (¹) | *** | (4,781) |
| Other factory costs: | | | | |
| Cost variance | (¹) | (¹) | *** | 1,743 |
| Volume variance | (¹) | (¹) | *** | (8,792) |
| Net other factory cost variance | (¹) | (¹) | *** | (7,049) |
| Net cost of sales: | | | | |
| Cost variance | (¹) | (¹) | *** | (104,382) |
| Volume variance | (¹) | (¹) | *** | (38,185) |
| Total net cost of sales variance | (¹) | (¹) | *** | (142,567) |
| Gross profit variance | (¹) | (¹) | *** | 21,048 |
| SG&A expenses: | | | | |
| Expense variance | (¹) | (¹) | *** | (38,325) |
| Volume variance | (¹) | (¹) | *** | (3,652) |
| Total SG&A variance | (¹) | (¹) | *** | (41,977) |
| Operating income variance | (¹) | (¹) | *** | (20,929) |
| Summarized as: | | | | |
| Price variance | (¹) | (¹) | *** | 124,628 |
| Net cost/expense variance | (¹) | (¹) | *** | (142,706) |
| Net volume variance | (¹) | (¹) | *** | (2,851) |

¹ Vestas Towers began U.S. wind tower operations in 2010.  Given the impact on the continuity of period-to-period sales volume and corresponding average sales values and costs/expenses, variances for 2009-11 and 2009-10 are not presented in this table.

Source:  Compiled from data submitted in response to Commission questionnaires.

JA 000381

reflects provisions for the pass-through of raw material costs.[16] [17]  However, changes in product and sales mix, such as ***, as noted above, also impacted average sales value and corresponding raw material costs.  As described in footnote 24, the increase in ***'s 2011 raw material cost also includes ***.

Other factory costs and direct labor are the second and third largest components of COGS, respectively.  During the period examined and with respect to commercial sales only (table VI-1), other factory costs ranged from a low of *** percent of total COGS in 2009 to a high of *** percent in 2010, while direct labor ranged from a low of *** percent in 2009 to a high of *** percent in interim 2011.[18] With regard to company-specific average direct labor costs, ***.  As shown in table VI-3, however, Vestas Towers reported a *** in interim 2011 which the company, in part, attributed to the timing/flow of operations in the first and second-half of that year.[19]

Notwithstanding differences in product and sales mix, as well as changes in underlying costs, the directional trend of company-specific average other factory costs (positive and negative) was generally consistent with corresponding increases and decreases in sales/production volume; e.g., ***.[20]

Period-to-period changes in the level of average other factory costs also reflect events/activity that occurred both prior to and during the period examined:  DMI, Katana, and Trinity, which added new facilities during 2008 (DMI (Tulsa, OK), Katana (Columbus, NE), Trinity (Newton, IA)), reported *** in 2009 (see table VI-3).[21] [22]  In contrast, Broadwind began start-up operations at a new plant in Abilene, TX

---

[16] Conference transcript, p. 64 (Cole).  With regard to volatility in steel input costs in general during the period, Trinity stated in its 2011 10-K that "{w}e often use contract-specific purchasing practices, existing supplier commitments, contractual price escalation provisions, and other arrangements with our customers, to mitigate the effect of this volatility on our operating profits for the year."  Trinity 2011 10-K, p. 7.  DMI's parent company stated in its 2010 10-K that it " . . . attempts to mitigate the risk of increases in steel costs by pricing contracts to recover the cost of steel purchased to meet contract requirements at initiation of the contract."  Otter Tail 2010 10-K, p. 23.

[17] With regard to the purchase of raw materials, petitioners' postconference brief provided the following description for the petitioning companies:  ***.  Petitioners' postconference brief, Exh. 1, pp. 27-28.

[18] Inclusive of Vestas Towers (see table VI-2), the trend is somewhat different which, to a large extent, appears to reflect Vestas Towers' increasing production and sales volume as the company transitioned from start-up operations in 2010 to more full-scale operations in 2011 and interim 2012.  As shown in table VI-2, other factory costs ranged from *** percent of total COGS in interim 2012 to *** percent of total COGS in 2010, while direct labor ranged from *** percent of total COGS in interim 2012 to *** percent in interim 2011.

[19] As described by Vestas Towers, ***.  October 29, 2012 e-mail with attachments from counsel for Vestas Towers to USITC auditor.

[20] Staff notes that "other factory costs" represent a combination of fixed, variable, and mixed (semi-fixed/semi-variable) costs which differ by company based on factors such as manufacturing operations, product mix, and company-specific accounting choices regarding cost assignment.  At the staff conference, wind tower production operations were described as highly capital intensive (conference transcript, p. 31 (Barczak)) which generally indicates that, all things being equal, it is reasonable to expect that changes in capacity utilization and corresponding fixed cost absorption will have a discernible impact on the overall level of average other factory costs.  As indicated in footnote 28, ***.

[21] See Part III for more detail regarding the specific plants operated by each U.S. producer and their disposition during the period examined.  In late 2009, Katana reportedly expanded the Columbus, NE plant.  Operations at Katana's other plant, located in Ephrata, WA, reportedly fluctuated and the plant itself appears to have been effectively idled during parts of the period examined.  Petitioners' postconference brief, Exh. 4 (Katana affidavit), p. 2.  Public information indicates that during interim 2012 activity at the Ephrata, WA plant increased somewhat. *Katana Hiring Workers in Ephrata*, Columbia Basin Herald (article dated January 29, 2012), retrieved at columbiabasinherald.com on August 2, 2012.

[22] ***.  Staff verification report, Trinity, p. 4.  ***.  Staff verification report, Trinity, p. 3.

in 2009 and, as shown in table VI-3, the company's average other factory costs in that year was *** of the period.[23]  Vestas Towers, which began operations in 2010, reported its *** average other factory costs in that year which is generally consistent with start-up operations. ***.[24] [25]  The subsequent ***, in large part, explains the *** in the company's gross profitability in interim 2012.[26]  In addition to the presumed impact of *** in sales volume, the *** of Trinity's average other factory costs in 2011 and interim 2012 also reflects transition issues related to the production of larger wind towers.[27] [28]  Similarly, and in addition to *** in Broadwind's average other factory costs in interim 2012 in part reflects inefficiencies

---

[23] In its 2009 10-K and with respect to its 2009 Tower segment operating results, Broadwind specifically notes production inefficiencies, as well as increased travel and administrative expenses of approximately $3.4 million associated with the start-up of its Abilene, TX facility.  Broadwind 2009 10-K, p. 32.  While construction of Broadwind's Brandon, SD plant began in 2008 and was completed in early 2010, other factory costs specific to this plant (or COGS in general) are not reflected in the company's financial results because Broadwind did not commission this plant (see footnote 41 regarding Broadwind's impairment related to this facility).

[24] ***.  January 24, 2012 e-mail with attachments from counsel for Petitioners to USITC auditor.  ***.  Ibid.  According to an article which described the latter issue, "{i}n December {2010}, the two companies {DMI and Evraz (the steel plate supplier)} allegedly entered into an agreement for Evraz to supply more than 14,300 tons of steel plate to DMI by early January {2011} . . . DMI needed the steel by mid-February to fill an order for 85 wind towers for the unnamed customer . . . DMI alleges that Evraz failed to fulfill the order, forcing it to buy steel from other sources for $1.4 million more than it would have paid Evraz."  *Evraz NA sued by wind tower manufacturer*, Metal Bulletin Daily, March 4, 2011, issue 252.

[25] The ***, as indicated in table VI-3, is generally consistent with the description of the Wind Energy segment financial results in that year.  As described by DMI's parent company,  ". . . our manufacturer of wind towers, recorded increased costs in the first half of 2011 related to productivity losses due to rework and underutilization of plant capacity and outsourced quality control costs and a $3.1 million pre-tax asset impairment charge related to the idling of its Fort Erie, Ontario plant in the fourth quarter of 2011.  DMI's operating loss for the second half of 2011, including the $3.1 million asset impairment charge, was $8.3 million less than in the second half of 2010.  The reduction in operating losses for the comparable six-month periods was the result of improved productivity, stabilized production, more efficient resource allocation and elimination of the need for outsourced quality assurance staffing."  Otter Tail 2011 10-K, p. 42 (emphasis added).  ***.  October 31, 2012 DMI response to USITC auditor follow-up questions.

[26] As described by its parent company and with respect to first half 2012, "{r}evenues at DMI's U.S. plants increased $33.1 million due to a 13.9% increase in towers produced at those facilities, while cost of goods sold increased by only $19.7 million at those locations as a result of productivity improvements, cost controls and the implementation of quality control measures that eliminated the need for outsourced quality assurance staffing."  Otter Tail 2012 10-Q (Q2), p. 39.

[27] Describing its Energy Equipment Group segment, Trinity's 2011 10-K states "{o}perating profit for the year ended December 31, 2011 decreased compared to the same period in 2010 primarily due to transition issues arising from changes in product mix in the structural wind towers business as well as competitive pricing on structural wind towers, partially offset by increased operating profit in other product lines.  Trinity 2011 10-K, p. 28.  Similarly, Trinity's 2012 first half 10-Q also refers to these factors when describing lower operating profit for first half 2012 compared to first half 2011.  Trinity 2012 10-Q (Q2), p. 28.

[28] As described by Trinity, ***.  October 24, 2012 Trinity response to USITC auditor follow-up questions.  ***.  Staff verification report, Trinity, p. 8.  Petitioners' posthearing brief, Exhibit 1, p. 80.  ***.  Staff verification report, Trinity, p. 5, p. 8.

***.  Ibid.

related to new tower designs.[29]  As described by Broadwind, ***.[30]  Katana, which reported *** in average other factory costs in interim 2012 compared to interim 2011, explained that ***.[31]

Table VI-3 shows that, while company-specific directional trends of average sales value and raw material costs generally followed the same pattern, the magnitude of company-specific change varied such that the ratio of average raw material costs to net sales value increased during the period for most producers.  At the gross margin level and when considering both commercial sales only (table VI-1) and commercial sales and transfers (table VI-2), the overall increase in the ratio of raw material costs to net sales value is an important factor explaining the overall decline in the industry's overall gross profit during the period.[32]

On a company-specific basis, the pattern of other factory costs (positive and negative) noted above also impacted gross profitability.  For example, and unlike other producers with commercial sales only, the *** gross profit margin in interim 2012 appears to be linked to the decline in the company's average other factory costs.  In contrast, while *** gross profit margin at the end of the period in part reflects a reduced level of higher margin fabrication-only sales.[33]  Although Trinity's gross profit margin ***.[34]

### SG&A Expenses and Operating Income or (Loss)

When considering commercial sales only (see table VI-1), the industry's overall SG&A expense ratio (i.e., total SG&A expenses divided by net sales) remained within a relatively narrow range throughout the period until interim 2012 when it reached its highest level.  This peak *** DMI's

---

[29] Broadwind 2012 10-Q (Q2), p. 24.  Similarly, Broadwind's 2011 10-K indicated that start-up inefficiencies related to the production of new tower designs in 2011 negatively impacted costs and corresponding profitability in that year.  Broadwind 2011 10-K, p. 32.

[30] October 25, 2012 Broadwind response to USITC auditor follow-up questions.  With regard to other operational changes at the end of the period, Broadwind's first half 2012 10-Q states that "{d}uring 2012 a portion of the Company's tower capacity has been shifted to support the growing demand for specialty weldments."  Broadwind 2012 10-Q (Q2), p. 14.  With regard to how this redeployment of capacity impacted Broadwind's reported financial results, the company stated that ***.  October 25, 2012 Broadwind response to USITC auditor follow-up questions.

[31] October 24, 2012 Katana response to USITC auditor follow-up questions.

[32] As indicated in the note to table VI-3, changes in the relative share of tolling activity also impacted the ratio of raw material costs to total sales value.

[33] As described in Broadwind's first half 2012 10-Q "{t}he decrease in {overall consolidated} gross profit was primarily attributable to a decline in Towers and Weldments gross profit due to the lack of higher margin fabrication-only towers in the current quarter. . ."  Broadwind 2012 10-Q (Q2), p. 21.

While Broadwind reported ***.  With regard to why fabrication-only sales are more profitable in general, Broadwind explained that ***.  October 25, 2012 Broadwind response to USITC auditor follow-up questions.

[34] Staff verification report, Trinity, p. 8.

impairment of its U.S. manufacturing operations.[35]  In contrast, and when considering commercial sales and transfers (see table VI-2), the pattern of SG&A expenses was more variable.[36]

Table VI-3 shows that company-specific SG&A expense ratios fluctuated during the period and, in some cases, directly reflect events/actions described above.  For example, the ***.[37]  In contrast, Broadwind's *** SG&A expense ratio in interim 2012 largely reflects ***.[38]  With regard to its 2010 SG&A expense ratio, Katana stated that ***.[39]

With the exception of interim 2012 (see footnote 35), overall SG&A expense ratios associated with operations on commercial sales only (table VI-1) remained within a relatively narrow range.  This limited variability for most of the period indicates that SG&A expenses, in general, played a secondary role in terms of explaining changes in wind tower operating income or (loss).

---

[35] See Part III of this report regarding the planned disposition of DMI's U.S. manufacturing assets.  With regard to the interim 2012 impairment, the first half 2012 10-Q of DMI's parent company states that "{t}he market value for DMI's assets has been significantly impacted by reduced demand for wind towers due to adverse market conditions affecting the industry, including uncertainty regarding renewal or extension of the Federal Production Tax Credit (PTC) for investments in renewable energy resources, which is set to expire at the end of 2012.  Based on the Company's second quarter 2012 decision to divest DMI's assets and the price for the fixed assets agreed to in the nonbinding letter of interest {with Trinity}, DMI recorded a noncash asset impairment charge of $45.6 million ($27.5 million net-of-tax) . . ."  Otter Tail 2012 10-Q (Q2), p. 10.

DMI provided the following information regarding the decision to sell its U.S. wind tower operations and how its reported financial results were impacted:  ***.  October 31, 2012 DMI response to USITC auditor follow-up questions.

Similarly, Katana was asked to indicate the extent to which its decision to sell its operations is reflected in its wind tower financial results.  In response, Katana stated ***.  October 24, 2012 Katana response to USITC auditor follow-up questions.

[36] ***.

[37] With regard to other company-specific events/actions which may have impacted the level of reported SG&A expenses, Trinity's first half 2012 10-Q states " . . {a}s of June 30, 2012, the backlog for structural wind towers was approximately $817.4 million compared to approximately $916.5 million as of June 30, 2011.  Approximately $412.5 million of this backlog is subject to litigation with a structural wind tower consumer for the customer's breach of a long-term supply contract for the manufacture of towers." Trinity 2012 10-Q (Q2), p. 28.  In response to a question regarding the extent to which the above-referenced contract dispute is reflected in its wind tower financial results, Trinity stated that ***.  October 24, 2012 Trinity response to USITC auditor follow-up questions.

[38] As described by Broadwind, ***.  October 25, 2012 Broadwind response to USITC auditor follow-up questions.

[39] January 24, 2012 e-mail with attachments from counsel for Petitioners.  See also footnote 40.

VI-10

**Non-Recurring Items**

As described above, U.S. producers reported non-recurring items which impacted the industry's financial results at both the gross and operating level.[40]  Below operating income or (loss), however, the only substantial non-recurring item was Broadwind's $13.3 million impairment charge related to its Brandon, SD plant.[41]  As presented in table VI-1 and table VI-2, this non-recurring charge accounts for *** of the industry total "other expenses" in 2010.

## CAPITAL EXPENDITURES AND RESEARCH AND DEVELOPMENT EXPENSES

Data on capital expenditures and research and development ("R&D") expenses related to operations on wind towers are presented in table VI-6.[42]

Consistent with expansion activity previously noted, most U.S. producers reported larger capital expenditures prior to the period examined.  In contrast, the *** level of Vestas Towers' capital expenditures in 2009 reflects the construction of the company's wind tower plant in Pueblo, CO.

As shown in table VI-6, while several U.S. producers reported R&D expenses, *** accounted for the majority.  As described by ***, R&D expenses were focused primarily on manufacturing-related improvements.[43]  Similar to ***.

---

[40] In response to Commissioner Pearson's hearing question regarding the extent to which liquidated damages were included in the industry's financial results, ***.  Petitioners' posthearing brief, Exhibit 1, pp. 68-69.

At the hearing, Commissioner Pinkert asked Petitioners to indicate the extent to which non-recurring charges unrelated to subject imports impacted the industry's financial results.  In response and with respect to items specifically impacting operating results, Petitioners stated that ***.  Petitioners' posthearing brief, Exhibit 1, pp. 62-63.  (See also footnote 24).  On a pro forma basis, which only impacts 2010 and 2011 (full-year and interim period), the U.S. industry's operating income margins would be as follows if the above-referenced items were eliminated:

| Item | | Calendar year | | Jan.-June | Jan.-June |
|---|---|---|---|---|---|
| | 2009 | 2010 | 2011 | 2011 | 2012 |
| Operating income or (loss): | | Ratio to net sales (*percent*) | | | |
| Commercial sales only | *** | *** | *** | *** | *** |
| Commercial sales and transfers/internal cons. | *** | *** | *** | *** | *** |

[41] With regard to this impairment, Broadwind stated in its 2010 10-K that "{i}n the first quarter of 2010, we completed construction of a third wind tower manufacturing facility in Brandon, South Dakota, but as of the date hereof, we have not commenced production at this facility.  Following the Company's strategic planning meetings that took place in the fourth quarter of 2010, we determined that due to the oversupply of capacity in the U.S. tower market and the significant level of towers imported from Asia, it would be difficult or impossible to operate this facility in a profitable or cost-effective manner.  We are currently exploring alternative uses for the building and equipment comprising this facility.  In connection with this determination, during the fourth quarter of 2010, we recorded an impairment charge of $13.3 million."  Broadwind 2010 10-K, p. 15.

***.  Petitioners' postconference brief, Exh. 4 (Broadwind affidavit) pp. 1-2.

[42] As reported by U.S. producers with commercial sales only, wind tower assets increased marginally from *** in 2009 to *** in 2011.  For commercial sales and transfers/internal consumption, wind tower assets increased from *** in 2009 to *** in 2011.

[43] ***.  January 24, 2012 e-mail with attachments from counsel for Petitioners to USITC auditor.

***.  Ibid.

***.

**Table VI-6**
**Wind towers:  Capital expenditures and R&D expenses, 2009-11, January-June 2011, January-June 2012**

              \*       \*       \*       \*       \*       \*       \*

\*\*\*.[44]

      In the final-phase U.S. producer questionnaire, U.S. producers were asked to describe the development of new wind tower production facilities in terms of total time and cost required to build a wind tower plant, the impact of plant location, and factors considered when selecting plant location. Their responses are presented below.

Broadwind    \*\*\*.
DMI       \*\*\*.
Katana     \*\*\*.
Trinity      \*\*\*.
Vestas Towers  \*\*\*.

      In response to hearing questions regarding capacity from Commissioner Aranoff, Commissioner Johanson, and Commissioner Pinkert, Petitioners provided additional information regarding time and investment requirements to establish/restart wind tower operations.[45]  \*\*\*.[46] \*\*\*.

## CAPITAL AND INVESTMENT

      The Commission requested that U.S. producers describe any actual or anticipated negative effects of imports of wind towers from China or Vietnam on their firms' growth, investment, ability to raise capital, existing development and production efforts (including efforts to develop a derivative or more advanced version of the product), or the scale of capital investments.  The U.S. producers' responses are presented below.

### Actual Negative Effects

Ameron     \*\*\*.[47]
Broadwind    \*\*\*.
DMI       \*\*\*.
Katana     \*\*\*.
Trinity      \*\*\*.
Vestas Towers  \*\*\*.

### Anticipated Negative Effects

Ameron     \*\*\*.[48]
Broadwind    \*\*\*.
DMI       \*\*\*.
Katana     \*\*\*.
Trinity      \*\*\*.
Vestas Towers  \*\*\*.

---

[44] October 25, 2012 Broadwind response to USITC auditor follow-up questions.

[45] Petitioners posthearing brief, Exhibit 1, pp. 20-23.

[46] Staff verification report, Trinity, p. 4.

[47] \*\*\*.

[48] \*\*\*.

# PART VII:  THREAT CONSIDERATIONS AND INFORMATION ON NONSUBJECT COUNTRIES

Section 771(7)(F)(i) of the Act (19 U.S.C. § 1677(7)(F)(i)) provides that—

*In determining whether an industry in the United States is threatened with material injury by reason of imports (or sales for importation) of the subject merchandise, the Commission shall consider, among other relevant economic factors[1]--*

*(I)      if a countervailable subsidy is involved, such information as may be presented to it by the administering authority as to the nature of the subsidy (particularly as to whether the countervailable subsidy is a subsidy described in Article 3 or 6.1 of the Subsidies Agreement), and whether imports of the subject merchandise are likely to increase,*

*(II)     any existing unused production capacity or imminent, substantial increase in production capacity in the exporting country indicating the likelihood of substantially increased imports of the subject merchandise into the United States, taking into account the availability of other export markets to absorb any additional exports,*

*(III)    a significant rate of increase of the volume or market penetration of imports of the subject merchandise indicating the likelihood of substantially increased imports,*

*(IV)     whether imports of the subject merchandise are entering at prices that are likely to have a significant depressing or suppressing effect on domestic prices, and are likely to increase demand for further imports,*

*(V)      inventories of the subject merchandise,*

*(VI)     the potential for product-shifting if production facilities in the foreign country, which can be used to produce the subject merchandise, are currently being used to produce other products,*

*(VII)    in any investigation under this title which involves imports of both a raw agricultural product (within the meaning of paragraph (4)(E)(iv)) and any product processed from such raw agricultural product, the likelihood that there will be increased imports, by reason of product shifting, if there is an affirmative determination by the Commission under section 705(b)(1) or 735(b)(1) with respect to either the raw*

---

[1] Section 771(7)(F)(ii) of the Act (19 U.S.C. § 1677(7)(F)(ii)) provides that "The Commission shall consider {these factors} . . . as a whole in making a determination of whether further dumped or subsidized imports are imminent and whether material injury by reason of imports would occur unless an order is issued or a suspension agreement is accepted under this title.  The presence or absence of any factor which the Commission is required to consider . . . shall not necessarily give decisive guidance with respect to the determination.  Such a determination may not be made on the basis of mere conjecture or supposition."

> *agricultural product or the processed agricultural product (but not both),*

> (VIII)    *the actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the domestic like product, and*

> (IX)    *any other demonstrable adverse trends that indicate the probability that there is likely to be material injury by reason of imports (or sale for importation) of the subject merchandise (whether or not it is actually being imported at the time).[2]*

Information in relation to subsidies in China is presented in Part I; information on the volume and pricing of imports of the subject merchandise is presented in Part IV and Part V; and information on the effects of imports of the subject merchandise on U.S. producers' existing development and production efforts is presented in Part VI.  Information on inventories of the subject merchandise; foreign producers' operations, including the potential for "product-shifting;" any other threat indicators, if applicable; and any dumping in third-country markets, follows.  Also presented in this section of the report is information obtained for consideration by the Commission on nonsubject countries and the global market.

### THE INDUSTRY IN CHINA

#### Overview

China was the largest global wind market in 2011, with 17.6 gigawatts ("GW," equivalent to 1,000 MW) in annual wind turbine installations (figure VII-1), though this is down from 18.9 GW in installations in 2010.  MAKE Consulting projects that installations in China will further decline to 16 GW in 2012, before rebounding to 19 GW in 2013.[3]  In 2011, there were *** wind turbines installed in China.[4]

---

[2] Section 771(7)(F)(iii) of the Act (19 U.S.C. § 1677(7)(F)(iii)) further provides that, in antidumping investigations, ". . . the Commission shall consider whether dumping in the markets of foreign countries (as evidenced by dumping findings or antidumping remedies in other WTO member markets against the same class or kind of merchandise manufactured or exported by the same party as under investigation) suggests a threat of material injury to the domestic industry."

[3] In comparison, U.S. installations are projected to total around 13 GW in 2012, but are likely to decline significantly in 2013.  Prior to the PTC renewal, analysts were projecting that installations might total 2 GW or less.  Revised estimates based on the PTC renewal are not available, but the extension may not have an immediate impact on installations given the long project development time-frame."  Pankratz, Howard, "Wind-energy Tax Credit Extended for One Year," *The Denver Post*, January 2, 2013, http://www.denverpost.com/breakingnews/ci_22296411/wind-energy-tax-credit-extended-one-year; Heltzell, Dallas, "Wind Industry Hails Tax-credit Extension," *Boulder County Business Report*, January 2, 2013, http://www.bcbr.com/article/20130102/NEWS/130109995.

[4] This was a *** from the *** towers installed in 2010.  BTM Consult reports the net increase in towers, which is the number installed minus the number of turbines decommissioned in that year.  There were *** Chinese turbines decommissioned in 2011, but ***. BTM Consult, *World Market Update 2011*, March 2012, pp. 33–34.

**Figure VII-1**
**Annual wind turbine installations in China, 2007–11**



Source: Petitioners' prehearing brief, exh. 14, GWEC, *Global Wind Report: Annual Market Update 2011*, p. 31;
Petitioners' prehearing brief, exh. 15, GWEC, *Global Wind Report: Annual Market Update 2010*, p. 12,
http://www.gwec.net.

There are more than 30 wind tower manufacturers in China, with production capacities ranging from 100 to 1,600 towers (table VII-1). Total production capacity, based on publicly available data, exceeds 16,000 towers. Despite the larger number of producers in China, however, only a small number are qualified to provide utility-scale towers for the U.S. market.[5] Of the 31 companies listed in table VII-1, ***.[6] [7]

---

[5] Conference transcript, p. 122 (Schutzman).

[6] ***.

[7] At the beginning of the period, there were three qualified suppliers in China (***). Two of these firms were later qualified as suppliers for other OEMS (***).

**Table VII-1**
**Wind towers: Identified Chinese producers and public production capacity data, January 2012**

| Company | Tower capacity (*number of towers*) |
|---|---|
| AUSKY (Shandong) Machinery Manufacturing Co., Ltd. | Not available |
| Chengde Tianbao Machinery Co., Ltd. | 200 |
| Chengxi [1] | 800 |
| China WindPower Group (via subsidiary Jilin Tianhe Wind Power Equipment Ltd.) | 100 |
| CleanTech Innovations Inc. | Not available |
| CNR Wind Turbine Co., Ltd. | 1,000 |
| CS Wind (China) [1] | 900 |
| Dajin Heavy Industry Corporation | 500 |
| Guangdong No 2 Hydropower Engineering Co., Ltd. | Not available |
| Harbin Hongguang [1] | 1,000 |
| Hebei Ningqiang Group | 600 |
| Hebei Qianshan Steel Industry Project Co. | Not available |
| Inner Mongolia Tianyuan New Energy Co., Ltd. | 300 |
| Jiangbiao Group ( Nanjing ) | Not available |
| Jiangsu Baolong Tower Tube Manufacturing Co., Ltd. | 450 |
| Jiangsu Taihu Boiler Co., Ltd. | Not available |
| Jilin Miracle Equipment Manufacturing Engineering Co., Ltd. | >400 |
| Kaiming Dafeng Machinery Manufacturing Co., Ltd. | 600 |
| Nantong Hongbo Widower Equipment Co., Ltd. | 400 |
| Ningxia Electric Power Group | 500 |
| Ningxia Yinxing Energy Co. | 500 |
| Qingdao Gelinte Environmental Protection Equipment Co., Ltd. | 200 |
| Qingdao Ocean Group | 550 |
| Qingdao Pingcheng Steel Structure Co., Ltd. | >600 |
| Qingdao Tianneng Electric Power Engineering Machinery Co., Ltd. | 800 to 1,000 |
| Qingdao Wuxiao Group Co., Ltd. | 1,000 |
| Renewable Energy Asia Group Ltd. | 1,200 |
| Shandong Endless Wind Turbine Technical Equipment Co., Ltd. | 500 |
| Shandong Zhongkai Wind Power Equipment Manufacturers, Ltd. | 800 |
| Shanghai Taisheng Wind Power Equipment Co., Ltd. [1] | 1,600 |
| Titan Wind Energy Suzhou Co., Ltd. [1] | 1,000 |
| Total capacity | >16,500 |

[1] ***.

Source: *** petition, exh. I-14; CS Wind, tower brochure; respondent's postconference brief, exh. 17; Research and Markets, *2011 Deep Research Report on China Wind Turbine Tower Industry*, Table of Contents, http://www.researchandmarkets.com/reports/1812779/2011_deep_research_report_on_china_wind.htm; "Shandong Sanxing Machinery Manufacturing Co.," http://www.worldwindpower.nethttp://www.worldwindpower.net/web.php?uid=67&wid=3; Chengde Tianbao Machinery Co.  Web site, http://www.cdccc.com.cn; CleanTech Innovations Web site, http://www.ctiproduct.com/html/wind.asp (accessed January 30, 2012); "Hebei Qianshan Steel Industry Project Co. Ltd. Wind Turbine Manufacturing Project," http://english.sjzdaily.com.cn/english/2011-10/26/content_1440575.htm; Jiangsu Taihu Boiler Co. Web site, http://taihuguoluen.oinsite.cn; Jilin Miracle Equipment Manufacturing Engineering Co. Web site, http://www.bctqzb.com; "600sets/year Kaiming Wind Turbine Tower Project Built and Put into Operation," April 22, 2011, http://www.worldwindpower.net; Qingdao Ocean Thermoelectric Chemical Co., http://www.worldwindpower.net; Qingdao Pingcheng Steel Structure Co. Web site, http://www.qd-pingcheng.com; CNR Wind Turbine Co. Brochure, http://www.jrvec.com/readservice.aspx?id=10; Bloomberg New Energy Finance database, https://www.bnef.com (accessed January 22, 2010).  All Web sites without a date accessed January 23, 2012.

**Wind Tower Operations**

Data provided by the five Chinese producers of wind towers responding to the Commission's questionnaire concerning capacity, production, inventories and shipments are presented in table VII-2. Three firms (Chengxi, CS Wind (China), and Titan) estimated that they account for *** percent of the production of utility scale wind towers in China. Chengxi and CS Wind (China) estimated that they accounted for the majority (*** percent) of total exports to the United States of such wind towers from China in 2011.[8][9]

**Table VII-2**
**Wind towers: Chinese producers' production capacity, production, shipments, and inventories, 2009-11, January- June 2011, January-June 2012, and projected 2012-13**

| Item | Actual experience | | | | | Projections | |
|---|---|---|---|---|---|---|---|
| | Calendar year | | | January–June | | | |
| | 2009 | 2010 | 2011 | 2011 | 2012 | 2012 | 2013 |
| Quantity (*towers*) | | | | | | | |
| Capacity | 2,475 | 2,732 | 3,455 | 1,637 | 1,777 | 3,715 | 3,680 |
| Production | 1,888 | 1,808 | 2,563 | 1,169 | 1,478 | 2,473 | 2,131 |
| End of period inventories | *** | 409 | 615 | 472 | 543 | 415 | 213 |
| Shipments: | | | | | | | |
| Internal consumption | *** | *** | *** | *** | *** | *** | *** |
| Home market | *** | *** | *** | *** | *** | *** | *** |
| Exports to-- | | | | | | | |
| The United States | *** | *** | *** | *** | *** | *** | *** |
| All other markets | *** | *** | *** | *** | *** | *** | *** |
| Total exports | *** | *** | *** | *** | *** | *** | *** |
| Total shipments | 1,734 | 1,684 | 2,358 | 1,106 | 1,550 | 2,686 | 2,196 |

Table continued on next page.

---

[8] Respondent foreign producers contend that while there are other manufacturers in China, these firms are not qualified as sources for OEMs in the United States, and that all firms which export to the United States have provided questionnaire responses. Conference transcript, pp. 130-131 (Marshak).

[9] These two firms accounted for *** percent of the reported 2011 production of wind towers in China, *** percent of reported 2011 exports of wind towers from China to United States, and *** percent of U.S. imports from China based on official import statistics. The other responding Chinese producers, Harbin Hongguang, Shanghai Taisheng, and Titan, accounted for *** percent of the reported 2011 production of wind towers in China, respectively. ***, which did not provide an estimate of its share of exports of wind towers from China to the United States, represented *** percent of 2011 U.S. imports of wind towers from China based on official import statistics.

**Table VII-2--*Continued***
**Wind towers:  Chinese producers' production capacity, production, shipments, and inventories, 2009-11, January- June 2011, January-June 2012, and projected 2012-13**

| Item | Actual experience | | | | | Projections | |
|---|---|---|---|---|---|---|---|
| | Calendar year | | | January-June | | | |
| | 2009 | 2010 | 2011 | 2011 | 2012 | 2012 | 2013 |
| Ratios and shares (*percent*) | | | | | | | |
| Capacity utilization | 76.3 | 66.2 | 74.2 | 71.4 | 83.2 | 66.6 | 57.9 |
| Inventories to production | *** | 22.6 | 24.0 | 20.2 | 18.4 | 16.8 | 10.0 |
| Inventories to total shipments | *** | 24.3 | 26.1 | 21.3 | 17.5 | 15.5 | 9.7 |
| Share of total quantity of shipments: | | | | | | | |
|    Internal consumption | *** | *** | *** | *** | *** | *** | *** |
|    Home market | *** | *** | *** | *** | *** | *** | *** |
|   Exports to-- | | | | | | | |
|    The United States | *** | *** | *** | *** | *** | *** | *** |
|    All other markets | *** | *** | *** | *** | *** | *** | *** |
|    All export markets | *** | *** | *** | *** | *** | *** | *** |
| Note.--Because of rounding, figures may not add to the totals shown. | | | | | | | |
| Source:  Compiled from data submitted in response to Commission questionnaires. | | | | | | | |

The reported aggregate capacity of Chinese producers increased by 39.6 percent between 2009 and 2011, and is projected to increase in 2012 before declining in 2013.  ***.  *** reported in the preliminary-phase investigations that the increase in production capacity in 2011 was due to ***.  *** attributed the increase to ***.  The other firm that reported increased production capacity, ***, did not provide an explanation for the increase.[10]

Although the reported aggregate production fluctuated over the period, declining in 2010 then increasing in 2011, various firms reported different trends.  ***.  The firms also projected differing trends in production in 2012 and 2013, although aggregate production was projected to decrease in each year. ***.[11]

During 2009-11, the Chinese producers reportedly operated at levels below their collective full capacity.[12]  The aggregate reported, as well as each firm's capacity utilization declined between 2009 and

---

[10] The remaining Chinese producer, ***.  ***.

[11] Importer ***, which accounted for the majority of the reported arranged imports from China after June 30, 2012, reported imports from ***.  ***, which accounted for the remaining arranged imports from China, reported imports from ***.

[12] *** reported that it is producing at capacity for any given month and therefore for the entire year, as it produces wind towers to meet a particular customers' needs which are not uniform in number, made to order and within strict time constraints.

2010, then increased in 2011 to approximately the same level as in 2009. Capacity utilization peaked at 83.2 percent in January-June 2012 but is projected to be lower in calendar years 2012 and 2013.[13]

Each reporting firm reported exports to the United States, although three firms (***) represented the vast majority of these exports.[14] For these three firms, exports to the United States represented the largest share (ranging from *** percent to *** percent of total shipments during 2009-11, ***).[15] These three firms reported increases in total exports and exports to the United States between 2009 and 2011, ending approximately *** percent higher than in 2009. *** project an increase in total exports and exports to the United States in 2012 followed by a decline in 2013. *** projects a *** percent increase in total exports but a *** decrease in exports to the United States in 2012, followed in 2013 by a decrease in exports to the United States but an increase to other export markets. All responding firms reported holding inventories.[16]

Only one firm, ***, reported producing other products (***) on the same equipment, machinery, and workers used in the production of wind towers, and ***, reported plans to produce other products, namely rotor houses, in 2013. Two firms, *** reported constraints on production capacity. Both reported being constrained by the capacity of the existing facility or inability to expand the existing facility, one reported being constrained by the number of skilled workers, and one noted the bottleneck at the painting process.

Table VII-3 presents total shipments produced in China by tower size reported by ***. The majority of the wind towers were 50-79.9 meters or 80-89.9 meters. Two firms reported shipments of 90-99.9 meter wind towers, and none reported shipments of 100 or more meter wind towers between January 2011 and June 2012.

**Table VII-3**
**Wind towers:  Chinese producers' shipments by size, January- June 2011, July-December 2011, and January-June 2012**

\*        \*        \*        \*        \*        \*        \*

---

[13] Three Chinese producers (***) reported having agreements relating to the production and sale of wind towers. ***.

[14] The other two firms reported ***.

[15] *** reported that ***.

[16] *** reported in the preliminary-phase investigations that ***. E--mail from ***, January 30, 2012. None of the firms reported holding inventories in the United States.

# THE INDUSTRY IN VIETNAM

## Overview

Vietnam has a relatively small wind market, with 29 MW installed in 2011, though there is substantial project development activity taking place.[17]  There are at least three firms producing wind towers in Vietnam—CS Wind (Vietnam), Vina Halla Heavy Industries Ltd., and UBI Tower Sole Member Company Ltd ("UBI").  These three companies have a combined production capacity of 1,600 towers, and currently export wind towers to Asia, Europe, and the United States.[18] [19]

## Wind Tower Operations

Data provided by two producers of wind towers in Vietnam, CS Wind (Vietnam) and UBI responding to the Commission's questionnaire concerning capacity, production, inventories and shipments are presented in table VII-4.  These firms reportedly accounted for the vast majority of subject wind towers production in Vietnam and *** exports to the United States of wind towers from Vietnam in 2011.[20]

**Table VII-4**
**Wind towers:  Vietnamese producers' production capacity, production, shipments, and inventories, 2009-11, January- June 2011, January-June 2012, and projected 2012-13**

*       *       *       *       *       *       *

Capacity increased between 2009 and 2011, while production declined over the same period.[21] UBI began production in 2010 with a capacity of 300 wind towers,[22] but only produced *** wind towers in 2010 and *** wind towers in 2011.  *** reported a *** percent decline in capacity and *** percent decline in production between 2009 and 2011.  Both firms project stable capacity in 2012 and 2013.  Both firms project increased production in 2012 compared with 2011.  In the following year, however, *** projects a *** percent decline in production, to the ***, while *** projects a *** of production between

---

[17] Petitioners' preconference brief, exh. 14, GWEC, *Global Wind Report: Annual Market Update 2011*, p. 11; Petitioners' preconference brief, ex. 18, GIZ Wind Energy Project, *Status of Wind Power Development and Financing of These Projects in Vietnam*, March 2012, pp. 18–22.

[18] CS Wind (Vietnam) has an annual production capacity of 900 towers, Vina Halla of 400 towers, and UBI Tower of 300 towers.  In addition to these companies, Renewable Energy of Vietnam (REVN) was listed as a producer of wind towers in a 2011 report, but was not listed in a 2012 report by the same group.  Respondent's postconference brief, exh. 9; Petitioners' prehearing brief, p. 48, GIZ Wind Energy Project, *Status of Wind Power Development and Financing of These Projects in Vietnam*, March 2012, p. 9; CS Wind, towers brochure; Vina Halla Web site, http://www.vinahalla.com/english/sub02_introduction/page_01.asp?tm=2&ts=1 (accessed November 9, 2012).

[19] GE reported ***.  Siemens reported that *** was a qualified supplier.

[20] Petitioners argue that there are a large number of subject producers that have failed to provide questionnaire responses; these include ***.  Petitioners' postconference brief, exh. 1, p. 8.

[21] *** calculated its production capacity based on the smaller of the bending machine capacity or capacity of workers.  While *** calculated its production capacity based on design capacity of the equipment and labor skills.

[22] "About us, company capacity," UBI, Found at http://ubitower.vn/en/About-us/Company-Capacity.aspx (accessed on June 10, 2012).

2012 and 2013.[23] *** stated that its production capacity is constrained by the number of skilled workers and the capacity and efficiency of its facility, while *** reported that the lack of orders constrained its production capacity.[24]

     *** of CS Wind (Vietnam)'s shipments of wind towers were exported, with exports to other markets in Europe and Asia growing over the period for which data were collected. Exports to the United States declined from *** percent of total shipments in 2009 to *** percent in 2011, and are projected to decrease to *** percent in 2012 and to *** percent in 2013. UBI, which started producing in 2010 has *** towers, *** of which were exported to the United States. UBI projects ***.

     CS Wind (Vietnam) reported that *** on the same equipment, machinery, and workers used in the production of wind towers. The firm attributed this ***. UBI reported that it is able to switch production to other products, such as *** and ***.

     Table VII-5 presents total shipments produced in Vietnam by tower size reported by ***. The majority of the wind towers were 50.0-79.9 meters or 90-99.9 meters.

**Table VII-5**
**Wind towers: Vietnamese producers' shipments by size, January-June 2011, July-December 2011, and January-June 2012**

<div align="center">*     *     *     *     *     *     *</div>

<div align="center">

## COMBINED DATA FOR THE INDUSTRIES IN CHINA AND VIETNAM

</div>

     Table VII-6 presents aggregate data for the reporting producers of wind towers from China and Vietnam. Table VII-7 presents total shipments produced in China and Vietnam by tower size.

**Table VII-6**
**Wind towers: Chinese and Vietnamese producers' combined reported production capacity, production, shipments, and inventories, 2009-11, January-June 2011, January-June 2012, and projected 2012-13**

<div align="center">*     *     *     *     *     *     *</div>

**Table VII-7**
**Wind towers: Chinese and Vietnamese producers' combined shipments by size, January-June 2011, July-December 2011, and January-June 2012**

<div align="center">*     *     *     *     *     *     *</div>

---

[23] *** based its projects on the ***. ***, on the other hand, based its projections on ***.

[24] One Vietnamese producer (***) reported having an agreement relating to the production and sale of wind towers. ***.

## U.S. IMPORTERS' INVENTORIES

Data collected in these investigations on U.S. importers' end-of-period inventories of wind towers are presented in table VII-8.[25][26]  U.S. importers' reported inventories of wind towers from China were present in only January-June 2011 and January-June 2012.  As a ratio of imports, inventories of imports from China fluctuated over a period when imports also fluctuated.

**Table VII-8**
**Wind towers:  U.S. importers' end-of-period inventories of imports, by source, 2009-11, January-June 2011, and January-June 2012**

\*     \*     \*     \*     \*     \*     \*

## U.S. IMPORTERS' CURRENT ORDERS

The Commission requested importers to indicate whether they imported or arranged for the importation of wind towers from China and Vietnam after June 30, 2012.  Table VII-9 presents the quantity and value of orders by five U.S. importers which indicated that they had imported or arranged for the importation of wind towers from China, Vietnam, and other sources.[27][28]

**Table VII-9**
**Wind towers:  U.S. importers' orders for delivery subsequent to June 30, 2012, by period**

\*     \*     \*     \*     \*     \*     \*

## ANTIDUMPING OR COUNTERVAILING DUTY ORDERS IN THIRD-COUNTRY MARKETS

No producer, importer, or foreign producer reported any countervailing or antidumping duty orders on wind towers from China or Vietnam in third-country markets.[29]

---

[25] As noted in Part II, most U.S. importers are the end users of the imported wind towers.

[26] One importer, \*\*\*, reported inventories of imports from China in January-June 2011 and January-June 2012, representing approximately \*\*\* percent of total reported quantity of imports from China during January 2009-June 2012.  No importers reported inventories of imports from Vietnam or from all other sources.

[27] Five importers reported imports from China (majority reported by \*\*\*), two importers (\*\*\*) reported imports from Vietnam, and 11 from all other sources (majority reported by \*\*\*).  No importers reported orders for the importation of wind towers after June 2012.

[28] \*\*\*  E-mail from \*\*\*, December 28, 2012.

[29] Respondents concurred that they were unaware of any third country trade barriers.  Conference transcript, p. 151 (Feldman/Schutzman).

## INFORMATION ON NONSUBJECT SOURCES

### Global Installations

The global wind tower market, as measured by annual wind turbine installations,[30] increased from 38.6 GW in 2009 to 40.6 GW in 2011 (figure VII-2). As shown in figure VII-3, five markets accounted for a combined 95 percent of wind turbine installations in 2011: China (17.6 GW, 43 percent of 2011 installations), the European Union (9.6 GW, 24 percent), the United States (6.8 GW, 17 percent), India (3.0 GW, 7 percent), and Canada (1.3 GW, 3 percent).[31]

**Figure VII-2**
**Global wind turbine installations, 2002–11**



Source: Petitioners' prehearing brief, exh. 14, GWEC, *Global Wind Report: Annual Market Update 2011*, p. 15.

---

[30] Wind turbines are not always installed in the same year in which they are shipped; therefore, there may be a difference between shipments and installations. Petition, exh. I-4, p. 39.

[31] Petitioners' prehearing brief, exh. 14, GWEC, *Global Wind Report: Annual Market Update 2011*, pp. 11–12.

**Figure VII-3**
**Global wind turbine installations, 2011**



Source: Petitioners' prehearing brief, exh. 14, GWEC, *Global Wind Report: Annual Market Update 2011*, p. 12.

### Global Shipments

Global wind tower shipments, as measured by overall wind turbine shipments, are estimated to have *** from *** GW in 2009 to *** GW in 2010 (figure VII-4).  However, wind turbine shipments *** in 2011 to *** GW.[32]

**Figure VII-4**
**Global wind turbine shipments, 2007–11**

\*          \*          \*          \*          \*          \*          \*

---

[32] ***.

**Leading Nonsubject Suppliers to U.S. Market**

The leading nonsubject sources of U.S. imports of wind towers in 2011 were Korea, Canada, Mexico, and Indonesia.[33]  More information on the industry in each of these countries is included below and aggregated in table VII-10.[34]

### Canada

There are currently five firms (CS Wind, DSTN, Enercon, Hitachi, and Marmen) producing wind towers in Canada.  DMI closed its Canadian tower plant in 2012, while TSP Towers Canada is opening its first Canadian plant and Enercon is planning to open a second plant.  The Canadian wind turbine market is expanding, with installations increasing from 1.0 GW in 2009 to 1.3 GW in 2011, so Canadian tower production is directed toward both meeting domestic demand and exports to the U.S. market.[35]

### Indonesia

The principal producer of wind turbine towers in Indonesia is Korindo Wind, which has an annual production capacity of more than 800 towers.

### Korea

There are at least five producers of wind towers in Korea (Dongkuk S&C, Hyosung, Sangwon ENS Co., Speco, and Win & P.), two of which are known to have supplied the U.S. market.  Production capacity at the two companies for which data are available totals 1,880 towers.

### Mexico

There are at least three wind tower producers in Mexico—Grupo Industrial Monclova (GIMSA), Speco, and Trinity Structural Towers—but information on production capacity for these companies is not available.

---

[33] Based on trade in HTS statistical reporting number 7308.20.0020, tubular iron or steel towers and sectional components thereof.  This provision may include some nonsubject products.  USITC Dataweb/USDOC (accessed November 7, 2012).

[34] Country profiles below based on the information and sources from table VII-10, unless otherwise noted.

[35] Petitioners' prehearing brief, exh. 14, GWEC, *Global Wind Report: Annual Market Update 2011*, pp. 11, 27.

**Table VII-10**
**Wind towers:  Producers in Canada, Indonesia, Mexico, and Korea**

| Company | Annual production capacity | Towers exports to the U.S.? |
|---|---|---|
| **Canada** | | |
| CS Wind | 500 towers | Yes |
| DSTN | 250 towers | Not available |
| Enercon[1] | 150 towers | No |
| Hitachi | Not available | Not available |
| Marmen | 2 plants, capacity not available | Yes |
| TSP Towers Canada | 250 towers, opening January 2013 | No (not yet in production) |
| **Indonesia** | | |
| Korindo Wind | More than 800 towers | Yes (more than 600 as of May 2010) |
| **Korea** | | |
| Dongkuk S&C | 860 towers[2] | Yes (2,074 towers as of 2009) |
| Hyosung | Not available | Not available |
| Sangwon ENS Co. | 25,000 tons | Not available |
| Speco | Not available | Not available |
| Win & P. | 1,020 towers | Yes |
| **Mexico** | | |
| Grupo Industrial Monclova (GIMSA)[3] | Not available | Not available |
| Speco | Not available | Not available |
| Trinity Structural Towers | Not available | Yes |

Table continued on next page.

**Table VII-10—*Continued***
**Wind towers:  Producers in Canada, Indonesia, Mexico, and Korea**

[1] Enercon produces concrete towers. It is planning on building a second tower plant in Canada. The listed production capacity is for its current plant.

[2] As of 2009.

[3] Towers are produced by at least one of GIMSA's subsidiaries.

Notes.--DMI closed its tower plant in Canada in 2012. TSP Canada Towers Inc. is a subsidiary of Shanghai Taisheng Wind Power Equipment Company.

Sources: Dongkuk S&C Brochure, http://www.dongkuksnc.co.kr/movie/DONGKUKS&C_ENGLISH.PDF; Win & P. Web site, http://www.winnp.co.kr (accessed January 9, 2012): Sangwon ENS Web Site, http://sw1823.koreasme.com/eng/product/pro02.htm; SPECO Web site, http://en.speco.co.kr/products/product00.html and http://en.speco.co.kr/products/product00_1.html (accessed January 10, 2012); Hyosung Web site, http://www.hyosungpni.com/eng/product/IndustrialMachinery/IndustrialMachinery/WindTower.jsp (accessed November 8, 2012); TSP Towers Canada Web site, http://tsptowers.com/?page_id=14 (accessed November 8, 2012); CS Wind, tower brochure; CS Wind Web site, "First Shipment of Wind Towers from CS Wind Canada," July 12, 2012, http://www.cswindcorp.com/eng/eboard/read.asp?bTable=eboard&b_code=1000&d_code=0&b_kind=&Inside_Frame=Y&current=1&search_name=&search_value=&b_num=17; Langle, Alison, "DMI closes up shop in Fort Erie," *Niagara Falls Review*, July 20, 2012, http://www.stcatharinesstandard.ca/2012/07/20/dmi-closes-up-shop-in-fort-erie; Hitachi Web site, http://www.hitachi.sk.ca/product/m-fabrication.php#wt (accessed November 8, 2012); Marmen Web site, http://www.marmeninc.com/en/marmen/who-are-we/ (accessed January 10, 2012); Marmen brochure, "Windpower," p. 2; Enercon, "Precast Tower Construction Facility in Matane Inaugurated," News release, June 14, 2011, http://www.enercon.de/p/downloads/PM_Inauguration_Matane_en.pdf; Brad Murray, "Harvest The Wind," April 29, 2011, http://www.strait-highlands.ns.ca/shrda/shrda_main.nsf/HTW-WindTowerAndBladeManufacturing-DSTN-BMurray.pdf; DSTN, "DSTN Celebrates Grand Opening," News release, June 14, 2011, http://www.dstn.ca/media_20110614.php; *The News*, "Wind tower plant sees business grow in 2011," December 27, 2011, http://www.ngnews.ca/Business/2011-12-27/article-2849344/Wind-tower-plant-sees-business-grow-in-2011/1; Kessler, Richard A., "Enercon to Build Second Canadian Concrete Tower Plant," *Recharge*, October 16, 2012, http://www.rechargenews.com/regions/north_america/article325330.ece; Korindo Wind Web site, http://www.korindowind.com/faq (accessed January 9, 2012); Speco Web Site, http://en.speco.co.kr/products/product00_1.html (accessed January 10, 2012); Trinity Structural Towers Web site, http://www.trin.net/trinbusi/energy.html (accessed January 10, 2012); Enertech Farbricaciones Web site, http://www.enertech.com.mx/html/products.htm (accessed January 11, 2012); GSTM Web site, http://www.gstm.com.mx/products.html (accessed January 11, 2012); conference transcript, pp. 69–70 (Cole).

# APPENDIX A

## *FEDERAL REGISTER* NOTICES

The Commission makes available notices relevant to its proceedings on its website, www.usitc.gov. In addition, the following tabulation presents, in chronological order, *Federal Register* notices issued by the Commission and Commerce.

| Date | Federal Register | Title | Link |
|---|---|---|---|
| January 6, 2012 | 77 FR 805 | Utility Scale Wind Towers From China and Vietnam; Institution of Antidumping and Countervailing Duty Investigations and Scheduling of Preliminary Phase Investigations | http://www.gpo.gov/fdsys/pkg/FR-2012-01-06/pdf/2012-15.pdf |
| January 24, 2012 | 77 FR 3440 | Utility Scale Wind Towers From the People's Republic of China and the Socialist Republic of Vietnam: Initiation of Antidumping Duty Investigations | http://www.gpo.gov/fdsys/pkg/FR-2012-01-24/pdf/2012-1377.pdf |
| | 77 FR 3447 | Utility Scale Wind Towers From the People's Republic of China: Initiation of Countervailing Duty Investigation | http://www.gpo.gov/fdsys/pkg/FR-2012-01-24/pdf/2012-1342.pdf |
| February 17, 2012 | 7 FR 9700 | Utility Scale Wind Towers From China and Vietnam {Determinations} | http://www.gpo.gov/fdsys/pkg/FR-2012-02-17/pdf/2012-3730.pdf |
| June 6, 2012 | 77 FR 33422 | Utility Scale Wind Towers From the People's Republic of China:  Preliminary Affirmative Countervailing Duty Determination | http://www.gpo.gov/fdsys/pkg/FR-2012-06-06/pdf/2012-13502.pdf |
| June 22, 2012 | 77 FR 37653 | Utility Scale Wind Towers From the People's Republic of China:  Alignment of Final Countervailing Duty Determination With Final Antidumping Duty Determination | http://www.gpo.gov/fdsys/pkg/FR-2012-06-22/pdf/2012-15376.pdf |
| August 2, 2012 | 77 FR 46034 | Utility Scale Wind Towers From the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination | http://www.gpo.gov/fdsys/pkg/FR-2012-08-02/pdf/2012-18929.pdf |
| | 77 FR 46058 | Socialist Republic of Vietnam: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination | http://www.gpo.gov/fdsys/pkg/FR-2012-08-02/pdf/2012-18936.pdf |
| August 22, 2012 | 77 FR 50715 | Utility Scale Wind Towers From China and Vietnam; Scheduling of the Final Phase of Countervailing Duty and Antidumping Investigations | http://www.gpo.gov/fdsys/pkg/FR-2012-08-22/pdf/2012-20624.pdf |
| December 26, 2012 | 77 FR 75978 | Utility Scale Wind Towers From the People's Republic of China: Final Affirmative Countervailing Duty Determination | http://www.gpo.gov/fdsys/pkg/FR-2012-12-26/pdf/2012-30947.pdf |
| | 77 FR 75984 | Utility Scale Wind Towers From the Socialist Republic of Vietnam: Final Determination of Sales at Less Than Fair Value | http://www.gpo.gov/fdsys/pkg/FR-2012-12-26/pdf/2012-30944.pdf |
| | 77 FR 75992 | Utility Scale Wind Towers From the People's Republic of China: Final Determination of Sales at Less Than Fair Value | http://www.gpo.gov/fdsys/pkg/FR-2012-12-26/pdf/2012-30950.pdf |

**APPENDIX B**

**HEARING WITNESSES**

## CALENDAR OF PUBLIC HEARING

Those listed below appeared as witnesses at the United States International Trade Commission's hearing:

| | |
|---|---|
| **Subject:** | Utility Scale Wind Towers from China and Vietnam |
| **Inv. Nos.:** | 701-TA-486 and 731-TA-1195-1196 (Final) |
| **Date and Time:** | December 13, 2012 - 9:30 a.m. |

Sessions were held in connection with these investigations in the Main Hearing Room (room 101), 500 E Street, S.W., Washington, D.C.

**OPENING REMARKS:**

Petitioner (**Daniel B. Pickard**, Wiley Rein LLP)
Respondents (**Elliot J. Feldman**, Baker & Hostetler LLP)

**In Support of the Imposition of**
  **Antidumping and Countervailing Duty Orders:**

Wiley Rein LLP
Washington, D.C.
on behalf of

The Wind Tower Trade Coalition

       **Kerry Cole**, President, Trinity Structural
            Towers, Inc.

       **Paul Smith**, President, Broadwind Towers, Inc.

       **J.D. Rubin**, Vice President and General Counsel,
            Broadwind Energy, Inc.

              **Daniel B. Pickard**     )
                                    ) – OF COUNSEL
              **Robert E. DeFrancesco**    )

**In Opposition to the Imposition of**
  **Antidumping and Countervailing Duty Orders:**

Grunfeld Desiderio Lebowitz Silverman Klestadt LLP
Washington, D.C.
on behalf of

CS Wind Tech Co., Ltd.
CS Wind Vietnam Co., Ltd.
Chengxi Shipyard Co., Ltd.
Titan Wind Energy (Suzhou) Co., Ltd.
Shanghi Taisheng Wind Power Equipment  Co., Ltd.
China Chamber of Commerce for Import & Export
        of Machinery & Electronics Products

   **James P. Dougan**, Senior Economist, Economic
    Consulting Services, LLC

   **Lauren Visek**, Economist, Economic Consulting
    Services, LLC

     **Max F. Schutzman**  )
            ) – OF COUNSEL
     **Ned H. Marshak**  )

Baker & Hostetler LLP
Washington, D.C.
on behalf of

Siemens Energy, Inc.
Siemens Power Generation

   **Michael Revak**, Vice President of Sales and
    Proposals, Siemens

   **Kevin Hazel**, Vice President of Supply Chain,
    Siemens

     **Elliot J. Feldman**  )
            ) – OF COUNSEL
     **Michael Snarr**  )

**REBUTTAL/CLOSING REMARKS:**

Petitioners (**Daniel B. Pickard**, Wiley Rein LLP)
Respondents (**Max F. Schutzman**, Grunfeld Desiderio Lebowitz
        Silverman & Klestadt, LLP; and **Elliot J. Feldman**, Baker & Hostetler LLP)

**APPENDIX C**

**SUMMARY DATA**

**Table C-1**
**Wind towers: Summary data concerning the U.S. market, 2009-11, January-June 2011, and January-June 2012**

(Quantity=units, value=1,000 dollars, unit values, unit labor costs, and unit expenses are per unit; period changes=percent, except where noted)

| Item | Reported data | | | | | Period changes | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2009 | 2010 | 2011 | January-June 2011 | January-June 2012 | 2009-11 | 2009-10 | 2010-11 | Jan.-June 2011-12 |
| **U.S. consumption quantity:** | | | | | | | | | |
| Amount . . . . . . . . . . . . . . . . . . . . | 3,842 | 2,887 | *** | *** | *** | *** | -24.9 | *** | *** |
| Producers' share (1) . . . . . . . . . . . . | 53.5 | 60.2 | *** | *** | *** | *** | 6.7 | *** | *** |
| Importers' share (1): | | | | | | | | | |
| China . . . . . . . . . . . . . . . . . . . | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Vietnam . . . . . . . . . . . . . . . . . | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Subtotal . . . . . . . . . . . . . . | 15.9 | 12.7 | *** | *** | *** | *** | -3.2 | *** | *** |
| All other sources . . . . . . . . . . . . | 30.6 | 27.1 | *** | *** | *** | *** | -3.5 | *** | *** |
| Total imports . . . . . . . . . . | 46.5 | 39.8 | *** | *** | *** | *** | -6.7 | *** | *** |
| **U.S. consumption value:** | | | | | | | | | |
| Amount . . . . . . . . . . . . . . . . . . . . | 1,248,167 | 922,282 | *** | *** | *** | *** | -26.1 | *** | *** |
| Producers' share (1) . . . . . . . . . . . . | 47.0 | 57.3 | *** | *** | *** | *** | 10.3 | *** | *** |
| Importers' share (1): | | | | | | | | | |
| China . . . . . . . . . . . . . . . . . . . | *** | *** | *** | *** | *** | *** | -0.7 | *** | *** |
| Vietnam . . . . . . . . . . . . . . . . . | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Subtotal . . . . . . . . . . . . . . | 14.8 | 14.1 | *** | *** | *** | *** | -0.7 | *** | *** |
| All other sources . . . . . . . . . . . . | 38.2 | 28.6 | *** | *** | *** | *** | -9.6 | *** | *** |
| Total imports . . . . . . . . . . | 53.0 | 42.7 | *** | *** | *** | *** | -10.3 | *** | *** |
| **U.S. shipments of imports from:** | | | | | | | | | |
| China: | | | | | | | | | |
| Quantity . . . . . . . . . . . . . . . . . . . | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Value . . . . . . . . . . . . . . . . . . . | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Unit value . . . . . . . . . . . . . . . . . | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Ending inventory quantity . . . . . . . . | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Vietnam: | | | | | | | | | |
| Quantity . . . . . . . . . . . . . . . . . . . | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Value . . . . . . . . . . . . . . . . . . . | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Unit value . . . . . . . . . . . . . . . . . | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Ending inventory quantity . . . . . . . . | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Subtotal (subject): | | | | | | | | | |
| Quantity . . . . . . . . . . . . . . . . . . . | 610 | 366 | 861 | 429 | 1,256 | 41.1 | -40.0 | 135.2 | 192.8 |
| Value . . . . . . . . . . . . . . . . . . . | 185,060 | 130,165 | 265,862 | 135,851 | 358,974 | 43.7 | -29.7 | 104.2 | 164.2 |
| Unit value . . . . . . . . . . . . . . . . . | $303,377 | $355,642 | $308,783 | $316,669 | $285,807 | 1.8 | 17.2 | -13.2 | -9.7 |
| Ending inventory quantity . . . . . . . . | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| All other sources: | | | | | | | | | |
| Quantity . . . . . . . . . . . . . . . . . . . | 1,175 | 783 | 475 | 246 | 382 | -59.6 | -33.4 | -39.3 | 55.3 |
| Value . . . . . . . . . . . . . . . . . . . | 476,976 | 263,968 | 155,942 | 78,882 | 137,764 | -67.3 | -44.7 | -40.9 | 74.6 |
| Unit value . . . . . . . . . . . . . . . . . | $405,937 | $337,124 | $328,299 | $320,659 | $360,639 | -19.1 | -17.0 | -2.6 | 12.5 |
| Ending inventory quantity . . . . . . . . | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| All sources: | | | | | | | | | |
| Quantity . . . . . . . . . . . . . . . . . . . | 1,785 | 1,149 | 1,336 | 675 | 1,638 | -25.2 | -35.6 | 16.3 | 142.7 |
| Value . . . . . . . . . . . . . . . . . . . | 662,036 | 394,133 | 421,804 | 214,733 | 496,738 | -36.3 | -40.5 | 7.0 | 131.3 |
| Unit value . . . . . . . . . . . . . . . . . | $370,889 | $343,023 | $315,722 | $318,123 | $303,259 | -14.9 | -7.5 | -8.0 | -4.7 |
| Ending inventory quantity . . . . . . . . | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| **U.S. producers':** | | | | | | | | | |
| Average capacity quantity . . . . . . . . | 3,343 | 3,898 | *** | *** | *** | *** | 16.6 | *** | *** |
| Production quantity . . . . . . . . . . . . | 2,069 | 1,751 | *** | *** | *** | *** | -15.4 | *** | *** |
| Capacity utilization (1) . . . . . . . . . | 61.9 | 44.9 | *** | *** | *** | *** | -17.0 | *** | *** |
| U.S. shipments: | | | | | | | | | |
| Quantity . . . . . . . . . . . . . . . . . . . | 2,057 | 1,738 | *** | *** | *** | *** | -15.5 | *** | *** |
| Value . . . . . . . . . . . . . . . . . . . | 586,131 | 528,149 | *** | *** | *** | *** | -9.9 | *** | *** |
| Unit value . . . . . . . . . . . . . . . . . | $284,945 | $303,883 | *** | *** | *** | *** | 6.6 | *** | *** |
| Export shipments: | | | | | | | | | |
| Quantity . . . . . . . . . . . . . . . . . . . | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Value . . . . . . . . . . . . . . . . . . . | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Unit value . . . . . . . . . . . . . . . . . | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Ending inventory quantity . . . . . . . . | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Inventories/total shipments (1) . . . . . | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Production workers . . . . . . . . . . . . | 1,616 | 1,695 | *** | *** | *** | *** | 4.9 | *** | *** |
| Hours worked (1,000s) . . . . . . . . . . | 3,021 | 3,332 | *** | *** | *** | *** | 10.3 | *** | *** |
| Wages paid ($1,000s) . . . . . . . . . . | 85,334 | 94,340 | *** | *** | *** | *** | 10.6 | *** | *** |
| Hourly wages . . . . . . . . . . . . . . . | $28.25 | $28.31 | *** | *** | *** | *** | 0.2 | *** | *** |
| Productivity (units/1,000 hours) . . . . | 0.7 | 0.5 | *** | *** | *** | *** | -24.8 | *** | *** |
| Unit labor costs . . . . . . . . . . . . . . | $41,059 | $53,878 | *** | *** | *** | *** | 31.2 | *** | *** |
| Net sales: | | | | | | | | | |
| Quantity . . . . . . . . . . . . . . . . . . . | *** | *** | 2,072 | 969 | 1,092 | *** | *** | *** | 12.7 |
| Value . . . . . . . . . . . . . . . . . . . | *** | *** | 766,495 | 307,139 | 470,754 | *** | *** | *** | 53.3 |
| Unit value . . . . . . . . . . . . . . . . . | *** | *** | $369,930 | $316,965 | $431,093 | *** | *** | *** | 36.0 |
| Cost of goods sold (COGS) . . . . . . . | *** | *** | 687,080 | 300,827 | 443,394 | *** | *** | *** | 47.4 |
| Gross profit or (loss) . . . . . . . . . . | *** | *** | 79,415 | 6,312 | 27,360 | *** | *** | *** | 333.5 |
| SG&A expenses . . . . . . . . . . . . . | *** | *** | 65,286 | 28,774 | 70,751 | *** | *** | *** | 145.9 |
| Operating income or (loss) . . . . . . . | *** | *** | 14,129 | -22,462 | -43,391 | *** | *** | *** | -93.2 |
| Capital expenditures . . . . . . . . . . . | *** | *** | 5,379 | 15,650 | 3,044 | *** | *** | *** | -80.5 |
| Unit COGS . . . . . . . . . . . . . . . . | *** | *** | $331,602 | $310,451 | $406,038 | *** | *** | *** | 30.8 |
| Unit SG&A expenses . . . . . . . . . . | *** | *** | $31,509 | $29,695 | $64,790 | *** | *** | *** | 118.2 |
| Unit operating income or (loss) . . . . | *** | *** | $6,819 | -$23,181 | -$39,735 | *** | *** | *** | 71.4 |
| COGS/sales (1) . . . . . . . . . . . . . . | *** | *** | 89.6 | 97.9 | 94.2 | *** | *** | *** | -3.8 |
| Operating income or (loss)/ sales (1) . . . . . . . . . . . . . . . . . | *** | *** | 1.8 | -7.3 | -9.2 | *** | *** | *** | -1.9 |

(1) "Reported data" are in percent and "period changes" are in percentage points.

(2) Undefined.

Note.--Financial data are reported on a fiscal year basis and may not necessarily be comparable to data reported on a calendar year basis. Because of rounding, figures may not add to the totals shown. Unit values and shares are calculated from the unrounded figures.

Source: Compiled from data submitted in response to Commission questionnaires.

**Table C-2**
**Wind towers: Summary data concerning the U.S. market excluding Vestas Towers, 2009-11, January-June 2011, and January-June 2012**

(Quantity=units, value=1,000 dollars, unit values, unit labor costs, and unit expenses are per unit; period changes=percent, except where noted)

| | Reported data | | | | | Period changes | | | |
| | | | | January-June | | | | | Jan.-June |
| Item | 2009 | 2010 | 2011 | 2011 | 2012 | 2009-11 | 2009-10 | 2010-11 | 2011-12 |
|---|---|---|---|---|---|---|---|---|---|
| **U.S. consumption quantity:** | | | | | | | | | |
| Amount . . . . . . . . . . . . . . . . . . . . . . . | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Producers' share (1) . . . . . . . . . . . . . | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Importers' share (1): | | | | | | | | | |
| China . . . . . . . . . . . . . . . . . . . . . . . . . | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Vietnam . . . . . . . . . . . . . . . . . . . . . | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Subtotal . . . . . . . . . . . . . . . . . . . . | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| All other sources . . . . . . . . . . . . . . . | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Total imports . . . . . . . . . . . . . . . . | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| | | | | | | | | | |
| **U.S. consumption value:** | | | | | | | | | |
| Amount . . . . . . . . . . . . . . . . . . . . . . . | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Producers' share (1) . . . . . . . . . . . . . | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Importers' share (1): | | | | | | | | | |
| China . . . . . . . . . . . . . . . . . . . . . . . . . | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Vietnam . . . . . . . . . . . . . . . . . . . . . | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Subtotal . . . . . . . . . . . . . . . . . . . . | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| All other sources . . . . . . . . . . . . . . . | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Total imports . . . . . . . . . . . . . . . . | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| | | | | | | | | | |
| **Net sales:** | | | | | | | | | |
| Quantity . . . . . . . . . . . . . . . . . . . . . | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Value . . . . . . . . . . . . . . . . . . . . . . . . | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Unit value . . . . . . . . . . . . . . . . . . . | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Cost of goods sold (COGS) . . . . . . . | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Gross profit or (loss) . . . . . . . . . . . . | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| SG&A expenses . . . . . . . . . . . . . . . . | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Operating income or (loss) . . . . . . . . | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Capital expenditures . . . . . . . . . . . . . | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Unit COGS . . . . . . . . . . . . . . . . . . . | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Unit SG&A expenses . . . . . . . . . . . . | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Unit operating income or (loss) . . . . | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| COGS/sales (1) . . . . . . . . . . . . . . . . | *** | *** | *** | *** | *** | *** | *** | *** | *** |
| Operating income or (loss)/ | | | | | | | | | |
| sales (1) . . . . . . . . . . . . . . . . . . . . . | *** | *** | *** | *** | *** | *** | *** | *** | *** |

(1) "Reported data" are in percent and "period changes" are in percentage points.

(2) Undefined.

Note.--Financial data are reported on a fiscal year basis and may not necessarily be comparable to data reported on a calendar year basis. Because of rounding, figures may not add to the totals shown. Unit values and shares are calculated from the unrounded figures.

Source: Compiled from data submitted in response to Commission questionnaires.

C-3

**APPENDIX D**

**WIND TOWER PROJECTS IN THE UNITED STATES**

The number of wind tower installations in the United States decreased from 5,664 in 2009 to 3,461 in 2011, and totaled 2,370 from January to September 2012 (table D-1). Texas accounted for the largest share of towers installed during 2009–September 2012, followed by Illinois, California, Oregon, and Iowa (table D-2 and figure D-3). There were substantial annual variations in the number of the wind towers installed and the share of wind towers accounted for by some states. Texas's share of wind tower installations declined from 24.7 percent in 2009 to 11.4 percent in January–September 2012, and Iowa's decreased from 9.4 to 4.6 percent. The share of installations in Illinois, on the other hand, remained fairly constant at between 7.4 and 11.7 percent during the period. California's share of installations increased from 3.0 percent in 2009 to 13.3 percent in January–September 2012, Oregon's from 6.0 to 10.8 percent, and Kansas's from 1.3 to 13.9 percent.

**Table D-1**
**Wind towers:  Installations of towers and turbines, 2009–September 2012**

|  | 2009 | 2010 | 2011 | Jan.-Sep. 2012 |
|---|---|---|---|---|
| Tower installations (number) | 5,664 | 2,899 | 3,461 | 2,370 |
| Wind turbine installations (MW) | 9,921 | 5,207 | 6,810 | 4,728 |
| Towers/MW installed | 0.57 | 0.56 | 0.51 | 0.50 |
| Source:  Compiled from table D-3. | | | | |

**Table D-2**
**Wind towers:  Leading states, installations, 2009–September 2012**

|  | Calendar Year | | | Jan.-Sep. | Calendar Year | | | Jan.-Sep. |
|---|---|---|---|---|---|---|---|---|
|  | 2009 | 2010 | 2011 | 2012 | 2009 | 2010 | 2011 | 2012 |
|  | Towers installed (*number*) | | | | Share of towers installed (*percent*) | | | |
| Texas | 1399 | 349 | 136 | 269 | 24.7 | 12.0 | 3.9 | 11.4 |
| Illinois | 421 | 282 | 404 | 208 | 7.4 | 9.7 | 11.7 | 8.8 |
| California | 168 | 221 | 349 | 316 | 3.0 | 7.6 | 10.1 | 13.3 |
| Oregon | 340 | 129 | 205 | 256 | 6.0 | 4.4 | 5.9 | 10.8 |
| Iowa | 534 | 3 | 282 | 110 | 9.4 | 0.1 | 8.1 | 4.6 |
| Oklahoma | 153 | 194 | 257 | 212 | 2.7 | 6.7 | 7.4 | 8.9 |
| Indiana | 529 | 184 | 1 | 3 | 9.3 | 6.3 | 0.0 | 0.1 |
| Washington | 241 | 162 | 157 | 55 | 4.3 | 5.6 | 4.5 | 2.3 |
| Minnesota | 36 | 218 | 331 | 0 | 0.6 | 7.5 | 9.6 | 0.0 |
| Kansas | 73 | 42 | 111 | 329 | 1.3 | 1.4 | 3.2 | 13.9 |
| Wyoming | 275 | 184 | 0 | 0 | 4.9 | 6.3 | 0.0 | 0.0 |
| North Dakota | 297 | 132 | 7 | 8 | 5.2 | 4.6 | 0.2 | 0.3 |
| New York | 345 | 0 | 64 | 6 | 6.1 | 0.0 | 1.8 | 0.3 |
| Colorado | 83 | 35 | 262 | 0 | 1.5 | 1.2 | 7.6 | 0.0 |
| Idaho | 34 | 134 | 155 | 32 | 0.6 | 4.6 | 4.5 | 1.4 |
| South Dakota | 68 | 229 | 50 | 0 | 1.2 | 7.9 | 1.4 | 0.0 |
| Pennsylvania | 213 | 0 | 21 | 108 | 3.8 | 0.0 | 0.6 | 4.6 |
| Michigan | 7 | 10 | 126 | 83 | 0.1 | 0.3 | 3.6 | 3.5 |
| Ohio | 0 | 4 | 56 | 155 | 0.0 | 0.1 | 1.6 | 6.5 |
| Maine | 64 | 39 | 72 | 0 | 1.1 | 1.3 | 2.1 | 0.0 |
| Other | 384 | 348 | 415 | 220 | 6.8 | 12.0 | 12.0 | 9.3 |
| Total | 5,664 | 2,899 | 3,461 | 2,370 | 100.0 | 100.0 | 100.0 | 100.0 |
| Note.--Listed in order from states with the most installations to states with the fewest installations. | | | | | | | | |
| Source:  Compiled from table D-3. | | | | | | | | |

JA 000418

**Figure D-1**
**Wind towers:  Leading states, share of installations, 2009–September 2012**



Source:  Compiled from table D-3.

**Table D-3**
**Wind towers:  Turbine installations, 2009–September 2012**

| State | Project Name | Capacity (*MW*) | Number of Turbines | Turbine Size (*MW*) | Turbine Manufacturer | Completed (*Year*) |
|---|---|---|---|---|---|---|
| AK | Kotzebue Wind Project | 1.8 | 2 | 0.9 | EWT Americas | 2012 |
| AK | Pillar Mountain  II | 4.5 | 3 | 1.5 | GE Energy | 2012 |
| AZ | Perrin Ranch | 99.2 | 62 | 1.6 | GE Energy | 2012 |
| CA | Brookfield Tehachapi 1 (CCDLP) | 102 | 34 | 3 | Vestas | 2012 |
| CA | Brookfield Tehachapi 2 (Alta VIII) | 21 | 7 | 3 | Vestas | 2012 |
| CA | Cemex Madison | 1.5 | 1 | 1.5 | GE Energy | 2012 |
| CA | Montezuma Winds II | 78.2 | 34 | 2.3 | Siemens | 2012 |
| CA | Mountain View IV | 49 | 49 | 1 | Mitsubishi | 2012 |
| CA | Mustang Hills (Alta VI) | 18 | 6 | 3 | Vestas | 2012 |
| CA | Pacific Wind | 142.25 | 69 | 2.05 | REpower | 2012 |
| CA | Solano Phase 3 | 127.8 | 55 | 1.80/3 | Vestas | 2012 |
| CA | Walmart - Red Bluff | 1.5 | 1 | 1.5 | GE Energy | 2012 |
| CA | Windstar | 120 | 60 | 2 | Gamesa | 2012 |
| HI | Kaheawa Wind II | 21 | 14 | 1.5 | GE Energy | 2012 |
| IA | AG Land 1 | 1.6 | 1 | 1.6 | GE Energy | 2012 |
| IA | AG Land 2 | 1.6 | 1 | 1.6 | GE Energy | 2012 |
| IA | AG Land 3 | 1.6 | 1 | 1.6 | GE Energy | 2012 |
| IA | AG Land 4 | 1.6 | 1 | 1.6 | GE Energy | 2012 |
| IA | AG Land 5 | 1.6 | 1 | 1.6 | GE Energy | 2012 |
| IA | AG Land 6 | 1.6 | 1 | 1.6 | GE Energy | 2012 |
| IA | Cumberland Rose | 1.6 | 1 | 1.6 | GE Energy | 2012 |
| IA | Forward Fontanelle | 1.6 | 1 | 1.6 | GE Energy | 2012 |
| IA | Greenfield Wind | 1.6 | 1 | 1.6 | GE Energy | 2012 |
| IA | GWE, LLC | 4 | 2 | 2 | HZ Windpower | 2012 |
| IA | Junction Hilltop Wind | 8 | 5 | 1.6 | GE Energy | 2012 |
| IA | Kirkwood Community College | 2.5 | 1 | 2.5 | Clipper | 2012 |
| IA | Meadow Ridge | 1.6 | 1 | 1.6 | GE Energy | 2012 |

Table continued on next page.

**Table D-3—*Continued***
Wind towers:  Turbine installations, 2009–September 2012

| State | Project Name | Capacity (MW) | Number of Turbines | Turbine Size (MW) | Turbine Manufacturer | Completed (Year) |
|---|---|---|---|---|---|---|
| IA | New Harvest | 100 | 50 | 2 | Gamesa | 2012 |
| IA | Pocahontas Prairie | 80 | 40 | 2 | Gamesa | 2012 |
| IA | Sky Volt | 1.68 | 1 | 1.68 | GE Energy | 2012 |
| IA | Wiota Wind | 1.6 | 1 | 1.6 | GE Energy | 2012 |
| ID | Horse Butte | 57.6 | 32 | 1.8 | Vestas | 2012 |
| IL | Bishop  Hill I | 200 | 133 | 1.5/1.6 | GE Energy | 2012 |
| IL | Eve | 2.5 | 1 | 2.5 | Clipper | 2012 |
| IL | Heartland Community College | 1.65 | 1 | 1.65 | Vestas | 2012 |
| IL | Shady Oaks | 109.5 | 73 | 1.5 | Goldwind | 2012 |
| IN | North Newton School Corporation | 0.9 | 1 | 0.9 | PowerWind | 2012 |
| IN | Northwestern School Corporation | 0.9 | 1 | 0.9 | PowerWind | 2012 |
| IN | West Central School Corporation | 0.9 | 1 | 0.9 | PowerWind | 2012 |
| KS | Cimarron  II | 131.1 | 57 | 2.3 | Siemens | 2012 |
| KS | Ironwood  I | 167.9 | 73 | 2.3 | Siemens | 2012 |
| KS | Post Rock | 201 | 134 | 1.5 | GE Energy | 2012 |
| KS | Shooting Star | 104 | 65 | 1.6 | GE Energy | 2012 |
| MA | Fairhaven Wind | 3 | 2 | 1.5 | Sinovel | 2012 |
| MA | Falmouth  II | 1.65 | 1 | 1.65 | Vestas | 2012 |
| MA | Kingston | 2 | 1 | 2 | Hyundai | 2012 |
| MA | No Fossil Fuel - Kingston | 6 | 3 | 2 | Gamesa | 2012 |
| MA | Philips Lightolier | 2 | 1 | 2 | Sany | 2012 |
| MA | Scituate Wind | 1.5 | 1 | 1.5 | Sinovel | 2012 |
| MI | Gratiot County | 110.4 | 69 | 1.6 | GE Energy | 2012 |
| MI | Heritage Garden | 28 | 14 | 2 | Gamesa | 2012 |
| MT | Gordon Butte | 9 | 6 | 1.5 | GE Energy | 2012 |
| ND | Bison Wind 1B (2012) | 24 | 8 | 3 | Siemens | 2012 |
| NH | Granite Reliable Power | 99 | 33 | 3 | Vestas | 2012 |
| NJ | Bayonne Wind Energy Project | 1.5 | 1 | 1.5 | Leitner-Poma | 2012 |
| NM | Wildcat Wind Project | 27.3 | 13 | 2.1 | Suzlon | 2012 |
| NV | Spring Valley | 151.8 | 66 | 2.3 | Siemens | 2012 |
| NY | Steel Winds II | 15 | 6 | 2.5 | Clipper | 2012 |
| OH | Blue Creek | 304 | 152 | 2 | Gamesa | 2012 |
| OH | Cooper Farms | 3 | 2 | 1.5 | Goldwind | 2012 |
| OH | Kenston School District | 0.75 | 1 | 0.75 | Aeronautica | 2012 |
| OK | Big Smile Wind Farm at Dempsey Ridge | 132 | 66 | 2 | Gamesa | 2012 |
| OK | Crossroads (2012) | 32 | 13 | 2.3/3.0 | Siemens | 2012 |
| OK | KODE Novus  I | 80 | 40 | 2 | DeWind | 2012 |
| OK | Rocky Ridge I | 148.8 | 93 | 1.6 | GE Energy | 2012 |
| OR | Shepherds Flat (Horseshoe Bend) | 82.5 | 33 | 2.5 | GE Energy | 2012 |
| OR | Shepherds Flat (Horseshoe Bend) | 207.5 | 83 | 2.5 | GE Energy | 2012 |
| OR | Shepherds Flat (North Hurlburt) (2012) | 60 | 24 | 2.5 | GE Energy | 2012 |
| OR | Shepherds Flat (South Hurlburt) | 165 | 66 | 2.5 | GE Energy | 2012 |
| OR | Shepherds Flat (South Hurlburt) | 125 | 50 | 2.5 | GE Energy | 2012 |
| PA | Highland North | 75 | 30 | 2.5 | Nordex | 2012 |
| PA | Laurel Hill | 69 | 30 | 2.3 | Siemens | 2012 |
| PA | Sandy Ridge | 50 | 25 | 2 | Gamesa | 2012 |

Table continued on next page.

**Table D-3—*Continued***
Wind towers:  Turbine installations, 2009–September 2012

| State | Project Name | Capacity (*MW*) | Number of Turbines | Turbine Size (*MW*) | Turbine Manufacturer | Completed (*Year*) |
|---|---|---|---|---|---|---|
| PA | South Chestnut | 46 | 23 | 2 | Gamesa | 2012 |
| RI | Hodges Badge | 0.25 | 1 | 0.25 | Siva | 2012 |
| TX | Frisco | 20 | 10 | 2 | DeWind | 2012 |
| TX | Harbor Wind | 9 | 6 | 1.5 | Guodian | 2012 |
| TX | Magic Valley | 201.6 | 112 | 1.8 | Vestas | 2012 |
| TX | Majestic  II | 79.6 | 51 | 1.50/1.6 | GE Energy | 2012 |
| TX | Trinity Hills | 225 | 90 | 2.5 | Clipper | 2012 |
| WA | Lower Snake River Phase  I (2012) | 126.5 | 55 | 2.3 | Siemens | 2012 |
| WI | Cashton Greens | 4.99 | 2 | 2.5 | Clipper | 2012 |
| WV | Pinnacle (2012) | 19.2 | 8 | 2.4 | Mitsubishi | 2012 |
| AZ | Kingman | 10 | 5 | 2 | Gamesa | 2011 |
| CA | Alta III | 150 | 50 | 3 | Vestas | 2011 |
| CA | Alta IV | 102 | 34 | 3 | Vestas | 2011 |
| CA | Alta V | 168 | 56 | 3 | Vestas | 2011 |
| CA | Alta VI (partial) | 132 | 44 | 3 | Vestas | 2011 |
| CA | Alta VIII (partial) | 129 | 43 | 3 | Vestas | 2011 |
| CA | Anheuser-Busch Fairfield | 1.5 | 1 | 1.5 | GE Energy | 2011 |
| CA | Inland Empire Utility Agency (IEUA) | 1 | 1 | 1 | Mitsubishi | 2011 |
| CA | Palm Springs | 49.5 | 33 | 1.5 | GE Energy | 2011 |
| CA | San Gorgonio Wind Farm (REpower) | 6 | 2 | 3 | Vestas | 2011 |
| CA | Shiloh III | 102.5 | 50 | 2.1 | REpower | 2011 |
| CA | Tehachapi 1.6 Proto- Type | 1.6 | 1 | 1.6 | GE Energy | 2011 |
| CA | Vasco Winds | 78.2 | 34 | 2.3 | Siemens | 2011 |
| CO | Cedar Creek II (GE) | 100.8 | 63 | 1.6 | GE Energy | 2011 |
| CO | Cedar Creek II (Nordex) | 150 | 60 | 2.5 | Nordex | 2011 |
| CO | Cedar Point Wind | 250.2 | 139 | 1.8 | Vestas | 2011 |
| HI | Kahuku Wind | 30 | 12 | 2.5 | Clipper | 2011 |
| IA | Elk | 42.5 | 17 | 2.5 | Nordex | 2011 |
| IA | Laurel | 119.6 | 52 | 2.3 | Siemens | 2011 |
| IA | Little Cedar | 1.5 | 1 | 1.5 | Goldwind | 2011 |
| IA | Luther College Wind Turbine | 1.6 | 1 | 1.6 | GE Energy | 2011 |
| IA | New London | 1.5 | 1 | 1.5 | VENSYS | 2011 |
| IA | Pomeroy | 29.9 | 13 | 2.3 | Siemens | 2011 |
| IA | Roeder Farms | 1.6 | 1 | 1.6 | GE Energy | 2011 |
| IA | Rolling Hills | 443.9 | 193 | 2.3 | Siemens | 2011 |
| IA | Story City Wind | 1.5 | 1 | 1.5 | Goldwind | 2011 |
| IA | Traer Wind | 1.5 | 1 | 1.5 | Goldwind | 2011 |
| IA | Wind Walkers | 1.6 | 1 | 1.6 | GE Energy | 2011 |
| ID | Idaho Wind Partners 1 (11 farms - 2011) | 118.5 | 79 | 1.5 | GE Energy | 2011 |
| ID | Power County | 45 | 18 | 2.5 | Nordex | 2011 |
| ID | Rockland | 79.2 | 44 | 1.8 | Vestas | 2011 |
| ID | Sawtooth | 22.4 | 14 | 1.6 | GE Energy | 2011 |
| IL | Big Sky Wind Facility | 239.4 | 114 | 2.1 | Suzlon | 2011 |
| IL | Brown County Wind | 1.5 | 1 | 1.5 | VENSYS | 2011 |
| IL | Pioneer Trail | 150.4 | 94 | 1.6 | GE Energy | 2011 |

Table continued on next page.

D-6

**Table D-3—*Continued***
**Wind towers: Turbine installations, 2009–September 2012**

| State | Project Name | Capacity (*MW*) | Number of Turbines | Turbine Size (*MW*) | Turbine Manufacturer | Completed (*Year*) |
|---|---|---|---|---|---|---|
| IL | Settler's Trail | 150.4 | 94 | 1.6 | GE Energy | 2011 |
| IL | Testa Produce | 0.8 | 1 | 0.8 | Aeronautica | 2011 |
| IL | White Oak Energy Center | 150 | 100 | 1.5 | GE Energy | 2011 |
| IN | Tippecanoe Valley School Corporation | 0.9 | 1 | 0.9 | Aeronautica | 2011 |
| KS | Caney River | 199.8 | 111 | 1.8 | Vestas | 2011 |
| MA | AFCEE MMR Turbines | 3 | 2 | 1.5 | GE Energy | 2011 |
| MA | Berkshire Wind Power Project | 15 | 10 | 1.5 | GE Energy | 2011 |
| MA | Charlestown Wind Turbine | 1.5 | 1 | 1.5 | Sinovel | 2011 |
| MA | Department of Correction, NCCI Gardner | 3.3 | 2 | 1.7 | Vestas | 2011 |
| MA | Ipswich | 1.6 | 1 | 1.6 | GE Energy | 2011 |
| MA | Mount Wachusett Community College | 3.3 | 2 | 1.7 | Vestas | 2011 |
| MD | Roth Rock | 50 | 20 | 2.5 | Nordex | 2011 |
| ME | Record Hill | 50.6 | 22 | 2.3 | Siemens | 2011 |
| ME | Rollins | 60 | 40 | 1.5 | GE Energy | 2011 |
| ME | Spruce Mountain | 20 | 10 | 2 | Gamesa | 2011 |
| MI | Gratiot | 102.4 | 64 | 1.6 | GE Energy | 2011 |
| MI | Michigan Wind II | 90 | 50 | 1.8 | Vestas | 2011 |
| MI | Stoney Corners III (Northern Power Systems) | 2.3 | 1 | 2.3 | Northern Power Systems | 2011 |
| MI | Stoney Corners III (Repower) | 18.3 | 9 | N/A | Repower | 2011 |
| MN | Adams | 19.8 | 12 | 1.7 | Alstom | 2011 |
| MN | Bent Tree | 201.3 | 122 | 1.7 | Vestas | 2011 |
| MN | Carleton College | 1.6 | 1 | 1.6 | GE Energy | 2011 |
| MN | Community Wind North | 30 | 12 | 2.5 | Clipper | 2011 |
| MN | Danielson Wind | 19.8 | 12 | 1.7 | Alstom | 2011 |
| MN | Eolos | 2.5 | 1 | 2.5 | Clipper | 2011 |
| MN | GL Wind | 5 | 2 | 2.5 | Clipper | 2011 |
| MN | Lakefield | 153 | 102 | 1.5 | GE Energy | 2011 |
| MN | Lakefield (phase I) | 52.5 | 35 | 1.5 | GE Energy | 2011 |
| MN | Oak Glen Wind Project | 43.2 | 24 | 1.8 | Vestas | 2011 |
| MN | University of Minnesota Morris II - PES | 1.7 | 1 | 1.7 | Vestas | 2011 |
| MN | Valley View | 10 | 5 | 2 | Gamesa | 2011 |
| MN | Winona County Wind | 1.5 | 2 | 0.8 | Unison | 2011 |
| MO | Lost Creek Ridge Wind Farm (2011) | 1.5 | 1 | 1.5 | GE Energy | 2011 |
| ND | Bison Wind 1B ('11) | 21 | 7 | 3 | Siemens | 2011 |
| NE | Laredo Ridge | 81 | 54 | 1.5 | GE Energy | 2011 |
| NE | Petersburg | 40.5 | 27 | 1.5 | GE Energy | 2011 |
| NE | Springview II Wind Facility | 3 | 2 | 1.5 | VENSYS | 2011 |
| NM | Macho Springs Wind Farm I | 50.4 | 28 | 1.8 | Vestas | 2011 |

Table continued on next page.

D-7

**Table D-3—*Continued***
Wind towers:  Turbine installations, 2009–September 2012

| State | Project Name | Capacity (*MW*) | Number of Turbines | Turbine Size (*MW*) | Turbine Manufacturer | Completed (*Year*) |
|---|---|---|---|---|---|---|
| NY | Hardscrabble | 74 | 37 | 2 | Gamesa | 2011 |
| NY | Howard | 51.3 | 25 | 2.1 | REpower | 2011 |
| NY | Zotos | 3.3 | 2 | 1.7 | Hyundai | 2011 |
| OH | Lincoln Electric | 2.5 | 1 | 2.5 | Kenersys | 2011 |
| OH | Timber Road II | 45 | 25 | 1.8 | Vestas | 2011 |
| OH | Timber Road II | 54 | 30 | 1.8 | Vestas | 2011 |
| OK | Blue Canyon VI | 99 | 55 | 1.8 | Vestas | 2011 |
| OK | Crossroads ('11) | 195.5 | 85 | 2.3 | Siemens | 2011 |
| OK | Minco II Wind Energy Center | 100.8 | 63 | 1.6 | GE Energy | 2011 |
| OK | Taloga | 129.6 | 54 | 2.4 | Mitsubishi | 2011 |
| OR | Leaning Juniper 2a | 90.3 | 43 | 2.1 | Suzlon | 2011 |
| OR | Leaning Juniper 2b | 111 | 74 | 1.5 | GE Energy | 2011 |
| OR | Lime Wind | 3 | 6 | 0.5 | Nordtank (refurbished) | 2011 |
| OR | Shepherds Flat ('11 portion) | 205 | 82 | 2.5 | GE Energy | 2011 |
| PA | Chestnut Flats | 38 | 19 | 2 | Gamesa | 2011 |
| PA | Frey Farm | 3.2 | 2 | 1.6 | GE Energy | 2011 |
| SD | Crow Lake (2011) | 64.5 | 43 | 1.5 | GE Energy | 2011 |
| SD | Crow Lake (2011) - Community Owned | 10.5 | 7 | 1.5 | GE Energy | 2011 |
| TX | Golden Spread Panhandle Wind Ranch | 78.2 | 34 | 2.3 | Siemens | 2011 |
| TX | Loraine II | 49.5 | 33 | 1.5 | GE Energy | 2011 |
| TX | Lubbock Wind Ranch | 5 | 2 | 2.5 | Samsung | 2011 |
| TX | Ralls Wind Farm | 10 | 5 | 2 | Sany | 2011 |
| TX | Sherbino II | 150 | 60 | 2.5 | Clipper | 2011 |
| TX | Suzlon Project VII | 4.2 | 2 | 2.1 | Suzlon | 2011 |
| UT | Milford II | 102 | 68 | 1.5 | GE Energy | 2011 |
| VT | Sheffield | 40 | 16 | 2.5 | Clipper | 2011 |
| WA | Juniper Canyon | 151.2 | 63 | 2.4 | Mitsubishi | 2011 |
| WA | Lower Snake River Phase I ('11) | 216.2 | 94 | 2.3 | Siemens | 2011 |
| WI | Glacier Hills | 162 | 90 | 1.8 | Vestas | 2011 |
| WV | Laurel Mountain | 97.6 | 61 | 1.6 | GE Energy | 2011 |
| WV | Pinnacle ('11 portion) | 36 | 15 | 2.4 | Mitsubishi | 2011 |
| AZ | Dry Lake II | 65.1 | 31 | 2.1 | Suzlon | 2010 |
| CA | Alta (Vestas) II | 150 | 50 | 3 | Vestas | 2010 |
| CA | Alta I | 150 | 100 | 1.5 | GE Energy | 2010 |
| CA | Hatchet Ridge Wind | 101.2 | 44 | 2.3 | Siemens | 2010 |
| CA | Montezuma | 36.8 | 16 | 2.3 | Siemens | 2010 |
| CA | Pine Tree extension | 15 | 10 | 1.5 | GE Energy | 2010 |
| CA | Teichert Aggregates | 1.5 | 1 | 1.5 | GE Energy | 2010 |
| CO | Kit Carson Project | 51 | 34 | 1.5 | GE Energy | 2010 |

Table continued on next page.

D-8

**Table D-3—*Continued***
Wind towers:  Turbine installations, 2009–September 2012

| State | Project Name | Capacity (*MW*) | Number of Turbines | Turbine Size (*MW*) | Turbine Manufacturer | Completed (*Year*) |
|---|---|---|---|---|---|---|
| CO | Pueblo Towers | 1.8 | 1 | 1.8 | Vestas | 2010 |
| DE | University of Delaware | 2 | 1 | 2 | Gamesa | 2010 |
| IA | Bulldog | 1.5 | 1 | 1.5 | GE Energy | 2010 |
| IA | Wolverine | 1.5 | 1 | 1.5 | GE Energy | 2010 |
| IA | Zachary Ridge | 2 | 1 | 2 | Gamesa | 2010 |
| ID | Goshen North | 124.5 | 83 | 1.5 | GE Energy | 2010 |
| ID | Oregon Trail - 11 wind farms | 64.5 | 43 | 1.5 | GE Energy | 2010 |
| ID | Tuana Springs | 16.8 | 8 | 2.1 | Suzlon | 2010 |
| IL | Cayuga Ridge | 300 | 150 | 2 | Gamesa | 2010 |
| IL | Top Crop II (3Q10) | 183 | 122 | 1.5 | GE Energy | 2010 |
| IL | Top Crop II (4Q10) | 15 | 10 | 1.5 | GE Energy | 2010 |
| IN | Meadow Lake II 2Q10 | 91.5 | 61 | 1.5 | Acciona | 2010 |
| IN | Meadow Lake II 3Q10 | 7.5 | 5 | 1.5 | Acciona | 2010 |
| IN | Meadow Lake III | 103.5 | 69 | 1.5 | GE Energy | 2010 |
| IN | Meadow Lake IV (3Q10) | 92.4 | 44 | 2.1 | Suzlon | 2010 |
| IN | Meadow Lake IV (4Q10) | 6.3 | 3 | 2.1 | Suzlon | 2010 |
| IN | Randolph Eastern School Corp. | 1 | 1 | 1 | Nordic | 2010 |
| IN | The City of Union City | 1 | 1 | 1 | Nordic | 2010 |
| KS | Greensburg | 12.5 | 10 | 1.3 | Suzlon | 2010 |
| KS | Spearville II | 48 | 32 | 1.5 | GE Energy | 2010 |
| MA | Berkshire East Ski Area | 0.9 | 1 | 0.9 | PowerWind | 2010 |
| MA | Falmouth | 1.7 | 1 | 1.7 | Vestas | 2010 |
| MA | Notus Falmouth | 1.7 | 1 | 1.7 | Vestas | 2010 |
| MD | Criterion | 70 | 28 | 2.5 | Clipper | 2010 |
| ME | Kibby Mountain, phase II | 66 | 22 | 3 | Vestas | 2010 |
| ME | Stetson Wind expansion | 25.5 | 17 | 1.5 | GE Energy | 2010 |
| MI | Stoney Corners II (Northern Power Systems) | 2.2 | 1 | 2.2 | Northern Power Systems | 2010 |
| MI | Stoney Corners II (Repower) | 18.5 | 9 | 2.1 | REpower | 2010 |
| MN | Elm Creek II | 148.8 | 62 | 2.4 | Mitsubishi | 2010 |
| MN | Grant County | 20 | 10 | 2 | Suzlon | 2010 |
| MN | Nobles | 201 | 134 | 1.5 | GE Energy | 2010 |
| MN | Ridgewind | 25.3 | 11 | 2.3 | Siemens | 2010 |
| MN | Woodstock Municipal Wind | 0.8 | 1 | 0.8 | EWT Americas | 2010 |
| MO | Lost Creek Ridge Wind Farm | 148.5 | 99 | 1.5 | GE Energy | 2010 |
| MT | Diamond Willow extension | 10.5 | 7 | 1.5 | GE Energy | 2010 |
| ND | Ashtabula III | 62.4 | 39 | 1.6 | GE Energy | 2010 |
| ND | Baldwin | 102.4 | 64 | 1.6 | GE Energy | 2010 |
| ND | Bison Wind 1A | 36.8 | 16 | 2.3 | Siemens | 2010 |
| ND | Cedar Hills | 19.5 | 13 | 1.5 | GE Energy | 2010 |
| NE | Flat Water | 60 | 40 | 1.5 | GE Energy | 2010 |
| NM | Red Mesa | 102.4 | 64 | 1.6 | GE Energy | 2010 |

Table continued on next page.

**Table D-3—*Continued***
Wind towers:  Turbine installations, 2009–September 2012

| State | Project Name | Capacity (*MW*) | Number of Turbines | Turbine Size (*MW*) | Turbine Manufacturer | Completed (*Year*) |
|---|---|---|---|---|---|---|
| OH | Conneaut Middle School | 0.6 | 1 | 0.6 | Elecon | 2010 |
| OH | Conneaut Waste Water Treatment | 0.4 | 1 | 0.4 | not available | 2010 |
| OH | Sandusky Waste Water Treatment | 0.6 | 1 | 0.6 | Elecon | 2010 |
| OH | Sandusky Water Filtration | 0.4 | 1 | 0.4 | not available | 2010 |
| OK | Elk City II (1.5) | 72 | 48 | 1.5 | GE Energy | 2010 |
| OK | Elk City II (1.6) | 28.8 | 18 | 1.6 | GE Energy | 2010 |
| OK | Keenan II | 151.8 | 66 | 2.3 | Siemens | 2010 |
| OK | Minco Wind | 99.2 | 62 | 1.6 | GE Energy | 2010 |
| OR | Biglow Canyon phase III | 174.8 | 76 | 2.3 | Siemens | 2010 |
| OR | Patu Wind Farm | 9 | 6 | 1.5 | GE Energy | 2010 |
| OR | Star Point | 98.7 | 47 | 2.1 | Suzlon | 2010 |
| SD | Buffalo Ridge II | 210 | 105 | 2 | Gamesa | 2010 |
| SD | Crow Lake (2010) | 87 | 58 | 1.5 | GE Energy | 2010 |
| SD | Day County Wind Project | 99 | 66 | 1.5 | GE Energy | 2010 |
| TX | Cedro Hill | 150 | 100 | 1.5 | GE Energy | 2010 |
| TX | DeWind Little Pringle # 1 | 10 | 5 | 2 | DeWind | 2010 |
| TX | DeWind Little Pringle # 2 | 10 | 5 | 2 | DeWind | 2010 |
| TX | Loraine | 100.5 | 67 | 1.5 | GE Energy | 2010 |
| TX | Lubbock Wind Ranch | 2.5 | 1 | 2.5 | Samsung | 2010 |
| TX | Papalote Creek II | 200.1 | 87 | 2.3 | Siemens | 2010 |
| TX | Penescal II | 201.6 | 84 | 2.4 | Mitsubishi | 2010 |
| WA | Big Horn 2 | 50 | 25 | 2 | Gamesa | 2010 |
| WA | Coastal Energy | 6 | 4 | 1.5 | GE Energy | 2010 |
| WA | Kittitas Valley | 100.8 | 48 | 2.1 | Suzlon | 2010 |
| WA | Linden | 50 | 25 | 2 | REpower | 2010 |
| WA | Vantage Point | 90 | 60 | 1.5 | GE Energy | 2010 |
| WI | Shirley | 20 | 8 | 2.5 | Nordex | 2010 |
| WV | Beech Ridge (Q2) | 84 | 56 | 1.5 | GE Energy | 2010 |
| WV | Beech Ridge (Q3) | 16.5 | 11 | 1.5 | GE Energy | 2010 |
| WY | Dunlap | 111 | 74 | 1.5 | GE Energy | 2010 |
| WY | Top of the World (GE) | 99 | 66 | 1.5 | GE Energy | 2010 |
| WY | Top of the World (Siemens) | 101.2 | 44 | 2.3 | Siemens | 2010 |
| AK | Kodiak Island Wind Project | 4.5 | 3 | 1.5 | GE Energy | 2009 |
| AZ | Dry Lake | 63 | 30 | 2.1 | Suzlon | 2009 |
| CA | Garnet Wind Project | 6.5 | 13 | 0.5 | not available | 2009 |
| CA | Pine Tree Wind Farm | 120 | 80 | 1.5 | GE Energy | 2009 |
| CA | Shiloh II | 150 | 75 | 2 | REpower | 2009 |
| CO | Northeastern Colorado Wind Energy Center | 151.8 | 66 | 2.3 | Siemens | 2009 |
| CO | Northeastern Colorado Wind Energy Center | 22.5 | 15 | 1.5 | GE Energy | 2009 |
| CO | NREL research | 1.5 | 1 | 1.5 | GE Energy | 2009 |

Table continued on next page.

D-10

**Table D-3—***Continued*
**Wind towers: Turbine installations, 2009–September 2012**

| State | Project Name | Capacity (*MW*) | Number of Turbines | Turbine Size (*MW*) | Turbine Manufacturer | Completed (*Year*) |
|---|---|---|---|---|---|---|
| CO | NREL research | 2.3 | 1 | 2.3 | Siemens | 2009 |
| IA | Barton | 160 | 80 | 2 | Gamesa | 2009 |
| IA | Crane Creek | 99 | 66 | 1.5 | GE Energy | 2009 |
| IA | Crystal Lake - Clipper (09) | 10 | 4 | 2.5 | Clipper | 2009 |
| IA | Crystal Lake II | 66 | 44 | 1.5 | GE Energy | 2009 |
| IA | Iowa Lakes Lakota Wind | 10.5 | 7 | 1.5 | GE Energy | 2009 |
| IA | Iowa Lakes Superior Wind | 10.5 | 7 | 1.5 | GE Energy | 2009 |
| IA | Lost Lakes Wind Farm | 100.7 | 61 | 1.7 | Vestas | 2009 |
| IA | Osage Utilities | 1.5 | 1 | 1.5 | GE Energy | 2009 |
| IA | Pioneer Prairie II (09) | 71 | 43 | 1.7 | Vestas | 2009 |
| IA | Story II | 150 | 100 | 1.5 | GE Energy | 2009 |
| IA | Whispering Willow I | 199.7 | 121 | 1.7 | Vestas | 2009 |
| ID | Cassia | 29.4 | 14 | 2.1 | Suzlon | 2009 |
| ID | Mountain Home | 42 | 20 | 2.1 | Suzlon | 2009 |
| IL | Blackstone (Top Crop) | 102 | 68 | 1.5 | GE Energy | 2009 |
| IL | EcoGrove | 100.5 | 67 | 1.5 | Acciona | 2009 |
| IL | Grand Ridge II | 51 | 34 | 1.5 | GE Energy | 2009 |
| IL | Grand Ridge III/IV | 60 | 40 | 1.5 | GE Energy | 2009 |
| IL | Lee/DeKalb | 217.5 | 145 | 1.5 | GE Energy | 2009 |
| IL | Rail Splitter | 100.5 | 67 | 1.5 | GE Energy | 2009 |
| IN | Fowler Ridge II | 199.5 | 133 | 1.5 | GE Energy | 2009 |
| IN | Fowler Ridge Wind Farm Phase I (Clipper) | 100 | 40 | 2.5 | Clipper | 2009 |
| IN | Fowler Ridge Wind Farm Phase I (Vestas) | 300.3 | 182 | 1.7 | Vestas | 2009 |
| IN | Hoosier | 106 | 53 | 2 | REpower | 2009 |
| IN | Meadow Lake | 199.7 | 121 | 1.7 | Vestas | 2009 |
| KS | Central Plains | 99 | 33 | 3 | Vestas | 2009 |
| KS | Flat Ridge I Wind Farm | 100 | 40 | 2.5 | Clipper | 2009 |
| MA | Air Force Center for Engineering | 1.5 | 1 | 1.5 | not available | 2009 |
| MA | Bartlett's Ocean Wind Farm | 0.3 | 1 | 0.3 | not available | 2009 |
| MA | Falmouth Wastwater | 1.7 | 1 | 1.7 | not available | 2009 |
| MA | Mark Richey Woodworking | 0.6 | 1 | 0.6 | not available | 2009 |
| MA | Mount Wachusetts wind farm | 3 | 2 | 1.5 | Fuhrlander | 2009 |
| MA | MWRA Deer Island | 1.2 | 2 | 0.6 | not available | 2009 |
| MA | Williams Stone | 0.6 | 1 | 0.6 | not available | 2009 |
| ME | Fox Islands | 4.5 | 3 | 1.5 | GE Energy | 2009 |
| ME | Kibby Mountain, phase I | 66 | 22 | 3 | Vestas | 2009 |
| ME | Presque Isle | 0.6 | 1 | 0.6 | not available | 2009 |
| ME | Stetson Wind (Evergreen) | 57 | 38 | 1.5 | GE Energy | 2009 |
| MI | Stoney Corners - REpower | 14 | 7 | 2 | REpower | 2009 |
| MN | Hilltop | 2 | 1 | 2 | not available | 2009 |

Table continued on next page.

D-11

JA 000426

**Table D-3—***Continued*
**Wind towers:  Turbine installations, 2009–September 2012**

| State | Project Name | Capacity (*MW*) | Number of Turbines | Turbine Size (*MW*) | Turbine Manufacturer | Completed (*Year*) |
|---|---|---|---|---|---|---|
| MN | Moraine II | 49.5 | 33 | 1.5 | GE Energy | 2009 |
| MN | Willmar | 4 | 2 | 2 | DeWind | 2009 |
| MO | Farmers City | 146 | 73 | 2 | Gamesa | 2009 |
| MT | Glacier Wind II | 103.5 | 69 | 1.5 | Acciona | 2009 |
| ND | Ashtabula II (3Q) | 52.5 | 35 | 1.5 | GE Energy | 2009 |
| ND | Ashtabula II (4Q) | 67.5 | 45 | 1.5 | GE Energy | 2009 |
| ND | Luverne | 49.5 | 33 | 1.5 | GE Energy | 2009 |
| ND | Prairie Winds ND1 | 115.5 | 77 | 1.5 | GE Energy | 2009 |
| ND | PrairieWinds Minot Wind 2 | 4.5 | 3 | 1.5 | GE Energy | 2009 |
| ND | Rugby | 149.1 | 71 | 2.1 | Suzlon | 2009 |
| ND | Wilton Wind Energy Center II | 49.5 | 33 | 1.5 | GE Energy | 2009 |
| NE | Elkhorn Ridge | 81 | 27 | 3 | Vestas | 2009 |
| NM | High Lonesome | 100 | 40 | 2.5 | Clipper | 2009 |
| NY | Dutch Hill/Cohocton (Canadaigua) | 125 | 50 | 2.5 | Clipper | 2009 |
| NY | High Sheldon | 112.5 | 75 | 1.5 | GE Energy | 2009 |
| NY | Noble Altona Windpark | 97.5 | 65 | 1.5 | GE Energy | 2009 |
| NY | Noble Chateaugay Windpark | 106.5 | 71 | 1.5 | GE Energy | 2009 |
| NY | Noble Wethersfield Windpark | 126 | 84 | 1.5 | GE Energy | 2009 |
| OK | Blue Canyon V | 34.5 | 23 | 1.5 | GE Energy | 2009 |
| OK | Blue Canyon V Q4 | 64.5 | 43 | 1.5 | GE Energy | 2009 |
| OK | Elk City | 98.9 | 43 | 2.3 | Siemens | 2009 |
| OK | OU Spirit | 101.2 | 44 | 2.3 | Siemens | 2009 |
| OR | Biglow Canyon phase II | 149.5 | 65 | 2.3 | Siemens | 2009 |
| OR | Echo 1-7 | 44.6 | 27 | 1.7 | Vestas | 2009 |
| OR | Echo 8-9 | 20 | 10 | 2 | REpower | 2009 |
| OR | Hay Canyon | 100.8 | 48 | 2.1 | Suzlon | 2009 |
| OR | Pebble Springs | 98.7 | 47 | 2.1 | Suzlon | 2009 |
| OR | Threemile Canyon | 9.9 | 6 | 1.7 | Vestas | 2009 |
| OR | Vancycle II | 98.9 | 43 | 2.3 | Siemens | 2009 |
| OR | Wheatfield | 96.6 | 46 | 2.1 | Suzlon | 2009 |
| OR | Willow Creek | 72 | 48 | 1.5 | GE Energy | 2009 |
| PA | Armenia Mountain | 100.5 | 67 | 1.5 | GE Energy | 2009 |
| PA | Highland Wind Project | 62.5 | 25 | 2.5 | Nordex | 2009 |
| PA | Locust Ridge II | 102 | 51 | 2 | Gamesa | 2009 |
| PA | North Allegheny | 70 | 35 | 2 | Gamesa | 2009 |
| PA | Stony Creek | 52.5 | 35 | 1.5 | GE Energy | 2009 |
| SD | Buffalo Ridge | 50.4 | 24 | 2.1 | Suzlon | 2009 |
| SD | Titan I | 25 | 10 | 2.5 | Clipper | 2009 |
| SD | Wessington Springs | 51 | 34 | 1.5 | GE Energy | 2009 |
| TX | Barton Chapel | 120 | 60 | 2 | Gamesa | 2009 |
| TX | Goat Phase II | 69.6 | 29 | 2.4 | Mitsubishi | 2009 |

Table continued on next page.

D-12

**Table D-3—*Continued***
**Wind towers:  Turbine installations, 2009–September 2012**

| State | Project Name | Capacity (*MW*) | Number of Turbines | Turbine Size (*MW*) | Turbine Manufacturer | Completed (*Year*) |
|---|---|---|---|---|---|---|
| TX | Gulf Wind | 283.2 | 118 | 2.4 | Mitsubishi | 2009 |
| TX | Inadale Wind Farm | 197 | 197 | 1 | Mitsubishi | 2009 |
| TX | JD Wind 11 | 10 | 8 | 1.3 | Suzlon | 2009 |
| TX | JD Wind 7 | 10 | 8 | 1.3 | Suzlon | 2009 |
| TX | JD Wind 8 | 10 | 8 | 1.3 | Suzlon | 2009 |
| TX | Langford | 150 | 100 | 1.5 | GE Energy | 2009 |
| TX | Majestic | 79.5 | 53 | 1.5 | GE Energy | 2009 |
| TX | Noble Great Plains Windpark | 114 | 76 | 1.5 | GE Energy | 2009 |
| TX | Notrees 1A (Vestas) | 90.8 | 55 | 1.7 | Vestas | 2009 |
| TX | Notrees 1B (GE Energy) | 60 | 40 | 1.5 | GE Energy | 2009 |
| TX | Notrees 1C (Vestas) | 1.9 | 1 | 1.9 | Vestas | 2009 |
| TX | Panther Creek II | 115.5 | 77 | 1.5 | GE Energy | 2009 |
| TX | Panther Creek III | 199.5 | 133 | 1.5 | GE Energy | 2009 |
| TX | Papalote Creek | 179.9 | 109 | 1.7 | Vestas | 2009 |
| TX | Penescal | 201.6 | 84 | 2.4 | Mitsubishi | 2009 |
| TX | Pyron Wind Farm | 249 | 166 | 1.5 | GE Energy | 2009 |
| TX | South Trent Mesa | 101.2 | 44 | 2.3 | Siemens | 2009 |
| TX | Sunray I | 10.5 | 7 | 1.5 | GE Energy | 2009 |
| TX | Sunray II | 39 | 26 | 1.5 | GE Energy | 2009 |
| UT | Milford Wind Corridor, Phase I (Clipper) | 145 | 58 | 2.5 | Clipper | 2009 |
| UT | Milford Wind Corridor, Phase I (GE Energy) | 58.5 | 39 | 1.5 | GE Energy | 2009 |
| WA | Harvest Wind Farm | 98.9 | 43 | 2.3 | Siemens | 2009 |
| WA | Wild Horse II | 44 | 22 | 2 | Vestas | 2009 |
| WA | Windy Point I - REpower (09) | 40 | 20 | 2 | REpower | 2009 |
| WA | Windy Point I - Siemens | 96.6 | 42 | 2.3 | Siemens | 2009 |
| WA | Windy Point II | 29.9 | 13 | 2.3 | Siemens | 2009 |
| WA | Windy Point II (09) | 172.5 | 75 | 2.3 | Siemens | 2009 |
| WA | Windy Point IIa - Windy Flats Extention | 59.8 | 26 | 2.3 | Siemens | 2009 |
| WI | Butler Ridge | 54 | 36 | 1.5 | GE Energy | 2009 |
| WY | Airforce | 2 | 1 | 2 | Gamesa | 2009 |
| WY | Campbell Hill | 99 | 66 | 1.5 | GE Energy | 2009 |
| WY | Casper Wind Farm | 16.5 | 11 | 1.5 | GE Energy | 2009 |
| WY | Glenrock III | 39 | 26 | 1.5 | GE Energy | 2009 |
| WY | High Plains | 99 | 66 | 1.5 | GE Energy | 2009 |
| WY | McFadden Ridge | 28.5 | 19 | 1.5 | GE Energy | 2009 |
| WY | Rolling Hills | 99 | 66 | 1.5 | GE Energy | 2009 |
| WY | Silver Sage | 42 | 20 | 2.1 | Suzlon | 2009 |

Table continued on next page.

D-13

**Table D-3—*Continued***
**Wind towers:  Turbine installations, 2009–September 2012**

Notes.--Based on end of year reports and may not include any subsequent revisions or corrections. Where not included in the AWEA reports, the number of turbines was calculated by dividing project size by rating of turbines installed. The Dutch Hill wind project is included in both the 2008 and 2009 AWEA market reports. It is included here in 2009 data only. Does not include turbines with a capacity of 0.1 MW or less.

Sources: Petition, exh. I-28; AWEA Web site, http://archive.awea.org/Projects/ProjectsNew.ASPx?s=Michigan (accessed January 30, 2012); AWEA, *U.S. Wind Industry First Quarter 2011 Market Report*, April 2011; AWEA, *U.S. Wind Industry Year-End 2010 Market Report*, January 2011; AWEA, *Third Quarter 2010 Market Report*, October 2010; AWEA, *AWEA Year End 2009 Market Report*, January 2010; AWEA, *U.S. Wind Industry Fourth Quarter 2011 Market Report*, January 2012; AWEA, *U.S. Wind Industry Third Quarter 2012 Market* Report, October 17, 2012; Sacramento Municipal Utility District, "Huge Wind Power Expansion Complete at SMUD Solano Wind Project," News release, May 10, 2012, https://www.smud.org/en/about-smud/news-media/news-releases/2012-05-10.htm; Windpower Intelligence Web site, http://www.windpowerintelligence.com/article/1ab8581698/2012/07/15/USA_Invenergy_commissions_200MW_Bishop_Hill_Wind/ (accessed December 17, 2012); RES Americas, "RES Americas Announces Completion of Crossroads Wind Farm," News release, February 21, 2012, http://www.res-americas.com/media/937292/res%20americas%20announces%20completion%20of%20crossroads%20wind%20farm.pdf;    Welch, Kevin, "Wind Farm Representatives Seek Potter Tax Abatements," *Amarillo Globe News*, February 13, 2012, http://amarillo.com/news/local-news/2012-02-13/wind-farm-representatives-seek-potter-tax-abatements; All AWEA market reports available at http://www.awea.org/learnabout/publications/reports/AWEA-US-Wind-Industry-Market-Reports.cfm.

**APPENDIX E**

**SELECTED MONTHLY U.S. PRODUCERS' DATA**

**All pages are confidential (figures E-1-E-5)**

**APPENDIX F**

**GE'S PRELIMINARY PHASE PRICE DATA**

Table F-1 contains data prepared by GE during the preliminary phase of the investigations. Rather than presenting data on a project basis, this data is presented on a tower type basis. Since these data are not for a specific project, they are on an f.o.b. basis and do not contain any delivery costs.[1] Therefore, the data represent the cost of a certain type of wind tower within the United States (for domestic producers) and the cost of that type of wind tower in China, Vietnam, Canada, and Korea. In each instance, the f.o.b. price in China from Chinese producers is lower than the f.o.b. price in the United States for domestic producers. The *** is lower than all but one domestic f.o.b. price quote. Also included in the table are the expected volume of towers from that bidder and the reason for selecting or not selecting a particular bidder.

**Table F-1**
**Wind towers:  GE's bid data by tower type during 2010 and 2011**

<div align="center">*        *        *        *        *        *        *</div>

---

[1] ***.

# UNITED STATES
# INTERNATIONAL TRADE COMMISSION

In the Matter of:               )
                                )  Investigation Nos.:
UTILITY SCALE WIND TOWERS       )  701-TA-486 and
FROM CHINA AND VIETNAM          )  731-TA-1195-1196 (Final)

### REVISED AND CORRECTED COPY

Pages:  1 through 281

Place:  Washington, D.C.

Date:   December 13, 2012

## HERITAGE REPORTING CORPORATION
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005
(202) 628-4888
contracts@hrccourtreporters.com

**JA 000576**

1  remain in the business, much of our efforts to cope

2  with the severe price competition from these imports

3  have failed, and even our most efficient plants

4  located in strategic areas have been negatively

5  impacted.

6          We have already closed plants, are planning

7  to idle our facility in Coleman, Texas, and because of

8  lost opportunities have repurposed our facility in

9  Fort Worth to produce tank cars.  The sales we lost to

10 the Chinese and Vietnamese imports have and continue

11 to cause this injury.

12         As the Commission is aware, wind towers are

13 sold to large OEMs either through a competitive closed

14 bidding process or through negotiated supply

15 agreements.  The OEM purchaser base is extremely

16 limited and consists of only a handful of large OEMs

17 like Siemens, GE and Vestas and, to a lesser extent,

18 Gamesa and Suzlon.  On the other hand, there are a

19 relatively large number of wind tower suppliers that

20 these OEMs can choose from, and this disparity gives

21 the OEMs a significant upper hand when it comes to

22 negotiating prices and volumes.

23         During the bidding process, tower suppliers

24 provide OEMs with detailed bid responses specifying

25 the ex-works cost of the tower and confirming the

1 supplier's ability to produce these towers within the

2 OEM's specified timeframe.  Because wind towers are

3 produced on a rolling basis and producers may take as

4 long as a year to produce an entire order, the

5 timeframe for OEM pickup of the towers generally

6 covers a period of several months.

7          I have been involved in bid negotiations for

8 many years, and I know that the price of a wind tower

9 typically is the most important factor in the OEM's

10 purchasing decisions.  For the most part, particularly

11 when competing against subject imports, the only price

12 negotiated is the price of the tower.  OEMs buying

13 towers on margin can obtain the best margin by

14 purchasing Chinese and Vietnamese towers, and because

15 the ex-works prices are so low freight costs are less

16 of an issue.

17          You can see this in the OEMs' purchasing

18 decisions.  Starting in 2009 and 2010, OEMs began

19 buying their base load capacity from China and

20 Vietnamese producers and used these imports to fill

21 projects in all regions, including the midwest.  At

22 the same time, they stopped purchasing significant

23 volumes from U.S. producers.  In Trinity's case, we

24 had a framework agreement in place prior to this shift

25 and had not had any delivery or quality issues.

1 Nonetheless, because the price of subject imports were

2 so low our customers chose subject imports over our

3 towers.

4          Because of the extreme price sensitivity

5 during the negotiations, the OEMs generally attempt to

6 push prices down by indicating that the tower

7 supplier's price is too high compared to other quotes

8 received.  Although the OEMs do not provide specific

9 details about other quotes, they generally have been

10 frank in telling us that they can best maximize their

11 own profits by choosing low-priced Chinese and

12 Vietnamese towers rather than ours.

13          In some cases, including the Shepherds Flat

14 project, we were specifically told to make our bid FOB

15 Port of Longview along the Pacific coast and thus knew

16 we were competing against these low-priced imports.

17 OEMs also sometimes indicate that their price quotes

18 from foreign suppliers are a certain percentage lower

19 than ours.  Often times these prices are far below our

20 cost and it is simply not feasible or sustainable to

21 supply them at such prices.  Although we have had

22 opportunities to match these low prices, we have

23 declined.

24          Apart from the bidding process, U.S.

25 producers also have supply agreements with OEMs that

1  fix volumes and prices for wind towers.  However, as a

2  result of competition from Chinese and Vietnamese

3  imports these contracts are frequently renegotiated,

4  the OEMs forcing U.S. producers to lower their prices,

5  delay or reduce their volume commitments, increase the

6  warranty periods, lengthen the receivables periods and

7  alter liquidated damages and penalty clauses.

8         To make matters worse, despite the OEMs'

9  contractual commitment to order volumes from us, the

10  OEMs have chosen to instead increase their purchases

11  from China and Vietnam.  When this previously

12  committed capacity becomes available, we're unable to

13  fill it with other wind tower orders because of unfair

14  imports from China and Vietnam.

15         In the past, Trinity has offered to set up

16  facilities in regions where supply is needed and to

17  bring on additional capacity when commercially

18  reasonable to do so.  Brownfield facilities generally

19  can be transitioned and running within five to six

20  months and a much shorter time period if the

21  facilities have previously produced products that are

22  similar to wind towers.

23         Because qualification is a fairly routine

24  process and Trinity almost always qualifies to produce

25  new wind tower designs, this should have been an

1  particular the sales process for wind towers has

2  changed considerably.  Prior to the financial crisis

3  when the tower market was thriving, sales of towers

4  primarily occurred through framework agreements, which

5  gave us the opportunity to level load our capacity.

6  At that time, prior to the surge of dumped and

7  subsidized imports, we are able to negotiate

8  reasonable prices for wind towers as OEMs worked to

9  secure available capacity from U.S producers in

10 locations convenient to their wind farm projects.

11          In 2008 and 2009 when the financial crisis

12 hit, the market for wind towers changed.  OEMs shifted

13 away from framework agreements with U.S. producers,

14 and sales began to occur on a spot basis.  Such spot

15 sales generally involved a bidding process in which

16 tower producers submit bids to OEMs on a project by

17 project basis.

18          At that time, the sales process for towers

19 became much more competitive because by this time the

20 OEMs had developed steady sources of low-priced

21 imports from China and Vietnam.  OEMs were able to

22 take advantage of these imports and adopted aggressive

23 negotiating strategies with the domestic industry.

24 During these spot sale negotiations we are typically

25 provided with target pricing.  This usually occurs in

1 sales, deliveries.

2          MR. SMITH:  Probably about six months before

3 we saw --

4          CHAIRMAN WILLIAMSON:  Okay.  So it takes

5 that long for the purchasers to decide to respond.

6          MR. SMITH:  Right.  For the manufacturing

7 cycle to kick in and support any new projects that

8 would be generated by that.

9          CHAIRMAN WILLIAMSON:  Okay.  Thank you.  You

10 want to add anything, Mr. Cole?

11          MR. COLE:  Well, it goes, the cycle is

12 pretty long.  I mean without any foresight that a PTC

13 was going to be passed, the upstream developers stop

14 procuring land, stop procuring power purchase

15 agreements, the whole industry stops, so it's not just

16 a matter of when the PTC comes back will there be a

17 magic order placed.

18          You know, we started being potentially

19 harmed with the PTC expiration at the end of December

20 back in the second quarter because that's the normal

21 length of time.  So that's been the out cry of the

22 industry is we can't wait until it expires because the

23 damage occurred nine months in advance.  So now we're

24 going to have to wait for that normal cycle again for

25 everything to unfreeze and begin.

```
 1              MR. SMITH:  And I --

 2              CHAIRMAN WILLIAMSON:  But in terms --

 3              MR. SMITH:  I'm sorry.

 4              CHAIRMAN WILLIAMSON:  Go ahead, Mr. Smith.

 5              MR. SMITH:  I can add that even in the spot

 6 the projects that we're bidding, we bid X works

 7 pricing.

 8              CHAIRMAN WILLIAMSON:  Yes, but is the

 9 purchaser, what are they thinking?  They're saying I'm

10 going to buy this because it's nearer or my

11 transportation cost is going to be X?

12              MR. SMITH:  We don't know that.  I mean

13 we're asked to bid the projects X works from our

14 facility, and that's it.

15              MR. COLE:  I think one of us stated before,

16 you know, in most OEMs the tower procurement side is

17 here and the logistics side is over here and a lot of

18 times they don't talk, you know?

19              CHAIRMAN WILLIAMSON:  Really?  Okay.

20              MR. COLE:  That's the brunt of the issue.

21 So the tower buyer is buying from us at lowest X works

22 price.  That's what our contracts are, and that's what

23 we're measured against when we're measured against the

24 domestic competition and what we're measured against

25 when we're bidding against the Chinese and the
```

1  Vietnamese.

2          CHAIRMAN WILLIAMSON:  Okay.  If you have to

3  move it a long distance, that transportation cost gets

4  to be an awful large percentage of the final cost.

5  That's why I'm having trouble understanding this.

6          MR. COLE:  I think when you enter into a

7  supply agreement and you buy a certain amount of

8  secure capacity that you know is going to be there

9  when you need it, there are certain risks that you may

10 take in order to have that secure capacity, and some

11 of those risks may be that you may have to spend a

12 little more money on logistics than you thought you

13 did or needed to because you just don't have the

14 products to find, or the projects to find at that

15 point when you make the purchase.

16         CHAIRMAN WILLIAMSON:  But in today's market,

17 given the supply and demand situation, do you have to

18 do that as much as you used to, might have had to do

19 it, used to do it?

20         MR. COLE:  That's really more of a question,

21 I would think, for the Respondents than us on what

22 their decisionmaking would be because I'm not very

23 clear on it.

24         CHAIRMAN WILLIAMSON:  Okay.  Thank you.  My

25 time has expired.  Commissioner Pearson?

1 this comes out of my experience with supply agreements

2 where, preferred supplier agreements is what I was

3 more familiar with, in the event that not all capacity

4 was needed, the purchaser in my experience had some

5 obligation to hold harmless the supplier such that the

6 supplier wasn't sitting out there not producing

7 anything and losing money.  If I understand you

8 correctly, that's not the situation you're in; is that

9 right?

10         MR. COLE:  That's correct.  We made an

11 effort to accommodate our customer because we believe

12 the demand that was less than the contracted volume

13 was based on some kind of an economic issue or an

14 industry or a market issue, so we did work with our

15 customers and accommodated them several times on

16 several amendments to move that volume out.  And

17 basically we did that at no financial penalty to try

18 to help our customer out and maintain the relationship

19 that we had with that customer.

20         COMMISSIONER PEARSON:  Did some of those

21 discussions take place in the context of the recession

22 in which demand for lots of things was evaporating and

23 everybody was scrambling to try to figure out how to

24 keep body and soul together.

25         MR. COLE:  Well, and that was the reasoning,

1 but as we found out, that wasn't necessarily the

2 truth.

3          COMMISSIONER PEARSON:  Okay.  Well, thanks.

4   If there's anything more we should know, go ahead and

5 put it on the prehearing record.

6          Mr. Chairman, I believe that concludes my

7 questions, so I'd like to thank the members of this

8 panel very much for your testimony this morning.

9          CHAIRMAN WILLIAMSON:  Thank you.

10          Commissioner Aranoff.

11          COMMISSIONER ARANOFF:  Just one last

12 question.  The Staff Report lists several substitute

13 types of towers that might have started to be seen in

14 the market including concrete lattice mast or space-

15 framed towers.

16          Are any of these products that the domestic

17 producers of the type of towers that we're talking

18 about also make or are they different producers and to

19 what extent have you seen these products used in the

20 U.S. market?

21          MR. SMITH:  We haven't seen a lot of any of

22 those so-called hybrid towers or concrete towers in

23 the U.S. market.  Right now they're primarily used in

24 Europe.  And we've done quite a bit of market research

25 on concrete towers and those types of hybrids, and we

1 to expand the number of qualified domestic producer

2 facilities so we could increase the domestic

3 production capacity available to us and could lower

4 our costs and commercial risk for tower transportation

5 to project sites.

6         Contrary to Petitioners' theory that we were

7 only looking to buy more towers from China and

8 Vietnam, we were diligently and at great expense

9 trying to grow the number of potential suppliers in

10 the United States.

11         In addition to the domestic suppliers we

12 already had qualified and relied upon, Ameron and DMI,

13 in 2011 and 2012, we qualified Katana's Nebraska and

14 Washington State facilities, Martifer Hirschfeld's

15 Texas facility, and Broadwind's Wisconsin facility.

16 All of these qualifications were completed or underway

17 before the petition was filed in this case.

18         We also had numerous communications with

19 Trinity that we hoped would lead to qualification of

20 facilities in Iowa and elsewhere, but we could not

21 come to agreement on warranties, liquidated damages,

22 and other issues, none of which were price related,

23 nor could we reach agreement on the kind of capacity

24 Trinity would have available and the terms for its

25 availability.

1 at least you touched up on this when you spoke a few

2 minutes ago.  One of the witnesses this morning stated

3 that transportation costs are an afterthought of

4 purchasers.  Would you mind commenting on that?

5         MR. DOUGAN:  Yes.  Sure.  I can't imagine

6 how that would be the case given how substantial they

7 are and what the contribution is to the overall

8 delivered cost, and like I said, it sort of raises the

9 question if it's an afterthought, why they buy any

10 domestic towers at all and why they would source East

11 Coast projects from Canada as opposed to from the

12 subject imports.

13         I can't speak for him, but I think it could

14 only potentially be an afterthought in the sense that

15 well, if you have a framework agreement where you have

16 an idea about what the FOB price might be for a

17 certain type of tower at a certain level of capacity

18 for next year or the year after that, we don't yet

19 know where that tower is going to be sent.  We don't

20 necessarily have a contract for a project and know

21 precisely where we want to send those towers.

22         In that sense, delivery costs aren't

23 negotiated with the wind tower producer up front.

24 That much is known.  That's done with the logistics

25 producer, but it's not an afterthought.  It is very

BEFORE THE U.S. INTERNATIONAL TRADE COMMISSION

UTILITY SCALE WIND TOWERS
FROM CHINA AND VIETNAM

USITC Inv. Nos. 701-TA-486 and 731-TA-1195-1196 (Final)

**Business Proprietary Information has been removed from pages 1-15, the Exhibit List and Exhibits 1-3B, 5-6B, 8, 28, and 29.**

**NON-CONFIDENTIAL VERSION**

POST-HEARING BRIEF OF THE WIND TOWER TRADE COALITION

Alan H. Price
Daniel B. Pickard
Robert E. DeFrancesco, III
Lori E. Scheetz

**WILEY REIN LLP**
1776 K Street, NW
Washington, DC 20006
(202) 719-7000

December 21, 2012

13536295.1

## ANSWERS TO COMMISSIONERS' QUESTIONS

### 1.    FRAMEWORK AGREEMENTS

*Questions:*

**COMMISSIONER BROADBENT**:  Okay. For Mr. Smith and Mr. Cole, I wanted to talk a little more about the supply agreements with purchasers. How often roughly do purchasers not buy the number of towers that they have contracted for? Does this happen often? Sounds like it does, but maybe you could answer that. Hr. Tr. at 120

**COMMISSIONER PEARSON**:  Thank you Mr. Chairman. We've been talking a lot about supply agreements, so for purposes of the post hearing, could you please let us know which firms in the domestic industry had supply framework agreements for which facilities covering how much capacity per year or whatever's the correct way to look at the time frames? And then let us know how much was actually supplied under these framework agreements. Hr. Tr. 126-127

**COMMISSIONER PEARSON**:  Okay. And then a specific question for Mr. Cole, and you may wish to comment on this now or perhaps in posthearing, but this comes out of my experience with supply agreements where, preferred supplier agreements is what I was more familiar with, in the event that not all capacity was needed, the purchaser in my experience had some obligation to hold harmless the supplier such that the supplier wasn't sitting out there not producing anything and losing money. If I understand you correctly, that's not the situation you're in; is that right? Hr. Tr. 127-128

---

*Answer:*

As the Commission is aware, prior to 2009, wind tower sales primarily occurred through framework agreements between tower producers and the Original Equipment Manufacturers ("OEMs").  Over the period of investigation ("POI"), the OEMs began to move away from framework agreements with the U.S. producers and instead shifted to spot sales.[1]  Framework agreements, however, remain in place between major OEMs and both domestic and foreign tower suppliers.  In fact, OEMs appears to have entered into larger global framework agreements with the foreign producers, demonstrating their recent move towards sourcing the base load

---

[1]    Hr. Tr. at 37 (Mr. Smith); Prehearing Staff Report at II-21; Conference Transcript, *Utility Scale Wind Towers from China and Vietnam*, Inv. Nos. 701-TA-486 and 731-TA-1195-1196 at 36 (Mr. Reinhardt) (Jan. 19, 2012) (Prelim.) ("Conf. Tr.").

1

Business Proprietary Information
Has Been Deleted NON-CONFIDENTIAL VERSION

capacity for the U.S. market from Chinese and Vietnamese producers rather than from domestic producers. Indeed, as demonstrated below, OEMs have taken to not honoring their volume and price commitments under their agreements with U.S. tower suppliers, shifting their purchases to subject imports, and then forcing the U.S. tower suppliers to renegotiate these agreements. With the increased availability of low-priced subject imports and the concentrated wind tower customer base, U.S. tower producers are forced to accept such renegotiations or lose even more sales.

Provided below is an overview of such framework agreements, followed by descriptions of the framework agreements in place between various U.S. producers and OEMs. Also provided is a list of the framework agreements between subject producers and OEMs of which Petitioner is aware.

## I.    OVERVIEW OF FRAMEWORK AGREEMENTS

Although the details of each framework agreement vary, such agreements generally establish the tower volume to be produced/purchased within a specified timeframe, establish specific production and delivery schedules, detail fixed and variable costs for the towers, contain general warranties, and provide for penalties for late delivery. Pursuant to such agreements, OEMs commit to purchase a set volume of towers from the producers over a specified period of time, generally anywhere between one to five years, at a pre-determined price, and in turn, tower producers commit to reserve the necessary capacity in order to deliver the towers within the specified timeframe.[2] As testified to at the hearing and as the discussion below indicates,[3] these agreements are not always honored by the OEMs and are frequently renegotiated.

---

[2]     *See* Prehearing Staff Report at II-21; *see, e.g.*, [                                    ], included at **Exhibit** [ ]; *see, e.g.*, [                                    ], included at **Exhibit** [ ].

[3]     Hr. Tr. at 30-32 (Mr. Cole).

2

Business Proprietary Information
Has Been Deleted     NON-CONFIDENTIAL VERSION

## A.     Volume

In general, framework agreements detail the specific type and number of towers to be produced over the specified time period.  In so doing, the agreement will also typically identify the specific production facility in which the towers are to be manufactured.[4]  In specifying the volume in the contract, the producer commits to reserve sufficient capacity to produce the relevant number of towers at the relevant facilities, and the OEM, in turn, commits to purchase that same volume.[5]  For example, in the [

].[7]

Over the POI, however, OEMs have repeatedly failed to purchase the volume committed to in these agreements with U.S. producers, and instead have replaced that volume with imports of towers from China and Vietnam.[8]  For example, in [

].[9]  When the OEMs fail to honor such volume commitments, it is difficult for U.S. tower producers to fill these production gaps with tower orders from other OEMs as such orders require significant lead times.[10]  Had the OEMs purchased the volumes committed, the U.S. tower producers' production, capacity utilization, and, ultimately, profits

---

[4]     *See, e.g.,* [                                    ] at [                              ], included at **Exhibit** [   ].

[5]     *See, e.g., id.* at [                          ].

[6]     *See infra* Part 1.II.A.1.

[7]     *See* [                                ] at [                  ], included at **Exhibit** [   ].

[8]     *See, e.g., infra* Part 1.II.

[9]     *See* [                                                            ] at [            ], included at **Exhibit** [      ]. U.S.
Importers' Questionnaire Response of [
                              ].

[10]     Hr. Tr. at 97-98 (Mr. Cole).

3

28940.4

Business Proprietary Information
Has Been Deleted            NON-CONFIDENTIAL VERSION

would have increased over the POI. It follows, therefore, that this volume that was lost to subject imports materially injured the domestic wind tower industry.

**B.    Materials**

As the Commission is aware, wind towers are manufactured from discrete steel plate that is processed into tubular-shaped sections to which additional materials, such as flanges and internals are attached.[11] Framework agreements typically identify the party responsible for the provision of these raw materials. In some instances, the OEMs provide the steel plate while the tower producers are primarily responsible for the provision of labor and welding consumables.[12] At other times, the producer may agree to procure the raw materials itself in addition to supplying the labor.[13]

Tower producers, whether domestic or foreign, are steel fabricators. Depending on the framework agreement, either the OEM buys the steel itself, or the tower producer purchases the steel and passes on the steel cost to the OEMs. Ultimately, the service that the tower producers are paid for is the conversion of the steel into the towers. Although framework agreements generally include escalation clauses that allow the tower producers to pass through changes in the price of steel to the OEMs,[14] such agreements do not allow for similar changes to labor and other factory costs related to the conversion. Yet, OEMs have repeatedly forced U.S. producers to renegotiate the contracts to reduce the per tower conversion costs.[15]

Pursuant to these framework agreements, and under fair trading conditions, therefore, an increase in the cost of steel should result in a corresponding increase in the price of the tower as

---

[11]    Prehearing Staff Report at I-15 – I-16.

[12]    *See, e.g.,* [                              ] at [              ], included at **Exhibit** [  ].

[13]    *See, e.g.,* [                              ] at [          ], included at **Exhibit** [  ].

[14]    Hr. Tr. at 54 (Mr. Cole).

[15]    *See, e.g., infra* Part I.II.

4

Business Proprietary Information Has Been Deleted

the tower producers pass on the increased steel costs to the OEM. Yet, this has not been the case. For example, between 2009 and 2011, the price of steel increased from $703 per metric ton to $1.092 per metric ton, an increase of approximately 55 percent.[16] Yet, during this same period [

].[17] Rather than the [

] with the increase in the price of steel, [                                            ].

Whether or not the changed steel price was passed through, this example shows that [

] based on low-priced Chinese and Vietnamese imports. Thus, subject imports have resulted in a cost-price squeeze that is injuring domestic tower producers.

### C.    Production/Delivery Schedule

Framework agreements also provide detailed production and delivery schedules that identify the facility for production and the number of towers to be produced each week.[18]  In general, deliveries are ex-works at the tower producer's facility.[19]  A review of such delivery schedules demonstrates that towers are produced throughout the year, and there is little to no seasonality in such production requirements.[20]  These production/delivery schedules also demonstrate that OEMs order towers with significant lead times and do not indicate where the towers are to be delivered.[21]  The OEMs simply pick up the towers at the factory site.

---

[16]    *See* Prehearing Brief of the Wind Tower Trade Coalition (Dec. 7, 2012) at Exhibit 27 ("Petitioner's Prehearing Brief").

[17]    *See* [                                            ], included at **Exhibit 5**.

[18]    *See, e.g.,* [                                            ] at [                    ], included at **Exhibit** [ ]; [
          ] at [                    ], included at **Exhibit** [ ].

[19]    *See, e.g.,* [                                            ] at [                    ], included at **Exhibit** [ ]; [
          ] at [                    ], included at **Exhibit** [ ].

[20]    *See, e.g.,* [                                            ] at [                    ], included at **Exhibit** [ ].

[21]    *See, e.g., id.*



Alan H. Price
202.719.3375
aprice@wileyrein.com

1776 K STREET NW
WASHINGTON, DC 20006
PHONE  202.719.7000
FAX   202.719.7049

7925 JONES BRANCH DRIVE
McLEAN, VA 22102
PHONE  703.905.2800
FAX   703.905.2820

www.wileyrein.com

December 7, 2012

USITC Inv. Nos. 701-TA-486
and 731-TA-1195-1196 (Final)
May Be Released Under APO
**NON-CONFIDENTIAL
VERSION**

**BY ELECTRONIC FILING AND
HAND DELIVERY**

Ms. Lisa R. Barton
Acting Secretary to the Commission
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436

> Re:     *Utility Scale Wind Towers from China and Vietnam*: Prehearing
> Brief of the Wind Tower Trade Coalition ("WTTC")

Dear Ms. Barton:

On behalf of the Wind Tower Trade Coalition ("WTTC"), a domestic
interested party in this proceeding, please find enclosed an original and four copies
of the non-confidential version of WTTC's Prehearing Brief in the above-referenced
investigations.

The requisite certification is enclosed in accordance with Sections 201.6 and
207.3 of the Commission's rules. In addition, in accordance with Section 201.16 of
the Commission's rules, the enclosed submission has been served, by hand delivery,
on all parties entitled to receive it as indicated on the attached public service list.

13530372.1



Ms. Lisa R. Barton
December 7, 2012
Page 2

NON-CONFIDENTIAL VERSION

Please do not hesitate to contact the undersigned with any questions that you

may have concerning this submission.

Respectfully submitted,

Alan H. Price
Daniel B. Pickard
Robert E. DeFrancesco, III
Lori E. Scheetz
Usha Neelakantan

**WILEY REIN LLP**
1776 K Street, NW
Washington, DC 20006
(202) 719-7000

*Counsel to the Wind Tower Trade
Coalition*

13530372.1

**JA 001555**

].[334] Because OEMs are purchasing towers on an FOB basis, wind tower producers must keep the FOB price of towers low in order to be competitive with subject imports, even if those subject imports are consistently priced below U.S. prices.

### 2.    Subject Imports Significantly Undersold Domestic Wind Towers

Subject imports were consistently priced lower than the domestic like product; the data provided by [


]. As these margins of underselling increased over the POI, so too did the volume of Chinese and Vietnamese imports.

### a.    A Comparison of Domestic and Subject Import AUVs Shows that Subject Imports Undersold Domestic Towers Throughout the POI

Subject AUVs were lower than domestic AUVs throughout the POI, and the volume of wind towers purchased by OEMs is directly tied to the AUV of those towers. As the Commission's Staff recognized, the [                                    ] reported to the Commission appear to be highly distorted, and Vestas has refused to verify [

].[335] Therefore, it is appropriate for the Commission to only consider AUV and financial performance data for commercial sales. In 2010, when subject imports [

], U.S. producers increased their market share and [

].[336] Subject producers, by contrast, exported the lowest volume and had [

] of U.S. market share during the POI in 2010.[337]

---

[334]    *See* [                    ].

[335]    *See supra* Section IV.A.2-3; Prehearing Staff Report at VI-1 n.1 and VI-4 n.5.

[336]    Prehearing Staff Report at VI-4 (Table VI-1) and C-3 (Table C-1); U.S. Market Share Analysis, included at **Exhibit 25**.

[337]    *See* Prehearing Staff Report at C-3 (Table C-1); U.S. Market Share Analysis, included at **Exhibit 25**.

65

From 2010 to 2011, however, when the underselling reversed and subject imports undersold the domestic like product, U.S. producers lost share and profits. As towers became taller and heavier and the cost of steel plate,[338] a key raw material, increased, the cost to manufacture towers rose significantly. From 2010 to 2011, the U.S. commercial shipment AUV increased to $[      ] to reflect the [   ] percent increase in per unit COGS.[339] However, the subject import AUV declined significantly by 11.5 percent from $349,042 to only $308,783.[340] At the same time, subject imports skyrocketed, and U.S. producers' share of the merchant market fell.[341] The Shepards Flat project in particular, in which domestic producers could not lower their prices enough to obtain the sale, accounted for a large volume of the increase in subject imports from 2010 to 2011. U.S. producers' total market share [

      ].[342]

From the first half of 2011 to the first half of 2012, and despite rising costs, subject imports continued to undersell, and the subject import AUV actually declined to only $285,807 (compared to the U.S. commercial shipment AUV of $[      ]).[343] Again, towers continued to become larger and heavier, but, despite that fact, domestic producers were unable to raise prices enough to cover costs. Unsurprisingly, as the gap between domestic producers' AUV and subject producers' AUV grew larger, subject imports surged, and Chinese and Vietnamese

---

[338]   *See* Prehearing Staff Report at II-1 and III-19.

[339]   *Id.* at VI-4 (Table VI-1).

[340]   *Id.* at C-3 (Table C-1).

[341]   U.S. Market Share Analysis, included at **Exhibit 25**.

[342]   Prehearing Staff Report at IV-15 (Table IV-6).

[343]   *Id.* at VI-4 (Table VI-1) and C-3 (Table C-1).

28816.17

JA 001627

imports captured a period high of 48 percent of the U.S. market, while domestic producers' share of the merchant and entire U.S. market fell [                    ].[344]

### b. The Data Provided By U.S. Purchasers Confirm that Subject Imports [                    ]

The limited data provided by [                         ] confirm that subject producers [                                        ] over the POI.

#### (1) U.S. Purchasers Failed to Provide Information Requested by the Commission

As an initial matter, while the Commission specifically instructed purchasers to provide "data on all bids submitted for each project," the bid data submitted by purchasers in general are severely deficient and do not comport with the scope or format of the Commission's data requests.[345]  Specifically, [     ] failed to provide any bid data.[346]  [     ] only supplied [                                             ].[347]  Rather than comply with the Commission's direct requests to supply all bid data, regardless of whether or not volume was ultimately awarded to the producer, [


].[348]  Moreover, [                    ] refused to provide the requested data, despite the fact that it [

---

[344]   *Id.* at IV-15 (Table IV-6); U.S. Market Share Analysis, included at **Exhibit 25**.

[345]   *See e.g.,* [                         ].

[346]   [                    ].

[347]   [                         ].

[348]   [                    ].

].[349]  The data provided

by [

].  Further, there

appear to be significant concerns regarding [

].

U.S. OEMs, which have [                                    ], should not be

rewarded for their refusal to cooperate with the Commission's information requests.  Because

they have not reported the data as requested, much of the data provided by U.S. OEMs are of

limited value, as such data simply do not allow the Commission to fully examine the constant

negotiations between OEMs and various suppliers and the price pressure exerted by subject

imports.  However, as detailed below, what the purchaser data do show are [

].

### (2)    [                              ]

Because [                ] did not provide data in the manner requested by the

Commission, the Commission is unable to examine the bid negotiations and renegotiations

between [            ] and its suppliers.  However, the data on the record allow the

Commission to engage in a more traditional underselling analysis.

[

---

[349]  [                                        ]; Petitioner's Post-Conference Brief at Exhibit 3B (Summary of
[                    ]).  [

].  In the final phase of these investigations, in addition to failing to report [
], [

].

68

]. [

].[350]  On a product basis, [

].  On a project-by-project basis, [

].  Moreover, the [

].[351]

[

].  For example, with respect

to [                                                                    ] sourced [

].[352]  In fact, [

].[353]  However, by 2012, subject producers captured nearly [   ] percent of

[                        ] purchases of [                                        ] domestic producers

by [    ] percent.  As a result, U.S. producers' share of these sales [

] percent.[354]

Moreover, from 2009 to 2011, Chinese prices for towers [

]; as a result, U.S. prices were [                                                        ]

---

[350]    [                    ] at **Exhibit 28**.

[351]    *Id.*

[352]    *Id.*

[353]    Petitioner's Post-Conference Brief at Exhibit 12 (Declaration of [            ]).

[354]    [                    ] at **Exhibit 28**.

69

despite the fact that the per unit cost of raw materials was increasing.[355]  In addition, subject imports [

].  Chinese subject towers [

] percent in 2011.  Chinese producers' share of [

] percent over this period.[356]  Chinese underselling grew more pervasive in [

].  By underselling domestic towers by an overall margin of [    ] percent, [

].[357]

### (3)    [                    ]

[                    ] also demonstrate [                    ].    [

] undersold domestic producers in [    ] percent of comparisons.[358]

[                    ] undersold domestic producers by enormous margins of up to [

], while [                    ] margin of underselling [

] percent in the first half of 2012.[359]

[                                        ], show that the [

], and as the gap [

], Chinese and Vietnamese producers were awarded a larger percentage of U.S. sales.  Further, [    ] used subject prices [

---

355    *Id.*; Prehearing Staff Report at VI-4 (Table VI-1) and VI-6 (Table VI-2).

356    [                    ] at **Exhibit 28**.

357    *Id.*

358    [                    ] at **Exhibit 29**.

359    *Id.*

70

].[360] In fact, although [                    ] asserts that [



].[361]

For example, from 2010 to 2011, U.S. prices for [



].  At

this point, the difference between U.S. and subject import prices for [

] per tower.   Unsurprisingly, [



].[362]

After the filing of the petition, in 2012, the quantity of [                    ] purchases from U.S.

producers [                                              ].[363]

[



].  [              ] sourced this [



].  At the same time, [              ] sourced all of its [

].[364]  As a result,

---

360      *Id.*

361      *See* [                              ]; Prehearing Staff Report at C-3 (Table C-1).

362      [                    ] at **Exhibit 29**.

363      The Tariff Act recognizes that domestic producers may experience positive changes after the filing of a
petition.  The Act notes that the "Commission shall consider whether any change in volume . . . .of imports of the
subject merchandise since the filing of the petition in an investigation . . . is related to the pendency of the
investigation, and if so, the Commission may reduce the weight accorded to the data for the period after the filing of
the petition." 19 U.S.C. § 1677(7)(I). Indeed, courts have recognized that the initiation of trade remedy proceedings
can result in artificially low demand for subject imports. *See, e.g.*, *USX Corp. v. United States*, 11 CIT 82, 87-88,
655 F. Supp. 487, 492 (Ct. Int'l Trade 1987).

364      [                    ] at **Exhibit 29**.  The U.S. price for [

].  *Id.*

71

the U.S. price for [                                    ] from 2011 to 2012.  Even though

domestic producers gained a [

                                    ], resulting in significant operating losses at a time

when the U.S. industry should have been profitable.[365]

The incredible pricing differences between domestic towers and subject imports also

explain why, in some instances, domestic producers were not even asked to bid on certain

projects.[366]  It appears from [

                                    ].[367]  Indeed, in 2011, [

] percent.[368]

### 3.    Subject Producers' [      ] Margins of Underselling Suppressed and Depressed Domestic Pricing

Low-priced, dumped and subsidized subject imports recalibrated market pricing for wind

towers and prevented U.S. producers from increasing prices sufficiently to cover rising costs,

resulting in a cost-price squeeze and significant financial losses at a time when domestic

producers should have been profitable.

In the wind tower industry, similar to the large power transformer industry, each time a

domestic producer loses a purchase order to subject imports, the producer adjusts its pricing in

---

[365]    *Id.*; Prehearing Staff Report at C-3 (Table C-1).

[366]    *See* [                              ]; [                              ]; Petition, Vol. 1 at Exhibit I-32; Conference Tr. at 10 and 55-56 (Mr. Price).

[367]    [                              ]. For example, there were [
                                                                    ]. *Id.*

[368]    [                    ] at **Exhibit 29**.

28816.17

future bids in an attempt to win new business.[369]   While the data demonstrate [

], in this market, only one or two high profile lost sales

are sufficient to substantially depress or suppress domestic pricing.  Due to the [

], the underselling by subject imports not only resulted in [

], but also had the effect of recalibrating market pricing.  This project, which would have

represented 10 to 15 percent of the market in terms of megawatts delivered in a given year,

"signaled new pricing levels in the market, exerting significant pressure on future bid prices."[370]

The presence of such dumped and subsidized imports in the U.S. market depressed and

suppressed market prices, even when these subject import prices were consistently below U.S.

prices.  [

]."[371]  In many instances, domestic pricing still was not

low enough to win bids, as meeting import pricing would have required domestic producers [

].[372]  Even when domestic producers were "awarded

the projects . . .  Chinese and Vietnamese imports {had} driven market pricing to such

unsustainable levels" that it was difficult to make any profits on such sales.[373]

The negative pricing pressure exerted by subject imports had predictable results.  For

those sales that domestic producers were able to make, the intense price competition with

dumped and subsidized subject imports prevented them from obtaining prices high enough to

cover increasing costs, resulting in a cost-price squeeze and heavy financial losses.  As detailed

---

[369]   *See Large Power Transformers from Korea*, Inv. No. 731-TA-1189 (Final), USITC Pub. 4346 at 19 (Aug. 2012) ("The transmission of bid price information contributes to the pressure on domestic prices in the LPT market."); Preliminary Determination at 24; Conference Tr. at 43 (Mr. Cole).

[370]   Conference Tr. at 42-43 (Mr. Cole). *See also* Petition, Vol. I at Exhibit I-32.

[371]   Petitioner's Post-Conference Brief at Exhibit 4 (Declaration of [          ]).

[372]   Conference Tr. at 43 (Mr. Cole); Petition, Vol. I at Exhibit I-32.

[373]   Conference Tr. at 43 (Mr. Cole).

73

above, towers became taller and heavier over the POI, and the cost of steel plate, a key raw material, increased from $703 per metric ton in 2009 to $1,011 per metric ton in the first half of 2012, an increase of 44 percent.[374]  Over the same period, domestic producers' per unit raw material costs increased by [    ] percent, and U.S. producers' COGS increased by [    ] percent,[375] as the per unit weight of domestically produced towers rose by approximately [    ] percent.[376]  At the same time, domestic producers' AUV increased by [    ] percent from 2009 to 2012.[377]

By contrast, the price of subject imports appears to bear no relation to rising costs throughout the POI.  The weight of subject imports increased by [    ] percent from 2009 to 2012;[378] yet, subject import AUVs declined by approximately [ ] percent.[379]  For example, from 2009 to the first half of 2012, the weight of the towers imported by [

];  the import AUVs for these towers [

].[380]  Similarly, the weight of the towers imported by [

].[381]  Likewise, the weight of towers imported by [

].[382]

---

[374]     U.S. Plate Prices, included at **Exhibit 27**.

[375]     Prehearing Staff Report at VI-4 (Table VI-1).

[376]     *See generally* Domestic Producer Questionnaire Responses at II-8.

[377]     Prehearing Staff Report at VI-4 (Table VI-1).

[378]     *See generally* Importer Questionnaire Responses at II-7, II-8.

[379]     Prehearing Staff Report at C-3 (Table C-1).

[380]     *See* [                          ].

[381]     *See* [                          ].

[382]     *See* [                          ].

74

**JA 001635**

These subject imports prevented domestic producers from pricing wind towers profitably.[383] From 2009 to the first half of 2012, as domestic producers' per unit COGS increased more significantly ([    ] percent) than per units sales values ([    ] percent), U.S. producers' operating margin fell from [    ] percent to [    ] percent.[384] The cost-price squeeze became particularly acute in 2011 and the first half of 2012. From 2010 to 2011, as production shifted toward taller, heavier towers, domestic producers' per unit COGS increased by [    ] percent, while per unit sales values increased by only [    ] percent.[385] As a result, domestic producers competing in the merchant market went from earning [

    ] in 2010 to experiencing [                                        ], and their operating margin fell from [    ] percent to [    ] percent.[386] From the first half of 2011 to the first half of 2012, total per unit costs increased more than per unit net sales values.[387] U.S. producers competing in the merchant market experienced a [

    ].[388] Thus, in 2012, when demand increased significantly as developers rushed to beat the potential expiration of the PTC and domestic producers should have been able to significantly increase shipments at higher prices, domestic producers could not raise prices sufficiently to cover increasing costs.

Here, there can be little doubt that subject imports have consistently and significantly undersold the market, causing price depression and suppression.

### C.    Dumped and Subsidized Subject Imports are Materially Injuring the Domestic Industry

[383]    *See* [                        ]; [                                        ].

[384]    Prehearing Staff Report at VI-3-4 (Table VI-1).

[385]    *Id.* at VI-4 (Table VI-1).

[386]    *Id.* at VI-3 (Table VI-1)

[387]    *Id.* at VI-4 (Table VI-1).

[388]    *Id.* at VI-3 (Table VI-1).

75

interim 2011 to interim 2012, the domestic industry's [

].[403]  That these

heavy losses occurred at a time when demand was increasing and the U.S. industry should have been profitable constitutes overwhelming evidence that Chinese and Vietnamese imports are a significant cause of material injury to the domestic industry.

### 2. Several U.S. Producers Have Shutdown U.S. Operations, While Others Have Been Forced to Idle Facilities and Lay Off Workers

Chinese and Vietnamese pricing practices resulted in price suppression, lost sales, and operating losses, which forced several U.S. manufacturers to shutter facilities and significantly reduce workforces.  Indeed, early in the POI, [

] – the same OEMs that later turned to low-priced, unfairly traded subject imports.[404] Faced with rapidly deteriorating financial performance, along with currently contracting order books due to competition with unfairly traded subject imports and the pending expiration of the PTC,  several U.S. producers recently shutdown U.S. operations or are in the process of exiting the domestic wind tower industry entirely:

• [



]."[405]   In  November  2012,  Valmont  Industries  Inc.  purchased  Katana's

---

[403]     *Id.* at VI-3 (Table VI-1).

[404]     Petitioner's Post-Conference Br. at 15-16.

[405]     [                                              ].

28816.17

**JA 001640**

manufacturing assets.  Valmont plans to convert Katana's Nebraska plant to a facility for the manufacture of steel transmission structures for the utility industry.[406]

* [




].[407]

* [



].[408]

* [




].[409]

* Gamesa Towers terminated utility scale wind tower production in the United States in 2009, and [

] at the end of the POI due to

the negative effects of subject imports.[410]

* Three other producers –  [

].[411]

---

[406]   Zachs Equity Research, *Valmont Buys Katana Summit Assets*, Yahoo! Finance (Nov. 21, 2012)], included at **Exhibit 1V**.

[407]   [                                                    ].

[408]   [                                            ].

[409]   [                                            ].

[410]   Prehearing Staff Report at III-1 (noting that SIAG Aerisyn filed for bankruptcy in April 2012) and III-5 n.5 ([                                                                          ]); *Ameron Will Close Wind Towers Division in Fontana, Calif., and cut 180 jobs*, Plant Prospecter (July 12, 2011), included at **Exhibit 1A**; Press Release, *National Oilwell Varco and Ameron Announce Closing of Merger*, Business Wire, (Oct. 5, 2011), included at **Exhibit 1O**; Mike Pare, *Parent of Chattanooga wind tower maker SIAG Aerisyn is filing for insolvency*, timesfreepress (Mar. 20, 2012), included at **Exhibit 1P**; Letter from Wiley Rein LLP to Sec'y of Commerce, re: *Utility Scale Wind Towers from the People's Republic of China and the Socialist Republic of Vietnam: Supplement to Petition for the Imposition of Antidumping Duties and Countervailing Duties* at Supp. Exhibit I-2 (Jan. 11, 2012).

[411]   Letter from [

]; Letter from Wiley Rein LLP to Sec'y Commerce, re: *Utility Scale Wind Towers from the People's Republic of China and the Socialist Republic of Vietnam: Supplement to Petition for the*

80



1776 K STREET NW
WASHINGTON, DC 20006
PHONE 202.719.7000
FAX 202.719.7049

7925 JONES BRANCH DRIVE
McLEAN, VA 22102
PHONE 703.905.2800
FAX 703.905.2820

www.wileyrein.com

January 16, 2013

Alan H. Price
202.719.3375
aprice@wileyrein.com

USITC Inv. Nos. 701-TA-486
& 731-TA-1195-1196 (Final)
**May Be Released Under APO**
**NON-CONFIDENTIAL VERSION**

**VIA EDIS**
**AND HAND DELIVERY**

Ms. Lisa R. Barton
Acting Secretary
U.S. International Trade Commission
500 E Street, S.W.
Washington, D.C. 20436

> Re:    *Utility Scale Wind Towers from China and Vietnam*: Final
> Comments

Dear Ms. Barton:

On behalf of the Wind Tower Trade Coalition ("WTTC"), Petitioner in this proceeding, please find enclosed an original and four copies of the non-confidential version of the WTTC's Final Comments to the International Trade Commission ("the Commission") in the above referenced investigation.

The requisite certification is enclosed in accordance with Sections 201.6 and 207.3 of the Commission's rules. In addition, in accordance with Section 201.16 of the Commission's rules, the enclosed brief has been served, by hand delivery, on all parties entitled to receive it as indicated on the attached public service list.

13401495.1



Ms. Lisa R. Barton
January 16, 2013
Page 2

NON-CONFIDENTIAL VERSION

If you have any questions regarding this submission, please do not hesitate

to contact the undersigned.

Respectfully submitted,

Alan H. Price, Esq.
Daniel B. Pickard, Esq.
Robert E. DeFrancescso, Esq.

**WILEY REIN LLP**
1776 K Street, N.W.
Washington, D.C. 20006
(202) 719-7000

*Counsel to the Wind Tower Trade Coalition*

13401495.1

**JA 003216**

BEFORE THE
UNITED STATES INTERNATIONAL TRADE COMMISSION

| |
|---|
| **UTILITY SCALE WIND TOWERS FROM CHINA AND VIETNAM** |

USITC Inv. Nos. 701-TA-486
& 731-TA-1195-1196 (Final)

**Business Proprietary Information has been removed from the Table of Contents and pages 1-15.**

**NON-CONFIDENTIAL VERSION**

**FINAL COMMENTS OF THE WIND TOWER TRADE COALITION**

Alan H. Price, Esq.
Daniel B. Pickard, Esq.
Robert E. DeFrancescso, Esq.

**WILEY REIN LLP**
1776 K Street, N.W.
Washington, D.C. 20006
(202) 719-7000

January 16, 2013

Business Proprietary Information     NON-CONFIDENTIAL VERSION
Has Been Deleted

further volume to subject product. Additionally, the contracts confirm that the ex-works or FOB

price of the towers forms the basis of price negotiations between OEMs and tower suppliers, and

it is at this point that the price suppressing and depressing effects of subject imports are visible.

This is the point of competition between the U.S. and foreign producers. The contracts further

demonstrate the injurious effects that subject imports are having on the domestic industry.

A.     **The Agreements Demonstrate the OEMs' Shift Towards Large Volume
Purchases of Low-Priced Subject Imports at the Direct Expense of the
Domestic Industry**

At the outset, Petitioner notes that many of the agreements now on the record are [

].[8]

1.     [          ] **Agreements**

Since [

].  [

].[10]  Shortly thereafter,

[

---

[8]     *See* Final Staff Report at VII-8 n.13.

[9]     Petitioner notes that contrary to a statement in the Final Staff Report, [                    ]. *See* Final
Staff Report at II-4.

[10]     *See id.* at VII-13 n.24; Foreign Producers' Posthearing Brief at Ex. 1A at [     ].  Petitioner notes that the
Final Staff Report erroneously states that [

].  Final Staff Report at VII-8 n.13.  To the contrary, [

].  Foreign Producers' Posthearing Brief at Ex. 1A.  Petitioner also notes that [

]  *See* [

].  To the contrary, [

].  *See* Foreign Producers' Posthearing Brief at Ex. 1A at [               ].

[11]     *See* Final Staff Report at III-11.

3

Business Proprietary Information **NON-CONFIDENTIAL VERSION**
Has Been Deleted

].[12] In [

].[13] In

[

].[14]

[

].[15]

Simultaneously, while [

]. Specifically, in [

].[16] In [

].[17] Further, [

].[18] Furthermore, [

].[19] [

---

[12]  *See* Petitioner's Posthearing Brief at Ex. 3 at [                    ].

[13]  *See* Final Staff Report at III-11 – III-12; Petitioner's Posthearing Brief at Ex. 3A at [      ].

[14]  *See* Final Staff Report at III-12; Petitioner Posthearing Brief at Ex. 3B at [            ].

[15]  U.S. Purchasers' Questionnaire Response of [                                    ].

[16]  Foreign Producers' Posthearing Brief at Ex. 1B.

[17]  *See* Final Staff Report at VII-13 n.24; Foreign Producers' Posthearing Brief at Ex. 1C at [      ].

[18]  Foreign Producers' Posthearing Brief at Ex. 1C at [                ].

[19]  *Id.*

4

Business Proprietary Information
Has Been Deleted    NON-CONFIDENTIAL VERSION

].[20]  All of these towers could have been sourced domestically.

**2.    [                              ] Agreements**

Similarly,  [

].    Specifically,  [

].[21]  In [

].  In [

].[22]  At the same time, [

].[23]  Although [

].[24]  Tellingly, [

].[25]

| [ | | 2010 | 2011 | 2012 |
|---|---|---|---|---|
| Contracted Volume [                    ][26] | | [    ] | [    ] | [    ] |
| [                                   ][27] | | [    ] | [    ] | [    ] |
| Percentage Difference | | [    ] | [    ] | [    ] |

---

[20]    *See* Final Staff Report at IV-2 (Table IV-1); U.S. Importers' Questionnaire Response of [
                          ].

[21]    Final Staff Report at III-12.

[22]    *Id.* at III-13 n.25.

[23]    *See* [
                                                      ].

[24]    *See* Final Staff Report at II-23; Hearing Tr. at [                              ].

[25]    *See* Petitioner's Posthearing Brief at Ex. 5 ([                    ]).

[26]    *See* Final Staff Report at III-13 n.24 and n.25.

[27]    *See* U.S. Purchasers' Questionnaire Response of [
                          ].  While [
                                  ].

5

THE UNITED STATES INTERNATIONAL TRADE COMMISSION

In the Matter of:              )
                               )  Investigation Nos.:
UTILITY SCALE WIND TOWERS      )  701-TA-486 and
FROM CHINA AND VIETNAM         )  731-TA-1195-1196
                               )  (Preliminary)

                          Thursday,
                          January 19, 2012
                          Room No. 111
                          U.S. International
                          Trade Commission
                          500 E Street, S.W.
                          Washington, D.C.

          The preliminary conference commenced, pursuant
to
          Notice, at 9:30 a.m., at the United States
International
          Trade Commission, CATHERINE DeFILIPPO, Director of
          Investigations, presiding.

          APPEARANCES:
            On behalf of the International Trade Commission:

                  Staff:
                  BILL BISHOP, HEARINGS AND MEETINGS COORDINATOR
                  SHARON BELLAMY, HEARINGS AND MEETINGS ASSISTANT
                  CATHERINE DeFILIPPO, DIRECTOR OF INVESTIGATIONS
                  NATHANAEL COMLY, INVESTIGATOR
                  ANDREW DAVID, INTERNATIONAL TRADE ANALYST
                  CLARK WORKMAN, ECONOMIST
                  DAVID BOYLAND, ACCOUNTANT/AUDITOR
                  MICHAEL HALDENSTEIN, ATTORNEY/ADVISOR
                  DOUGLAS CORKRAN, SUPERVISORY INVESTIGATOR

APPEARANCES:     (Cont'd.)
In Support of the Imposition of Antidumping and
Countervailing Duty Orders:
On behalf of The Wind Tower Trade Coalition:
        MICHAEL J. BARCZAK, Vice President of Sales, DMI
            Industries, Inc.
        KERRY COLE, President, Trinity Structural Towers,
            Inc.
        DENNIS JANDA, Director of Engineering, Broadwind
            Towers, Inc.
        ANTHONY REINHARDT, Director of Finance and
            Controller, DMI Industries, Inc.
        ALAN H. PRICE, Esquire
        DANIEL B. PICKARD, Esquire
        LORI SCHEETZ, Esquire
        Wiley Rein LLP
        Washington, D.C.

In Opposition to the Imposition of Antidumping and
Countervailing Duty Orders:
On behalf of Siemens Energy, Inc. and Siemens Power
Generation:
        CHRISTOPHER E. HAUER, Director of Tower
            Operations, SCM Americas
        ANTHONY R. CHRISTIANO, Contracts Manager, Energy
            Sector, Wind Power Division/Solar & Hydro
            Division, Siemens Energy, Inc.
        MICHAEL REVAK, Vice President, Sales and
            Proposals, Siemens Energy, Inc. Americas
        ELLIOT J. FELDMAN, Esquire
        MICHAEL S. SNARR, Esquire
        Baker & Hostetler LLP
        Washington, D.C.

3

APPEARANCES:     (Cont'd.)
On behalf of CS Wind Tech Co., Ltd., CS Wind Vietnam
Co., Ltd., Chengxi Shipyard Co., Ltd., Titan Wind
Energy (Suzhou) Co., Ltd., Shanghai Taisheng Wind
Power
Equipment Co., Ltd., and China Chamber of Commerce
for
Import & Export of Machinery & Electronic Products:
    MAX F. SCHUTZMAN, Esquire
    NED H. MARSHAK, Esquire
    JEFFREY O. FRANK, Esquire
    ANDREW T. SCHUTZ, Esquire
    Grunfeld, Desiderio, Lebowitz, Silverman &
      Klestadt LLP
    Washington, D.C.

1    and qualified American manufacturers are sometimes

2    unable to fill our orders.

3            The trend in 2011 and 2012 in this industry

4    are all favorable, notwithstanding the intense

5    competition we face for contracts to supply wind

6    turbines in which tower manufacturers are the

7    beneficiaries who have to do very little to compete

in

8    our business or the businesses of other wind turbine

9    manufacturers.  They need only to have capacity to

10   meet growing demand, and commitment of quality and

11   timely delivery that the wind industry requires.

12   Thank you for your time.  I'm open for questions.

13           MR. HAUER:  Is it on?  Good afternoon.  My

14   name is Chris Hauer.  I'm the Director of Wind Tower

15   Operations for Siemens Wind Power, America Supply

16   Chain Management.  I would like to begin by telling

17   you about how Siemens builds wind turbine generators

18   and the role of wind towers in that process, and then

19   I will describe for you, and why Siemens purchases

20   wind towers for wind turbine generator orders.

21   Finally, I will give you some history of Siemens'

wind

22   tower transactions for projects since 2008.

23           Siemens requires towers built to its own

24   customized specifications in order to operate with

the

25   wind turbine generator that Siemens builds itself.

1   Mexico or to receive towers from a facility in

2   Oklahoma that to date had never produced the wind

3   tower.

4          These options were not economically viable

5   for Siemens for wind turbine projects in the midwest

6   given the significant expense of over land

7   transportation costs for Mexico and risk associated

8   with an Oklahoma facility having no experience

9   producing wind towers.  In 2010, Siemens considered a

10  Petitioner for a project with Puget Sound Energy

which

11  was the largest wind turbine generator project that

12  Siemens had won up to that point.  Siemens offered a

13  portion of this business to their Washington facility

14  and negotiated together as part of a total cost of

15  valuation for delivering towers to the project site.

16         During the initial visit to the Washington

17  facility it was revealed to Siemens that the plant

18  operations had been suspended and that there were

only

19  two active employees remaining.  Even though the

20  Petitioner had a facility in Washington State with

21  good proximity to the project, Siemens concluded that

22  it needed to source towers elsewhere due to the total

23  cost for delivery to the project, the tight delivery

24  schedules and the risks associated with restarting

the

25  facility in this short timeframe.

## BEFORE THE

## UNITED STATES INTERNATIONAL TRADE COMMISSION

USITC Inv. Nos. 701-TA-486 and
731-TA-1195-1196 (Final)

**BUSINESS PROPRIETARY
INFORMATION** deleted at
Pages 1-6.

**NONCONFIDENTIAL VERSION**

## UTILITY SCALE WIND TOWERS FROM CHINA AND VIETNAM

**POST-HEARING BRIEF
ON BEHALF OF
GE GENERATORS (PENSACOLA) LLC**

Charles S. Levy
John D. Greenwald
Thomas M. Beline
*CASSIDY LEVY KENT (USA) LLP*
2000 Pennsylvania Ave, NW
Suite 3000
Washington, DC 20006
(202) 567-2300

December 20, 2012

NONCONFIDENTIAL VERSION

## I.    INTRODUCTION

GE Generators (Pensacola) LLC ("GE") has not appeared publicly in this proceeding as a matter of corporate policy. GE has cooperated to its best ability with the Commission, and filed very extensive answers to the U.S Purchasers' Questionnaire and the U.S. Importers' Questionnaire in order to provide the Commission with complete and accurate information available in this case.

GE is filing this Post-hearing brief because there were numerous direct and implied references to GE during the course of the Commission's public hearing on December 13, 2012, and GE wants ensure the Commission has a clear understanding of the information it has submitted.

## II.    SHEPHERDS FLAT

The Shepherds Flat project is unique in its technical specifications. *It is not, as argued by Petitioners, a unique "lighthouse" project which signaled a shift in the market to foreign sourced wind towers.*

The wind turbines installed at Shepherds Flat are GE 2.5 and 2.75 megawatt ("MW") machines. *They are the only GE 2.5 and 2.75 MW wind turbines in the United States.* Since signing its contract for the supply of wind turbines for the Shepherds Flat project in October 2009, [

].

GE's 2.5 and 2.75MW models were first produced at GE's facilities in Europe. Many European wind farms are built in densely-settled regions and, as a result, the projects are typically smaller and sites are land-constrained, leading developers to install larger machines to

maximize power output at higher unit cost. These GE models were specifically designed to meet the needs of such products.

Because many states with excellent wind resources are less densely developed, fewer American wind farms are land-constrained, and American developers apply different selection criteria to optimize their returns at each site. GE's most popular product among its American customers is its 1.6MW machine, and the wind towers designed for use with 1.6MW machines will not support the larger 2.5 and 2.75MW machines. The 2.5 and 2.75 MW machines for the Shepherds Flat project are the exception, not the rule.

In light of GE's detailed questionnaire responses concerning the Shepherds Flat project, GE is surprised that Petitioners continue to characterize Shepherds Flat as a project that "signaled a shift in the market, affecting both the domestic industry's volume and prices". For the Commission's benefit we are reproducing the relevant passages from our Questionnaire responses below:

[

].[1]

---

[1] GE U.S. Purchaser QR at IV-6.

NONCONFIDENTIAL VERSION

***

[



].[2]

## III.    DOMESTIC INDUSTRY CAPACITY AND DELIVERY PROBLEMS

GE also provided in its Questionnaire responses detailed information on why [



]. We are [



].[3]  As GE said in its

Questionnaire responses:

### A.    **Domestic Industry Capacity Problems**

During the period of investigation [



]. For more than a year, [



].[4]

[



---

[2] GE U.S. Importer QR at II-4.

[3] *Id.* At II-10(a).

[4] *Id.* at II-4.

BEFORE THE
UNITED STATES INTERNATIONAL TRADE COMMISSION

_____

<u>PUBLIC VERSION</u>

_____

In the Matter of:                    )
                                     )
                                     )    Investigation Nos. 701-TA-486,
                                     )    731-TA-1195-1196
UTILITY SCALE WIND TOWERS            )    (Final Injury Determination)
FROM CHINA AND VIETNAM               )
                                     )
_____

PRE-HEARING BRIEF OF
SIEMENS ENERGY, INC. AND
SIEMENS POWER GENERATION

Submitted by:

Elliot J. Feldman
Michael S. Snarr
BAKER HOSTETLER
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Tel: 202-861-1679
Fax: 202-861-1783
efeldman@bakerlaw.com
msnarr@bakerlaw.com

Counsel for Siemens Energy, Inc.
and Siemens Power Generation

Date submitted:  December 6, 2012

1

underselling or underpricing, and are unable to refute widespread OEM complaints that they have been unable or unwilling to take or fill orders for towers.

## VII.    THE COLLAPSING INDUSTRY IS CAUSED BY EXPIRATION OF THE PTC

Although in this proceeding petitioners insist repeatedly that unfairly traded imports are driving them out of business, they make this claim only in this proceeding, for this audience.  Their legal, formal, Securities and Exchange Commission filings admit that the PTC expiration is the proximate cause of their difficulties, consistent with historical experience.  And, they [

] that have discouraged or even prevented companies such as Siemens from purchasing their towers.

It is only reasonable to ask why, under these circumstances, so many tower manufacturers are going out of business.  Notwithstanding RPS that promise public utility investment in alternative energy sources, wind power is less cost-effective, and has less possibility of competing with tumbling natural gas prices to achieve grid parity, than solar.  "Demand for wind towers is derived from the demand for wind turbines which is in turn derived from the demand for wind-generated electric power."  CSR at II-1.  OEMs have not been receiving many contracts for delivery after 2012 from wind farms and utilities because the expiration of the PTC makes wind power comparatively uncompetitive.  OEMs can purchase wind towers only when utilities and wind farms are purchasing wind turbines.

A logical question may be asked as to why the domestic manufacturers did not benefit more from the boom.  Why did they have idle or underutilized capacity

when demand had exploded in 2012?  Why did they not raise prices and increase profit when demand surged?

OEMs were liable for completing installations for entire wind farms.  Tower manufacturers were liable only for the towers they had contracted to build and deliver. Tower manufacturers, anticipating few if any orders in 2013 and thereafter, generally turned away new orders in 2012, planned to shut down and exit the business.  The publicly traded manufacturers explained in public filings that the expiration of the PTC was putting them out of business.  Press releases almost uniformly blamed the PTC expiration for the apparent demise of much of the domestic wind tower industry.

In its 2011 10-K Annual Report filing with the SEC, Otter Tail, the parent company of petitioner DMI, addresses the impact of the expiration of the PTC on DMI's business:

> The looming expiration of the Production Tax Credit (PTC) at the end of 2012, which is weighing heavily on wind farm development decisions for 2013 and beyond, provides for an uncertain near-term outlook for the wind industry. With this in mind, we continue to explore a broad range of strategic alternatives for DMI, including diversification and the possible manufacture of other products. (p. 3).

> The demand for wind towers manufactured by DMI depends in part on the existence of either renewable portfolio standards or a federal production tax credit for wind energy. Renewable or alternative energy portfolio standards exist in 31 states and eight additional states have renewable or alternative energy portfolio objectives. A federal production tax credit is in place through December 31, 2012. (p. 23)

As to the impact of imports, the company only states that "[t]he market in which DMI competes is characterized by competition from both foreign and domestic manufacturers." (p. 23). It did not explain the nature of the competition.

41

Petitioner, Trinity, similarly explained in its 2011 10-K Annual Report:

Some of our customers place orders for our products in reliance on
their ability to access government subsidies in the form of early tax
benefits or tax credits such as accelerated depreciation or the
production tax credit for renewable energy. There is no assurance
that the United States government will reauthorize, modify, or
otherwise not allow the expiration of such early tax benefits or tax
credits, and in cases where such subsidies are materially modified
to reduce the available early benefit or credit, or otherwise allowed
to expire, the demand for our products could decrease, thereby
creating the potential for a material adverse effect on our financial
condition or results of operations. (p. 15)

As to imports, Trinity simply stated: "There are a number of well-established entities

that actively compete with us in the business of manufacturing energy equipment

including several domestic and foreign manufacturers of structural wind towers for the

North American market." (p. 5).  The nature of the competition was apparently

assumed.

Broadwind stated in its 2011 10-K Annual Report:

{P}rograms {like the PTC}, many of which expire at the end of 2012,
provide material incentives to develop wind energy generation
facilities and thereby impact the demand for our manufactured
products and services.  The increased demand for our products
and services that generally results from the credits and incentives
has been impacted by the pending expiration of these programs at
the end of 2012. Because of the long lead times necessary to
develop wind energy projects, the failure of Congress to extend or
renew these incentives beyond their current expiration dates in
2012 has already negatively impacted potential wind energy
installations planned for 2013. The failure to immediately renew or
extend these incentives will likely further delay the development of
wind energy generation facilities and the demand for wind turbines,
towers, gearing and related components. It is possible that these
federal incentives will not be extended beyond their current
expiration dates. Although we believe that the production tax credit
may be renewed or extended in 2012 or 2013, the duration thereof
and whether such extension or renewal will be retroactive is
unclear. Moreover, we currently believe it is unlikely that the

42

PUBLIC VERSION

> investment tax credit and cash grant program will be renewed or extended in 2012 or 2013. The continued delay or failure to extend or renew these or similar incentives in the future could have a material adverse impact on our business, results of operations, financial performance and future development efforts." pp.9-10.

Broadwind reported that it "face{d} competition from a number of smaller tower producers, including Katana Summit and SIAG, as well as imports from a number of Asian tower manufacturers," and mentioned that it had asked the Commission to conduct these investigations.  (pp. 5-6).  But Broadwind also stated that "{f}or our Towers and Weldments segment, the largest North American based competitors are Trinity Industries and DMI industries." (p. 5).  The record in this investigation does not reveal  head-to-head competition, with Trinity, DMI, or anyone else.

Katana Summit is not a publicly traded company, but its September 11, 2012 press release, which announced that the company was looking for a buyer, mentioned only the PTC, and not imports, as the cause of its struggles:

> Katana Summit had significant production in 2012 due to the increased demand for wind turbines caused by the pending expiration of the Production Tax Credit.  However, that same pending tax credit expiration has caused the wind industry to halt the majority of development for 2013 until the government policy is more certain.  This ongoing uncertainty has taken a toll on the future of companies like Katana Summit.  Kevin Strudthoff, President/CEO of Katana Summit said "It's unfortunate that the gridlock in Washington D.C. has prevented the extension of the Production Tax Credit. ... unless government policy for renewable energy becomes more stable, I'm afraid we'll see more closures and job losses in the industry into 2013.[41]

The OEMs generally have reported to the Commission [

] effort to buy domestically produced towers up until the third

---

[41] "Katana Summit Seeks Buyer For Company," Press Release on Katana Summit website, dated September 11, 2012, available at http://www.katana-summit.com/pdfs/KatanaPressRelease091112.pdf.

PUBLIC VERSION

quarter of 2012. They also report, with obvious chagrin, that their efforts have been

spurned. While the petitioners report available capacity, they reject orders, because of

the imminent expiration of the PTC, because of lack of capacity, and because of [

].

American wind power history has been driven by boom and bust, mostly

caused by government incentive programs and contracts. "In the years in which {the

PTC} was allowed to lapse, there were substantial declines in wind tower

installations."[42] Charts created by the American Wind Energy Association in 2012 show

that "{t}he wind industry is facing the recurrence of the boom-bust cycle it has seen in

previous years when the PTC was allowed to expire {and} installations dropped

between 73 and 93%, with corresponding job losses."[43] When the PTC expired in

1999, it was followed by a 93% drop in wind turbine installation in 2000. When the PTC

expired in 2001, it was followed by a 73% drop in 2002. When the PTC expired in 2003,

it was followed by a 77% drop in 2004. It was reinstated in 2005 and, following

expiration in 2012, the AWEA predicts a nearly 100% drop in wind turbine installation for

2013.[44]  See CSR at II-11, Figure II-1.

This is not the first time wind power manufacturers have exited the

business with the expiration or termination of government subsidies. The Wikipedia

entry for "history of wind power" describes this boom-bust cycle as follows:

> When oil prices declined by a factor of three from 1980 through the early
> 1990s, many turbine manufacturers, both large and small, left the
> business. The commercial sales of the NASA/Boeing Mod-5B, for

---

[42] CSR at II-10.

[43] "The American Wind Industry Urges Congress To Take Immediate Action To Pass An Extension Of The PTC," American Wind Energy Association (August 2012) attached as Ex. 16.

[44] "Save USA Wind Jobs: Historic Impact of PTC Expiration on Annual Wind Installation," (August 2012) attached as Ex. 17.

44

PUBLIC VERSION

example, came to an end in 1987 when Boeing Engineering and Construction announced they were "planning to leave the market because low oil prices are keeping windmills for electricity generation uneconomical."

Later, in the 1980s, California provided tax rebates for wind power. These rebates funded the first major use of wind power for utility electricity.[45]

Competing imports did not drive them out of business then, and are not driving them out now.

That most of the petitioning U.S. industry in this case is only five years old or less largely explains the Questionnaire [          ] of petitioners that they have [                              ] and [                    ]. They are a new industry. They also have developed no export capability (in significant part, perhaps, because they are too distant from ports to ship safely and economically), whereas European and Asian tower manufacturers have been delivering to a growing global demand for decades. The American industry grew suddenly and rapidly in response to government incentives, and as in the past, companies are exiting wind power when the subsidies are going away.

Anticipating, with the expiration of the PTC, the sudden and rapid decline in orders for towers, the bust conclusion to a boom cycle, domestic tower manufacturers have opted to exit the market, converting plants to alternative production or shuttering altogether. They are leaving the business because they are confident the demand for their product is drying up, impacting imports every bit as much as it impacts them. Imported towers, too, are market victims, not a cause of market decline.

---

[45] Available at http://en.wikipedia.org/wiki/History_of_wind_power, last visited December 6, 2012.

## <u>CERTIFICATE OF SERVICE</u>

<u>SIEMENS ENERGY, INC. V. UNITED STATES, NO. 2014-1725</u>

I hereby certify that two copies of the foregoing **NONCONFIDENTIAL JOINT APPENDIX** were served on this 29th day of December, 2014 upon the following parties as indicated below:

<u>Via CM/ECF Electronic Notice of Docket Activity:</u>

Michael Haldenstein, Esq.
International Trade Commission
Office of the General Counsel
707-V
500 E Street, SW
Washington, DC 20436
Direct: 202-205-3041
Email: michael.haldenstein@usitc.gov

Daniel B. Pickard, Esq.
Wiley Rein, LLP
1776 K Street, NW
Washington, DC 20006
Direct: 202-719-7285
Email: dpickard@wileyrein.com
Fax: 202-719-7049

/s/ Michael S. Snarr
Michael S. Snarr

BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, NW
Washington, DC 20036
Tel: 202-861-1710
Fax: 202-861-1783
E-mail: msnarr@bakerlaw.com